UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. | : | |
| JAMES R. BERKLEY | : | **FILED UNDER SEAL** |
| | : | **PURSUANT TO 31 U.S.C. § 3730** |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. |
| | : | |
| OCEAN STATE, LLC, | : | PLAINTIFF DEMANDS TRIAL BY JURY |
| | : | |
| Defendant. | : | |

## COMPLAINT

Plaintiff, United States of America *ex rel*. James R. Berkley, brings this action against defendant, Ocean State, LLC, and alleges as follows:

### NATURE OF THE ACTION

1.      This action brought by relator, James R. Berkley ("Relator"), on behalf of the United States of America (the "United States" or the "Government") and against named defendant, Ocean State, LLC ("Ocean State"), alleging violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. (the "False Claims Act"), and Relator claims entitlement to a portion of any recovery obtained by the United States as a *qui tam* plaintiff authorized by 31 U.S.C. § 3730.

2.      Relator brings this action to impose liability upon Ocean State for violation of 31 U.S.C. § 3729 and non-compliance with various federal laws, regulations, and guidance by submission of a false claim for payment made under the United States Small Business Administration ("SBA") Paycheck Protection Program ("PPP").

### PARTIES

3.      Relator, James R. Berkley, is a citizen of Massachusetts residing in Hopkinton, Massachusetts.

1

4.    Defendant, Ocean State, is a Delaware limited liability company with a principal place of business at 2130 Mendon Road, Cumberland, Rhode Island 02864.

## JURISDICTION AND VENUE

5.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732.

6.    This Court has personal jurisdiction over Ocean State because Ocean State can be found, resides, and transacts business within Rhode Island.

7.    Venue is proper under 28 U.S.C. § 1391(b) and (c), because events giving rise to this action occurred in this forum and S & M suffered harm in this forum.

8.    Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C. §1395, and 31 U.S.C. § 3732(a), because Ocean State can be found, resides, and transacts business within Rhode Island.

## THE FALSE CLAIMS ACT

9.    Originally enacted in the 1860s to combat fraud against the Union Army during the Civil War, the False Claims Act is the primary tool with which the United States combats false or fraudulent claims against the Government and protects federal funds.  The Supreme Court has held that the False Claims Act's provisions must be construed broadly to reach "all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co*., 390 U.S. 228, 232 (1968).

10.    The False Claims Act provides that a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1)(A).

11.    The False Claims Act also makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

12.    The False Claims Act also contains a "reverse false claim" provision, which makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). An obligation includes "the retention of any overpayment." *Id*. § 3729(b)(3). Generally speaking, an "overpayment" means any funds that a person or entity receives or retains to which that person or entity is not entitled. 42 U.S.C. § 1320a–7k(d)(4)(B).

13.    The False Claims Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). The False Claims Act provides that no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

14.    The False Claims Act defines the term "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

15.    The False Claims Act defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other

3

recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(b)(2)(A).

16.    The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the False Claims Act.  *See Neifert-White Co*., 390 U.S. at 232-33 (the term "claim" is not limited to legally enforceable claims, but includes all fraudulent attempts to cause government to pay out money).

17.    The False Claims Act is an "expansive" statute, reaching "all types of fraud, without qualification, that might result in financial loss to the Government."  *Cook Cnty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 129, 123 S. Ct. 1239, 155 L. Ed. 2d 247 (2003) (*quoting Neifert-White Co*., 390 U.S. at 232).

18.    Any person who violates the False Claims Act "is liable to the United States Government for a civil penalty of not less than [$11,665] and not more than [$23,331] … plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.5(a)(9); 28 C.F.R. § 85.5.

## FACTUAL BACKGROUND

**A.    The SBA Paycheck Protection Program**

**1.    SBA Loan Programs in General**

19.    Created in 1953, the mission of the United States Small Business Administration (SBA) is to help small business owners and entrepreneurs pursue the American dream.  The SBA

is a cabinet-level agency of the United States.  It is fully dedicated to small business and provides counseling, capital, and contracting expertise as the nation's only go-to resource and voice for small businesses.

20.     The SBA works with lenders to provide loans to small businesses.  The SBA doesn't lend money directly to small business owners.  Instead, it sets guidelines for loans made by its partnering lenders, community development organizations, and micro-lending institutions.

21.     Loans guaranteed by the SBA range from small to large and can be used for most business purposes, including long-term fixed assets and operating capital.  Certain loan programs set restrictions on how businesses can use the funds.

22.     Additionally, SBA loan programs have unique eligibility requirements.  In general, eligibility is based on what a business does to receive its income, the character of its ownership, and where the business operates.  Normally, businesses must meet size standards, be able to repay, and have a sound business purpose.

### 2.     Applicable Laws, Regulations, and Guidance for the SBA's Paycheck Protection Program

23.     On March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") (Pub. L. 116-136) to provide emergency assistance and health care response for individuals, families, and businesses affected by the coronavirus pandemic. The SBA received funding and authority through the CARES Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency.

24.     Section 1102 of the Act temporarily permits SBA to guarantee 100 percent of 7(a) loans under a new program titled the Paycheck Protection Program (PPP).  Section 1106 of the

Act provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the PPP.

25.    The SBA and the United States Department of the Treasury ("Treasury") worked together to implement PPP, releasing regulations and guidance on a regular basis.

26.    Title I of the CARES Act established PPP under a new Section 7(a)(36) of the Small Business Act of 1953 (the "Small Business Act").  PPP was subsequently expanded by the Paycheck Protection Program and Health Care Enhancement Act, which was signed into law on April 24, 2020, and extended by the Paycheck Protection Program Flexibility Act (the "Flexibility Act"), which was signed into law on June 5, 2020.

27.    Loans guaranteed under the PPP will be 100 percent guaranteed by SBA, and the full principal amount of the loans may qualify for loan forgiveness.

28.    Because PPP is a loan program under Section 7(a) of the Small Business Act, it is subject to the regulations applicable to SBA Section 7(a) business loans except where the CARES Act or applicable regulations provide otherwise.

29.    Section 7(a) loan regulations are generally found in 13 C.F.R. part 120.  PPP is also subject to SBA affiliation rules in 13 C.F.R. § 121.301(f).

30.    In addition to the laws and regulations that apply to PPP loans, the SBA has issued ongoing official guidance regarding PPP loans.  Relevant guidance is discussed below.

31.    On April 2, 2020, the SBA published its first Interim Final Rule on Business Loan Program Temporary Changes; Paycheck Protection Program (the "Interim Final Rule").

32.    On April 3, 2020, the SBA published an Interim Final Rule on Applicable Affiliation Rules ("IFR #2").

33.     Also on April 3, 2020, SBA published a summary of affiliation rules applicable to PPP (the "Affiliation Guidance"), which confirmed that the affiliation rules of 13 C.F.R. § 121.301(f) apply to PPP.

34.     On April 24, 2020, SBA published an Interim Final Rule on Requirements for Promissory Notes, Authorizations, Affiliation, and Eligibility ("IFR #4"), which provided clarification regarding eligibility for private equity fund portfolio companies, and a guide on How to Calculate Maximum Loan Amounts.

35.     On April 30, 2020, SBA published an Interim Final Rule on Corporate Groups and Non-Bank and Non-Insured Depository Institution Lenders ("IFR #7").

36.     On May 8, 2020, SBA published an Interim Final Rule on Extension of Limited Safe Harbor with Respect to Certification Concerning Need for PPP Loan Request ("IFR #9").

37.     On May 20, 2020, SBA published an Interim Final Rule on Second Extension of Limited Safe Harbor with Respect to Certification Concerning Need for PPP Loan and Lender Reporting ("IFR #13").

38.     On May 22, 2020, SBA published an Interim Final Rule on Loan Forgiveness ("IFR #14") and an Interim Final Rule on SBA Loan Review Procedures and Related Borrower and Lender Responsibilities ("IFR #15").

39.     On June 11, 2020, SBA published an Interim Final Rule on Revisions to First Interim Final Rule ("IFR #17") to revise the Interim Final Rule to account for changes made by the Flexibility Act.

40.     On June 22, 2020, SBA published an Interim Final Rule on Revisions to Loan Forgiveness Interim Final Rule and SBA Loan Review Procedures Interim Final Rule ("IFR #20") to revise IFR #14 and IFR #15 to account for changes made by the Flexibility Act.

41.     Since early April 2020, guidance from SBA can be found in a regularly updated

FAQ (the "SBA FAQ") that is posted on the SBA and Treasury websites.

**3.      PPP Loan Eligibility**

42.     A business is eligible for a PPP loan if it meets any one of the following

standards:

    i.    Together with its affiliates, it has 500 or fewer employees, regardless of their principal place of residence. *See* 15 USCS § 636(a)(36)(D)(i)(I); SBA FAQ Question 44 (published May 5, 2020).

    ii.    Together with its affiliates, it meets the SBA employee-based size standard for the North American Industry Classification System ("NAICS") code applicable to its primary industry.[1] *See* 15 USCS § 636(a)(36)(D)(i)(II); SBA FAQ Question 3.

    iii.    Its primary industry is in NAICS category 72 (accommodations and food service) and it has, together with its affiliates, no more than 500 employees per physical location. *See* 15 USCS § 636(a)(36)(D)(iii).

    iv.    On its own, it meets the size standard (employee-based or receipts-based) established by SBA for the NAICS code applicable to its primary industry, and together with its affiliates, it meets the size standard (employee-based or receipts-based) established by SBA for the NAICS code applicable to either its primary industry or the primary industry of itself and its affiliates on a combined basis, whichever standard is higher. *See* 13 C.F.R. § 121.301(a); SBA FAQ Question 2.

    v.    It has, together with its affiliates, $15 million or less of tangible net worth as of March 27, 2020, and $5 million or less of average net income after Federal income taxes (excluding carry-over losses) for the last two full fiscal years before the date of application. *See* 15 USCS § 632(a)(5)(B); SBA FAQ Question 2.

43.     In counting employees for purposes of determining PPP eligibility, PPP

applicants may use (a) their average number of employees over the previous 12 months, (b) their

average number of employees for calendar year 2019, or (c) their average number of employees

for each pay period during the last 12 calendar months completed prior to the loan application.  If

the business has been operational for less than 12 months, it may use the average number of

---

[1] SBA size standards based on industry codes are found in 13 C.F.R. § 121.201.

employees for each of the pay periods that it has been operational.  *See* 13 C.F.R. § 121.106(b); SBA FAQ Question 14.  The employee test for determining PPP loan eligibility is a head-count test, including full-time, part-time, temporary, leased, and furloughed employees.  *See* 13 C.F.R. § 121.106(a).

44.    Certain businesses are ineligible for PPP loans even if they meet the size tests described above.  Among the ineligible businesses, financial businesses primarily engaged in the business of lending and speculative businesses are ineligible.  *See* Interim Final Rule § 2(c); 13 C.F.R. § 120.110; SBA Standard Operating Procedure (SOP) 50 10 5(K), Subpart B, Chapter 2.

45.    As a result, private equity funds and management companies are ostensibly ineligible for PPP loans.  SBA has taken the position that "[h]edge funds and private equity firms are primarily engaged in investment or speculation, and such businesses are therefore ineligible to receive a PPP loan."  *See* IFR #4 § 2(a).

46.    Private equity fund portfolio companies may be generally eligible for PPP loans, assuming they meet the size standards (described above) and are not in an ineligible business.

47.    However, the SBA's affiliation rules apply and can cause other portfolio companies of the private equity fund to be aggregated for purposes of the size test (see below).

48.    In addition, the SBA notes that "all borrowers should carefully review the required certification on the Paycheck Protection Program Borrower Application Form (SBA Form 2483) stating that '[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.'"  *See* IFR #4 § 2(b).

49.    SBA guidance further provides that "Borrowers must make this certification in good faith, taking into account their current business activity and their ability to access other

sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business." *See* SBA FAQ Question 31.

50.    An applicant is not specifically required to show that it is unable to obtain credit elsewhere in order to get a PPP loan, but SBA guidance issued on April 23, 2020 and April 26, 2020 informs this analysis.  The CARES Act waives the SBA requirement that a borrower show it is unable to obtain credit elsewhere.  *See* 15 USCS § 636(a)(36)(I).

51.    However, SBA FAQ Question 31 indicates that availability of alternate liquidity sources is relevant to whether an applicant can certify in good faith that a PPP loan is necessary, as required by the PPP loan application.  *See* SBA FAQ Question 37 (published April 23, 2020). While SBA FAQ Question 31 refers to "public company[ies] with substantial market value and access to capital markets," SBA FAQ Question 37 extends SBA FAQ Question 31 to all businesses owned by private companies with adequate sources of liquidity.  *See* SBA FAQ Question 37 (published April 26, 2020).

52.    SBA FAQ 31 states:

> In addition to reviewing applicable affiliation rules to determine eligibility, all borrowers must assess their economic need for a PPP loan under the standard established by the CARES Act and the PPP regulations at the time of the loan application. Although the CARES Act suspends the ordinary requirement that borrowers must be unable to obtain credit elsewhere (as defined in section 3(h) of the Small Business Act), borrowers still must certify in good faith that their PPP loan request is necessary. Specifically, before submitting a PPP application, all borrowers should review carefully the required certification that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Borrowers must make this certification in good faith, taking into account their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business. For example, it is unlikely that a public company with

substantial market value and access to capital markets will be able to make the required certification in good faith, and such a company should be prepared to demonstrate to SBA, upon request, the basis for its certification.

53.     For applicants that applied for and received a PPP loan but then believed, based on subsequent SBA guidance, that they could not certify in good faith that current economic uncertainty makes their PPP loan necessary to support ongoing operations, the SBA provided a safe harbor that permitted borrowers to repay PPP loans in full by May 18, 2020.

54.     Borrowers that repaid their PPP loans in full by May 18, 2020, will be deemed to have made the required certification of need in good faith.  See IFR #4 § 5 as modified by IFR #9 and IFR #13 § 1; SBA FAQ Question 31, as modified by SBA FAQ Question 43 and SBA FAQ Question 47.

55.     In addition, the SBA has stated that: "Any borrower that, *together with its affiliates*, received PPP loans with an original principal amount of less than $2 million will be deemed to have made the required certification concerning the necessity of the loan request in good faith." Affiliation for this purpose is determined based on the rules that apply for determining eligibility for a PPP loan.  *See* SBA FAQ Question 46.

**4.     Affiliation for Purposes of PPP Size Tests**

56.     The SBA defines "affiliation" as one business controlling or having the power to control another or when a third party (or parties) controls or has the power to control both businesses.  S*ee* 13 C.F.R. § 121.301(f); Affiliation Guidance.  The SBA has an expansive view of what constitutes "control," and it does not matter whether control is exercised, so long as the power to control exists.  SBA applies four specific affiliation rules for purposes of the PPP size tests:

i.  *Affiliation based on ownership*.  For determining affiliation based on equity ownership, a concern is an affiliate of an individual, concern, or entity that owns or has the power to control more than 50% of the concern's voting equity.  If no individual, concern, or entity is found to control, SBA will deem the board of directors or president or chief executive officer (or other officers, managing members, or partners who control the management of the concern) to be in control of the concern.  SBA will deem a minority shareholder to be in control if that individual or entity has the ability, under the concern's charter, bylaws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders.  *See* 13 C.F.R. § 121.301(f)(1).

ii.  *Affiliation arising under stock options, convertible securities, and agreements to merge*.  For purposes of determining control and affiliation, options, convertible securities, and agreements to merge (including agreements in principle) are considered effective as if exercised or consummated, as the case may be, unless subject to conditions precedent which are incapable of fulfillment, speculative, conjectural, or unenforceable under state or Federal law, or where the probability of the transaction (or exercise of the rights) occurring is shown to be extremely remote.  Significantly, a person or entity that controls one or more other entities cannot use options, convertible securities, or agreements to appear to eliminate control before actually doing so.  SBA will not give present effect to a person's or entity's ability to divest all or part of its ownership interest in order to avoid a finding of affiliation.  *See* 13 C.F.R. § 121.301(f)(2).

iii.  *Affiliation based on management*.  Where the chief executive officer or president of an entity (or other officers, managing members, or partners who control the management of the entity) also controls the management of another entity, the two entities will be deemed affiliates under common control.  Where a single person or entity that controls the board of directors or management of one entity also controls the board of directors or management of another entity, the two entities will be deemed affiliates under common control.  Where a person or entity controls the management of another entity through a management agreement, the entities are deemed affiliated.  *See* 13 C.F.R. § 121.301(f)(3).

iv.  *Affiliation based on identity of interest*.  Where there is an identity of interest between close relatives with identical or substantially identical business or economic interests (e.g., in the same or similar industry in the same geographic area), such interests are presumed to be affiliated.  This presumption may be rebutted with evidence showing that the interests are separate.  *See* 13 C.F.R. § 121.301(f)(4).

57.  Affiliation is particularly relevant for private equity and venture funds because, if a private equity or venture fund is deemed to be an affiliate of a PPP applicant, all other affiliates

of the fund (e.g., all other portfolio companies controlled by the fund) will be deemed affiliates of that PPP applicant.

58.    Moreover, if the fund is part of a family or series of funds under common control, the affiliates of those funds would also be deemed affiliates of the PPP applicant.  In many cases, such extended affiliation would make it impossible for the applicant to meet the size standards for PPP eligibility.

59.    In addition, private equity management companies are deemed affiliates of the funds they manage by virtue of common management or common control, which make them affiliates of controlled portfolio companies and exclude them from PPP eligibility.  In any of these situations, a PPP applicant must account for affiliates in size determinations.

60.    There are certain circumstances in which the affiliation rules do not apply.  *See* 15 USCS § 636(a)(36)(D)(iv).  Specifically, the CARES Act waives the affiliation rules with respect to eligibility of a PPP applicant that is one of the following:

    i.    A business within NAICS category 72 that has no more than 500 employees.

    ii.    A franchise with a franchise identifier code assigned by SBA in the SBA Franchise Directory.

    iii.    A business that receives financial assistance from a small business investment company licensed by SBA ("SBIC").

61.    Potentially, a portfolio company controlled by a private equity fund could qualify for a PPP loan using the tangible net worth and net income test (described above), assuming the portfolio company and its affiliates, which would include the fund's other controlled portfolio companies, meet the tangible net worth and net income tests on a combined basis.

### 5. PPP Loan Terms

62.     PPP loans funded before the enactment of the Flexibility Act mature two years from the date of funding, *see* Interim Final Rule § 2(j), unless modified by the lender and borrower, *see* Flexibility Act § 2(b).  PPP loans funded after the enactment of the Flexibility Act on June 5, 2020, mature five years after the date of funding.  *See* Small Business Act § 7(a)(36)(K)(ii), as amended by Flexibility Act § 2.

63.     No payments are due on a PPP loan until the SBA has paid the lender the amount of the PPP loan to be forgiven or notified the lender that no forgiveness will be allowed, but interest will accrue during that period.  *See* 15 USCS § 636(a)(36)(M)(ii), as amended by Flexibility Act § 3(c); Interim Final Rule § 2(n), as revised by IFR #17 § 1(c).

64.      Thereafter, most banks will charge monthly or quarterly payments of principal and interest until maturity.  However, any borrower that does not apply for forgiveness within ten months after the end of its eight-week or 24-week covered period must begin making payments of principal and interest on or after the expiration of that ten-month period.  *See* 15 USCS § 636(a)(36)(M)(v), as amended by Flexibility Act § 3(c).

65.     Lenders must notify borrowers when SBA pays the forgiveness amount or determines that no forgiveness is allowed.  *See* Interim Final Rule § 2(n), as revised by IFR #17 § 1(c).

### 6. Permitted Uses and Forgivable Uses of PPP Loan Funds

66.     PPP loan proceeds may be used for the following expenses:

    i.     Payroll costs.

    ii.    Costs related to the continuation of group health care benefits during periods of paid sick, medical, or family leave, and insurance premiums;

    iii.   Employee salaries, commissions, or similar compensations.

     iv.    Payments of interest on any mortgage obligation (but not principal payments or prepayments).

     v.    Rent (including rent under a lease agreement).

     vi.    Utilities.

     vii.    Interest on any other debt obligations that were incurred before the covered period.

*See* 15 USCS § 636(a)(36)(F)(i).

67.    Prior to the enactment of the Flexibility Act on June 5, 2020, the SBA required that at least 75% of PPP loan proceeds be used for payroll costs.  *See* Interim Final Rule § 2(r). The Flexibility Act revised the CARES Act to provide that a borrower must use at least 60% of PPP loan proceeds for payroll costs in order to be eligible for forgiveness of its PPP loan, *see* CARES Act § 1106(d)(7), as added by Flexibility Act § 3(b), and IFR #17 revised the Interim Final Rule to require that at least 60% of PPP loan proceeds be used for payroll costs.  *See* IFR #17 § 1(e), amending Interim Final Rule § 2(r).  Additionally, not all permitted uses of PPP loan proceeds qualify for forgiveness.

68.    Technically speaking, PPP loan proceeds may be used for other allowable purposes under Section 7(a) of the Small Business Act.  However, the PPP loan application requires the applicant to disclose the purpose of the loan and includes a certification that the proceeds of the loan will be used "to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments…."  Based on that certification, borrowers may not use PPP loan proceeds for purposes that were not disclosed in the loan application or would not fall within the certification on the loan application form.

69.    If a borrower uses PPP loan funds for unauthorized purposes, SBA will require those amounts to be repaid.  If a borrower knowingly uses PPP loan proceeds for unauthorized purposes, it will be subject to additional liability, such as fraud charges.  If a borrower's

shareholder, member, or partner uses PPP loan proceeds for unauthorized purposes, SBA will have recourse against that shareholder, member, or partner.  *See* Interim Final Rule § 2(s).

70.    Subject to various limitations, the outstanding principal amount of a PPP loan can be forgiven to the extent that PPP loan proceeds were used to pay the following:

    i.    Payroll costs.

    ii.    Mortgage interest (but not principal payments or prepayments) on mortgage obligations on real or personal property incurred before February 15, 2020.

    iii.    Rent under leases for real or personal property in force before February 15, 2020.

    iv.    Utilities where service began before February 15, 2020.

*See* CARES Act § 1106(b).

71.    However, the Flexibility Act amended the CARES Act to provide that a borrower must use at least 60% of PPP loan proceeds for payroll costs in order to be eligible for forgiveness of its PPP loan, *see* CARES Act § 1106(d)(7), as added by Flexibility Act § 3(b), and IFR #17 revised the Interim Final Rule to require that at least 60% of PPP loan proceeds be used for payroll costs *see* IFR #17 § 1(e), amending Interim Final Rule § 2(r).

72.    The CARES Act and initial SBA forgiveness guidance tie forgiveness of PPP loan proceeds to use during an eight-week period beginning when the PPP loan is funded or, with respect to payroll costs of certain borrowers, beginning with the start of the first pay period after the PPP loan is funded.

73.    The Flexibility Act revised the CARES Act to permit (but not require) borrowers to use PPP loan proceeds over 24 weeks instead of eight weeks, provided that the 24-week period may not extend beyond December 31, 2020.  *See* CARES Act § 1106(a)(3), as amended by Flexibility Act § 3(b).  The "covered period" will be 24 weeks unless a borrower elects to use the original eight-week period.

74.     In order to obtain forgiveness of a PPP loan, borrowers must submit to their PPP lenders a Loan Forgiveness Application plus documentation showing the permitted use of PPP loan proceeds and employment and payroll records for the relevant periods, together with certifications of accuracy.

75.     The lender must perform a good faith review of the borrower's calculations and supporting documents and work with the borrower to remedy any errors the lender identifies. The lender is not required to independently verify the borrower's reported information. *See* IFR #15 § 2(a), as amended by IFR #20 § 2(b).

76.     The lender has 60 days after it has received a complete forgiveness application to make a determination of the forgiveness amount, if any, and submit its determination and supporting documentation to SBA. Subject to any SBA review of the loan or loan application, SBA will pay the forgiveness amount, plus interest accrued through the date of payment, to the lender within 90 days after the lender submits its determination to SBA. *See* CARES Act § 1106(e)-(g); IFR #15 § 2(b), as amended by IFR #20 § 2(b).

77.     A PPP borrower may submit its forgiveness application any time on or before the maturity date of the loan if the borrower has used all of the PPP loan proceeds for which it is requesting forgiveness. A borrower may apply before the end of its chosen eight-week or 24-week covered period, but if it does so and has reduced any employee's salary or hourly wage by more than 25%, it must account for the excess reduction for the full eight-week or 24-week covered period, as applicable. If a borrower does not file its forgiveness application within ten months after the end of its eight-week or 24-week covered period, it must begin paying principal and interest on the PPP loan. *See* IFR #14 § 2(b), as added by IFR #20 § 1(c).

78.     SBA began approving PPP forgiveness applications and remitting forgiveness payments to PPP lenders for PPP borrowers on October 2, 2020.

**7.     The PPP Loan Application and Required Certifications**

79.     The PPP Loan Application form requires the applicant to certify its number of employees.

80.     The PPP Loan Application form also requires the applicant to identify all owners of 20% of more of the equity of the applicant.

81.     For limited liability companies, the instructions to the PPP loan application state that all members owning 20% or more of the company are "owners."

82.     The loan application requires an express certification that the applicant "has read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them."

83.     The loan application also requires an express certification that "[t]he applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule)."

84.     The loan application also requires an express certification that the applicant "employs no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry."

85.     The loan application also requires an express certification that "[a]ll SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule."

86.     The loan application also requires the applicant to expressly certify that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

87.     The loan application also requires the applicant to expressly certify that "[t]he funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

88.     The loan application also requires the applicant to expressly certify that "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects" and that  "[the applicant] understand[s] that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

89.     The loan application also requires the applicant to expressly certify that "[the applicant] acknowledge[s] that the lender will confirm the eligible loan amount using required documents submitted."

90.     The loan application requires an authorized representative of the applicant to sign.

91.     As noted, at least with respect to larger companies and businesses owned by private companies with adequate sources of liquidity, the SBA has indicated that applicants must

take into account "their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business." *See* SBA FAQ Questions 31 and 37. Accordingly, in making the express certification, applicants are required to consider their need for PPP funding in light of SBA FAQ Question 31, stated above.

92.    Absent the applicable express certifications for a PPP loan as described above, the applicant is not eligible to receive PPP loan funds and the lender cannot approve the loan for PPP funds.

93.    Each of the foregoing PPP loan application certifications is material condition to SBAs approval and payment of any claim submitted under the PPP. SBA does not review PPP loan applications for approval prior to the loan funds being disbursed; instead, it relies on its lenders to comply with SBA requirements and to ensure that every loan is in fact eligible for the PPP. The certifications are required for approval of the PPP loan application and for each applicant to receive payment of PPP loan funds. The certifications are critical to SBA's and the United States' ability to ensure that only qualified and eligible loans are approved and paid. And the certifications are needed to protect SBA and the United States from undue risk and loss.

94.    The SBA permitted any borrower that received a PPP loan and believed upon reconsideration that it could not make the required certification in light of SBA's guidance to repay the PPP loan in full by May 18, 2020. According to the SBA, it would deem any borrower that repaid by May 18, 2020 to have made the required certification of need in good faith. *See* IFR #4 § 5 as modified by IFR #9 and IFR #13 § 1; SBA FAQ Question 31, as modified by SBA FAQ Question 43 and SBA FAQ Question 47.

95.     On May 13, 2020, the SBA published FAQ Question and Answer 46 ("FAQ 46"), which provides a new safe harbor based on the principal amount of PPP loans received by a borrower and its affiliates: "Any borrower that, together with its affiliates, received PPP loans with an original principal amount of less than $2 million will be deemed to have made the required certification concerning the necessity of the loan request in good faith." (Affiliation for this purpose is determined based on the rules that apply for determining eligibility for a PPP loan, as announced in IFR #2.)

96.     FAQ 46 also gives PPP borrowers with loans greater than $2 million that do not satisfy the new safe harbor a means to limit their exposure to sanctions from the SBA. If the SBA determines that such a borrower did not have an adequate basis for the certification of need, SBA will notify the borrower and seek repayment in full of the PPP loan, and tell the lender that the borrower is not eligible for loan forgiveness. FAQ 46 provides that SBA will not pursue further administrative enforcement or refer the borrower to other governmental agencies based on its determination regarding the certification of need if the borrower repays the loan in full after receiving notification from SBA. *See* SBA FAQ Question 46.

97.     Notably, repaying the loan pursuant to FAQ 46 does not shield the borrower from all potential liability. FAQ 46 merely states that SBA will not pursue additional action based on a determination that the borrower lacked an adequate basis for the certification of need. A borrower is still liable if there are other violations of the PPP statute or implementing regulations. Further, nothing in FAQ 46 prevents the Government or a *qui tam* relator or whistleblower who believes that the borrower knowingly made a false statement in connection with its PPP loan application from bringing a complaint under the False Claims Act.

**B.      Ocean State's PPP Loan Application and Receipt of PPP Loan Funds**

**1.      Ocean State and Its Private Equity Firm Majority Owner New Harbor Capital Fund LP**

98.      Founded in 2013, Ocean State is an independent provider of primary care, urgent care and related services in Rhode Island.

99.      In October 2017, Chicago-based private equity firm New Harbor Capital Fund LP and/or its parent fund New Harbor Capital Management, LP (collectively, "New Harbor") completed a majority equity investment in Ocean State.

100.      New Harbor Capital Fund, LP is a private equity fund with a gross asset value of approximately $260,099,243 as of March 30, 2020.

101.      In addition to New Harbor Capital Fund LP, New Harbor Capital Management, LP is the parent fund for three other private equity funds: New Harbor Capital Fund II-A, LP, New Harbor Capital Fund-A, LP, and New Harbor Capital Fund II, LP.[2]

102.      In total, New Harbor Capital Management, LP has discretionary assets under management of $509,963,209 (gross asset value) as of March 30, 2020.[3]

103.      New Harbor is registered with the SEC as a large advisory firm meaning that it has regulatory assets under management of $100 million or more.

104.      In addition to Ocean State, New Harbor's other current private equity portfolio companies include: Fix-It 24/7; Quigley Eye Specialists; Blueprint Test Preparation, LLC; Fyzical Therapy & Balance Centers; LGM Pharma; Wedgewood Pharmacy; Certica Solutions; and New York Kids Club.[4]

---

[2] *See* https://whalewisdom.com/filer/new-harbor-capital-fund-lp#tabsummary_tab_link (last accessed December 22, 2020).
[3] *Id.*
[4] *See* https://www.newharborcap.com/current-investments/ (last accessed December 22, 2020).

     **2.**     **Ocean State's Express Certifications Made in Its PPP Loan Application**

105.    On or about April 3, 2020, Ocean State submitted a PPP borrower application form.

106.    Ocean State certified that the purpose of the loan was for only payroll, lease/mortgage interest, and utilities.  Ocean State did not identify any other purpose for the loan.

107.    As required, Ocean State identified in the application New Harbor Capital Fund LP as the owner of 84% of Ocean State.

108.    Ocean State certified in the loan application that it "has read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them."

109.    Ocean State certified in the loan application that "[t]he applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule).

110.    Ocean State certified in the loan application that it "employs no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry."

111.    Ocean State certified in the loan application that "[a]ll SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule."

112.    Ocean State certified in the loan application that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

113.    Ocean State certified in the loan application that "[t]he funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

114.    Ocean State certified in the loan application that "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects" and that  "[the applicant] understand[s] that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

115.    Ocean State certified in the loan application that "[the applicant] acknowledge[s] that the lender will confirm the eligible loan amount using required documents submitted."

116.    The loan application was signed by Ocean State's Controller, Sarah Charette, as Ocean State's authorized representative.

### 3.    Ocean State Received PPP Loan Funds, Along With Several of New Harbor's Other Affiliated Portfolio Companies

117.    According to SBA PPP loan data made public by the SBA and Treasury, Ocean State received PPP loan funds of $3,159,800 million through Bristol County Savings Bank, which was approved in April 2020.[5]

---

[5] *See* SBA paycheck Protection Program Loan Level Data, https://home.treasury.gov/policy-issues/cares-act/assistance-for-small-businesses/sba-paycheck-protection-program-loan-level-data (last accessed December 22, 2020); *see also* SBA PPP Data as of December 1, 2020,

118.    Based on standard PPP eligibility rules, Ocean State's total 2019 payroll expenses were between $9.6 million and $24 million in order to qualify for the PPP loan amount received. Based on Ocean State's reported 277 jobs retained, this equals an estimated average yearly compensation between $34,657 and $86,643 per employee.

119.    Because the loan received by Ocean State is at least $2 million, it is subject to a full review by the SBA to ensure eligibility and compliance with PPP program requirements.

120.    In addition to Ocean State, the data show that at least three of New Harbor's other portfolio companies applied for and received PPP loan funds.

121.    Blueprint Test Preparation, LLC applied for and received PPP loan funds of $1,267,200 million through PNC Bank, NA, which was approved in April 2020.

122.    Based on standard PPP eligibility rules, Blueprint Test Preparation LLC's total 2019 payroll expenses were between $4.8 million and $9.6 million in order to qualify for the PPP loan amount received. Based on its reported 160 jobs retained, this equals an estimated average yearly compensation between $30,000 and $60,000 per employee.

123.    Because the loan received by Blueprint Test Preparation, LLC, *together with its affiliates*, is at least $2 million, it is subject to a full review by the SBA to ensure eligibility and compliance with PPP program requirements. *See* SBA FAQ Question 46.

124.    Fyzical Acquisition Holdings, LLC applied for and received PPP loan funds of $3,076,600 million through Webster Bank, NA, which was approved in April 2020. Based on standard PPP eligibility rules, Fyzical Acquisition Holdings, LLC's total 2019 payroll expenses were between $9.6 million and $24 million in order to qualify for the PPP loan amount received.

https://sba.app.box.com/s/5myd1nxutoq8wxecx2562baruz774si6/folder/127201759675 (last accessed December 22, 2020).

Unlike most businesses, it did not report the number of jobs retained by its receipt of the PPP loan, so per-employee payrolls cannot be estimated.

125.    Because the loan received by Fyzical Acquisition Holdings, LLC is at least $2 million, it is subject to a full review by the SBA to ensure eligibility and compliance with PPP program requirements.

126.    Necessarily, Blueprint Test Preparation, LLC and Fyzical Acquisition Holdings, LLC also made all of the required certifications in their respective PPP loan applications. Otherwise, they would not have received the PPP loan funds.

127.    Thus, Ocean State and its affiliates, collectively, applied for and received PPP loan funds of $7,503,600 and reported 437 jobs retained by their receipt of the PPP loans.

## C.    Ocean State Submitted and Caused to be Submitted False Claims for Payment to SBA

### 1.    Ocean State Falsely Certified the Necessity of Its PPP Loan

128.    As noted, applicants for PPP funds must make several express certifications when applying for loans and loan forgiveness.  One of those express certifications is that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

129.    Because the SBA requires an express certification of necessity to determine eligibility, and thoroughly discussed the certification in guidance, a false certification of necessity is a materially false misrepresentation that would have affected SBA's decision to approve a PPP loan.

130.    The SBA notes that "all borrowers should carefully review the required certification on the Paycheck Protection Program Borrower Application Form (SBA Form 2483)

stating that '[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.'"  *See* IFR #4 § 2(b).

131.    SBA FAQ 31 explains that applicants making the PPP loan certification should "tak[e] into account their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business."

132.    SBA FAQ 31 states the general principle that, in order to certify in good faith that the PPP loan is necessary, as required by the PPP loan application, a borrower must take into account other sources of liquidity (e.g., cash and cash equivalents, short-term funds, bank loans, liquidating assets, capital raises, etc.) that could be utilized instead of a PPP loan, and SBA FAQ Question 37 extends SBA FAQ Question 31 to all businesses owned by private companies with adequate sources of liquidity.  *See* SBA FAQ Question 37.

133.    Despite the fact that the PPP was intended for small businesses, many apparently large businesses, such as companies backed by private equity firms, claimed PPP funds while making the necessity certification.  Ocean State is one of those companies.

134.    Ocean State falsely certified in its application that a PPP loan was "necessary" to support its ongoing operations.

135.    Additionally, upon information and belief, New Harbor's other portfolio companies—Blueprint Test Preparation, LLC and Fyzical Acquisition Holdings, LLC—also falsely certified in their applications that a PPP loan was "necessary" to support their ongoing operations.

136.    As described, on the date of Ocean State's PPP loan application, 84% of Ocean State's equity (or membership interests) was owned by private equity firm New Harbor Capital Fund LP.

137.    On or around the date of Ocean State's PPP loan application, New Harbor Capital Fund LP had a gross asset value of approximately $260,099,243 and its parent fund, New Harbor Capital Management, LP, had discretionary assets under management of $509,963,209.

138.    Taking into account New Harbor's significant financial resources and 84% ownership of Ocean State, Ocean State knowingly misrepresented that its PPP loan request was "necessary" to support its ongoing operations insofar as Ocean State had alternate sources of liquidity available and was able to access those sources without significantly damaging its business.

139.    Ocean State's false certification of necessity was material because the certification affected Ocean State's eligibility for the PPP loan and the SBA's decision to approve the loan.

**2.    Ocean State Falsely Certified Compliance with the PPP Size and Affiliation Rules**

140.    The CARES Act expressly limits PPP loans to businesses with less than 500 employees, or otherwise qualifying as a small business concern under other SBA standards, with certain limited exceptions.

141.    The "alternative size standard" for PPP loans also allows businesses to qualify if, as of March 27, 2020, the maximum tangible net worth of the business is not more than $15 million, and their average net income after federal income taxes for the two full fiscal years before the date of the application was not more than $5 million.

142.     Businesses must include the employees of affiliate businesses in its size determinations, according to the SBA's affiliation rules.  *See* 13 C.F.R. § 121.301(f)(1); Affiliation Guidance.

143.     New Harbor is an affiliate of Ocean State because *inter alia* it owns and has the power to control more than 50% of Ocean State's voting equity.

144.     Because New Harbor is an affiliate of Ocean State, both New Harbor along with all other affiliates of New Harbor (e.g., all other portfolio companies that are majority owned and/or controlled by New Harbor) are deemed affiliates of Ocean State.

145.     Upon information and belief, New Harbor is the majority owner of and controls or has the power to control its other portfolio companies, including: Fix-It 24/7[6]; Quigley Eye Specialists[7]; Blueprint Test Preparation, LLC[8]; Fyzical Therapy & Balance Centers[9]; LGM Pharma[10]; Wedgewood Pharmacy[11]; Certica Solutions[12]; and New York Kids Club[13].

146.     Accordingly, New Harbor is an affiliate of each of these other portfolio companies and, in turn, the portfolio companies are affiliates of Ocean State for purposes of PPP size and net-worth tests.  *See* 13 C.F.R. § 121.301(f); Affiliation Guidance.

---

[6] *See* https://www.newharborcap.com/news/fix-it/ (last accessed December 22, 2020).

[7] See https://www.newharborcap.com/investments/quigley-eye-specialists/ (last accessed December 22, 2020).

[8] *See* https://www.newharborcap.com/news/new-harbor-capital-completes-majority-equity-investments-in-blueprint-test-preparation-and-next-step-test-preparation/ (last accessed December 22, 2020).

[9] *See* https://www.newharborcap.com/news/new-harbor-capital-acquires-majority-interest-in-fyzical/ (last accessed December 22, 2020).

[10] *See* https://www.newharborcap.com/news/new-harbor-capital-acquires-majority-interest-in-lgm-pharma/ (last accessed December 22, 2020).

[11] *See* https://www.newharborcap.com/news/new-harbor-capital-acquires-majority-interest-in-wedgewood-pharmacy/ (last accessed December 22, 2020).

[12] *See* https://www.newharborcap.com/news/new-harbor-capital-acquires-majority-interest-in-certica-solutions/ (last accessed December 22, 2020).

[13] *See* https://www.newharborcap.com/news/new-harbor-capital-acquires-majority-interest-in-new-york-kids-club/ (last accessed December 22, 2020).

147.    As a result of this extended affiliation, it was impossible for Ocean State to meet the size standards for PPP eligibility and Ocean State knew or should have known that it did not meet these standards and was thus ineligible for a PPP loan.

148.    The CARES Act's limited waiver of the affiliation rules does not apply to Ocean State because Ocean State: (i) is not a business within NAICS category 72; (ii) is not a qualifying franchise; and (iii) does not have SBIC investment.  *See* 15 USCS § 636(a)(36)(D)(iv).  Thus, the affiliation rules apply to Ocean State.

149.    First, together with its affiliates, Ocean State had more than 500 employees at the time it filed its PPP application.  *See* 15 USCS § 636(a)(36)(D)(i)(I); SBA FAQ Question 44.

150.    Ocean State reported 277 employees in its PPP application.

151.    Upon information and belief, New Harbor had approximately 38 employees and an estimated annual revenue of $8 million at the time of Ocean State's PPP application.[14]

152.    Blueprint Test Preparation, LLC reported 160 employees in its PPP application and, upon information and belief, has annual revenue of roughly $30 million.[15]

153.    Upon information and belief, Quigley Eye Specialists had approximately 70 employees at the time of Ocean State's PPP application.[16]

154.    Upon information and belief, LGM Pharma had approximately 191 employees and an estimated annual revenue of $38 million at the time of Ocean State's PPP application.[17]

---

[14] See https://www.zoominfo.com/c/new-harbor-capital-llc/357236710 (last accessed December 22, 2020).
[15] *See* https://www.zoominfo.com/c/blueprint-lsat-preparation/347093137 (last accessed December 22, 2020).
[16] See https://www.quigleyeye.com/prendiville-facial-plastic-surgery-joins-quigley-eye-specialists/#:~:text=Quigley%20Eye%20Specialists%2C%20founded%20in,Port%20Charlotte%20and%20Punta%20Gorda. (last accessed December 22, 2020).
[17] See https://www.zoominfo.com/c/lgm-pharma-llc/347288370 (last accessed December 22, 2020).

155.    Upon information and belief, Wedgewood Pharmacy had approximately 650 employees and an estimated annual revenue of $43 million at the time of Ocean State's PPP application.[18]

156.    Upon information and belief, Certica Solutions had approximately 130 employees and an estimated annual revenue of $27 million at the time of Ocean State's PPP application.[19]

157.    Upon information and belief, New York Kids Club had approximately 452 employees and an estimated annual revenue of $86 million at the time of Ocean State's PPP application.[20]

158.    Accordingly, together with its affiliates, Ocean State had approximately 1,968 employees and an estimated annual revenue of over $232 million at the time it filed its PPP application (not including Fyzical).

159.    Second, Ocean State, together with its affiliates, did not meet the SBA employee-based size standard for the NAICS code applicable to its primary industry (found in 13 C.F.R. § 121.201).  *See* 15 USCS § 636(a)(36)(D)(i)(II); SBA FAQ Question 3.

160.    Ocean State's NAICS code is 621999 ("All Other Miscellaneous Ambulatory Health Care Services") and there is no applicable employee-based size standard for NAICS code 621999.  Accordingly, Ocean State could not rely on this size-standard test.

161.    Third, Ocean State's primary industry is not in NAICS category 72 (accommodations and food service).  *See* 15 USCS § 636(a)(36)(D)(iii).  Accordingly, Ocean State could not rely on this size-standard test.

---

[18] See https://www.zoominfo.com/c/wedgewood-pharmacy/41779539 (last accessed December 22, 2020).
[19] *See* https://www.zoominfo.com/c/certica-solutions/345397120 (last accessed December 22, 2020).
[20] *See* https://www.zoominfo.com/c/ny-kids-club/70846279 (last accessed December 22, 2020).

162.    Fourth, Ocean State, on its own, does not meet the size standard (employee-based or receipts/revenue-based) established by SBA for the NAICS code applicable to its primary industry (621999), and together with its affiliates, it does not meet the size standard (employee-based or receipts/revenue-based) established by SBA for the NAICS code applicable to the higher of its primary industry or the primary industry of itself and its affiliates on a combined basis.[21] See 13 C.F.R. § 121.301(a); SBA FAQ Question 2.

163.    Fifth, Ocean State had, together with its affiliates, $15 million or more of tangible net worth as of March 27, 2020, and $5 million or more of average net income after Federal income taxes (excluding carry-over losses) for the last two full fiscal years before the date of application. See 15 USCS § 632(a)(5)(B); SBA FAQ Question 2.

164.    Based on the foregoing, Ocean State knowingly miscalculated and misrepresented its employee-count and net worth, its compliance with the PPP size and affiliation rules, and its eligibility for a PPP loan.

165.    Ocean State's false certification of employee-count and/or net worth was material because the certification affected Ocean State's eligibility for the PPP loan and the SBA's decision to approve the loan.

166.    Additionally, based on the foregoing, upon information and belief New Harbor's other portfolio companies—Blueprint Test Preparation, LLC and Fyzical Acquisition Holdings, LLC—also knowingly miscalculated and misrepresented their employee-count and net worth, their compliance with the PPP size and affiliation rules, and their eligibility for a PPP loan.

---

[21] The receipts/revenue-based size standard for Ocean State's NAICS code is $16.5 million. See https://www.ecfr.gov/cgi-bin/text-idx?SID=b919ec8f32159d9edaaa36a7eaf6b695&mc=true&node=pt13.1.121&rgn=div5#se13.1.121_1201 (last accessed December 22, 2020).

**D.      Ocean State Failed to Repay PPP Loan Funds for Which It Was Not Entitled**

167.      As described above, Ocean State falsely certified in its application that a PPP loan was "necessary" to support its ongoing operations.

168.      Ocean State also falsely certified in its application compliance with the PPP size and affiliation rules.

169.      As described above, for applicants that applied for and received a PPP loan but then believed, based on subsequent SBA guidance, that they could not certify in good faith that current economic uncertainty makes their PPP loan necessary to support ongoing operations, the SBA provided a safe harbor that permitted borrowers to repay PPP loans in full by May 18, 2020.

170.      Borrowers that repaid their PPP loans in full by May 18, 2020, will be deemed to have made the required certification of need in good faith.  *See* IFR #4 § 5 as modified by IFR #9 and IFR #13 § 1; SBA FAQ Question 31, as modified by SBA FAQ Question 43 and SBA FAQ Question 47.

171.      In addition, the SBA has stated that: "Any borrower that, together with its affiliates, received PPP loans with an original principal amount of less than $2 million will be deemed to have made the required certification concerning the necessity of the loan request in good faith." Affiliation for this purpose is determined based on the rules that apply for determining eligibility for a PPP loan.  *See* SBA FAQ Question 46.

172.      However, repaying the loan pursuant to FAQ 46 does not shield the borrower from all potential liability.  FAQ 46 merely states that SBA will not pursue additional action based on a determination that the borrower lacked an adequate basis for the certification of need. A borrower is still liable if there are other violations of the PPP statute or implementing regulations, such as falsely certifying compliance with the PPP size and affiliation rules.

173.    Ocean State did not repay the PPP loan funds it received but for which it was not eligible.

174.    Further, because the loan received by Ocean State is at least $2 million, it is not deemed to have made the necessity certification in good faith and is subject to a full review by the SBA to ensure eligibility and compliance with PPP program requirements.

175.    Ocean State knowingly avoided and/or concealed its obligation to return money back to the Government.

176.    Additionally, based on the foregoing, upon information and belief New Harbor's other portfolio companies—Blueprint Test Preparation, LLC and Fyzical Acquisition Holdings, LLC—also knowingly avoided and/or concealed their obligation to return money back to the Government.

**COUNT I**
**Violation of the False Claims Act**
**(31 U.S.C. § 3729(a)(1)(A))**

177.    Relator repeats and realleges the foregoing paragraphs as if fully set forth herein.

178.    Ocean State violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), by knowingly presenting and causing to be presented to the SBA false and/or fraudulent claims for payment or approval.

179.    Upon information and belief, the United States paid or approved the false and/or fraudulent claims because of Ocean State's acts that would not have been paid or approved but for Ocean State's unlawful conduct and incurred damages as a result.

**COUNT II**
**Violation of the False Claims Act**
**(31 U.S.C. § 3729(a)(1)(B))**

180.    Relator repeats and realleges the foregoing paragraphs as if fully set forth herein.

181.    Ocean State violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), by knowingly making, using, or causing to be made or used, false records, or statements: (i) material to false or fraudulent claims for payment to the SBA; and/or (ii) in order to get false or fraudulent claims paid or approved; and (iii) which claims the United States did pay or approve.

182.    Upon information and belief, the United States paid or approved the false and/or fraudulent claims because of Ocean State's acts that would not have been paid or approved but for Ocean State's unlawful conduct and incurred damages as a result.

## COUNT III
## Violation of the False Claims Act
## (31 U.S.C. § 3729(a)(1)(G))

183.    Relator repeats and realleges the foregoing paragraphs as if fully set forth herein.

184.    Ocean State violated the so-called "reverse false claim" provision of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), by knowingly making or using a false record or statement for the purpose of avoiding or decreasing an obligation owed to the United States.

185.    Ocean State retained overpayments or avoided an obligation to repay money to the United States and the United States incurred damages as a result.

## RELIEF REQUESTED

WHEREFORE, Relator, acting on behalf of and in the name of the United States, and on his own behalf, demands and prays that judgment be entered against Ocean State as follows:

A.    Ocean State cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*;

B.    Ocean State pay an amount equal to three times the amount of damages the United States has sustained because of Ocean State's actions, plus civil penalties as are required by law in the amount of not less than $11,665 and not more than $23,331 per

violation of the False Claims Act, post-judgment interest, costs, and such other relief as may be necessary and proper;

C.      Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

D.      Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d); and

E.      The United States and Relator be granted such other and further relief as the Court deems just and appropriate.

**RELATOR HEREBY DEMANDS A TRIAL BY JURY FOR ALL ISSUES SO TRIABLE**

Respectfully submitted,

Plaintiff,
UNITED STATES OF AMERICA *ex rel*
JAMES R. BERKLEY

By His attorneys,

/s/ Eric E. Renner
Eric E. Renner  (#7481)
Renner Law, LLC
50 South Main Street, Suite 202
Providence, RI  02903
Phone: 401-404-5251
Fax: 401-404-5285
erenner@rennerlawllc.com

Date:  December 28, 2020