UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. JAMES R. BERKLEY, <br>                 Plaintiff, <br><br>      vs. <br><br> OCEAN STATE, LLC, <br> NEW HARBOR CAPITAL FUND LP, NEW HARBOR CAPITAL FUND II LP, <br> NEW HARBOR CAPITAL MANAGEMENT LP, BLUEPRINT TEST PREPARATION, LLC, FYZICAL ACQUISITION HOLDINGS, LLC, <br>                 Defendants. | C.A. No. 1:20-cv-00538-JJM-PAS |

## MEMORANDUM OF LAW IN SUPPORT OF
## RELATOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Eric E. Renner (#7481)
DUFFY & SWEENEY, LTD
321 South Main Street, Suite 400
Providence, RI 02903
Phone: 401-457-1803
Fax: 401-457-0701
erenner@duffysweeney.com


*Attorneys for Plaintiff-Relator,*
*United States of America ex rel James R. Berkley*

**TABLE OF CONTENTS**

TABLE OF CONTENTS……………………………………………………………………………….i

TABLE OF AUTHORITIES……………………………………………….......................iii

INTRODUCTION……………………………………………………………………...1

FACTS…………………….....……………………………………………...………....3

ARGUMENT……………………………………........……………………………….....3

    I.        Standard of Review……………………………………………………….…3

    II.      PPP Rules and Requirements………………………………….…………..4

    III.    Relator's False Claims Act Claims……………………………………...9

    IV.    The Court Should Grant Summary Judgment Against the MSJ Defendants
           on Relator's Claims Under 31 U.S.C. § 3729(a)(1)(A), (B) and (G)……………10

          A.    Ocean State and Fyzical Holdings *Falsely* Certified
               Compliance with the PPP Size and Affiliation Rules
               and Their Eligibility to Receive the PPP Loans and Then
               Falsely Certified that the PPP Funds Were Used to Pay Costs
               that were Eligible for Forgiveness and Avoided Their Obligation
               to Repay the Funds…………………………………………………………12

               1.    Ocean State………………………………………………...12

               2.    Fyzical Holdings………………………………………….19

          B.    Ocean State and Fyzical Holdings *Knowingly* Submitted False
               Claims and Records and Avoided Their Obligations to Repay
               the PPP Funds……………………………………………………………30

               1.    Ocean State………………………………………………...32

               2.    Fyzical Holdings………………………………………….39

          C.    Ocean State and Fyzical Holdings' False Certifications Were
               *Material* to the Government's Payment Decision and to Their
               Payment Obligations……………………………………………….…43

          D.    New Harbor Capital Knowingly *Caused* Ocean State and
               Fyzical Holdings to Submit False Claims and Records
               and Is Thus Liable Under the FCA…………………………….……48

i

E.    As a Matter of Law, the Measure of *Damages* for the
MSJ Defendants' FCA Violations is The Entirety
of The Government's Expenditures for Claims Resulting
from the False PPP Loan Applications……………………………...51

F.    The MSJ Defendants' *Public Disclosure Bar*
Affirmative Defense Fails……………………………………………52

CONCLUSION………………………………………………………………..54

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*A & I Realty Corp. v. Kent Dry Cleaners, Inc.*,
61 Misc. 2d 887, (Dist. Ct. 1969) .................................................................................... 20

*Aldridge on Behalf of United States v. Corp. Mgmt., Inc.*,
No. 1:16-CV-369 HTW-LGI, 2021 WL 2518221, at *14 (S.D. Miss. June 18, 2021),
*aff'd*, 78 F.4th 727 (5th Cir. 2023), cert. denied, 144 S. Ct. 694 (2024) ......................... 45

*Allied Chem. Corp. v. United States*,
305 F.2d 433 (Ct. Cl. 1962).............................................................................................. 20

*Any v. United States*,
47 F.3d 1156, at *4 (1st Cir.1995) ................................................................................... 37

*Commonwealth ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*,
334 F. Supp. 3d 394 (D. Mass. 2018) .......................................................................... 48, 49

*Farmer v. Brennan*,
511 U.S. 825 (1994)........................................................................................................... 31

*First Tennessee Bank Nat. Ass'n v. Johanns*,
618 F. Supp. 2d 778 (M.D. Tenn. 2008) .................................................................... 17, 28

*Global-Tech Appliances, Inc. v. SEB S. A.*,
563 U. S. 754 (2011).......................................................................................................... 31

*Guilfoile v. Shields*,
913 F.3d 178 (1st Cir. 2019)....................................................................................10, 43, 48

*Jenkins v. Haworth, Inc.,*
572 F. Supp. 591 (W.D. Mich. 1983)................................................................................ 25

*Junius Constr. Co. v. Cohen*,
257 N.Y. 393, (1931) ........................................................................................................ 12

*Kane ex rel. United States v. Healthfirst, Inc.*,
120 F. Supp. 3d 370 (S.D.N.Y. 2015)............................................................................... 11

*Liss v. United States*,
915 F.2d 287 (7th Cir.1990) ............................................................................................. 37

*North American Co. v. Securities and Exchange Commission*,

iii

327 U.S. 686 (1946) ................................................................................................... 20

*Photographic Illustrators Corp. v. Orgill, Inc.,*
953 F.3d 56 (1st Cir. 2020) ......................................................................................... 3

*Rock Island, Arkansas & Louisiana R.R. Co. v. United States,*
254 U.S. 141 (1920) (Holmes, J.) .............................................................................. 17

*Sturgeon v. Pharmerica Corp.,*
438 F. Supp. 3d 246 (E.D. Pa. 2020) ................................................................... 38, 43

*Sun Cap. Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund,*
724 F.3d 129 (1st Cir. 2013) ................................................................................ 49, 50

*Taber Partners, I v. Merit Builders, Inc.,*
987 F.2d 57 (1st Cir. 1993) ........................................................................................ 20

*Torres Vargas, et al. v. Santiago Cummings et al.,*
149 F.3d 29 (1st Cir. 1998) ......................................................................................... 3

*U.S. v. Caremark, Inc.,*
634 F.3d 808 (5th Cir. 2011) ...................................................................................... 11

*U.S. ex rel. Atkins v. McInteer,*
470 F.3d 1350 (11th Cir. 2006) .................................................................................. 47

*U.S. ex rel. Booker v. Pfizer, Inc.,*
9 F. Supp. 3d 34 (D. Mass. 2014) .............................................................................. 11

*U.S. ex rel. Brooks v. Stevens-Henager College,*
305 F. Supp. 3d 1279 (D. Utah 2018) ........................................................................ 44

*U.S. ex rel. Escobar v. Universal Health Services, Inc.,*
842 F.3d 103 (1st Cir. 2016) ................................................................................. 44, 47

*U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.,*
44 F.4th 838 (9th Cir. 2022) ...................................................................................... 44

*U.S. ex rel. Hutcheson v. Blackstone Med., Inc.,*
647 F.3d 377 (1st Cir. 2011) ................................................................................ 10, 48

*U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.,*
360 F.3d 220 (1st Cir. 2004) ....................................................................................... 9

*U.S. ex rel. Longhi v. United States,*
575 F.3d 458 (5th Cir. 2009) ................................................................................ 46, 51

iv

*U. S. ex rel. Marcus v. Hess,*
317 U.S. 537 (1943) ............................................................................................ 44, 51

*U.S. ex rel. McCready v. Columbia/HCA Healthcare Corp.,*
251 F. Supp. 2d 114 (D.D.C. 2003) ........................................................................... 53

*U.S. ex rel. Ondis v. City of Woonsocket,*
587 F.3d 49 (1st Cir. 2009) ...................................................................................... 52

*U.S. ex rel. Petras v. Simparel, Inc.,*
No. CIV.A. 13-2415 FLW, 2015 WL 337472 (D.N.J. Jan. 26, 2015) ........................... 11

*U.S. ex rel. Prather v. Brookdale Senior Living Communities, Inc.,*
892 F.3d 822 (6th Cir. 2018) .............................................................................. 44, 47

*U.S. ex rel. Taylor v. Boyko,*
39 F.4th 177 (4th Cir. 2022) ..................................................................................... 47

*U.S. ex rel. Ubl v. IIF Data Sols.,*
650 F.3d 445 (4th Cir. 2011) ..................................................................................... 47

*United States v. Aegerion Pharms., Inc.,*
No. 13-CV-11785-IT, 2019 WL 1437914 (D. Mass. Mar. 31, 2019) ........................... 47

*United States v. Bourseau,*
531 F.3d 1159 (9th Cir. 2008) ................................................................................... 30

*United States v. Giordano,*
898 F. Supp. 2d 440 (D.R.I. 2012) ............................................................................ 16

*United States v. Gorski,*
36 F. Supp. 3d 256 (D. Mass. 2014) ..................................................................... 37, 42

*United States v. Journey to Hope, Health & Healing, Inc.,*
728 F. Supp. 3d 251 (D.R.I. 2024) ............................................................................ 10

*United States v. Krizek,*
111 F.3d 934 (D.C. Cir. 1997) ................................................................................... 30

*United States v. Luce,*
873 F.3d 999 (7th Cir. 2017) ..................................................................................... 45

*United States v. Mackby,*
261 F.3d 821 (9th Cir. 2001) ................................................................................ 31, 32

v

*United States v. Neifert-White Co.*,
390 U.S. 228 (1968) ......................................................................................... 9

*United States v. Peripheral Vascular Assocs., P.A.*,
No. SA-17-CV-00317-XR, 2024 WL 390091 (W.D. Tex. Jan. 30, 2024) ...................... 32

*United States v. Science Applications Int'l Corp.*,
626 F.3d 1257 (D.C. Cir. 2010) ......................................................................... 51

*United States v. Stevens*,
605 F. Supp. 2d 863 (W.D. Ky. 2008) ........................................................... 35, 36

*United States v. Strock*,
982 F.3d 51 (2d Cir. 2020) ................................................................................ 44

*United States v. Triple Canopy, Inc.*,
857 F.3d 174 (4th Cir. 2017) ............................................................................. 45

*United States ex rel. Allen v. Alere Home Monitoring, Inc.*,
334 F. Supp. 3d 349 (D. Mass. 2018) ................................................................. 11

*United States ex rel. Carmen Medrano v. Diabetic Care RX, LLC*,
No. 15-CV-62617, 2018 WL 6978633 (S.D. Fla. Nov. 30, 2018) ................................ 48

*United States ex rel. Concilio De Salud Integral De Loiza, Inc. v. J.C. Remodeling, Inc.*,
962 F.3d 34 (1st Cir. 2020) ............................................................................... 51

*United States ex rel. David Jones v. Victory Automotive Group, LLC*,
Case No. 8:21-cv-1742-CEH-CPT ("Victory Automotive Action") .............................. 27

*United States ex rel. Ebu-Isaac v. INSYS Therapeutics, Inc.*,
No. 216CV07937JLSAJW, 2021 WL 3619958 (C.D. Cal. June 9, 2021)........................ 48

*United States ex rel. Ellsworth Assoc., LLP v. CVS Health Corp.*,
660 F. Supp. 3d 381 (E.D. Pa. 2023) .............................................................. 48, 49

*United States ex rel. Feldman v. van Gorp*,
697 F.3d 78 (2d Cir. 2012) ........................................................................... 51, 52

*United States ex rel. Garbe v. Kmart Corp.*,
824 F.3d 632 (7th Cir. 2016) ............................................................................. 46

*United States ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Fairfield Co.*,
5 F.4th 315 (3d Cir. 2021) ............................................................................ 35, 45

*United States ex rel. Integra Med Analytics, LLC v. Creative Sols. in Healthcare, Inc.*,

No. SA-17-CV-1249-XR, 2019 WL 5970283 (W.D. Tex. Nov. 13, 2019) ................... 44

*United States ex rel. Loughren v. Unum Grp.*,
613 F.3d 300 (1st Cir. 2010) ................................................................................. 43

*United States ex rel. Mackillop v. Grand Canyon Educ., Inc.*,
626 F. Supp. 3d 418 (D. Mass. 2022) ........................................................ 37, 38, 45

*United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*,
No. CV 15-13065-PBS, 2018 WL 4539684 (D. Mass. Sept. 21, 2018) .............. 11, 48, 49

*United States ex rel. Martino-Fleming v. S. Bay Mental Health Centers*,
No. 15-CV-13065-PBS, 2021 WL 2003016 (D. Mass. May 19, 2021) ......................... 48

*United States ex rel. Schutte v. SuperValu Inc.*,
598 U.S. 739 .................................................. 30, 31, 32, 33, 34, 35, 36, 37, 39, 40, 41, 42

*United States ex rel. Souza v. Embrace Home Loans, Inc.*,
No. 122CV00453JJMPAS, 2023 WL 4234967 (D.R.I. June 28, 2023) ......... 35, 36, 40, 41

*United States ex rel. Williams v. City of Brockton*,
No. 12-CV-12193-IT, 2016 WL 7429176 (D. Mass. Dec. 23, 2016) ............................ 47

*See United States ex rel. Winkelman v. CVS Caremark Corp.*,
827 F.3d 201 (1st Cir. 2016) ................................................................................. 52

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
579 U.S. 176 ........................................................ 10, 12, 17, 28, 31, 32, 43, 44, 45, 47

*Urquilla-Diaz v. Kaplan Univ.*,
780 F.3d 1039 (11th Cir. 2015) ............................................................................ 32

*Zabriskie v. Cleveland, Ohio, C., C. & C.R. Co.*,
64 U.S. 381 (1859) ................................................................. 14, 15, 27, 33, 39

## Statutes

15 U.S.C. § 634(b)(11) ........................................................................................ 8

15 U.S.C. § 636(a) ............................................................................................. 4

15 U.S.C. §§ 636(a)(36) ...................................................................................... 4

15 U.S.C. § 636(a)(36)(A)(ii) ........................................................................... 15, 27

15 U.S.C. § 636(a)(36)(A)(iv) ............................................................................. 27

15 U.S.C. § 636(a)(36)(A)(viii) .................................................................. 14, 17, 26, 27

15 U.S.C. § 636(a)(36)(A)(viii)(I)(aa) ................................................................ 15, 27

15 U.S.C. § 636(a)(36)(D)(i) ........................................................................5, 6, 15, 27

15 U.S.C.  § 636(a)(36)(D)(i)(I), (II) .................................................... 13, 15, 17, 23, 28

15 U.S.C.  § 636(a)(36)(D)(iv) .........................................................5, 14, 15, 17, 24, 26, 27

15 U.S.C.  § 636(a)(36)(D)(iv)(II) ........................................................................ 23, 24

15 U.S.C.  § 636(a)(36)(D)(iv)(III) ........................................................................ 16

15 U.S.C.  § 636(a)(36)(D)(v) ................................................................................ 14, 26

15 U.S.C. § 636(a)(36)(E)(i)(I)(aa)(AA) .................................................. 7, 14, 15, 17, 26, 27

15 U.S.C. § 636(a)(36)(F) ...............................................................................7, 17, 27

15 U.S.C. § 636(a)(36)(G) .................................................................................. 7, 8

15 U.S.C. §§ 636(a)(37) ...................................................................................... 4

15 U.S.C. §§ 636(m) ............................................................................................ 4

15 U.S.C.A. § 9012 .............................................................................................. 21

31 U.S.C. § 3729(a)(1)(A) .................................................................................. 9, 48

31 U.S.C. § 3729(a)(1)(B) .................................................................................. 9, 48

31 U.S.C. § 3729(b)(1)(A)(i)-(iii) ...................................................................... 30

31 U.S.C. § 3729(b)(1)(B) .................................................................................. 30

31 U.S.C. § 3729(a)(1)(G) .................................................................................. 9, 48

31 U.S.C. § 3729(b)(2)(A) .................................................................................. 10

31 U.S.C. § 3729(b)(3) ....................................................................................... 11

31 U.S.C. § 3729(b)(4) ....................................................................................... 43

31 U.S.C. § 3730(a) ............................................................................................ 9

31 U.S.C. § 3730 (b) ............................................................................... 9

42 U.S.C. § 1320a–7k(d)(4)(B) ............................................................ 11

R.I. Gen. Laws § 7-5.1-3 ....................................................................... 16

**Regulations**

*Business Loan Program Temporary Changes; Paycheck Protection Program*,
85 Fed. Reg. 20,811 (Apr. 15. 2020) .................................................. 21

*Business Loan Program Temporary Changes; Paycheck Protection Program*,
85 Fed. Reg. 20,817 (Apr. 15, 2020) .................................................. 21

*Business Loan Program Temporary Changes; Paycheck Protection Program—Additional
Eligibility Criteria & Requirements for Certain Pledges of Loans*,
85 Fed. Reg. 21,747 ............................................................................ 21

*Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—
Promissory Notes, Authorizations, Affiliation, and Eligibility*,
85 Fed. Reg. 23,450 (April 28, 2020) ................................................. 22

85 Fed. Reg. 20811 (III)(2)(S) ............................................................. 8

85 Fed. Reg. 33010 (III)(1)(c) ............................................................. 8

86 Fed. Reg. 3692 (January 14, 2021) ........................................... 4, 22

86 Fed. Reg. 8283 (Feb. 5, 2021) ......................................................... 4

Consolidated IFR, Part III, A, C.3, 86 Fed. Reg. 3692 ......................... 8

Consolidated IFR, Part III, A, C.3, 86 Fed. Reg. 3694 ......................... 8

Consolidated IFR, Part III, A, C.3, 86 Fed. Reg. 3707-3708 ................ 8

Consolidated IFR, Part III, B.1.a, 86 Fed. Reg. 3695 ........................... 5

Consolidated IFR, Part III, B.2.b., 86 Fed. Reg. 3695 ..................... 5, 22

Consolidated IFR, Part III, B.2.d., 86 Fed. Reg. 3698 ..................... 7, 22

Consolidated IFR, Part III, B.3.a. through b, 86 Fed. Reg. 3698-3697 ........................... 5

Consolidated IFR, Part III, B.3.d., 86 Fed. Reg. 3699 ........................... 7

Consolidated IFR, Part III, B.11, 86 Fed. Reg. 3692 ........................................... 7

Consolidated IFR, Part III, B.11, 86 Fed. Reg. 3704 ........................................... 7

Consolidated IFR, Part III, B.11, 86 Fed. Reg. 3705 ........................................... 7

*also* Consolidated IFR, Part III, B.11.c.ix., 86 Fed. Reg. 3705 .................................... 22

Consolidated IFR, Part III, B.12.ix, 86 Fed. Reg. 3692 ........................................ 7

Consolidated IFR, Part III, B.12.ix, 86 Fed. Reg. 3706 ........................................ 7

**Other Authorities**

IFR on Loan Forgiveness Requirements and Loan Review Procedures
("Loan Forgiveness IFR")
SBA FAQ Question 1 (published April 3, 2020) ............................................... 5

SBA FAQ Question 4 (published on April 6, 2020) ............................................ 5

SBA FAQ Question 5 (published on April 6, 2020) ............................................ 5

PPP First Draw Borrower Application Form,
available at https://www.sba.gov/document/sba-form-2483-ppp-first-draw-borrower-application-form ............................................................................................. 6

SBA Form 2483,
"Paycheck Protection Program Borrower Application Form" (April 2020) ..................... 6

SBA Standard Operating Procedure (SOP) 50 10 5(K), Subpart B, Chapter 2 ................. 7

PPP EZ Loan Forgiveness Application,
https://www.sba.gov/document/sba-form-3508ez-ppp-ez-loan-forgiveness-application-instructions ............................................................................................. 8

6A Fletcher Cyc. Corp. § 2821 ................................................................ 20

2019 SOP, Subpart B, Chapter 2 .............................................................. 27

Relator seeks summary judgment against the MSJ Defendants on the six issues and claims identified in his Motion for Partial Summary Judgment ("Motion").  There is no genuine dispute as to any material fact on these issues and claims, and summary judgment is thus appropriate as to Counts I-III of the Second Amended Complaint ("SAC") (ECF 28).[1]

## INTRODUCTION

In early 2020, as COVID-19 wreaked havoc on small businesses across the United States, Ocean State and Fyzical Holdings turned to taxpayers for help.  With New Harbor Capital's oversight, direction and control, these private equity-backed portfolio companies took millions in PPP loans.  PPP loans were aimed at protecting small businesses without access to other sources of capital or debt, such as money available from well-heeled backers.  Rather than let this taxpayer money go where it was intended, the MSJ Defendants that didn't need the money used their lawyers and banking connections and raided the piggy bank, preventing the small businesses that actually needed the money from getting the loans they deserved.  In their haste to "get to the front of the line" to get PPP money before the government funds ran out, as one New Harbor Capital principal put it, the MSJ Defendants ignored the PPP rules and requirements, warnings from government entities, and their own lawyers and deliberately blinded themselves as to whether Ocean State and Fyzical Holdings satisfied the conditions for PPP loan eligibility in the first place.

Then, a month after filing the PPP loan applications and taking the PPP funds, and at their lawyers' behest, the MSJ Defendants papered the file with the false and misleading PPP "business case" memos and Board consent documents crafted to retroactively make it look like they had a good faith belief that Ocean State and Fyzical Holdings were eligible for the PPP loans at the time

---

[1] Capitalized terms have the same meaning set forth in the Motion and in Relator's Statement of Undisputed Material Facts ("SUMF") in Support of Relator's Motion for Summary Judgment, unless otherwise defined herein.

they submitted the PPP applications.  They were not.  In the words of Tom Formolo, New Harbor Capital's founder and managing partner, the MSJ Defendants wanted to do anything "we need to do in order to keep this money."

Relator commenced this *qui tam* action in December 2020, alleging that the MSJ Defendants defrauded the government in violation of the FCA when they knowingly presented and caused to be presented false claims and records for payment to the government and used false records and statements that caused false claims to be paid by the government, in violation of the FCA.  As relevant to this Motion, the evidence conclusively shows that Ocean State and Fyzical Holdings violated the FCA by falsely and knowingly certifying compliance with the PPP size and affiliation rules, which was a condition for eligibility for the PPP loans, because, together with their affiliates, Ocean State and Fyzical Holdings each had more than 500 employees and no affiliation waiver applied.  The evidence also shows that Ocean State and Fyzical Holdings violated the FCA by falsely certifying in their PPP forgiveness applications that the loan proceeds were used to pay costs that were eligible for forgiveness and failed to repay the PPP loan funds that they were not entitled to receive.  The evidence also shows that New Harbor Capital is liable for causing the submission of false claims and records made by Ocean State and Fyzical Holdings because it oversaw, directed and controlled the conduct and operations of Ocean State and Fyzical Holdings both generally and with respect to the PPP loans.  The evidence also shows that the false certifications were material to the government's decision to pay the PPP loans.  As a matter of law, the measure of damages is the full value of the government's expenditures for the tainted PPP claims.  Finally, the evidence shows that the MSJ Defendants have failed to factually support their public disclosure bar defense as to these allegations and transactions.

## FACTS

As the material facts are set forth in the accompanying SUMF, Relator will not restate those facts in full here and, instead, will address each of his substantive arguments, in turn.

## ARGUMENT

### I.    Standard of Review

Rule 56(a) explicitly provides for partial summary-judgment motions directed towards not just claims and defenses but also parts of claims or defenses.  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment is appropriate even in cases where the moving party has the burden of proof, as long as "the evidence that [it] provides on that issue is conclusive." *Torres Vargas, et al. v. Santiago Cummings et al.*, 149 F.3d 29, 35 (1st Cir. 1998*); see also Photographic Illustrators Corp. v. Orgill, Inc*., 953 F.3d 56, 65 (1st Cir. 2020).

The law is clear and there is no genuine dispute of fact as to following issues: (1) Ocean State and Fyzical Holdings submitted false claims and records by falsely certifying compliance with the PPP size and affiliation rules and no affiliation waiver applied and then avoided obligations to repay the PPP funds; (2) Ocean State and Fyzical Holdings knowingly (i.e., with the requisite scienter) submitted false claims and records and avoided their obligations to repay the PPP funds; (3) Ocean State and Fyzical Holdings' false certifications of eligibility were material to the government's payment decision; (4) New Harbor Capital knowingly caused Ocean State and Fyzical Holdings to submit false claims and records and is thus liable under the FCA; (5) as a matter of law, the proper measure of damages for the MSJ Defendants' FCA violations is the entirety of the government's expenditures for claims resulting from the false PPP loan applications;

and (6) the MSJ Defendants have failed to factually support their public disclosure bar affirmative defense on these claims.

## II.    PPP Rules and Requirements

PPP loans were loans made in accordance with the terms, conditions and processes under the PPP. *See* 15 U.S.C. § 636(a).   There were two rounds, or draws, of PPP loans.  The first, which is the round relevant in this case, was provided under section 1102 of the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020) ("CARES Act"), to assist small businesses in the United States adversely affected by the COVID-19 pandemic in paying payroll costs and other eligible expenses.  The PPP was administered by the SBA as part of its "7(a) Loan Program" under § 7(a) of the Small Business Act.  *See* 15 U.S.C. § 636(a).   For PPP loans ("covered loans"), the lender may forgive, and the SBA may guarantee, the full principal amount, if certain criteria are met.  *See* 15 U.S.C. §§ 636(a)(36), (a)(37), and 636m.

To implement the PPP, the SBA issued regulatory interim final rules ("IFRs") in the Federal Register in 2020 and 2021, including the Consolidated IFR implementing updates to the PPP ("Consolidated IFR"), *see* 86 Fed. Reg. 3692 (January 14, 2021), and the IFR on Loan Forgiveness Requirements and Loan Review Procedures ("Loan Forgiveness IFR"), *see* 86 Fed. Reg. 8283 (Feb. 5, 2021).  The Consolidated IFR provides general rules governing covered loans and qualifying forgiveness of those loans, and the Loan Forgiveness IFR further details the SBA rules on qualifying forgiveness.  *Id.*

Lenders that participated in the PPP could make PPP loans, fully guaranteed by the SBA, to eligible recipients only under the specified terms, conditions and processes of the program.  An **"eligible recipient"** was an individual or entity that was eligible to receive a covered loan.  As

relevant here, a prospective recipient (or, applicant) was eligible to receive a first draw PPP loan if the applicant was a **"small business concern,"** which is defined as a business concern with 500 or fewer employees or that satisfies the relevant employee-based or revenue-based size standard for the industry in which the business operates. *See* Consolidated IFR, Part III, B.1.a, 86 Fed. Reg. 3695. *See also* 15 U.S.C. § 636(a)(36)(D)(i). However, certain types of small business concerns were ineligible for a first draw PPP loans even if they met the eligibility requirements in section B.1., including business concerns that were generally ineligible for § 7(a) SBA loans under 13 C.F.R. 120.110, except as otherwise permitted by the PPP rules. *See* Consolidated IFR, Part III, B.2.b., 86 Fed. Reg. 3695.

In counting employees, applicants were required to apply the SBA's **affiliation** rules under 13 C.F.R. 121.301(f). *See* Consolidated IFR, Part III, B.3.a. through b., 86 Fed. Reg. 3698-3697. *See also* SBA FAQ Question 5 (published on April 6, 2020). There were certain circumstances in which the affiliation rules did not apply. *See* 15 U.S.C. § 636(a)(36)(D)(iv). Specifically, the affiliation rules were waived with respect to eligibility of a PPP applicant that was one of the following: (i) a business concern within NAICS category 72 that has no more than 500 employees; (ii) a business concern **operating as a franchise** with a franchise identifier code assigned by SBA; or (iii) a business concern that receives financial assistance from a small business investment company licensed by SBA ("**SBIC**"). *Id.* It was the responsibility of the applicant to determine which entities (if any) were its affiliates and determine the employee headcount of the borrower and its affiliates. Lenders were permitted to rely on borrowers' certifications. *See* SBA FAQ Question 1 (published April 3, 2020) and Question 4 (published on April 6, 2020).

The PPP borrower application form, which all applicants were required to submit to be considered for a PPP loan, required the applicant to **certify** that "I have read the statements

included in this form … and I understand them." *See* PPP First Draw Borrower Application Form, available at https://www.sba.gov/document/sba-form-2483-ppp-first-draw-borrower-application-form. The PPP borrower application form also required the applicant to **certify** that "[t]he Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the [SBA] and the Department of the Treasury (Treasury) implementing the Paycheck Protection Program …" *Id.*

The PPP borrower application form also required the applicant to **certify** that, together with its affiliates (if applicable), it "employ[ed] not more than the greater of" 500 employees or a size standard set by the SBA for the business's industry. *Id. See also* 15 U.S.C. § 636(a)(36)(D)(i). The PPP borrower application form also required the applicant to **certify** that "[a]ll loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rules." *Id.* The PPP borrower application form also required the applicant to **certify** that "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects." *Id.*

The PPP borrower application form also required the applicant to **state** "Yes" or "No" if it, or any of its owners, is an owner of any other business, or has common management with, any other business. *Id.* If "Yes", the applicant was required to list all such businesses and describe the relationship on a separate sheet identified as addendum A. *See* SBA Form 2483, "Paycheck Protection Program Borrower Application Form" (April 2020). The applicant was also required to **state** "Yes" or "No" if it is a franchise that is listed in the SBA's Franchise Directory. *Id.*

As noted, certain business concerns were **ineligible** for PPP loans even if they met the size tests described above. Among the ineligible business concerns, business concerns primarily

6

engaged in the business of **investment** or speculation were ineligible.  *See* 13 C.F.R. §§ 120.110(b), (s); Consolidated IFR, Part III, B.2.d., 86 Fed. Reg. 3698; SBA Standard Operating Procedure (SOP) 50 10 5(K), Subpart B, Chapter 2.  As a result, hedge funds and **private equity firms** were ineligible for PPP loans: the SBA took the position that "[h]edge funds and private equity firms are primarily engaged in investment or speculation, and such businesses are therefore ineligible to receive a PPP loan."  *See* Consolidated IFR, Part III, B.2.d., 86 Fed. Reg. 3698.

SBA guidance (published April 28, 2020) instructed that private equity fund portfolio companies were potentially eligible for PPP loans, assuming they met the size standards (described above) and were not in an ineligible business.  *See* Consolidated IFR, Part III, B.3.d., 86 Fed. Reg. 3699.  However, the SBA guidance warned that the affiliation rules applied to private equity-owned businesses in the same manner as any other business and would generally cause other portfolio companies of the private equity fund to be aggregated for purposes of the size test.  *Id.*

The applicant's maximum PPP loan amount was 2.5 times the applicant's average monthly **payroll costs paid by the applicant**, up to $10 million.  *See* 15 U.S.C. § 636(a)(36)(E)(i)(I)(aa)(AA) (referencing "payments by the applicant for payroll costs incurred").  PPP loan proceeds could be used only for "eligible expenses," namely, "payroll costs" for employees (as defined in 15 U.S.C. § 636(a)(36)(A)(viii)), rent, interest on the business's mortgage, utilities, and other specified operations expenditures, subject to repayment and additional liability if the proceeds are misused.  *See* Consolidated IFR, Part III, B.11, 86 Fed. Reg. 3692, 3704-3705.  *See also* 15 U.S.C. § 636(a)(36)(F).

The application for a PPP loan required that the applicant attest to eligibility, verify certain financial information, and meet other legal qualifications.  *See* Consolidated IFR, Part III, B.12.ix, 86 Fed. Reg. 3692, 3706.  *See also* 15 U.S.C. § 636(a)(36)(G).  The SBA allowed lenders to rely

on applicants' certifications and documentation to determine whether to originate PPP loans. Similarly, the SBA allowed lenders to rely on loan recipients' certifications and documentation in determining whether to forgive PPP loans.  *See* Consolidated IFR, Part III, A, C.3, 86 Fed. Reg. 3692, 3694, 3707-3708.  *See also* 15 U.S.C. § 636(a)(36)(G).

The PPP loan forgiveness application form, which all recipients were required to submit to be considered for forgiveness of a PPP loan, required the PPP loan recipient to **certify** that "[t]he dollar amount for which forgiveness is requested … was used to pay costs that are eligible for forgiveness" such as payroll costs to retain employees.  *See* PPP EZ Loan Forgiveness Application, available at https://www.sba.gov/document/sba-form-3508ez-ppp-ez-loan-forgiveness-application-instructions.  The PPP loan forgiveness application form also required the PPP loan recipient to **certify** that "[t]he Borrower has accurately verified the payments for the eligible payroll and nonpayroll costs for which the Borrower is requesting forgiveness." *Id.*  The PPP loan forgiveness application form also required the PPP loan recipient to **certify** that "[t]he information provided in this application and the information provided in all supporting documents and forms is true and correct in all material respects." *Id.*

The SBA has the authority and discretion to review a PPP loan of any size at any time (including for borrower eligibility, loan amounts and use of proceeds and loan forgiveness amounts) and, when warranted, direct borrowers to repay funds used for unauthorized purposes. *See* 85 Fed. Reg. 33010 (III)(1)(c) and 85 Fed. Reg. 20811 (III)(2)(S); 15 U.S.C. § 634(b)(11).

### III.    Relator's False Claims Act Claims

The FCA allows either the Attorney General or private parties—called relators—to bring civil actions alleging fraud on the government.  31 U.S.C. § 3730(a), (b). The FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'"  *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp*., 360 F.3d 220, 225 (1st Cir. 2004).  The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the FCA.  *See United States v. Neifert-White Co*., 390 U.S. 228, 232-33 (1968) (the term "claim" is not limited to legally enforceable claims but includes all fraudulent attempts to cause government to pay out money).

Count I of the SAC arises under 31 U.S.C. § 3729(a)(1)(A), which penalizes any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  Relator alleges that that the MSJ Defendants violated this provision by submitting, and causing to be submitted, PPP loan applications that falsely certified compliance with the PPP size and affiliation rules and eligibility to receive the PPP loans.  *See* SAC, ¶¶ 187-219, 241-244.

Count II arises under 31 U.S.C. § 3729(a)(1)(B) and is closely related to Count 1.  This provision imposes liability on one who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  Relator alleges that the same conduct underlying Count I gives rise to Count II.  *Id*., ¶¶ 187-219, 245-248.

Count III alleges a "reverse false claim" theory under 31 U.S.C. § 3729(a)(1)(G), which imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the

9

Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." Relator alleges that the MSJ Defendants violated both clauses of this provision when they falsely certified or caused certifications in the loan forgiveness applications that the loan proceeds were used to pay costs that were eligible for forgiveness and failed to repay the PPP loan funds that they were not entitled to receive. *Id.*, ¶¶ 221-222, 227, 229-240, 250-253.

## IV.    The Court Should Grant Summary Judgment Against the MSJ Defendants on Relator's Claims Under 31 U.S.C. § 3729(a)(1)(A), (B) and (G)

To prevail on a claim under 31 U.S.C. § 3729(a)(1)(A) and (B) and recover damages, a relator must prove four elements: (1) there was a false claim; (2) made or carried out knowingly, that is, with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due. *See, e.g., Guilfoile v. Shields*, 913 F.3d 178, 187 (1st Cir. 2019) (discussing elements of a FCA claim); *United States v. Journey to Hope, Health & Healing, Inc.*, 728 F. Supp. 3d 251, 257–58 (D.R.I. 2024) (same). For purposes of the FCA, a "claim" includes "direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 182, 136 S. Ct. 1989, 1996, 195 L. Ed. 2d 348 (2016) (*citing* 31 U.S.C. § 3729(b)(2)(A)); *see also Guilfoile*, supra. "A 'non-submitting' entity that knowingly causes the submission of a false claim may be liable under the FCA even if the entity directly submitting the claim to the government lacks the requisite mental state." *Guilfoile*, supra (*quoting U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 389 (1st Cir. 2011)).

To prevail on a claim under clause 1 of section (a)(1)(G), a relator must prove that the defendant: (1) knowingly; (2) made, used, or caused to be made or used, a false record or statement; (3) that is material to; (4) an obligation to pay or transmit money or property to the government.

10

*See U.S. ex rel. Booker v. Pfizer, Inc*., 9 F. Supp. 3d 34, 48 (D. Mass. 2014). This provision also imposes liability for causing someone to make or use a false record or statement material to an obligation to pay money to the government.    *See U.S. v. Caremark, Inc*., 634 F.3d 808 (5th Cir. 2011). To prevail under clause 2 of section (a)(1)(G), a relator must prove the defendant: (1) knowingly; (2) concealed; or (3) knowingly and improperly avoided or decreased; (4) an obligation to pay or transmit money or property to the government. *See United States ex rel. Allen v. Alere Home Monitoring, Inc.*, 334 F. Supp. 3d 349, 354 (D. Mass. 2018); *Kane ex rel. United States v. Healthfirst, Inc*., 120 F. Supp. 3d 370, 394 (S.D.N.Y. 2015); *U.S. ex rel. Petras v. Simparel, Inc*., No. CIV.A. 13-2415 FLW, 2015 WL 337472, at *5 (D.N.J. Jan. 26, 2015).

The FCA defines the term "obligation" to mean "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C § 3729(b)(3). In general, an "overpayment" means any funds that a person or entity receives or retains to which that person or entity is not entitled. 42 U.S.C. § 1320a–7k(d)(4)(B). *See also United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc*., No. CV 15-13065-PBS, 2018 WL 4539684, at *6 (D. Mass. Sept. 21, 2018. For purposes of the second clause of section (a)(1)(G), the term "avoid" as used in that clause "includes behavior where an individual is put on notice of a potential issue, is legally obligated to address it, and does nothing." *Kane,* 120 F. Supp. 3d at 394. The avoidance clause does not require a false statement or record to be presented to the government. *See Petras*, 2015 WL 337472, at *5 n. 18.

**A. Ocean State and Fyzical Holdings *Falsely* Certified Compliance with the PPP Size and Affiliation Rules and Their Eligibility to Receive the PPP Loans and Then Falsely Certified that the PPP Funds Were Used to Pay Costs that were Eligible for Forgiveness and Avoided Their Obligation to Repay the Funds**

For purposes of Relator's claims under 31 U.S.C. § 3729(a)(1)(A), (B) and (G), the falsity element "encompasses ... fraudulent misrepresentations, which include certain misleading omissions," and it incorporates "the common-law meaning of fraud." *Escobar*, 579 U.S. at 186–87. The FCA does not require literal falsity; rather, "half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations" under the FCA. *Id.* at 188. As the Supreme Court explained in *Escobar*, a "seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road might bisect the property," makes a " 'tacit representation' " that the third road did not exist, resulting in "an actionable half-truth." *Id.* at 188–89 (*quoting Junius Constr. Co. v. Cohen*, 257 N.Y. 393, 178 N.E. 672, 674 (1931)). Likewise, the Supreme Court explained, "an applicant for an adjunct position at a local college makes an actionable misrepresentation when his resume lists prior jobs and then retirement, but fails to disclose that his "retirement" was a prison stint for perpetrating a $12 million bank fraud." *Id.* at 189 (citations omitted).

### 1. Ocean State

On April 3, 2020, Ocean State applied for a first draw PPP loan in the amount of $3,159,800, which loan was approved and paid. SUMF, ¶ 77. With its application, Ocean State claimed 277 employees—███████████████████████████████████████████ █████████████████████████████████████████████ and certified that it fell below the 500-employee threshold. *Id.*, ¶ 78.

Ocean State checked the "No" box in its PPP application in response to the question

whether any of Ocean State's owners was an owner of any other business, or had common management with, any other business, and failed to identify any such businesses and describe the relationship in an addendum A. *Id*., ¶ 81. Additionally, Ocean State certified that "[t]he Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the [SBA] and the Department of the Treasury (Treasury) implementing the Paycheck Protection Program …" *Id*., ¶ 82. Additionally, Ocean State certified in its PPP borrower application form that together with its affiliates (if applicable), it "employ[ed] not more than the greater of" 500 employees or a size standard set by the SBA for the business's industry. *Id*., ¶ 83. Additionally, Ocean State certified in its PPP borrower application form that "[a]ll loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rules." *Id*., ¶ 84. Additionally, Ocean State also certified "that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects." *Id*., ¶ 85.

Given Ocean State's affiliation with New Harbor Capital, together with its affiliates, Ocean State had more than 500 employees and it did not meet the SBA employee-based or revenue-based size standard. *Id*., ¶ 109. Absent waiver of the affiliation rules, Ocean State was not eligible for a PPP loan. *Id*., ¶ 110. *See also* 15 U.S.C. § 636(a)(36)(D)(i)(I), (II).

The MSJ Defendants claim that Ocean State qualified for a waiver of the affiliation rules and thus did not need to consider affiliates with respect to its PPP loan application because it received financial assistance from an SBIC-approved lender, Deerpath. *Id*., ¶ 111. That is wrong. Ocean State was the MSO that provided non-medical administrative and management services to the 23 separate and legally distinct medical practices—the Ocean State Companies—that were 100% owned by Dr. Crausman (not Ocean State) and for whom most of the employees claimed in

Ocean State's PPP borrower application form worked.  *Id.*, ¶ 112.  Ocean State entered into a Management Services Agreement ("MSA") with each of the 23 Ocean State Companies.  *Id.*, ¶ 113.  As the MSO, Ocean State merely "facilitated" payment of payroll costs incurred by the 23 separate Ocean State Companies and managed the business and non-medical tasks for the Ocean State Companies.  *Id.*, ¶ 114. Ocean State itself had only about a dozen employees; the rest of the 277 "employees" included in Ocean State's PPP loan application worked at the 23 Ocean State Companies.  *Id.*, ¶ 115.

Each of the 23 Ocean State Companies were the "business concerns" for whom the "employees" worked and that paid "payroll costs" under the PPP law, not Ocean State as the MSO. *See also* 15 U.S.C. § 636(a)(36)(A)(viii); 15 U.S.C. § 636(a)(36)(D)(v); 15 U.S.C. § 636(a)(36)(E)(i)(I)(aa)(AA).  By aggregating (or, combining) the Ocean State Companies' employees in its PPP borrower application, Ocean State—with New Harbor Capital's knowledge, direction and control—falsely and knowingly claimed eligibility for the PPP loan in the inflated amount of $3,159,800 and Ocean State did so because it was the entity (or, "business concern") with an SBIC loan.

As Ocean State and New Harbor Capital knew or should have known by virtue of being parties to the Deerpath loan documents, none of the 23 Ocean State Companies (each a separate "business concern") were parties to those loan documents, and thus did not qualify for the SBIC waiver of the affiliation rule and were ineligible for PPP loans given the affiliation rules.  SUMF, ¶ 116.  None of the 23 Ocean State Companies was a business concern that received financial assistance from a SBIC, and thus none qualified for the SBIC affiliation waiver.  *See* 15 U.S.C. § 636(a)(36)(D)(iv).

New Harbor Capital and Ocean State designed a complex ownership structure to create a

legal separateness between themselves and between Ocean State and the 23 Ocean State Companies to both comply with Corporate Practice of Medicine ("CPOM") laws and to limit liability. SUMF, ¶ 122. Ocean State and New Harbor Capital are presumed to know their organizational structure. *See, e.g., Zabriskie v. Cleveland, Ohio, C., C. & C.R. Co*., 64 U.S. 381, 398 (1859) ("[A] corporation cannot vary from the object of its creation, and [] persons dealing with a company must take notice of whatever is contained in the law of their organization."). With Ocean State's PPP loan application, however, Ocean State—with New Harbor Capital's knowledge, direction and control—disregarded the legal separateness of the 23 Ocean State Companies, falsely claimed payroll costs for the 277 employees included in its PPP borrower application form, and falsely claimed that it qualified for the SBIC affiliation waiver and was an "eligible recipient" for the "covered loan" it applied for and received. SUMF, ¶ 123. *See also* 15 U.S.C. § 636(a)(36)(A)(ii), (iv), (viii)(I)(aa); 15 U.S.C. § 636(a)(36)(D)(i); 15 U.S.C. § 636(a)(36)(D)(iv); 15 U.S.C. § 636(a)(36)(E)(i)(I)(aa)(AA).

This contrasts with another of New Harbor Capital's portfolio companies, Blueprint: unlike Ocean State, the Blueprint-entity that applied for the PPP loan was Blueprint Test Prep, LLC, which was the business concern that the employees worked for and that paid payroll costs. SUMF, ¶ 124. Unlike the 23 Ocean State Companies, Blueprint Test Prep, LLC was a party to the loan documents with SBIC lender Deerpath and thus received financial assistance from a SBIC lender. *Id*., ¶ 125.

As Ocean State and New Harbor Capital knew or should have known, just because Ocean State had MSAs with the 23 Ocean State Companies (which, again, were owned by Dr. Crausman, not Ocean State) does not mean that the employees of the 23 Ocean State Companies were Ocean State's employes for PPP purposes. As Ocean State and New Harbor Capital knew or should have

known, entering into a MSA between a professional entity owned by a licensed medical professional and a MSO does not result in the transfer of legal ownership by the professional, even though the MSO may control many aspects of the professional corporation's operations through the MSA or the professional corporation may be included in a consolidated federal income tax return filed by the MSO. *Cf. United States v. Giordano*, 898 F. Supp. 2d 440, 458 (D.R.I. 2012) (where the management agreement between Mt. St. Francis Health Center and Sterling Health Care Management Company provided Sterling with complete authority to manage and control all health care and financial aspects of the operation, but it did not transfer ownership).

Ocean State did not produce a copy of its MSAs with the 23 Ocean State Companies in this litigation; however, to comply with Rhode Island CPOM laws, those MSAs necessarily must provide for Ocean State's independent corporate existence and affairs and disclaim any ownership or employer-employee relationship between Ocean State and the 23 Ocean State Companies. *See, e.g.,* R.I. Gen. Laws § 7-5.1-3 (mandating that every officer, director and shareholder of a professional services corporation must be an individual authorized to practice such profession and be employed by the corporation in such practice). SUMF, ¶¶ 112-115, 126. At its core, the MSO model employed by Ocean State and New Harbor Capital is a contractual relationship between two parties: a physician-owned professional corporation ("PC") (here, each of the Ocean State Companies) and a non-professional corporate entity known as a MSO (here, Ocean State). As structured, the MSO provides managerial and administrative support services to the captive (or, friendly) PC in exchange for a fee. That is exactly the relationship that Ocean State and the Ocean State Companies had here.

Ocean State did not factually satisfy the conditions for the SBIC affiliation rule waiver for eligibility for a covered loan because it disregarded the legal separateness of Ocean State from the

23 Ocean State Companies and aggregated in its PPP borrower application the employees of the 23 separate Ocean State Companies, which did not receive financial assistance from an SBIC lender. *See* 15 U.S.C. § 636(a)(36)(D)(iv)(III). Thus, Ocean State did not factually satisfy the conditions for eligibility for a covered loan because, together with its affiliates, Ocean State had more than 500 employees and no affiliation waiver applied. *See* 15 U.S.C. § 636(a)(36)(D)(i)(I).

Moreover, even if Ocean State itself were eligible for a PPP loan by virtue of the SBIC affiliation waiver because it had a loan from a SBIC lender, it miscalculated the "maximum loan amount" it claimed by aggregating the employees of the 23 Ocean State Companies with its own. *See* 15 U.S.C. § 636(a)(36)(D)(iv); 15 U.S.C. § 636(a)(36)(E)(i)(I)(aa)(AA). Further, Ocean State misused the PPP loan proceeds because it did not use the proceeds only for "eligible expenses", namely, "payroll costs" for its own employees because it used the bulk of the proceeds for payroll costs incurred by the 23 Ocean State Companies, not Ocean State's own payroll costs as required. *See* 15 U.S.C. § 636(a)(36)(A)(viii); 15 U.S.C. § 636(a)(36)(F).

The PPP loan statute is not a substantial compliance law; either an applicant meets the eligibility requirements and complies with the statute, or it does not, and Ocean State did not. *See* 15 U.S.C. § 636(a)(36)(D)(i)(I), (II). *See also First Tennessee Bank Nat. Ass'n v. Johanns,* 618 F. Supp. 2d 778, 796–97 (M.D. Tenn. 2008) (holding that the concept of "substantial compliance" was not applicable to the SBA's regulations governing loan guarantees, emphasizing the need for strict adherence to the SBA's requirements).

At a minimum, Ocean State's claim for payment based on the SBIC affiliation waiver while at the same time aggregating employees of the separate 23 Ocean State Companies that didn't qualify for the SBIC wavier falls "squarely within the rule that half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be

actionable misrepresentations." *Escobar*, 579 U.S. at 188.  *See also Rock Island, Arkansas & Louisiana R.R. Co. v. United States*, 254 U.S. 141, 143, 41 S. Ct. 55, 56, 65 L. Ed. 188 (1920) (Holmes, J.) (warning that those who deal with the government must turn square corners).  By submitting its PPP application based on the SBIC affiliation waiver, Ocean State tacitly represented that all of the employees claimed in its application worked for an employer that qualified for the SBIC affiliation waiver.  By aggregating the Ocean State Companies' employees, Ocean State's certifications constituted misrepresentations.

By virtue of the above, Ocean State—with New Harbor Capital's knowledge, direction and control—falsely checked the "No" box in its PPP application in response to the question whether any of Ocean State's owners was an owner of any other business, or had common management with, any other business, and failed to identify all such businesses and describe the relationship in an addendum A.  SUMF, ¶ 81.  Additionally, Ocean State—with New Harbor Capital's knowledge, direction and control—falsely certified in its PPP borrower application form that "[t]he Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the [SBA] and the Department of the Treasury (Treasury) implementing the Paycheck Protection Program …"  *Id.*, ¶ 82.  Additionally, Ocean State—with New Harbor Capital's knowledge, direction and control—falsely certified in its PPP borrower application form that together with its affiliates (if applicable), it "employ[ed] not more than the greater of" 500 employees or a size standard set by the SBA for the business's industry.  *Id.*, ¶ 83.  Additionally, Ocean State—with New Harbor Capital's knowledge, direction and control—falsely certified in its PPP borrower application form that "[a]ll loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rules."  *Id.*, ¶ 84.  Additionally, Ocean State—with New Harbor Capital's knowledge, direction

and control—falsely and without good faith certified in its PPP borrower application form "that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects." *Id.*, ¶ 85.

In November 2020, Ocean State applied for forgiveness of its PPP loan, this time certifying in its forgiveness application that it used the loan exclusively for its own payroll costs (as opposed to those of the Ocean State Companies) and that it accurately verified the payments for the eligible payroll costs. *Id.*, ¶ 105. In June 2021, the SBA forgave Ocean State's PPP loan in the amount of $3,159,800. *Id.*, ¶ 106. Ocean State did not repay its PPP loan and neither Ocean State nor New Harbor Capital ever considered repaying the PPP money, despite Ocean State's clear obligation to repay the PPP funds to which it was not entitled. *Id.*, ¶ 107. Through such conduct, Ocean State falsely certified in its forgiveness application that it used the PPP loan funds to pay costs that were eligible for forgiveness, thereby dodging its obligation to return to the government money it paid out based on Ocean State's false claim, and, more generally, improperly retained and thus avoided its obligation to repay the PPP funds to which it was not entitled.

Accordingly, summary judgment should enter for Relator against Ocean State and New Harbor Capital as to the falsity element on Relator's claims under Subsections 3729(a)(1)(A), (B) and (G) and as to the avoidance and obligation elements on Relator's claims under Subsection 3729(a)(1)(G).

## 2. Fyzical Holdings

On April 3, 2020, Fyzical Holdings applied for a first draw PPP loan through in the amount of $3,076,600, which loan was approved and paid. SUMF, ¶ 127. In doing so, Fyzical Holdings claimed 226 employees— ███████████████████████████ ████████████████████████ and certified that it fell below the 500-employee threshold.

19

*Id.*, ¶ 128.

Fyzical Holdings checked the "No" box in its PPP application in response to the question whether any of Fyzical Holdings' owners was an owner of any other business, or had common management with, any other business, and failed to identify all such businesses and describe the relationship in an addendum A. *Id.*, ¶ 131. Additionally, Fyzical Holdings checked the "Yes" box in its PPP application in response to the question whether it is a franchise that is listed in the SBA's Franchise Directory. *Id.*, ¶132. Fyzical Holdings also certified in its PPP borrower application form that "[t]he Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the [SBA] and the Department of the Treasury (Treasury) implementing the Paycheck Protection Program …" *Id.*, ¶ 133. Additionally, Fyzical Holdings certified in its PPP borrower application form that together with its affiliates (if applicable), it "employ[ed] not more than the greater of" 500 employees or a size standard set by the SBA for the business's industry. *Id.*, ¶ 134. Additionally, Fyzical Holdings certified in its PPP borrower application form that "[a]ll loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rules." *Id.*, ¶ 135. Fyzical Holdings also certified in its PPP borrower application form "that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects." *Id.*, ¶ 136.

Fyzical Holdings—a holding company—is a passive business primarily involved in investment or speculation. *Id.*, ¶ 153 ("Fyzical Acquisition Holdings, LLC was formed as a holding company for investment in its subsidiaries."). The purpose of a holding company is to own investments, including other private businesses, and that is what Fyzical Holdings does.[2]

_____

[2] *See North American Co. v. Securities and Exchange Commission*, 327 U.S. 686, 701 (1946) ("The dominant characteristic of a holding company is the ownership of securities by which it is possible to control

On January 31, 1996, the SBA first declared certain types of businesses ineligible to participate in SBA lending programs (the "Original SBA Ineligibility Rule"). The Original SBA Ineligibility Rule is codified at 13 C.F.R. § 120.110 and prohibits "[f]inancial businesses primarily engaged in the business of lending, such as banks, finance companies, and factors" and "speculative businesses" among others, from receiving SBA-backed loans.   13 C.F.R. §§ 120.110(b), (s).

In 2019, the SBA issued its "Standard Operating Procedure for Lender and Development Company Loan Programs 50 10 5(K)" (the "2019 SOP"). In relevant part, the 2019 SOP explains that "certain business types" may be "ineligible" to participate in SBA loan programs. With respect to "Businesses Engaged in Lending", the 2019 SOP instructs that "SBA cannot guarantee a loan that provides funds to businesses primarily engaged in lending, investments, or to an otherwise eligible business engaged in financing or factoring" and that "[t]his prohibits SBA loans to … investment companies. 2019 SOP, Subpart B, Chapter 2. With respect to "Speculation", the 2019 SOP instructs that "[s]peculative businesses are not eligible." *Id*.

To implement the PPP, Congress mandated that the SBA Administrator issue, no later than

---

or substantially to influence the policies and management of one or more operating companies in a particular field of enterprise."); *see also Taber Partners, I v. Merit Builders, Inc*., 987 F.2d 57, 63 n. 9 (1st Cir. 1993) (discussing nature of holding companies that manage their assets in separate, legally distinct entities); *Allied Chem. Corp. v. United States*, 305 F.2d 433, 437 (Ct. Cl. 1962) (stating that the business of a holding company consists of conserving and protecting its holdings, influencing, or directing when it can, the management of the companies in which it holds stock, so as to increase the value of its holdings and the income to be derived therefrom, the collection of dividends, the advantageous disposition of stocks in companies with whose management it is not satisfied; or where it appears desirable to do so, and reinvesting the proceeds, etc.); 6A Fletcher Cyc. Corp. § 2821 ("A 'holding company' has a separate corporate existence and is to be treated as a separate entity, unless such corporate existence is a mere sham, or has been used as an instrument for concealing the truth, or where the organization and control are shown to be such as that it is but an instrumentality or adjunct of another corporation. So a holding company is generally held not to be doing or transacting business through its subsidiary where the separate corporate entities are maintained."). *Cf. A & I Realty Corp. v. Kent Dry Cleaners, Inc*., 61 Misc. 2d 887, 307 N.Y.S.2d 99 (Dist. Ct. 1969) (a holding company, not itself engaged in manufacturing, cannot claim the exemption from taxation allowed to a manufacturing corporation).

fifteen days after the enactment of the CARES Act, "regulations to carry out [title I of the Act] and the amendments made by this title without regard to the notice requirements under [5 U.S.C. § 553(b)]." 15 U.S.C.A. § 9012. Pursuant to this mandate, in April 2020, the SBA Administrator promulgated four interim rules about the PPP. *See Business Loan Program Temporary Changes; Paycheck Protection Program*, 85 Fed. Reg. 20,811 (Apr. 15. 2020) (to be codified at 13 C.F.R. pt. 120) (hereinafter "First Rule"); *Business Loan Program Temporary Changes; Paycheck Protection Program*, 85 Fed. Reg. 20,817 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120) (hereinafter "Second Rule"); *Business Loan Program Temporary Changes; Paycheck Protection Program—Additional Eligibility Criteria & Requirements for Certain Pledges of Loans*, 85 Fed. Reg. 21,747 (Apr. 20, 2020) (to be codified at 13 C.F.R. pt. 120) (hereinafter "Third Rule"); *Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—Promissory Notes, Authorizations, Affiliation, and Eligibility*, 85 Fed. Reg. 23,450 (April 28, 2020) (to be codified at 13 C.F.R. pts. 120 and 121) (hereinafter "Fourth Rule").

These four Rules were subsequently consolidated in the Consolidated IFR, *see* 86 Fed. Reg. 3692. Among other things, the First Rule provides that "[b]usinesses that are not eligible for PPP loans are identified in 13 CFR 120.110 and described further in [the 2019 SOP], Subpart B, Chapter 2." First Rule, III.2.c. *See also* Consolidated IFR, Part III, B.2.b., 86 Fed. Reg. 3695. Thus, *businesses engaged in investment or speculation were ineligible to receive PPP loans under the First Rule*. The Third Rule clarified that the term "ongoing operations" meant that the PPP loan funds were meant to be used to "maintain existing operations and payroll and not for business expansion." Third Rule, III.1.d.v. *See also* Consolidated IFR, Part III, B.11.c.ix., 86 Fed. Reg. 3705. The Fourth Rule further provides that "[h]edge funds and private equity firms are primarily engaged in investment or speculation, and such businesses are therefore ineligible to receive a PPP

loan. The Administrator, in consultation with the Secretary, does not believe that Congress intended for these types of businesses, which are generally ineligible for section 7(a) loans under existing SBA regulations, to obtain PPP financing." Fourth Rule, III.2.a. *See also* Consolidated IFR, Part III, B.2.d., 86 Fed. Reg. 3698. Thus, with the Forth Rule, the SBA clarified its position that business concerns that are primarily engaged in investment or speculation were ineligible to receive a PPP loan.

Here, as provided in the First Rule and the Fourth Rule, New Harbor Capital was ineligible for a PPP loan because it is a private equity firm primarily engaged in investment or speculation. For the same reason, Fyzical Holdings was ineligible for a PPP loan—regardless of whether it qualified for an affiliation waiver (it did not)—because as a holding company it is primarily engaged in investment or speculation.

Aside from being ineligible to receive a PPP loan by virtue of its status as a holding company primarily involved in investment or speculation, together with its affiliates, Fyzical Holdings had more than 500 employees and it did not meet the SBA employee-based or revenue-based size standard. SUMF, ¶ 155. Thus, absent waiver of the affiliation rules, Fyzical Holdings was not eligible for a PPP loan for the additional reason that it had more than 500 employees and it did not meet the SBA employee-based or revenue-based size standard. *Id*., ¶ 156. *See also* 15 U.S.C. § 636(a)(36)(D)(i)(I), (II).

Fyzical Holdings and New Harbor Capital claim that Fyzical Holdings qualified for a waiver of the affiliation rules and thus did not need to consider affiliates with respect to its PPP loan application because Fyzical Holdings "was a 'business operating as a franchise' within the meaning of the CARES Act because it was parent of the Fyzical franchise brand and its employees directly participated in running the franchise system, including in the operation of company-run

clinics." SUMF, ¶ 157.   They say nothing about Fyzical Holdings being ineligible because it is a holding company.   Further, as they knew or should have known, there is no support for their reasoning found in the PPP statute, in the SBA regulations, or in any relevant guidance from the SBA.   On top of being a holding company, Fyzical Holdings did not factually satisfy the conditions for the franchise affiliation waiver for eligibility for a covered loan and otherwise ran afoul of the PPP rules for a host of additional reasons.

**First**, as noted above, the franchise affiliation waiver applies to a "business concern" that is "operating as a franchise" that is assigned a franchise identifier code by the SBA.  *See* 15 U.S.C. § 636(a)(36)(D)(iv)(II).   The SBA's own regulations warn that a "business concern" means a single, distinct entity.  *See How Does SBA Define "Business Concern or Concern"?*, 13 C.F.R. § 121.105; s*ee also* SAC, ¶ 62 (discussing 13 C.F.R. § 121.301(f), which defines "affiliation" as one business concern controlling or having the power to control another).   Each Fyzical-entity in the so-called Fyzical "franchise-system" that Defendants refer to, including the "company-run clinics", is a separate and distinct legal entity and thus each entity is a separate "business concern" for purposes of the PPP affiliation waiver.  SUMF, ¶ 158.

**Second**, Fyzical Holdings did not factually satisfy the conditions for the affiliation rules waiver for eligibility for a covered loan because it was not "a business concern operating as a franchise."  *See* 15 U.S.C. § 636(a)(36)(D)(iv).   Rather, Fyzical Holdings is (and was) merely a holding company that has no operations of its own and has maybe around 10 employees of its own. SUMF, ¶ 159.   While the roughly 200 "Fyzical" franchisees could take advantage of the CARES Act waiver of affiliation for franchises, and did in fact apply for their own PPP loans, Fyzical Holdings itself did not sell any goods or services or operate under a franchise agreement and, therefore, was not an eligible small business concern for purposes of its PPP loan.  *Id.*, ¶¶ 160-166.

24

Moreover, the non-franchisee "company-run clinics" were managed by New Harbor Capital Fund II GP, LP—not Fyzical Holdings—pursuant to a Professional Services Agreement between New Harbor Capital Fund II GP, LP and another "Fyzical" entity, Fyzical Buyer, LLC.  *Id.*, ¶ 164. Simply put, Fyzical Holdings was merely a holding company and didn't "operate" anything.

*Third*, Fyzical Holdings claimed its PPP loan for its indirectly owned, *non-franchisee* "company-run clinics."  *Id.*, ¶ 165.  The "company-run clinics" are not franchisees but rather are 100% owned by Fyzical Buyer, LLC. *Id.*, ¶ 162.  For this additional reason, Fyzical Holdings was not a business concern operating as a franchise in connection with the separate and legal distinct clinics because they are not franchisees operating under a franchise agreement (that is, they were directly owned by one of Fyzical Holdings' subsidiaries and were thus also not "operating as a franchise").  *See Jenkins v. Haworth, Inc.,* 572 F. Supp. 591 (W.D. Mich. 1983) (distinguishing parent-subsidiary relationship from franchisor-franchisee relationship).

*Fourth*, even crediting Fyzical Holdings' assertion that it is the "parent of the Fyzical franchise brand", the SBA guidance in SBA FAQ Question 23 (published April 13, 2020) warned that "[i]f a franchise brand is listed on the SBA Franchise Directory, each of its *franchisees* that meets the applicable size standard can apply for a PPP loan.  (The franchisor does not apply on behalf of its franchisees.)") (Emphasis added).  Indeed, the majority of the roughly 200 "Fyzical" franchisees (as opposed to the "company-run clinics" that Fyzical Holdings indirectly owned) did apply for their own PPP loans and were eligible for the affiliation waiver because they were franchisees operating under a franchise agreement with another "Fyzical" entity, Fyzical, LLC. SUMF, ¶ 167.  There is no support for the notion that both a franchisor and its franchisees can apply for PPP loans.

*Fifth*, Fyzical Holdings is not even the Fyzical entity that enters into franchise agreements

25

with its franchisees. Fyzical, LLC is the franchisor. *Id.*, ¶ 167. As such, under no circumstances can Fyzical Holdings be said to have been acting or operating as a "franchisor" since it is not granting franchises to anyone. *See Jenkins*, 572 F. Supp. at 600 (parent corporation owning controlling interest in subsidiary was not acting as a "franchisor," since it did not grant anything to "another person.").

**Sixth**, even assuming Fyzical Holdings was a business concern operating as a franchise (it was not), it incurred minimal, if any, payroll costs of its own. The individual "company-run clinics" incurred the payroll for their own employees and then other Fyzical entities—Fyzical, LLC and FyzBiz, LLC—paid the payroll on behalf of those clinics, not Fyzical Holdings. SUMF, ¶ 168.

**Seventh**, each of the so-called "company-run clinics" were the "business concerns" for whom the "employees" worked and paid "payroll costs" under the PPP law, not Fyzical Holdings as a tertiary parent holding company. *See* 15 U.S.C. § 636(a)(36)(A)(viii); 15 U.S.C. § 636(a)(36)(D)(v); 15 U.S.C. § 636(a)(36)(E)(i)(I)(aa)(AA). By aggregating the separate clinics' employees in its PPP borrower application, Fyzical Holdings—with New Harbor Capital's knowledge, direction and control—falsely and knowingly claimed eligibility for the PPP loan in the inflated amount of $3,076,652 and Fyzical Holdings did so because the "company-run clinics" were not franchisees, and thus did not qualify for the franchise waiver of the affiliation rule and were ineligible for PPP loans given the affiliation rules.

**Eighth**, even if Fyzical Holdings itself were eligible for a PPP loan (it was not), it miscalculated the "maximum loan amount" it claimed by aggregating the employees of the "company-run clinics" with its own. *See* 15 U.S.C. § 636(a)(36)(D)(iv); 15 U.S.C. § 636(a)(36)(E)(i)(I)(aa)(AA). As stated above regarding Ocean State, nothing in the PPP statute,

26

the SBA regulations, or in any relevant guidance from the SBA suggest that related employers are aggregated and treated as a single employer for purposes of determining an employer's eligibility for and the amount of the PPP loan.

*Ninth*, again assuming Fyzical Holdings itself were eligible for a PPP loan (it was not), Fyzical Holdings misused the PPP loan proceeds because it did not use the proceeds only for "eligible expenses", namely, "payroll costs" for its own employees because it used the bulk of the proceeds for payroll costs incurred by the legally separate "company-run clinics", not Fyzical Holdings' own payroll costs as required.  *See* 15 U.S.C. § 636(a)(36)(A)(viii); 15 U.S.C. § 636(a)(36)(F).

*Tenth*, assuming Fyzical Holdings was operating as a franchise (it was not), it was not eligible for a franchise identifier code because it operated under a management agreement with a third-party, New Harbor Capital, who is affiliated with the franchisor.  SUMF, ¶ 169.  *See also* 2019 SOP, Subpart B, Chapter 2; 15 U.S.C. § 636(a)(36)(D)(iv)(II).

As with Ocean State, New Harbor Capital and Fyzical Holdings designed a complex ownership structure to create a legal separateness between themselves and between Fyzical Holdings and the "company-run clinics" to both comply with CPOM laws and to limit liability. SUMF, ¶ 171.  They are presumed to know their organizational structure.  *See Zabriskie*, 64 U.S. at 398.  With Fyzical Holdings' PPP loan, however, Fyzical Holdings—with New Harbor Capital's knowledge, direction and control—disregarded the legal separateness of the company-run clinics, falsely claimed payroll costs for the 226 employees included in its PPP borrower application form, and falsely claimed that it qualified for the franchise affiliation waiver and was an "eligible recipient" for the "covered loan" it applied for and received.  SUMF, ¶ 172.  *See* 15 U.S.C. § 636(a)(36)(A)(ii), (iv), (viii)(I)(aa); 15 U.S.C. § 636(a)(36)(D)(i); 15 U.S.C.  § 636(a)(36)(D)(iv);

15 U.S.C. § 636(a)(36)(E)(i)(I)(aa)(AA).

The conclusion that Fyzical Holdings was ineligible for its PPP loan because it was not a "small business concern" due to its size after inclusion of its affiliates and that the affiliation rules applied to Fyzical Holdings because it was not "operating as a franchise" with a franchise identifier code from the SBA is buttressed by the September 2023 settlement in a False Claims Act action filed in the United States District Court for the Middle District of Florida captioned *United States ex rel. David Jones v. Victory Automotive Group, LLC,* Case No. 8:21-cv-1742-CEH-CPT ("Victory Automotive Action"). SUMF, ¶ 173. In the Victory Automotive Action, the United States alleged that Victory Automotive Group, LLC ("VAG") provides management services to approximately 42 car dealerships ("Affiliates") located throughout the United States and that VAG obtained a PPP loan for $6,282,362 on or about April 3, 2020 (which coincidentally is the same day as Fyzical Holdings' PPP application). *Id.,* ¶ 174. In the September 2023 Settlement Agreement, VAG agreed that it was ineligible for the PPP loan because it was not a "small business concern" due to its size after inclusion of VAG's Affiliates. *Id.,* ¶ 175. The affiliation rules applied to VAG as it was not operating as a franchise with a franchise identifier code from SBA because VAG does not sell cars and does not operate under a franchise agreement. *Id.,* ¶ 176. Notwithstanding the size of VAG after inclusion of its Affiliates, VAG certified in its PPP loan application that the company was "eligible to receive a loan under the rules in effect at the time [the] application [was] submitted." *Id.,* ¶ 177. VAG agreed to pay $9 million plus $80,000 in attorney's fees to settle the Victory Automotive Action. *Id.,* ¶ 178.

Again, the PPP loan statute is not a substantial compliance law and Fyzical Holdings didn't even comply at all. *See* 15 U.S.C. § 636(a)(36)(D)(i)(I), (II). *See also First Tennessee Bank Nat. Ass'n,* 618 F. Supp. 2d at 796–97. At a minimum, Fyzical Holdings' claim for payment based on

28

the franchise affiliation waiver as an ineligible, non-franchisor holding company while at the same time aggregating the separate non-franchisee clinics' that also didn't qualify for the franchise wavier falls squarely within the rule that half-truths can be actionable.  *See Escobar*, 579 U.S. at 188.

By virtue of the above, Fyzical Holdings—with New Harbor Capital's knowledge, direction and control—falsely checked the "No" box in its PPP application in response to the question whether any of Fyzical Holdings' owners was an owner of any other business, or had common management with, any other business, and failed to identify all such businesses and describe the relationship in an addendum A.  SUMF, ¶ 131.  Additionally, Fyzical Holdings—with New Harbor Capital's knowledge, direction and control—falsely checked the "Yes" box in its PPP application in response to the question whether it is a franchise that is listed in the SBA's Franchise Directory.  *Id*., ¶ 132.  Additionally, Fyzical Holdings —with New Harbor Capital's knowledge, direction and control—falsely certified in its PPP borrower application form that "[t]he Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the [SBA] and the Department of the Treasury (Treasury) implementing the Paycheck Protection Program …"  *Id*., ¶ 133.  Additionally, Fyzical Holdings—with New Harbor Capital's knowledge, direction and control—falsely certified in its PPP borrower application form that together with its affiliates (if applicable), it "employ[ed] not more than the greater of" 500 employees or a size standard set by the SBA for the business's industry.  *Id*., ¶ 134.  Additionally, Fyzical Holdings—with New Harbor Capital's knowledge, direction and control—falsely certified in its PPP borrower application form that "[a]ll loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rules."  *Id*., ¶ 135.  Additionally, Fyzical Holdings—with New Harbor Capital's knowledge,

direction and control—falsely and without good faith certified in its PPP borrower application form "that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects." *Id*., ¶ 136.

In January 2021, Fyzical Holdings applied for forgiveness of its PPP loan, this time certifying that it used the loan exclusively for its own payroll costs to retain employees (as opposed to those of the separate company-run clinics) and that it accurately verified the payments for the eligible payroll costs.    *Id*., ¶ 149.  In June 2021, the SBA forgave Fyzical Holdings' PPP loan in the amount of $3,076,600.  *Id*., ¶ 150.  Fyzical Holdings did not repay its PPP loan and neither Fyzical Holdings nor New Harbor Capital ever considered repaying the PPP money, despite its clear obligation to repay the PPP funds to which they were not entitled.  *Id*., ¶ 151 . Through such conduct, Fyzical Holdings falsely certified in its forgiveness application that it used the PPP loan funds to pay costs that were eligible for forgiveness, thereby dodging its obligation to return to the government money it paid out based on Fyzical Holdings' false claim, and, more generally, improperly retained and thus avoided its obligation to repay the PPP funds to which it was not entitled.

Accordingly, summary judgment should enter for Relator against Fyzical Holdings and New Harbor Capital as to the falsity element on Relator's claims under Subsections 3729(a)(1)(A), (B) and (G) and as to the avoidance and obligation elements on Relator's claims under Subsection 3729(a)(1)(G).

## B.    Ocean State and Fyzical Holdings *Knowingly* Submitted False Claims and Records and Avoided Their Obligations to Repay the PPP Funds

The FCA defines the term "knowingly" as encompassing three mental states.  *See United States ex rel. Schutte v. SuperValu Inc*., 598 U.S. 739, 749–50, 143 S. Ct. 1391, 1399, 216 L. Ed. 2d 1 (2023).  A person either "has actual knowledge of the information," "acts in deliberate

ignorance of the truth or falsity of the information," or "acts in disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A)(i)-(iii).  Liability under the FCA can be established without a specific intent to defraud.  *See* 31 U.S.C. § 3729(b)(1)(B).  With this broad definition of "knowingly," Congress intended "'to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted.'"  *United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008); *see also United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997) (quoting legislative history stating that FCA was "intended to reach the 'ostrich-with-his-head-in-the sand problem'").

In *United States ex rel. Schutte v. SuperValu Inc.*, the Supreme Court specifically considered the mental state necessary to prove a FCA claim.  The Court noted that the text of the FCA tracks the common law scienter requirement for claims of fraud.  This connection is unsurprising, the Supreme Court said, considering the FCA is a fraud statute.  *Schutte*, 598 U.S. at 750.  *See also Escobar,* 579 U.S. at 187-188.  Further, the FCA's definition of "knowing" tracks the common law scienter standard for fraud.  *Schutte*, 598 U.S. at 751.

The Supreme Court further observed that per the language of the FCA and at common law, the FCA standard focuses primarily on what the defendant thought and believed at the time it submitted the claim.  *Id.* at 751, 755.  "Actual knowledge "refers to whether a person is "aware of" information.  *Id.* at 751; *see also Escobar*, 579 U.S. at 191.  "Deliberate ignorance" encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statements' truth or falsity.  *Id.* at 751 (citing *Global-Tech Appliances, Inc. v. SEB S. A.*, 563 U. S. 754, 769 (2011)).  And the term "reckless disregard" relates to defendants who are conscious of a substantial and unjustifiable risk that their claims are

false, but submit the claims anyway.  *Id.* (*citing Farmer v. Brennan*, 511 U.S. 825, 826 (1994)).

Recklessness under the FCA still includes an objective component after *Schutte*.  In *Schutte*, the Supreme Court noted that a defendant might be liable if it "act[ed] in the face of an unjustifiably high risk of illegality that was so obvious that it should have been known," even where there is no evidence that he was subjectively aware of that risk.  598 U.S. at 751 n.5.  The Court did not need to consider this form of recklessness in *Schutte* because that case was about whether a defendant's subjective knowledge matters if it offers a reasonable interpretation of an ambiguous regulation.  The existing FCA precedent is in accord.  *See, e.g., United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001) (holding that a provider's "claim that he did not know of the Medicare requirements does not shield him from liability" because "[b]y failing to inform himself of those requirements . . . he acted in reckless disregard or in deliberate ignorance"); *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 (11th Cir. 2015) (explaining that "circuits have uniformly described reckless disregard . . . as akin to an extension of gross negligence or an extreme version of ordinary negligence") (quotation marks omitted); *United States v. Peripheral Vascular Assocs., P.A.*, No. SA-17-CV-00317-XR, 2024 WL 390091, at *4 (W.D. Tex. Jan. 30, 2024) (noting that *Schutte* explicitly declined to foreclose objective recklessness and nothing in the case suggests that a defendant may bury its head in the sand and avoid FCA liability); *cf. Escobar*, 579 U.S. at 191 (explaining that recklessness would be satisfied if "a reasonable person would realize" the materiality of a condition).

### 1.    Ocean State

There is no genuine dispute that Ocean State and New Harbor Capital were "aware of a substantial risk" that Ocean State was submitting a false claim that misrepresented Ocean State's eligibility for a PPP loan and its compliance with the PPP rules and regulations, "but intentionally

avoid[ed] taking steps to confirm the statements' truth or falsity." *Schutte*, 598 U.S. at 751. It is also indisputable that Ocean State and New Harbor Capital were "conscious of a substantial and unjustifiable risk" that the claim was false, but Ocean State "submit[ed] the claim[] anyway." *Id*. The same is true with respect to Ocean State's forgiveness application and avoidance of its obligation to repay the PPP funds.

The MSJ Defendants assert that they "diligently investigated the applicable rules and requirements in order to ensure the lawfulness of their conduct" and that "[t]he boards of each company reviewed applicable regulations and supporting documentation prior to determining whether to approve the PPP loans and reached the same conclusion that the applications were lawful—including any New Harbor Capital employees or agents serving as board members of Ocean State, Fyzical, or [Blueprint Test Preparation, LLC]." SUMF, ¶ 117. Crediting those assertions, Ocean State and New Harbor Capital were aware of the rules and requirements of the PPP loan program, including those contained in the PPP statute, in the SBA regulations, or in any relevant guidance from the SBA, including the SBA FAQ's, the IFRs and the Consolidated IFR. None of these supports Ocean State and New Harbor Capital's decision to claim the SBIC affiliation waiver while at the same time aggregating employees of the 23 Ocean State Companies (none of which received financial assistance from a SBIC lender) for purposes of determining Ocean State's eligibility for and the amount of the PPP loan. Nothing in the PPP statute, the SBA regulations, or in any relevant guidance from the SBA suggests that related employers are aggregated and treated as a single employer for purposes of the PPP loan program.

Moreover, as noted, New Harbor Capital and Ocean State designed a complex ownership structure to create a legal separateness between themselves and between Ocean State and the 23 Ocean State Companies and they are presumed to know their organizational structure. *See*

*Zabriskie*, 64 U.S. at 398.  Despite that knowledge, Ocean State and New Harbor Capital disregarded the legal separateness of the 23 Ocean State Companies, falsely claimed payroll costs for the 277 employees included in Ocean State's PPP borrower application form, and falsely claimed that Ocean State qualified for the PPP loan and they did so because Ocean State was the entity that received financial assistance from a SBIC lender.  SUMF, ¶¶ 79, 80, 123.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ SUMF, ¶¶ 74-76.  If Ocean State and New Harbor Capital were warned then they were "aware of a substantial risk that [Ocean State's] statements are false, but intentionally avoid[ed] taking steps to confirm the statements' truth or falsity," they were deliberately ignorant.  *Schutte,* 598 U.S. at 751.  ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ SUMF, ¶¶ 74-76.  Ocean State and New Harbor Capital acted with "reckless disregard" if they were "conscious of a substantial and unjustifiable risk that [Ocean State's] claims are false, but submit[ed] the claims anyway."  *Schutte,* 598 U.S. at 751.  It cannot be genuinely disputed that Ocean State submitted a false claim misrepresenting Ocean State's eligibility for and compliance with the PPP loan rules and requirements while conscious that there was at least a substantial risk that the claim was false, but ignored that risk and submitted the claim anyway.

At a minimum, Ocean State and New Harbor Capital delegated authority for analyzing whether it was appropriate to aggregate the Ocean State Companies' employees to Ocean State's nominal CFO, Sarah Charette, who was not qualified to handle the task and testified that she came

up with the 277 employees included in Ocean State's PPP borrower application form by simply looking at Ocean State's payroll reports (which included the employees of the 23 Ocean State Companies for which Ocean State facilitated payroll payment). SUMF, ¶¶ 95-96, 118-119. Ocean State and New Harbor Capital then relied on a one-page generic form letter from Ocean State's lender, Deerpath, to claim that Ocean State qualified for the SBIC affiliation waiver without conducting (or at least identifying in this litigation) any further investigation or analysis of their own. *Id.*, ¶ 120. The letter was addressed to Ocean State's PPP lender and simply said that the "Applicant" has received financial assistance from Deerpath; the letter said nothing specific about Ocean State or about the separate 23 Ocean State Companies receiving financial assistance from Deerpath (which they did not) or about the legality of Ocean State aggregating the employees of the 23 Ocean State Companies for purposes of determining Ocean State's eligibility for and the amount of the PPP loan. *Id.*, ¶ 121.

As this Court recently held in another FCA case, *United States ex rel. Souza v. Embrace Home Loans, Inc.,* No. 122CV00453JJMPAS, 2023 WL 4234967, at *4 (D.R.I. June 28, 2023), Ocean State and New Harbor Capital, on one hand, cannot claim to know and have complied with PPP rules and requirements while, on the other hand, submitted a PPP loan application that led to Ocean State's receipt of a PPP loan that Ocean State was not eligible to receive under the PPP rules and requirements. The evidence shows that Ocean State submitted, and New Harbor caused to be submitted, a claim for a PPP loan for which Ocean State was not eligible, despite Ocean State certifying its eligibility and compliance with the relevant PPP rules and requirements Ocean State's certifications of compliance were, at least, ignoring a "substantial risk" that it was not eligible to receive a PPP loan and that its certifications of eligibility and compliance were false. *See Souza*, supra (*citing Schutte*, 598 U.S. at 757).

Likewise, if Ocean State and New Harbor Capital claim to have known and have complied with the PPP rules and requirements while failing to catch the eligibility and compliance issues, then they at least ignored a "substantial risk" that their evaluation of its eligibility and certifications was inadequate.  *Id*.   And by delegating responsibility to Ms. Charette, and then relying on the form Deerpath letter, Ocean State and New Harbor Capital acted in reckless disregard.  *See United States ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Fairfield Co*., 5 F.4th 315, 348-49 (3d Cir. 2021) (company "recklessly delegated to unknowledgeable individuals the responsibility for ensuring that employees were properly classified"); *United States v. Stevens*, 605 F. Supp. 2d 863, 869 (W.D. Ky. 2008) (granting summary judgment for Government where undisputed evidence showed defendant had delegated complete control over billing to a person with no medical billing experience, which was sufficient to demonstrate reckless disregard).   Indeed, crediting Ocean State and New Harbor Capital's own interrogatory answers, there can be no genuine dispute that they knew that Ocean State was falsely applying for a PPP loan because of their professed investigation and knowledge of the PPP rules and requirements and their knowledge of Ocean State's own corporate structure.  *See Souza*, supra.

To the extent Ocean State and New Harbor Capital would seek to rely on communications with counsel to negate scienter, this would not help them for several reasons.  ***First***, ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████SUMF, ¶¶ 74-76.

***Second***, ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████ *Id.,* ¶¶ 91-94.  As

the Supreme Court noted in *Schutte*, scienter is determined by looking to Ocean State's subjective

belief only "at the time [it] submitted [its] claim[]," not "post hoc interpretations that might have

rendered [its] claim[] accurate."  598 U.S. at 752.  Subsequently learned facts or analysis are

insufficient to save a then-subjectively unreasonable belief as to the falsity of a claim.[3]

    ***Third***, ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ SUMF, ¶ 93.

    ***Fourth***, Ocean State and New Harbor Capital have represented to Relator, to the Court and

to the First Circuit that they are not relying on an advice of counsel defense to defeat the scienter

element.  *See, e.g.*, ECF 58, ECF 59, ECF 63.  But even if they were, this defense would not help.

In order to assert that defense, Ocean State would need to establish that:

> (1) ***before*** taking action, (2) [they] in ***good faith*** sought the advice
> of an attorney whom [they] considered competent, (3) for the
> purpose of securing advice on the lawfulness of [their] possible
> ***future*** conduct, (4) and made a ***full and accurate report*** to [their]
> attorney of all material facts which the defendant[s] knew, (5) and
> ***acted strictly in accordance*** with the advice of [their] attorney who
> had been given a full report.

*United States v. Gorski,* 36 F. Supp. 3d 256, 267 (D. Mass. 2014) (*quoting Liss v. United States*,

915 F.2d 287, 291 (7th Cir.1990) (emphasis added)); *see also Any v. United States*, 47 F.3d 1156,

---

[3] It bears note that the MSJ Defendants' attorney communications and efforts to paper the file came years prior to the Supreme Court's *Schutte* decision.  Prior to *Schutte*, FCA defendants routinely raised the objectively reasonable interpretation defense where the defendant would claim that even though its claim might have been false, it believed it was accurate based on an objectively reasonable interpretation of the relevant laws or regulations, essentially arguing that a reasonable person in the defendant's position would have understood the claim as truthful, despite it being ultimately incorrect.  That is exactly what the MSJ Defendants and their attorneys were doing.  The *Schutte* decision eliminated this defense, meaning a defendant's liability under the FCA is now primarily based on their subjective belief about the claim's truthfulness, not a post hoc objective standard argument.

at *4 (1st Cir.1995) (*citing Liss* with approval) (table decision); *United States ex rel. Mackillop v. Grand Canyon Educ., Inc*., 626 F. Supp. 3d 418, 453 (D. Mass. 2022) (discussing advice of counsel defense in a FCA case).

Here, again, 

So, even assuming good faith (rather than papering the file), Ocean State and New Harbor Capital cannot satisfy the first and third elements.  As to the fourth element,

SUMF, ¶¶ 74-76.  And as to the fifth element,

SUMF, ¶¶ 93-94, 75, 104, 140.  *See also Mackillop*, 626 F. Supp. 3d at 453 (evidence of FCA defendant ignoring attorney advice would demonstrate reckless disregard).

The same is true with respect to Ocean State's PPP forgiveness application and failure to repay the PPP funds.  Even assuming Ocean State and New Harbor Capital did not have the requisite scienter of the illegality of Ocean State's PPP application when it was filed (which they did), they plainly knew or should have known of illegality at the time of Ocean State's loan forgiveness application.  *See Sturgeon v. Pharmerica Corp*., 438 F. Supp. 3d 246, 281 (E.D. Pa. 2020) (reverse false claims act provision applies to two situations distinct from fraudulently obtaining payment in the first place, namely where unknowingly submit a false claim, discover it later and do not repay, and where receive money incrementally based on an estimate and retain

38

money overpaid during the estimate process). Ocean State and New Harbor Capital could have and should have repaid the PPP loan. They chose not to do so.

Accordingly, summary judgment should enter for Relator against Ocean State and New Harbor Capital as to scienter on Relator's claims under Subsections 3729(a)(1)(A), (B) and (G).

### 2. Fyzical Holdings

As with Ocean State, there is no genuine dispute that Fyzical Holdings and New Harbor Capital were "aware of a substantial risk" that Fyzical Holdings was submitting a false claim that misrepresented Fyzical Holdings' eligibility for a PPP loan and its compliance with the PPP rules and requirements, "but intentionally avoid[ed] taking steps to confirm the statements' truth or falsity." *See Schutte*, 598 U.S. at 751. It is also indisputable that Fyzical Holdings and New Harbor Capital were "conscious of a substantial and unjustifiable risk" that the claim was false, but Fyzical Holdings "submit[ed] the claim[] anyway." *Id*. The same is true with respect to Fyzical Holdings' forgiveness application and avoidance of its obligation to repay the PPP funds.

Again, the MSJ Defendants assert that they were aware of the rules and requirements of the PPP loan program, including those contained in the PPP statute, in the SBA regulations, and in the relevant guidance from the SBA, including the SBA FAQ's, the IFRs and the Consolidated IFR. SUMF, ¶ 154. Thus, Fyzical Holdings and New Harbor Capital knew or should have known that Fyzical Holdings was ineligible for a PPP loan because as a holding company it is primarily engaged in investment or speculation and for the myriad other reasons stated above. *See supra* at p. 23-29.

Moreover, as with Ocean State, New Harbor Capital and Fyzical Holdings designed a complex ownership structure to create a legal separateness between themselves and between Fyzical Holdings and the company-run clinics and they are presumed to know their organizational

structure.  *See Zabriskie*, 64 U.S. at 398.  Despite that knowledge, Fyzical Holdings and New Harbor Capital disregarded the legal separateness of Fyzical Holdings and the company-run clinics, falsely  claimed payroll costs for the 226 employees included in Fyzical Holdings' PPP borrower application form, falsely claimed that Fyzical Holdings was a franchise (as opposed to a holding company) and falsely claimed that Fyzical Holdings qualified for the PPP loan.  SUMF, ¶¶ 128, 165, 171, 172.

The MSJ Defendants assert that Fyzical Holdings claimed payroll costs for the 226 employees included in its PPP borrower application form based on its status as the "franchise brand" that is the tertiary parent for the company-run clinics that "owns all of the money underneath it." *Id*., ¶¶ 157, 165, 172, 172.  But none of these supports Fyzical Holdings' decision to claim the franchise affiliation waiver while at the same time aggregating employees of the non-franchisee company-run clinics for purposes of determining Fyzical Holdings' eligibility for and the amount of the PPP loan.  Nothing in the PPP statute, the SBA regulations, or in any relevant guidance from the SBA suggests that a parent and its tertiary subsidiaries are aggregated and treated as a single employer for purposes of the PPP loan program.

As with Ocean State, Fyzical Holdings and New Harbor Capital, on one hand, cannot claim to know and have complied with PPP rules and requirements while, on the other hand, submitted a PPP loan application that led to Fyzical Holdings' receipt of a PPP loan that Fyzical Holdings was not eligible to receive under the PPP rules and requirements.  *See* p. 23-29 supra.  The evidence shows that Fyzical Holdings and New Harbor Capital submitted and caused to be submitted a claim for a PPP loan for which Fyzical Holdings was not eligible, despite certifying its eligibility and compliance with the relevant PPP rules and requirements.  Fyzical Holdings and New Harbor Capital's certifications of compliance were, at least, ignoring a "substantial risk" that Fyzical

Holdings was not eligible to receive a PPP loan and that its certifications of eligibility and compliance were false.  *See Souza*, 2023 WL 4234967, at *4 (*citing Schutte*, 598 U.S. at 757). Likewise, if Fyzical Holdings and New Harbor Capital claim to have known and have complied with the PPP rules and requirements while failing to catch the eligibility and compliance issues, then they at least ignored a "substantial risk" that their evaluation of Fyzical Holdings' eligibility and certifications was inadequate.  *Id.*

Indeed, Fyzical Holdings and New Harbor Capital's claim that Fyzical Holdings qualified for the affiliation waiver based on its status as the tertiary parent for the non-franchisee company-run clinics is absurd on its face and thus objectively reckless for all the myriad reasons stated above at p. 23-29 supra.  An FCA defendant cannot bury its head in the sand and avoid FCA liability in the face of overwhelming evidence that its submissions to the government contained false statements.  *See Schutte*, 598 U.S. at 751 n.5.  And, crediting Fyzical Holdings and New Harbor Capital's own interrogatory answers, there can be no genuine dispute that they knew that Fyzical Holdings was falsely applying for a PPP loan because of their professed investigation and knowledge of the PPP rules and requirements and their knowledge of Fyzical Holdings' own corporate structure.  *See Souza*, supra.

To the extent Fyzical Holdings and New Harbor Capital would seek to rely on communications with counsel to negate scienter, like with Ocean State, this would not help them for several reasons.  ***First***, █████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████ SUMF, ¶ 137. ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████ SUMF, ¶ 138.  Clearly, as of this date, Mr. Formolo was aware of the risk

of Fyzical Holdings' non-eligibility for the PPP loan it had already taken.

*Second*, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ *Id*.,

¶¶ 139-143. ████████████████████████████████████████████████

████████████████████████████████████ *See Schutte*, 598 U.S. at 752.

*Third*, █████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████ SUMF, ¶ 138. ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

*Fourth*, as noted above with Ocean State, the advice of counsel defense requires that five

elements be met: (1) before taking action; (2) Fyzical Holdings and New Harbor Capital in good

42

faith sought ███████ advice; (3) for the purpose of securing advice on the lawfulness of their possible future conduct; (4) and made a full and accurate report to ███████ of all material facts which they knew; and (5) acted strictly in accordance with the advice of ███████ who had been given a full report. *See Gorski*, 36 F. Supp. 3d at 267. ███████████████

██████████████████████████████████████████████████████. So, they can't satisfy the first and third elements. As to the fourth and fifth elements, ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ SUMF, ¶¶ 137-143.

And the same is true with respect to Fyzical Holdings' PPP forgiveness application and failure to repay the PPP funds. Even assuming Fyzical Holdings and New Harbor Capital did not have the requisite scienter of the illegality of Fyzical Holdings' PPP application when it was filed, they plainly knew or should have known of illegality at the time of Fyzical Holdings' loan forgiveness application. *See Sturgeon*, 438 F. Supp. 3d at 281. Fyzical Holdings and New Harbor Capital could have and should have repaid the PPP loan. They chose not to do so.

Accordingly, summary judgment should enter for Relator against Fyzical Holdings and New Harbor Capital as to scienter on Relator's claims under Subsections 3729(a)(1)(A), (B) and (G).

### C.    Ocean State and Fyzical Holdings' False Certifications Were *Material* to the Government's Payment Decision and to Their Payment Obligations

The FCA also requires proof of materiality—meaning whether the alleged misrepresentations had the natural tendency to influence the (1) payment or (2) receipt of funds— and the involvement of federal funds. *See Guilfoile*, 913 F.3d at 187; *United States ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 307 (1st Cir. 2010). The FCA defines "material" as

"having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). "What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Escobar*, 579 U.S. at 181.

The government's identification of a requirement as a condition of payment or receipt is key to the evaluation of materiality. While the Supreme Court in *Escobar* stated that this factor was not dispositive, it will often overlap with other factors, for the very reason that it is identified as a condition of payment. For example, where such a requirement goes "to the very essence of the bargain" between the government and the defendant, the Supreme Court has said it weighs heavily in favor of materiality. *See U.S. ex rel. Escobar v. Universal Health Services, Inc.*, 842 F.3d 103, 110 (1st Cir. 2016) (*quoting Escobar*, 579 U.S. at 193).[4]

Here, as a condition of payment and receipt of a PPP loan, and of forgiveness, the borrower was required to attest to eligibility, verify certain financial information, and meet other legal qualifications. As relevant to this Motion, that meant that Ocean State and Fyzical Holdings were required to certify that together with their affiliates they had no more than 500 employees and were otherwise eligible to receive a PPP loan. *See supra*, p. 5-6. Without those certifications, Ocean

---

[4] *See, e.g., U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.*, 44 F.4th 838 (9th Cir. 2022) (certification is material if the requirement is so central to the claims that the government would not have paid the claims if it had known); *United States v. Strock*, 982 F.3d 51, 114 Fed. R. Evid. Serv. 84 (2d Cir. 2020) (explaining that misrepresentation to obtain a contract "undergirds" the subsequent decision to pay claims under the contract) (*citing U. S. ex rel. Marcus v. Hess*, 317 U.S. 537, 543, 63 S. Ct. 379, 87 L. Ed. 443 (1943)); *U.S. ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822 (6th Cir. 2018) (designation of requirement as a condition of payment is a relevant factor in determining materiality, timing requirement for certification for home health care was a fraud prevention device and went to the heart of the bargain); *United States ex rel. Integra Med Analytics, LLC v. Creative Sols. in Healthcare, Inc.*, No. SA-17-CV-1249-XR, 2019 WL 5970283, at *7 (W.D. Tex. Nov. 13, 2019) (statutory requirements satisfied inference that Government would deny payment if it knew of the alleged violations); *U.S. ex rel. Brooks v. Stevens-Henager College*, 305 F. Supp. 3d 1279 (D. Utah 2018) (decision to condition eligibility on promise to comply with regulation is strong evidence that government attached importance to that promise which was supported by legislative and regulatory history and requirement of annual certification of compliance and defendant's efforts to conceal violation).

State and Fyzical Holdings would not have received, and the government would not have paid, the PPP loans.  Then, for forgiveness, they were required to certify that they used the loans exclusively for their own payroll costs to retain employees and that they accurately verified the payments for the eligible payroll costs.  *See* supra, p. 8.

Further, the MSJ Defendants knew that compliance with the PPP rules and requirements was material.  According to them, they fully investigated the PPP rules and requirements and then they crafted their business case memos and board consents in an effort to paper the file and show compliance.  The MSJ Defendants' conduct further proves the materiality of the various PPP certifications.  *See, e.g., United States ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98*, 5 F.4th at 345 (defendant's actual knowledge that compliance was a de facto requirement of continued eligibility relevant to materiality*); United States v. Triple Canopy, Inc*., 857 F.3d 174, 178 (4th Cir. 2017) (defendant's own actions in covering up noncompliance relevant to materiality); *Aldridge on Behalf of United States v. Corp. Mgmt., Inc*., No. 1:16-CV-369 HTW-LGI, 2021 WL 2518221, at *14 (S.D. Miss. June 18, 2021), *aff'd*, 78 F.4th 727 (5th Cir. 2023), cert. denied, 144 S. Ct. 694 (2024) (defendants' fabrication of information supported they were aware of materiality of information to Government).

The government's action in the Victory Automotive Action also shows that noncompliance with the PPP size and affiliation rules, being a threshold eligibility requirement, is material to the government's payment decision.  *See, e.g., United States v. Luce*, 873 F.3d 999, 1008-09 (7th Cir. 2017) (considering as part of its materiality analysis that a defendant's misrepresentation concerned a "threshold eligibility requirement that, by extension, was tied to every" claim).  There, the government took action in a strikingly similar fact pattern to Fyzical Holdings to recover the PPP funds because the affiliation rules applied to VAG because—just like Fyzical Holdings—it was

not operating as a franchise with a franchise identifier code from SBA because VAG does not sell -cars and does not operate under a franchise agreement. *See* supra. p. 28-29.

Another factor that shows materiality is the magnitude and substantiality of the MSJ Defendants' violations. *See Escobar*, 579 U.S. at 194; *see also Mackillop*, 626 F. Supp. 3d at 451. The MSJ Defendants took millions of dollars in government PPP money that they were not entitled to take.

The fact that Ocean State, on its own, might have qualified for a PPP loan covering its own employees based on the SBIC affiliation waiver does not offer it any solace. For purposes of materiality, a misstatement regarding the payment or receipt of more money than actually owed is sufficient to establish materiality. *See United States ex rel. Garbe v. Kmart Corp.,* 824 F.3d 632, 639 (7th Cir. 2016). *Cf. U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 471 (5th Cir. 2009) (false statements in phase one grant taint phase two grant, which was predicated on phase one grant). By aggregating the employees of the separate Ocean State Companies, Ocean State received, and the government paid, more money than Ocean State was entitled to receive. That is sufficient to establish materiality. Ocean State falsely submitted a tainted claim that was capable of influencing the payment or receipt of money, which is all that is required for materiality.

The fact that the government did not direct Ocean State or Fyzical Holdings to repay the PPP loans also does not negate materiality. As an initial matter, ███████████████

████████████████████████████████████████████████████████

███████. SUMF, ¶ 79. ██████████████████████████████

████████████████████████████████████████████████. *Id.*, ¶ 80. ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████ *Id.*, ¶¶ 129-130.  Moreover, the SBA did not conduct a manual review of the loans, so there is no evidence that it was even aware of any potential issues concerning Ocean State and Fyzical Holdings' PPP loans.  *Id.*, ¶¶ 108, 152.  And as the First Circuit and other courts have recognized, the government's awareness of *allegations* of noncompliance is not the same as *actual* awareness of noncompliance.  *See Escobar,* 842 F.3d at 106; *United States ex rel. Williams v. City of Brockton*, No. 12-CV-12193-IT, 2016 WL 7429176, at *6 (D. Mass. Dec. 23, 2016).  Further, even if the government is aware of the misrepresentation in a particular case, continued payment of claims may occur for a number of reasons.  *See United States v. Aegerion Pharms., Inc*., No. 13-CV-11785-IT, 2019 WL 1437914, at *7 (D. Mass. Mar. 31, 2019); *Williams*, 2016 WL 7429176, at *6.

Likewise, the fact that the government did not intervene in this case does not negate materiality.  The First Circuit and other courts have consistently rejected the contention that the government's decision not to intervene in a case demonstrates lack of materiality.  *See Escobar*, 842 F.3d at 112 (holding that the relators had sufficiently pleaded materiality, without reference to the government's declination of intervention).  *See also U.S. ex rel. Taylor v. Boyko*, 39 F.4th 177, 194 (4th Cir. 2022) ("While the Government's decision to 'immediately intervene[]' tends to demonstrate materiality, …the inverse is not true."); *United States ex rel. Prather v. Brookdale Senior Living Communities, Inc*., 892 F.3d 822, 836 (6th Cir. 2018).  The FCA contemplates that cases can go forward without the government, which may not intervene for reasons unrelated to the merits of the case.  *See, e.g., U.S. ex rel. Ubl v. IIF Data Sols*., 650 F.3d 445, 457 (4th Cir. 2011) (fact that government does not join case does not mean case lacks merit; otherwise provision allowing qui tam cases to go forward without government would be meaningless); *U.S. ex rel.*

47

*Atkins v. McInteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006) ("In any given case, the government may have a host of reasons for not pursuing a claim").

Accordingly, summary judgment should enter for Relator against the MSJ Defendants as to materiality on Relator's claims under Subsections 3729(a)(1)(A), (B) and (G).

### D. New Harbor Capital Knowingly *Caused* Ocean State and Fyzical Holdings to Submit False Claims and Records and Is Thus Liable Under the FCA

The FCA imposes liability on anyone that knowingly presents, or *causes* to be presented, a false claim for payment to the government, or that knowingly makes or uses, or causes to be made or used, a false record or statement in connection with a claim. *See* 31 U.S.C. § 3729(a)(1)(A), (B). The reverse false claims provision imposes liability for *causing* someone to make or use a false record or statement material to an obligation to pay or transmit money to the government. *See* 31 U.S.C. § 3729(a)(1)(G).

The First Circuit has noted that a "non-submitting" entity such as New Harbor Capital "that knowingly causes the submission of a false claim may be liable under the FCA even if the entity directly submitting the claim to the government lacks the requisite mental state." *Guilfoile*, 913 F.3d at 187 (*quoting Hutcheson*, 647 F.3d at 389). Thus, as this Court ruled in its Order denying the MSJ Defendants' motion to dismiss (ECF 33), a private equity firm, like other defendants, can be held liable if it causes a portfolio company to submit a false claim or record to the government. *See* 31 U.S.C. § 3729(a)(1)(A), (B) and (G); *see also United States ex rel. Ellsworth Assoc., LLP v. CVS Health Corp.*, 660 F. Supp. 3d 381, 404–05 (E.D. Pa. 2023); *United States ex rel. Martino-Fleming v. S. Bay Mental Health Centers*, No. 15-CV-13065-PBS, 2021 WL 2003016, at *18 (D. Mass. May 19, 2021); *United States ex rel. Ebu-Isaac v. INSYS Therapeutics, Inc.*, No. 216CV07937JLSAJW, 2021 WL 3619958, at *5-7 (C.D. Cal. June 9, 2021); *United States ex rel.*

*Carmen Medrano v. Diabetic Care RX, LLC*, No. 15-CV-62617, 2018 WL 6978633 (S.D. Fla. Nov. 30, 2018).

The FCA targets any person who knowingly assists in causing the government to pay claims that are grounded in fraud, regardless of whether that person has direct contractual relations with the government.  *See Commonwealth ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc*., 334 F. Supp. 3d 394, 406 (D. Mass. 2018).  This includes cases where, as here, a person or entity knowingly participates in a scheme that, if successful, would result in the submission of a false claim or record.  *See Martino-Fleming*, supra.; *Ellsworth Assoc., LLP*, supra.

On top of the mountain of email and other evidence showing New Harbor Capital's involvement with the PPP loans, the structure and management of NHC Fund I and NHC Fund II and their affiliates shows that New Harbor Capital is deeply involved in the management and operation of the companies in which it invests, including Ocean State.  SUMF, ¶¶ 40, 62 (describing that New Harbor Capital's investment strategy is to closely partner with portfolio company management and engage in active investment management and that New Harbor Capital focuses primarily on making control equity investments).  *See also Sun Cap. Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 724 F.3d 129, 133 (1st Cir. 2013).  This involvement includes the authority to make decisions and determinations relating to decisions about Investments, Investment Contributions, Investment Proceeds, Partnership Expenses (including all costs, expenses, liabilities and obligations relating to the Partnership's and/or its subsidiaries' activities, investments and business (to the extent not borne or reimbursed by a Portfolio Company), Affiliates (including Portfolio Companies and subsidiaries thereof) (as those terms are defined).  SUMF, ¶¶ 41, 63.

49

NHC Fund I and NHC Fund II's controlling stakes in Ocean State and Fyzical Holdings placed NCH Fund I and NCH Fund II and their affiliated entities in a position where they were intimately involved in the management and operation of Ocean State and Fyzical Holdings, well beyond that of a passive investor or shareholder. *Id.*, ¶¶ 42, 65. NHC Fund I and NHC Fund II's investment approach is distinguishable from mere stock holding or mutual fund investments and NHC Fund I and NHC Fund II's investment strategy could only be achieved by active management through an agent, since NCH Fund I and NHC Fund II themselves had no employees. It is one thing to manage one's investments in businesses. It is another to manage the business in which one invests. *Id.*, ¶¶ 43, 66. *See also Sun Cap. Partners III, LP*, 724 F.3d at 134.

The evidence conclusively shows that New Harbor Capital knowingly caused the submission of false claims and records made by Ocean State and Fyzical Holdings. As fully detailed above and in the SUMF, New Harbor Capital directed and controlled Ocean State and Fyzical Holdings, both generally and in connection with the PPP loans through a combination of management (e.g., through the Professional Services Agreement), operational influence (e.g., voting and governance control through control of the Board), and financial control (e.g., through the controlling stakes in Ocean State and Fyzical Holdings). SUMF, ¶¶ 44, 67.

Through this involvement, New Harbor Capital directed and controlled the claims process and New Harbor Capital's actions were a substantial factor in causing the submission of the false claims and records in connection with the PPP loans. New Harbor Capital, through its ownership and managerial and influential control over Ocean State and Fyzical Holdings, played a substantial role in a scheme that resulted in the submission of false claims and records, and it is thus liable under the FCA.

Accordingly, summary judgment should enter for Relator against New Harbor Capital as

to falsity and scienter on Relator's claims under Subsections 3729(a)(1)(A), (B) and (G).

**E.    As a Matter of Law, the Measure of *Damages* for the MSJ Defendants' FCA Violations is The Entirety of The Government's Expenditures for Claims Resulting from the False PPP Loan Applications**

The FCA provides for damages equal to "3 times the amount of damages which the Government sustains because of the act of that person," in addition to a "civil penalty." 31 U.S.C. § 3729(a)(1). The FCA does not specify how damages are to be calculated, but the Supreme Court has recognized that the purpose of damages, even as multiplied, under the FCA is to make the government "completely whole" for money taken from it by fraud. *See U. S. ex rel. Marcus v. Hess*, 317 U.S. 537, 551–52, 63 S. Ct. 379, 388, 87 L. Ed. 443 (1943).

The First Circuit has recognized that, in cases like this, involving government funding designed to benefit third parties—i.e., deserving small businesses eligible for and in legitimate need of PPP loans—and to further a declared societal goal, the government loses the entire benefit of its bargain when a recipient obtains such funding by fraud and thereby denies the government the ability to award the funding to a truly deserving recipient and promote the purpose sought to be advanced-the benefit the government pursued through providing the funding. *See United States ex rel. Concilio De Salud Integral De Loiza, Inc. v. J.C. Remodeling, Inc*., 962 F.3d 34, 43 (1st Cir. 2020). *See also United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 88 (2d Cir. 2012) ("[W]hen a third-party successfully uses a false claim regarding how a grant will be used in order to obtain the grant, the government has entirely lost its opportunity to award the grant money to a recipient who would have used the money as the government intended."); *U.S. Longhi* , 575 F.3d at 473 ("[W]here there is no tangible benefit to the government and the intangible benefit is impossible to calculate, it is appropriate to value damages in the amount the government actually paid to the Defendants."); *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1279

(D.C. Cir. 2010) ("[W]here the defendant fraudulently sought payments for participating in programs designed to benefit third-parties rather than the government itself, the government can easily establish that it received nothing of value from the defendant and that all payments made are therefore recoverable as damages.").

Here, the government paid $3,159,800 on Ocean State's PPP loan and paid $3,076,600 on Fyzical Holdings' PPP loan. SUMF, ¶¶ 77, 106, 127, 150. The government received nothing in return. Inasmuch as the damages equal the full amount that the government paid and that amount is not in dispute, no further finding of fact on damages is necessary and single damages can be determine on summary judgment as a matter of law. *See Feldman*, 697 F.3d at 92.

Accordingly, summary judgment should enter for Relator against the MSJ Defendants as to damages for three times the amounts above.

### F.    The MSJ Defendants' *Public Disclosure Bar* Affirmative Defense Fails

The FCA's public disclosure provision, 31 U.S.C. § 3730(e)(4)(A), states in pertinent part:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> > (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> >
> > (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> >
> > (iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

As the Court noted in its Order denying Defendants' motion to dismiss, *see* ECF 33, p. 6, the FCA's public disclosure bar is triggered *only* if three conditions are met: (1) the disclosure occurred through one of the channels specified in the statute; (2) the disclosure consisted of the

"allegations or transactions" in the relator's complaint, as opposed to more general information; and (3) the disclosed allegations or transactions are substantially the same as the allegations or transactions of the relator's complaint. *See United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 (1st Cir. 2016) (*citing U.S. ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 53 (1st Cir. 2009)).

Relator propounded interrogatories to the MSJ Defendants that asked them to "State the basis for Your Second Affirmative Defense that "The False Claims Act's public disclosure bar bars Relator's claim in whole or in part." SUMF, ¶ 179. In response, the MSJ Defendants did not identify a single source of alleged public disclosure concerning the allegations or transactions alleged by Relator concerning Ocean State and Fyzical Holdings' false certifications of compliance with the PPP size and affiliation or forgiveness rules or repayment avoidance. *Id.*, ¶ 180. Nor did the MSJ Defendants identify a single source of alleged public disclosure concerning the allegations or transactions alleged by Relator concerning New Harbor Capital's direction and control of Ocean State and Fyzical Holdings' PPP applications or loans. *Id.*, ¶ 181.

Instead, the MSJ Defendants devoted the bulk of their interrogatory answers to once again maligning Relator by arguing that he is not a prototypical FCA relator in that he had no insider relationship with the MSJ Defendants. This, however, has no bearing on Relator's lawsuit or their public disclosure bar defense. While "[i]t is generally contemplated than an FCA relator will be an insider ... the statute contains no such requirement." *U.S. ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 119 (D.D.C. 2003). "Any person who can muster significant evidence of fraud, that is not publicly disclosed, and be the first to file a complaint alleging that fraud, may maintain a qui tam suit." *Id.* Relator has done just that.

Accordingly, summary judgment should enter for Relator against the MSJ Defendants as

to their public disclosure bar defense as it relates to Relator's claims at issue in this Motion.

## CONCLUSION

For the foregoing reasons, Relator respectfully requests that the Court grant the Motion in its entirety and enter summary judgment in Relator's favor on Counts I-III of the SAC.


Respectfully submitted,


/s/ Eric E. Renner
Eric E. Renner (#7481)
DUFFY & SWEENEY, LTD
321 South Main Street, Suite 400
Providence, RI  02903
Phone: 401-457-1803
Fax: 401-457-0701
erenner@duffysweeney.com

*Attorneys for Plaintiff-Relator,*
*United States of America ex rel James R. Berkley*

Date:  January 6, 2025


## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of January, 2025, a true copy of the foregoing document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and copies will be mailed to those indicated as non-registered participants.


/s/ Eric E. Renner