# **EXHIBIT 16**

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF RHODE ISLAND
 3   UNITED STATES OF AMERICA  )
     ex rel. JAMES R.          )
 4   BERKLEY,                  )
                Plaintiffs,    )
 5        vs.                  )  No. 1:20-cv-00538
     OCEAN STATE, LLC, NEW     )
 6   HARBOR CAPITAL FUND LP,   )
     NEW HARBOR CAPITAL FUND   )
 7   II LP, NEW HARBOR         )
     CAPITAL MANAGEMENT LP,    )
 8   BLUEPRINT TEST            )
     PREPARATION, LLC,         )
 9   FYZICAL ACQUISITION       )
     HOLDINGS, LLC,            )
10            Defendants.      )
11
12       The CONFIDENTIAL DEPOSITION of JOHN ROSELLI,
13   called for examination pursuant to the Rules of
14   Civil Procedure for the United States District
15   Courts pertaining to the taking of depositions,
16   taken before MARY KAY ANDRIOPOULOS, Certified
17   Shorthand Reporter in the State of Illinois, at
18   300 North LaSalle Street, Illinois, on
19   March 14, 2024, at the hour of 10:00 a.m.
20
21
22
23
24   REPORTED BY: MARY KAY ANDRIOPOULOS, CSR
25   LICENSE NO.  084-002248
```

**Page 2**

```
 1   APPEARANCES:
 2
 3        DUFFY & SWEENEY, LTD.
 4        BY: MR. ERIC E. RENNER
 5        321 South Main Street
 6        Suite 400
 7        Providence, Rhode Island 02903
 8        401.455.0700
 9        Erenner@duffysweeney.com
10             Representing the Plaintiffs;
11
12        KIRKLAND & ELLIS, LLP
13        BY: MR. RYAN MOORMAN
14           MR. PATRICK J. WEEKS
15        300 North LaSalle Street
16        Chicago, Illinois 60654
17        312.862.3755
18        Ryan.moorman@kirkland.com
19        Patrick.weeks@kirkland.com
20             Representing the Defendants.
21
22
23
24
25
```

**Page 3**

```
 1                  I N D E X
 2   WITNESS                        EXAMINATION
 3   JOHN ROSSELLI
 4     BY MR. RENNER                   4, 168
 5     BY MR. MOORMAN                     152
 6
 7
 8
 9
10
11              E X H I B I T S
12   NUMBER                    MARKED FOR ID
13   ROSELLI Deposition
       Exhibit No. 1                     4
14     Exhibit No. 2                     4
       Exhibit No. 3                     4
15     Exhibit No. 4                     4
       Exhibit No. 5                     4
16     Exhibit No. 6                     4
       Exhibit No. 7                     4
17     Exhibit No. 8                     4
       Exhibit No. 9                     4
18     Exhibit No. 10 (withdrawn)        4
       Exhibit No. 11                    4
19     Exhibit No. 12                    4
       Exhibit No. 13                    4
20     Exhibit No. 14                    4
       Exhibit No. 15                    4
21     Exhibit No. 16                    4
       Exhibit No. 17                    4
22     Exhibit No. 18                    4
       Exhibit No. 19                    4
23     Exhibit No. 20                   66
24
25
```

**Page 4**

```
 1   ***CONFIDENTIAL DEPOSITION OF JOHN ROSELLI***
 2               (whereupon, ROSELLI Deposition
 3               Exhibit Nos. 1-19 were marked
 4               for identification.)
 5               (whereupon, the witness was duly
 6               sworn.)
 7               JOHN ROSELLI,
 8   having been first duly sworn, was examined and
 9   testified as follows:
10               EXAMINATION
11   BY MR. RENNER:
12       Q.   Good morning, Mr. Roselli.  My name is
13   Eric Renner.  I represent the plaintiff in a
14   lawsuit pending in Rhode Island Federal Court.
15           I'm here to today for your deposition.
16   I don't know if you've been deposed before or
17   not.
18       A.   I have not.
19       Q.   Never, okay.
20           So I'll just go over kind of some
21   ground rules.
22           I'm going to be asking you questions.
23   If you don't understand my question, please let
24   me know, I'll try to rephrase so that you
25   understand the question; is that okay?
```

1    A.  Yeah.
2    Q.  Do you receive any payment from any New
3  Harbor entity?
4    A.  Yes.
5    Q.  Okay.  Which?
6    A.  It's from -- I guess, it's from the GP.
7  I don't really honestly know.
8        It's a New Harbor -- I'm an employee of
9  New Harbor.  They pay me a small salary to be on
10 staff to work in portfolio companies as needed,
11 and also do some general things across our
12 portfolio.
13   Q.  Okay.  And has that always been the
14 case?
15   A.  Yeah.
16   Q.  Okay.
17   A.  Yes.
18   Q.  Okay.  At some point -- maybe you still
19 are -- a portfolio operations manager or
20 director, something?
21   A.  I'm an operating partner is the title.
22   Q.  Okay.  And what does that entail?
23   A.  So an operating partner, I work with
24 the portfolio companies, certain ones that, you
25 know, I'm designated to work with to help with

9

1  the operations.
2        So mostly what you do is you're helping
3  with new investments to try to implement the
4  strategy that we want to implement, to maybe
5  hire the management team, to get the management
6  team working well, to kind of be the liaison
7  between the private equity and the management
8  team, because oftentimes, we're hiring
9  management that have never worked with private
10 equity, so I can be the go-between to interpret
11 between the two groups.  So that's what I do.
12   Q.  Okay.  And do you have any ownership
13 interest in New Harbor entities?
14   A.  I have -- I have -- for the entities
15 that I have worked in that, you know, I've had
16 an assignment, like executive chair or interim
17 CEO, I will typically get incentive equity, like
18 a management -- like somebody who's a manager
19 would get.
20   Q.  You're referring to from the portfolio
21 company?
22   A.  Yeah, from the portfolio company.
23   Q.  What about New Harbor, are there any
24 New Harbor entities that you have an ownership
25 interest in?

10

1    A.  It's not --
2        MR. MOORMAN:  You guys are using New
3  Harbor entities to mean different things.
4        You should get clarification of what
5  New Harbor entities means.
6  BY MR. RENNER:
7    Q.  Sure, okay.
8        I'll refer to portfolio companies as
9  one of the portfolio companies that is,
10 whatever, is owned by one of the New Harbor
11 funds, right?
12   A.  I'm sorry, say that again.
13   Q.  So portfolio companies, you understand
14 what I'm referring to?
15   A.  Yes.
16   Q.  All right.  When I say New Harbor
17 entities, I'm referring to, you know, whether it
18 be a fund, from a fund, from the management
19 companies.
20   A.  Management, you mean the portfolio
21 companies?
22   Q.  No, like a New Harbor Capital
23 management, for instance.
24   A.  Okay.  Like the general partnership?
25   Q.  Yes.

11

1    A.  Okay.  So I have -- I have no ownership
2  in the general partnership.
3    Q.  What about any of the funds?
4    A.  In the funds I have -- I have -- I
5  mean, there's -- I don't know how you call it.
6  I wouldn't call it ownership.
7        I have the ability to co-invest, so I
8  can invest my own money in those funds, and then
9  I also have a percentage of carry, of carried
10 interest in Fund II and Fund III, that's --
11   Q.  I'm sorry, I didn't mean to cut you
12 off.
13   A.  That's over a seven-year period.
14   Q.  Okay.  So carried interest, why don't
15 you explain for me what that is.
16   A.  Okay.  I'll do it to the best of my
17 ability.  I'm not an expert in this, and you can
18 -- you could read up on this, but basically,
19 carried interest is, in the world of private
20 equity, when you raise money from limited
21 partners, you charge a fee, but you also get a
22 carried interest, which is a percentage of the
23 profits of the fund.
24        So it's typically 2 and 20, that's the
25 common structure; so 2 percent management fee

12



1  annually, and then, you know, when all is said
2  and done in the fund, ten years later, and you
3  -- and you add up all the profits, 20 percent of
4  the profits is the carried interest, and that
5  gets distributed to those that have a carried
6  interest.
7       Q.  All right.  So you have some --
8       A.  I have a very small carried interest,
9  yeah.
10           And just to be clear, in Fund I, which
11  was Ocean State, I had no carried interest.
12      Q.  So we're here obviously to talk about
13  the Ocean State.
14           Going back to the 2019/2020, that
15  timeframe, did you have any kind of ownership
16  interest in Ocean State?
17      A.  No.
18      Q.  All right.  And at that point, did you
19  have an ownership interest in any of the New
20  Harbor companies?
21      A.  Well, I had -- I had -- at the same
22  time I was working with Ocean State as interim
23  CEO, I was also executive chair of Blueprint,
24  which is the Fund II portfolio company, and as
25  part of that role, I got -- I got incentive

13

1  equity that vested over a certain period, and
2  also based on performance.
3       Q.  In what entity?
4       A.  In Blueprint.
5       Q.  In Blueprint, okay.
6       A.  Yeah.
7       Q.  And at that point, 2019/2020, that
8  timeframe, were you also employed by -- directly
9  by a New Harbor company?
10      A.  So a portfolio company or --
11      Q.  No, one of like the New Harbor --
12      A.  Well, I was -- I was getting my salary,
13  as we discussed earlier, from New Harbor at that
14  time, yeah.
15      Q.  All right.  And so maybe you already
16  answered this, but with respect to being an
17  employee of New Harbor, what were your roles and
18  responsibilities in the 2020/2019 timeframe?
19      A.  For New Harbor or for portfolio
20  companies?
21      Q.  For New Harbor.
22      A.  You know, I don't have -- I mean,
23  basically the responsibilities are -- I have a
24  background in education and training, and so I
25  work -- that's one of our investment areas -- so

14

1  I'll work with them when they look at investment
2  opportunities and education, and I'll sort of
3  help on the diligent side of things.
4           I'm involved in the investment
5  committee just, you know, so I can keep up to
6  speed on everything that we're looking at
7  investing in, and I also help with, you know,
8  connecting the CEOs of all of our portfolio
9  companies, so we do kind of a quarterly CEO call
10  and CEO networking that I kind of facilitate.
11          That's pretty much what I do for them,
12  but most of my, you know, 90 percent of my work
13  is in portfolio companies.
14      Q.  And so when did you start as the CEO at
15  Ocean State?
16      A.  The first day I started -- I mean, the
17  first time I got involved with New Harbor.
18          So I was hired as an operating partner
19  to be interim CEO of Ocean State and executive
20  chair of Blueprint, so it was -- I think, it was
21  August of 2019.
22      Q.  Who do you report to at New Harbor?
23      A.  It depends on what I'm working on.
24          So, you know, it depends on the
25  portfolio company.  Whoever is the lead partner

15

1  on that portfolio company, that's who I report
2  to for that work.
3       Q.  What about with respect to Ocean State?
4       A.  With Ocean State, yeah, you know,
5  effectively, I was reporting to the board in
6  that -- in that situation, the board of Ocean
7  State.
8       Q.  So who was on the board of Ocean State?
9       A.  Let's see if I can remember everybody.
10          Scott Wilson, I believe, one of the
11  doctors, Frank D'Alessandro was one of the
12  doctors, Rob Crausman, one of the doctors, Ed
13  Kuklenski, who's an independent director.  There
14  was one other independent director that I'm
15  going to forget, and then John Pircon and Ed
16  Lhee and Tom Formolo.
17      Q.  And those last three, those are the
18  upper people?
19      A.  Yes.
20      Q.  And was that -- was that true for the
21  entirety of your time at Ocean State?
22      A.  Yes.
23      Q.  All right.  What was your salary at
24  Ocean State?
25      A.  I think they paid me 250 annually, but

16



1  then when it really got tight, I reduced that to
2  200.
3      Q.   And when was that?
4      A.   I think it was in like October,
5  November of 2019, maybe it was a little later
6  than that, maybe it was early 2020, but they
7  accrued unpaid, and then eventually when the
8  sale happened, you know, they trued me up.
9      Q.   So just kind of a line of demarcation,
10 this was pre-COVID when you reduced your salary?
11     A.   Yeah.
12     Q.   So I take it -- well, maybe correct me
13 if I'm wrong -- but I assume you're familiar
14 with the relationship, contractual relationship
15 between New Harbor and Ocean State?
16     A.   Yeah, yes.
17     Q.   Is it fair to say New Harbor purchased
18 a majority ownership in Ocean State in 2017?
19     A.   I believe that's right.
20     Q.   All right.  I want to ask you some
21 questions about Ocean State's operations.
22          I'm going to show you what's been
23 marked as Exhibit 1.
24          All right.  Have you seen this document
25 before, sir?

17

1      A.   I have.
2      Q.   All right.  Is it correct to say that
3  this is the most recent operative LLC agreement
4  for Ocean State?
5      A.   You know, I believe so, but I know it
6  was amended a number of times, so I don't know
7  if this is the final amended version.
8      Q.   All right.  So if you look at the first
9  paragraph, it refers to Ocean State Buyer, LLC?
10     A.   Mm-hmm.
11     Q.   Who owns Ocean State Buyer, LLC?
12     A.   I believe that's New Harbor Fund I.
13     Q.   All right.  What was Ocean State's
14 business?
15     A.   So we owned -- we ran primary care and
16 urgent care offices in Rhode Island.
17     Q.   Primary care, urgent care, is that it?
18     A.   Yeah.
19     Q.   All right.  And just in Rhode Island?
20     A.   Just in Rhode -- we did have one office
21 in Massachusetts.
22     Q.   Okay.
23     A.   Just over the border.
24     Q.   All right.
25     A.   In that area where it's still Rhode

18

1  Island kind of, do you know what I mean?
2      Q.   All right.  If you look at Exhibit 1,
3  Section 6, and specifically 6.1, it talks about
4  capital contribution?
5      A.   Mm-hmm.
6      Q.   Do you know generally what does this
7  Section 1 deal with?
8      A.   With contribution -- you know, equity
9  invested into the company.
10     Q.   All right.  So is it accurate to say
11 that -- well, the member is Ocean State Buyer
12 according to this document, right?
13     A.   Mm-hmm, yeah.
14     Q.   So is this basically saying that the
15 member can make capital contributions to Ocean
16 State, LLC in its discretion whenever it wants?
17          MR. MOORMAN:  Objection, form.
18          THE WITNESS:  Well, it says the member
19 shall not be obligated to make initial capital
20 contributions.
21 BY MR. RENNER:
22     Q.   All right.  But is it -- just to make
23 sure I understand -- so the member can make
24 capital contributions, but it's not required to?
25     A.   Yes.

19

1      Q.   Okay.  I'm going to show you Exhibit 2.
2  Specifically, I'm referring to Page 2 of this
3  document.
4      A.   Mm-hmm.
5      Q.   So this organizational chart, does this
6  reflect the operational structure of Ocean State
7  Urgent Care as it existed in 2020?
8      A.   I believe so.
9      Q.   Well, yeah, I --
10     A.   I mean, I don't know what the date is
11 of this, so --
12          MR. MOORMAN:  You can look at the
13 document if you need to.
14          THE WITNESS:  This is as of '18.  So
15 this is as of '18.
16 BY MR. RENNER:
17     Q.   Right.  I want to know if there were
18 any changes since this date.
19     A.   If you have a document that you want to
20 point me to, I'd be happy to look at that
21 document, but as of 2018, this is what it was.
22     Q.   All right.
23     A.   I can't really respond unless I see a
24 document related to it.
25     Q.   Well, I don't have another document,

20



1  but do you have any --
2      A.   If this is the most recent one, then
3  this is what it was in 2020.
4      Q.   All right.  It appears to me that Ocean
5  State Holdings, LLC owns 100 percent of Ocean
6  State Buyer, LLC?
7      A.   Mm-hmm.
8      Q.   That's correct?
9      A.   Yeah.
10     Q.   And then it turned, Ocean State Buyer,
11  LLC owns 100 percent of Ocean State, LLC?
12     A.   Yeah.
13     Q.   All right.  And then over to the left,
14  it references -- a square or a rectangle that
15  references 23 Ocean State companies?
16     A.   Yeah.
17     Q.   What are those?
18     A.   So those are the -- those are medical
19  operations.
20     Q.   Okay.
21     A.   Right.
22     Q.   Like the professional corporations?
23     A.   Yeah, exactly.  Like there's 23
24  different offices.
25     Q.   Right.

21

1      A.   And that's where those entities are, so
2  that's where all the clinical operations are.
3      Q.   Like the Barrington location?
4      A.   Yeah.
5      Q.   The East Providence location and so
6  forth?
7      A.   Yes.
8      Q.   Okay.  So these 23 -- I'll call them
9  PCs -- professional corporations.
10     A.   Mm-hmm, yeah.
11     Q.   Unless you have some other term.
12     A.   That's fine.
13     Q.   All right.  Those -- are those their
14  own legally distinct entity, each one of those?
15     A.   Yes.
16     Q.   All right.  And who owns those 23 PCs,
17  or who did in 2020?
18     A.   Dr. Crausman.
19     Q.   He owned each and every one of them?
20     A.   And then -- well, I don't know how to
21  actually respond to that.
22     Q.   Were they owned -- I guess what I'm
23  getting at -- were they owned by any of the
24  either Ocean State, LLC, Ocean State Buyer,
25  Ocean State Holdings?

22

1      A.   No.
2      Q.   Okay.  So they were legally distinct
3  entities from the Ocean State Holdings, Buyer or
4  LLC?
5      A.   Mm-hmm.
6      Q.   All right.  And was there payroll for
7  each of those 23 entities, they each did their
8  own -- I mean, maybe I'm wrong.
9      A.   No, there was a centralized management
10  services agreement that Ocean State, LLC is
11  doing the management services.
12          So at that point they would do the
13  payroll for all those entities, but we still had
14  separate tax returns for all those entities.
15  They all had their own tax ID.
16          we had -- you know, when you, you know,
17  go to get reimbursement for medical, you know,
18  through Medicare and Medicaid, each entity was
19  doing that separately, and they were paid
20  separately, but we had a management services
21  company that was managing all of that side.
22     Q.   I'm going to show you Exhibit 3,
23  please.
24          Is this the agreement you're referring
25  to, or is it something else?

23

1      A.   I believe this is it.
2      Q.   All right.  So if you look at
3  Exhibit 2, there's, you know, the dotted line
4  between the 23 Ocean State companies and then
5  Ocean State, LLC?
6      A.   Yeah.
7      Q.   And it refers to the management
8  services agreement?
9      A.   Mm-hmm.
10     Q.   Is that Exhibit 3, is that --
11     A.   I believe -- I believe so.
12     Q.   Okay.  So for each of the 23 entities,
13  they had employees, I assume, right?
14     A.   Mm-hmm.
15     Q.   And those employees --
16     A.   Yes.
17     Q.   For instance, if we take the Barrington
18  location, right, there were employees working at
19  the Barrington location?
20     A.   Yes.
21     Q.   And I only use Barrington, because
22  that's where I live, so would those employees --
23  would they pay directly by one of those -- like
24  the Barrington location or were they paid by
25  Ocean State, LLC?

24

John Roselli 03/14/2024

Confidential

1    A.   We did -- we had one payroll, but I
2  honestly can't tell you if we had -- if they
3  were paid from an entity that was that entity or
4  if it was paid for by the management services
5  agreement.  I just don't know.
6    Q.   So I take it from Exhibit 3, the
7  management services agreement, it's -- you know,
8  New Harbor is providing, you know, management
9  services, right?
10    A.   No.
11    Q.   No, okay.  Maybe I'm mistaken then.
12    A.   Ocean State, LLC is providing
13  management services.
14    Q.   Oh, I see, yeah.  Never mind.  I
15  misspoke.
16         Okay.  So Ocean State, LLC is providing
17  services to the 23 entities, right and -- right,
18  yes?
19    A.   Yes.
20    Q.   All right.  And one of those is payroll
21  services?
22    A.   Yes.
23    Q.   Okay.  So who issued the W-2s for the
24  employees of those 23 entities?
25    A.   Like the company, the entity or the

25

1  person?
2    Q.   No, no, no, not the person.
3         I'm trying to figure out, you know, did
4  -- say I work at the Barrington location.
5    A.   Yeah.
6    Q.   I don't know, I'm a -- I don't know,
7  I'm not in the healthcare field -- medical
8  secretary, something, if that even exists, am I
9  paid by the Barrington location or am I paid by
10  Ocean State, LLC?
11    A.   I honestly cannot remember how we did
12  that to be -- to be quite honest with you.
13         There was one payroll run.  I just
14  don't remember if they were paid separately out
15  of a Barrington account or if it was coming out
16  of, you know, just directly out of the Ocean
17  State, LLC.
18    Q.   All right.  And what would you -- what
19  document would enable you to determine which
20  entity paid?
21    A.   I guess, I'd have to see payroll
22  records.
23    Q.   All right.  Does the Barrington
24  location -- does it pay the payroll or does
25  Ocean State, LLC?

26

1    A.   I think I just answered that question
2  already.
3    Q.   Okay.
4    A.   Yeah.
5    Q.   So in this chart we're looking at,
6  Exhibit 2, you know, the Ocean State --
7    A.   Yeah, mm-hmm.
8    Q.   I'll call it the Ocean State
9  organizational chart, which entity is the MSO,
10  and, you know, when I refer to MSO, do you know
11  what I'm talking about?
12    A.   Mm-hmm, yeah, I believe it's Ocean
13  State, LLC.
14    Q.   Okay.  So what exactly does Ocean
15  State, LLC do?
16    A.   It's the management professional
17  services entity that provides basic operational
18  management for all the professional services
19  organizations; so payroll, hiring and firing,
20  you know, negotiating benefits.
21         We centralized what's called revenue
22  cycle management, so that's all the work to get
23  reimbursement from third-party payors.
24         All the nonmedical basically.
25    Q.   That was my next question.

27

1    A.   Yeah.
2    Q.   So I take it Ocean State, LLC does not
3  actually provide medical services?
4    A.   No.
5    Q.   So who are Ocean State, LLC's actual
6  employees?
7    A.   Well, so there were, you know -- you
8  know, Sarah Charette, the CFO, there was a head
9  of HR, there was, you know, revenue cycle
10  people, there was an IT person.
11         You know, there's a lot.  I can't tell
12  you everyone.
13    Q.   Roughly, how many employees actually
14  work for Ocean State, LLC?
15    A.   Yeah, that's a good question.  I don't
16  totally know.
17         I mean, I could -- if you put the
18  records in front of me, I could identify who
19  was, but it was probably only -- I don't want to
20  speculate -- but most of the 277 employees that
21  we had were in the -- in the medical operations.
22    Q.   So Exhibit 3, this services agreement,
23  is this the document that governs the
24  relationship between Ocean State, LLC and each
25  one of the 23 --

28

1      A.   I think earlier I had said that this
2 was a professional services between the
3 management -- the LLC and the medical entities,
4 but I had that wrong.
5           So this is the agreement between the
6 LLC and New Harbor.
7      Q.   All right.  And then Exhibit 3 in
8 Section 4 talks about management fees?
9      A.   Ah-huh.
10     Q.   So those are management fees paid by
11 Ocean State, LLC?
12     A.   To New Harbor.
13     Q.   Okay.
14     A.   To -- it says the company shall pay to
15 New Harbor.
16     Q.   Yeah.  And so is this the 2 and 20?
17     A.   No.
18     Q.   That's separate thing, okay.
19          So on top of the management fees that
20 Ocean State, LLC is obligated to pay to New
21 Harbor, what other fees, if any --
22     A.   None.
23          MR. MOORMAN:  Let him finish his
24 question.
25          THE WITNESS:  Oh, sorry.

                                              33

1 BY MR. RENNER:
2      Q.   Are there other fees -- on top of the
3 -- I'm just trying to figure out if on top of
4 the management fee we're talking about in
5 Section 4 --
6      A.   Yeah.
7      Q.   -- are there other fees that Ocean
8 State, LLC was obligated to pay to New Harbor?
9      A.   Not that I'm aware of, no.
10     Q.   All right.  So you've testified that
11 your understanding is that there are services
12 agreements between the 23 professional entities
13 and Ocean State, LLC, is that right?
14     A.   Yeah, and I think they're pointed out
15 right on this document.
16     Q.   All right.  That's the management
17 services agreements?
18     A.   Yeah.
19     Q.   And can you tell me, is there a
20 separate management services agreement for each
21 of the 23 entities, or is there one that governs
22 all of them?
23     A.   I honestly don't know.
24     Q.   All right.  And what kind of services
25 does Ocean -- or would Ocean State, LLC provide

                                              34

1 under the management services agreements?
2      A.   Well, I think I answered that
3 previously, yeah.
4      Q.   The payroll?
5      A.   Payroll, you know, benefits, revenue
6 cycle management.
7      Q.   Okay.
8      A.   Yeah, not everything -- everything
9 nonmedical.
10     Q.   And do you see under management
11 services agreements, that references deficit
12 funding loan agreements?
13     A.   Mm-hmm.
14     Q.   What are those?
15     A.   I don't -- I do not know.
16     Q.   All right.  But those -- I take it from
17 Exhibit 2, that those would be agreements
18 between the 23 entities and Ocean State, LLC?
19     A.   I'm not familiar with those agreements,
20 so I can't really respond to that.
21     Q.   All right.  Let me show you Exhibit 4.
22          MR. WEEKS:  Do you know the Bates of
23 this, Eric?  It just got cut off.
24          MR. RENNER:  I know it got cut off
25 because of --

                                              35

1          THE WITNESS:  I see 215 up at the top.
2          MR. MOORMAN:  This number.
3 BY MR. RENNER:
4      Q.   It looks like 70004.  I printed it.  I
5 didn't print it in the legal size.  It's what
6 the tif comes out as.
7          Have you ever seen this document
8 before, sir?
9      A.   No.
10     Q.   All right.  Well, I'll represent -- or
11 let me know if you disagree -- but it appears to
12 be a -- well, the PDF of it anyway -- is called
13 NHC structure chart.
14     A.   Mm-hmm.
15     Q.   It looks to me to be an operational
16 chart for the New Harbor Capital Fund, LP?
17     A.   Mm-hmm.
18     Q.   So is this Fund I this is talking about
19 if you look at the names of these two entities?
20          MR. MOORMAN:  Objection, foundation.
21          Just for the record, he's here to
22 testify on behalf of Ocean State and not New
23 Harbor.
24          If he knows, he can answer it in his
25 personal capacity.

                                              36

Q. So Robert Crausman, is it true that you replaced him as CEO?
A. No.
Q. No?
A. No, there was a few in between that.
Q. Okay. But at some point you became the CEO?
A. Yeah.
Q. And were you also president?
A. I didn't have that title. I was interim CEO.
Q. Okay. Scott Wilson, he was one of the doctors, right?
A. Yeah.
Q. And then Mr. Lhee, Formolo and Pircon, they were new upper people, right?
A. Yes. So Dr. Crausman and Scott Wilson were owners of the business.
There were five original doctors that were owners of the business.
Two of those were -- and then those two took the seats, the board seats.
Q. Crausman and Wilson?
A. Yeah.
Q. So getting back to Exhibit 5, the org

41

chart.
A. Exhibit 5, this one? No.
Q. No, the chart for Ocean State.
A. Here, there we go, yeah.
Q. So the board of directors, what is the responsibility of the board of directors?
A. They really oversee the management of the business, to hire and fire management, to, you know, make decisions for the company.
Q. So the board oversees management, ultimately, you as the CEO?
A. Yes.
Q. And then you in turn oversee --
A. Yeah.
Q. -- the under people?
A. Yeah, mm-hmm.
Q. All right. I'm going to show you what's been marked Exhibit 6 and 7, and I will not be going through this in depth -- so don't get nervous -- 6 is the fourth amendment and 7 is the second amendment.
A. To which agreement?
Q. Well, I'm just saying so you know which one is 6 and --
A. Yeah, but this is amendment to which

42

agreement?
Q. Well, Exhibit 6, I guess, I'll call it the Deerpath loan agreement.
MR. MOORMAN: If you need a second to skim the documents.
MR. RENNER: Yeah, please, don't take my word for it. I'm giving you what I understand the document to be, so if you disagree, let me know.
MR. MOORMAN: It is 165 pages long, so if you need to refer back to it after you skim it, too, by all means, take your time.
THE WITNESS: Okay. So it's a fourth amendment to the loan agreement, this is Exhibit 6, and so that loan agreement by and among Ocean State, LLC -- yeah, so it's a loan agreement with Deerpath.
BY MR. RENNER:
Q. Okay.
A. The fourth amendment.
Q. Was Deerpath Ocean State's only SBIC lender?
A. Yes. I mean, at the time I was involved in the business. I don't know about previously.

43

Q. Do you know when Ocean State originally took the loan from Deerpath?
A. I believe it was, you know, when they first -- New Harbor first -- did the first transaction to partner with Ocean State.
Q. What kind of funding was it from Deerpath; was it debt, equity?
A. Debt.
Q. When was the last time Ocean State received funds from Deerpath?
A. It was before I was CEO.
Q. And so what kind of debt was it; it was a revolver loan, is that a fair characterization?
A. That was part of it. I think there was --
Q. All right. Well --
A. There was senior debt, and there was a revolver, too.
Q. Okay. Can you describe for me what you're referring to?
A. Well, I mean, by the time I got involved, we had maxed out the revolver, and then there was other -- you know, the original loan, you know, that was issued when they -- New

44

1   Harbor did the original transaction, so --
2       Q.   What was the amount of the loan, i
3   mean, ballpark?
4       A.   Like 14 million something,
5   approximately.
6       Q.   All right.  And so, just so I
7   understand, when you say revolver, that's kind
8   of like a line of credit; fair?
9       A.   Yeah, yes.
10      Q.   All right.  And then there was some
11  other component to the debt?
12      A.   Yeah.
13      Q.   What was that?
14      A.   It was a -- it was a -- it was senior
15  debt.
16           I mean, I wasn't at the company when
17  that was set up, so I really can't talk to the
18  specifics of that.
19      Q.   What do you mean by senior debt?
20      A.   They -- well, it just, you know, it's
21  secured, right.
22      Q.   Okay.  By what, the Ocean State, LLC
23  assets?
24      A.   You know, again, I wasn't at the
25  company when it was -- when it was originally

45

1   additional roughly 5 million dollar loan to
2   Ocean State; is that a fair characterization?
3       A.   Again, it was all -- it was all before
4   I was there, so --
5       Q.   All right.  So this is dated
6   September 17th, 2019.
7       A.   Okay.
8       Q.   You were at Ocean State at the time?
9       A.   Yeah, I was -- I was.  I had just
10  joined, yeah.
11      Q.   Did you have involvement in negotiation
12  or --
13      A.   No.
14      Q.   -- discussions regarding this loan
15  agreement?
16      A.   No.
17      Q.   So who was involved with this loan
18  agreement?
19      A.   That would have likely been the former
20  CEO and the CFO and New Harbor, because New
21  Harbor is, you know, responsible for the, you
22  know, capital structure, the board is
23  responsible for the capital structure.
24      Q.   Okay.  And New Harbor is a guarantor
25  under this, right?

47

1   issued, so I can't get into the specifics of it.
2       Q.   All right.  Do you know what the --
3   what were the terms of the funding for Deerpath?
4       A.   I really can't respond to that either.
5       Q.   All right.  Exhibit 6 generally refers
6   to --
7       A.   It's clearly in this 165-page document.
8       Q.   And again, the document says what it
9   says.  I'm not going to go through it with a
10  fine tooth comb, but it does refer to Ocean
11  State being in default.
12           What can you tell me about that?
13      A.   We were in -- when I joined, we were in
14  default.
15           So they usually have various covenants
16  within these agreements that you have to
17  maintain, and we were not meeting those covenant
18  requirements, so we were in technical default.
19      Q.   What was the nature of the default?
20      A.   I honestly don't remember, you know,
21  the specifics of what -- of what the covenants
22  were in this agreement, but whatever the
23  covenants were, we weren't meeting them.
24      Q.   It looks to me with Exhibit 6, this
25  fourth amendment, it looks like Deerpath made an

46

1       A.   That's correct.
2       Q.   All right.  So fair to say in September
3   of 2019 Deerpath made an additional 5 million
4   dollar loan to Ocean State?
5       A.   I don't believe that's right, but I'd
6   have to read through this whole document.
7           MR. MOORMAN:  Take your time.  If you
8   need to look at a document, take your time, and
9   if there's a part of the document that's the
10  source of your question, it might expedite the
11  process if you point to it.
12  BY MR. RENNER:
13      Q.   Sure.  Well, Page 30.  So Section 3
14  talks about additional term loan, and it looks
15  to me -- I could be wrong -- but it looks to me
16  like this is New Harbor making the additional
17  5 million dollar loan -- I mean, excuse me --
18  Deerpath making roughly a 5 million dollar loan?
19      A.   It says in an amount equal to
20  5.1 million to fund the revolver paydown, and
21  pay fees expressed as occurred in connection
22  with the fourth amendment.
23           So, I mean, this is literally two weeks
24  after I joined the company, so I really wasn't
25  involved in this.

48

1    Q.   Okay.  All right.  So if you look at
2  Exhibit 7 then, and this is titled second
3  amended and restated guarantee agreement.
4    A.   Okay.
5    Q.   And again, this is dated
6  September 17th, 2019?
7    A.   Yeah.
8    Q.   So is it -- based on your testimony a
9  minute ago, is it fair to say that you weren't
10  involved with kind of the negotiation of this
11  document?
12    A.   No.
13    Q.   All right.  Would you agree it's a fair
14  -- it's a fair characterization that Exhibit 7
15  is a document by which New Harbor is
16  guaranteeing the Deerpath loan?
17    A.   I believe it is, yes.
18    Q.   And if you turn to Page 5, Section 3,
19  it talks about required payments by guarantors,
20  semicolon, guarantor capital calls?
21    A.   Mm-hmm.  Guarantors, so who is the
22  guarantor?
23    Q.   Well, it looks like --
24    A.   New Harbor Fund, yeah, New Harbor Fund
25  is the guarantor.

49

1    Q.   So with respect to the guarantor
2  capital calls, what is that referring to, if you
3  know?
4    A.   You know, does not have sufficient
5  funds to pay the guarantor guaranteed obligation
6  -- the capital call notice to each partner
7  defined in the --
8    Q.   Is it fair to say -- I mean, basically
9  what I'm getting at is, does this give the
10  ability of New Harbor to require its limited
11  partners or the investors to contribute more
12  capital?
13    A.   You know, I wasn't --
14    MR. MOORMAN:  Objection, foundation,
15  same scope limitation as before.
16    THE WITNESS:  Yeah, this is a New
17  Harbor -- you know, you'll have to talk to
18  somebody at New Harbor about this.
19    Q.   Are you aware --
20    MR. MOORMAN:  We've been going about an
21  hour.  Can we take a break now?
22    MR. RENNER:  Sure.
23    (Whereupon, a short recess was
24     taken.)
25

50

1  BY MR. RENNER:
2    Q.   Okay.  We talked earlier about a 5
3  million dollar guarantee.
4    Do you recall in April, specifically
5  April 20th of 2020, New Harbor Capital making a
6  5 million dollar payment to Deerpath?
7    MR. MOORMAN:  Objection, foundation to
8  the extent he's asking what you remember New
9  Harbor doing.
10  BY MR. RENNER:
11    Q.   Well, do you recall -- April 20th of
12  2020, do you recall a New Harbor Capital entity
13  making a roughly 5 million dollar guarantee
14  payment to Deerpath?
15    A.   I honestly don't remember the timing of
16  it.
17    I actually thought that that was --
18  that happened in the sale when we actually sold
19  Ocean State, and it was from the sale proceeds
20  that that was paid, but, you know, unless you
21  can show me a document that otherwise --
22    Q.   Okay.  New Harbor might be able to
23  better answer that?
24    MR. MOORMAN:  Better answer whether New
25  Harbor made a payment?

51

1    MR. RENNER:  Right.
2    THE WITNESS:  Yeah, I would think so.
3  BY MR. RENNER:
4    Q.   So just to be clear, your testimony is
5  you don't recall in April of 2020 whether or not
6  New Harbor made a 5 million dollar payment to
7  Deerpath?
8    MR. MOORMAN:  Same objection with
9  respect to the scope.
10    He can answer in his personal capacity
11  if he knows.
12    THE WITNESS:  Yeah, in my capacity as
13  CEO of Ocean State at the time, I just honestly
14  can't remember the timing of those, so --
15  BY MR. RENNER:
16    Q.   So in this litigation you're aware
17  Ocean State is claiming that it qualified for an
18  exemption from the affiliation rules, because
19  they received SBIC financing?
20    A.   Yes.
21    Q.   Okay.
22    A.   Not claiming.  That was the fact.
23    Q.   Fair enough.
24    Would you agree that if Ocean State did
25  not qualify for that SBIC exemption, that it

52

John Roselli 03/14/2024

Confidential

1  would not otherwise have been eligible under the
2  affiliation rules due to New Harbor's ownership?
3      A.  Well, that would just be speculation,
4  because we did.
5      Like we had an SBA loan from Deerpath,
6  and we qualified waiving the affiliation
7  requirements, so --
8      Q.  So did you -- when I say you, I mean
9  Ocean State -- did Ocean State undertake any
10 analysis as to whether or not the affiliation
11 rules would have precluded it from being
12 eligible if the SBIC didn't apply?
13     MR. MOORMAN:  Let him finish his
14 question.
15     Are you done?
16     MR. RENNER:  Yes.
17     THE WITNESS:  So in the -- in the SBA
18 loan explanations that we got from the Small
19 Business Administration, it clearly stated in
20 there affiliation requirements are waived if you
21 already have credit from an SBIC accredited
22 lender.
23     So the affiliation waived the
24 affiliation requirements.
25 BY MR. RENNER:

53

1      Q.  Fair enough.
2      My question, though, is if the
3  affiliation rules weren't waived, would you
4  agree that Ocean State would not have been
5  eligible for a PPP loan?
6      A.  I mean, it --
7      MR. MOORMAN:  Objection, calls for
8  speculation, calls for a legal conclusion.
9      THE WITNESS:  So again, we specifically
10 waived the affiliation, because we had SBA
11 lending, so there's no reason to speculate.
12 BY MR. RENNER:
13     Q.  Maybe I'm not asking the question the
14 right way.
15     Let's -- well, so is it fair to say
16 then that because Ocean State determined that it
17 received SBIC funding, it did not undertake any
18 analysis as to whether or not it otherwise would
19 have been precluded under the affiliation rules
20 from eligibility?
21     A.  So we did quite a bit of analysis and
22 consultation with the bankers that facilitated
23 the loan, our CFO did a whole bunch of webinars
24 to try to understand what was going on.
25     You have to remember, the PPP loan

54

1  program came out in like late March, and, you
2  know, you were applying like a week later.
3      They had -- they had hotlines that you
4  could call, e-mails you could send, and nobody
5  responded to any of those.  They weren't even
6  picking up the phone.
7      So we had to go with, you know, the
8  legal counsel we were getting and --
9      MR. MOORMAN:  Don't say anything you
10 talked about with lawyers.
11     THE WITNESS:  And, you know, we had to
12 go with, you know, our banker's advice, and all
13 the webinars we were doing, and all the other
14 things we were doing, and it clearly stated in
15 the Small Business Administration explanation
16 documents that you can qualify one of two ways;
17 you know, you have 500 or less employees and a
18 certain amount less revenue, and in that
19 situation you have to identify your affiliates,
20 or if you're already SBIC qualified, you know,
21 getting money from an SBIC qualified lender, you
22 can waive the affiliation requirements.
23 BY MR. RENNER:
24     Q.  All right.  And so if the affiliation
25 rules weren't waived, you'd agree that there

55

1  would have been more than 500 employees, right,
2  if you take into account all of the New Harbor
3  --
4      A.  Again, I don't know why we have to
5  speculate.  That wasn't the case.  They were
6  waived.
7      Q.  I know, I mean, I know that's what
8  you're saying, but I just want to confirm,
9  though, that if you -- if Ocean State were to
10 have considered the employees of Ocean State
11 combined with the various other portfolio
12 companies owned by New Harbor, then that would
13 have been more than the 500 employee limit,
14 right?
15     A.  Yes.
16     Q.  Okay.  And likewise --
17     A.  And so that's why the portfolio
18 companies we had that weren't -- that didn't
19 have money from an SBIC lender, did not take PPP
20 money.
21     Q.  Okay.  And like for the same reason you
22 mentioned, the revenue amount would have
23 exceeded the revenue amount allowable --
24     A.  Yes.
25     Q.  -- for a PPP program?  Okay.

56

1    A.   If you included all those, although you
2    didn't have to include all those, because we
3    waived -- we were waiving the affiliation
4    requirements based on the SBA explanation and
5    regulation.
6    Q.   All right.  This is Exhibit 8.
7         Well, before we talk about Exhibit 8,
8    you just talked a little bit ago about the
9    various analyses Ocean State did prior to
10   applying for the loan, right, so you -- what
11   input did New Harbor have?
12   A.   Well, again, you know, for Ocean State
13   to take -- to enter into any debt agreement or
14   credit agreement, it has to be approved by the
15   board, so as far as New Harbor's on the board,
16   they were participating in that.
17        They also, for a myriad of reasons,
18   right, just general management reasons, there's
19   always times where you're communicating with New
20   Harbor about things unrelated to this, and you
21   might share ideas among portfolio companies, so
22   --
23   Q.   And fair to say that New Harbor did
24   share a whole bunch of ideas and information --
25   A.   Well, they were trying to -- oh, sorry.

57

1         MR. MOORMAN:  Why don't you ask your
2    question again.
3    BY MR. RENNER:
4    Q.   So is it fair to say that New Harbor,
5    in fact, did share a whole bunch of advice and
6    information with Ocean State regarding the PPP
7    program?
8         MR. MOORMAN:  Objection, form.
9         THE WITNESS:  So it was more about --
10   it was more about sharing between, because all
11   the portfolio companies were all looking at,
12   okay, should we be doing this or not, and there
13   was more -- New Harbor was more functioning as a
14   conduit so that people can share what they're
15   discovering and what they're finding out.
16   BY MR. RENNER:
17   Q.   Whose ultimate decision was it whether
18   or not for Ocean State to apply for the PPP
19   loan?
20   A.   You know, myself and our CFO approved
21   by the board of Ocean State.
22   Q.   Why didn't you sign the loan
23   application that's Exhibit 8?
24   A.   Because it was the pandemic, and I was
25   in Chicago, and this had to be submitted in

58

1    Rhode Island.
2    Q.   So you think it had to be physically
3    signed, like an electronic signature?
4    A.   Yeah, it was physically signed, yeah.
5    Q.   But you couldn't -- something precluded
6    you from signing it?
7    A.   I honestly don't remember the
8    situation, but I gave approval for her to sign
9    it, so --
10   Q.   All right.  Did someone have to give
11   you approval for --
12   A.   Yeah, the Ocean State --
13        MR. MOORMAN:  Hold on one second.
14   You've got to let Mr. Renner finish.
15        THE WITNESS:  Okay.
16        MR. MOORMAN:  It's for the court
17   reporter.
18        Let him finish.  Make sure he's done,
19   and you then you can answer the question.
20        THE WITNESS:  Okay.
21        MR. MOORMAN:  Go ahead, Eric.
22   BY MR. RENNER:
23   Q.   Did you have to -- strike that.
24        Can you read back my question, please?
25

59

1              (whereupon, the record was read
2               as requested.)
3    BY MR. RENNER:
4    Q.   Did someone have to give you approval
5    as Ocean State's CEO for Ocean State to apply
6    for the PPP loan?
7         MR. MOORMAN:  Objection, form.
8         THE WITNESS:  We had a board
9    resolution, so the board had to approve it along
10   with Deerpath, because they had rights to block
11   any additional debt into the business, so they
12   had to approve it as well.
13   BY MR. RENNER:
14   Q.   All right.  So I went through the
15   documents that have been produced, and it looks
16   like Deerpath was involved in Ocean State's PPP
17   application; is that fair to say?
18   A.   They provided certification that they
19   were SBIC accredited, and we included that in
20   our application, so they had all the information
21   they needed to determine if we could get the
22   loan or not.
23   Q.   I'm referring to kind of advice,
24   information regarding the loan.
25   A.   Well, so because Deerpath was an SBIC

60

1  accredited lender, many of their portfolio
2  companies were going through the same process,
3  so they were being helpful in providing
4  information that they were getting, you know,
5  again, kind of being a conduit for all their --
6  for all their portfolio companies.
7     Q.  Would you say that Deerpath supported
8  the idea of Ocean State taking out the -- taking
9  the PPP loan?
10        MR. MOORMAN:  Objection, form and
11  foundation.
12        THE WITNESS:  So they -- you know, they
13  provided a certification to us that we
14  requested.
15  BY MR. RENNER:
16     Q.  Right, but would you say that they
17  wanted Ocean State to take the loan?
18        MR. MOORMAN:  When you say they, you
19  mean Deerpath?
20        MR. RENNER:  Deerpath.
21        MR. MOORMAN:  Objection, foundation.
22        THE WITNESS:  I really can't speculate
23  on what Deerpath was thinking.
24        I can tell you that our board approved
25  it, and that they had rights to block it if they

                                                61

1  wanted to, and they didn't.
2  BY MR. RENNER:
3     Q.  You mean Deerpath?
4     A.  Deerpath, yeah.
5     Q.  Again, you know, just based on my
6  review of the documents that have been produced,
7  it looks like there was a lot of e-mails going
8  back and forth between New Harbor people and
9  Deerpath and you regarding the PPP loan?
10     A.  Yeah.
11     Q.  Is that fair to say?
12     A.  Yes.
13     Q.  All right.  So getting back to
14  Exhibit 8.
15     A.  Yeah.
16     Q.  Is it correct that this is a copy of
17  the loan, the PPP loan application that Ocean
18  State submitted?
19     A.  Yes.
20     Q.  All right.  I'll show you Exhibit 9.
21        Have you seen this document before, Mr.
22  Roselli?
23        MR. MOORMAN:  Take your time to review
24  it if you need to.
25        THE WITNESS:  I honestly don't

                                                62

1  remember.  I mean, I'm not a signer to it, so --
2  BY MR. RENNER:
3     Q.  Did you have any involvement in
4  preparing this document, and by you, I mean
5  personally?
6     A.  Well, no, I'm not a lawyer.  So a
7  lawyer would have written this document.
8     Q.  Do you know who wrote this document?
9     A.  I don't.
10     Q.  But you believe it was lawyers?
11     A.  I would assume so.
12     Q.  Okay.  You just don't -- you're
13  assuming, you don't know?
14     A.  Yeah.  Well, I mean, it's -- I know
15  this says McDermott Will and Emery on the top,
16  so yes, I know that this was prepared by
17  McDermott Will and Emery.
18     Q.  All right.  If you look at -- well,
19  strike that.
20        All right.  I'll show you Exhibit 10.
21     A.  Yeah.
22     Q.  Take a minute to look at Exhibit 10,
23  and let me know if you've ever seen this
24  document before.
25     A.  Yes, I have seen this document before.

                                                63

1     Q.  Did you prepare this document?
2     A.  Yes, I believe so, with input from
3  others.
4     Q.  And which others are you referring to?
5     A.  I think Sarah Charette was involved,
6  and, I think, there was input from some of our
7  board members as well as New Harbor.
8     Q.  Can you be more specific, like, which
9  specific individuals at New Harbor?
10     A.  Probably John Pircon had some
11  involvement I would believe.
12     Q.  Ed Lhee?
13     A.  Ed Lhee probably had some review
14  capability.
15        I pretty much wrote this myself, but I
16  think they --
17     Q.  Tom Formolo?
18     A.  Likely as a board member, like all the
19  board members reviewed it of Ocean State.
20     Q.  So in Exhibit 8 --
21     A.  Exhibit 8.
22     Q.  -- it identifies 277 employees --
23     A.  Yeah.
24     Q.  -- that Ocean State, LLC was using to
25  calculate the average payroll, right?

                                                64

1    A.   Yes.

2    Q.   So we -- I mean, we went through this
3  before, but those 277 employees, those are not
4  just employees of Ocean State, LLC, but that
5  also includes 23 professional entities, right?

6    A.   Yes.

7    Q.   Okay.

8         MR. MOORMAN:  Eric, could we take a
9  break real quick?

10        I think this document has a missing
11  redaction on it, and I just want to confirm
12  whether this has to be clawed back.

13        I think there were other versions of
14  this document that correctly redacted a portion
15  that's not redacted in this version of the
16  document.

17        Can we take a quick break?

18        MR. RENNER:  Yes.

19             (Whereupon, a short recess was
20             taken.)

21        MR. MOORMAN:  All right.  We're back on
22  the record.

23        Ocean State is clawing back Exhibit 10,
24  which is PPPLITDEFS_00074573, because there was
25  a portion of it that should have been redacted

65

1  for legal advice.

2         This is an Ocean State memo drafted by
3  John Roselli.

4         We've since provided to Mr. Renner
5  another version of this document that contains
6  the proper redaction.

7         I don't know if you want to introduce
8  that as Exhibit 11 or a new Exhibit 10, it's up
9  to you.

10        MR. RENNER:  Yeah, I'll make it
11  Exhibit 20 just because that's what -- rather
12  than having to review all the exhibits.

13             (Whereupon, ROSELLI Deposition
14             Exhibit No. 20 was marked for
15             identification.)

16        MR. RENNER:  All right.  Do you have
17  anything else?

18        MR. MOORMAN:  No.

19        MR. RENNER:  All right.  I'm just going
20  to state for the record, and reserve my
21  objection to challenge the clawback and dispute
22  whether or not the document contains privileged
23  work product information.  I'm just reserving
24  that right.

25

66

1  BY MR. RENNER:

2    Q.   All right.  Mr. Roselli, you have
3  before you now what's Exhibit 20?

4    A.   Mm-hmm, yes.

5    Q.   And this is the redacted version of the
6  May 7, 2020 Ocean State memo, right?

7    A.   Yes.

8    Q.   All right.  I also want to refer you
9  back to Exhibit 8, which is the PPP application.

10   A.   Yes, yes.

11   Q.   So you see here Ocean State lists
12  1,263,920 for the average monthly payroll; do
13  you see that?

14   A.   Yes.

15   Q.   All right.  And again, I don't want to
16  have you restate your testimony, but that's the
17  payroll for the 277 employees that you testified
18  includes -- also includes the 23 professional
19  corporations?

20   A.   Yes.

21   Q.   All right.  So this 1.263 million
22  number that's in Exhibit 8, so is it correct to
23  say this payroll does not all relate to Ocean
24  State, LLC payroll; is that fair?

25        MR. MOORMAN:  Objection, form.

67

1         THE WITNESS:  It's the payroll of all
2  the employees of the Ocean State, LLC and all
3  the employees of the -- of the medical
4  companies.

5  BY MR. RENNER:

6    Q.   All right.  And so Ocean State, LLC
7  aggregated that payroll together to come up with
8  the number claimed in Exhibit 8?

9    A.   Yes.

10        MR. MOORMAN:  Objection, form.

11  BY MR. RENNER:

12   Q.   Yes?

13   A.   Yes.

14   Q.   What analysis, if any, did Ocean State,
15  or anyone on its behalf, undertake to determine
16  the propriety of aggregating that payroll?

17   A.   Well, since the inception of this
18  structure of the business, you know, with New
19  Harbor partnering with the former owners, that
20  was the structure that they always paid the
21  payroll.

22        Like the medical companies, they
23  effectively had no real bank accounts.  It was
24  all held at the Ocean State, LLC level.

25        Ocean State paid all their bills and

68

**Page 69**

```
 1   all their, you know, payroll and everything,
 2   right.
 3        Q.   But you testified earlier that Ocean
 4   State, LLC, you know, provided as part of its --
 5   under its management services --
 6        A.   Yeah.
 7        Q.   -- agreement, it provided payroll
 8   services, right?
 9        A.   Yeah.
10        MR. MOORMAN:  Let him finish the
11   question.
12   BY MR. RENNER:
13        Q.   Right, but the payroll itself -- I
14   understand that Ocean State, LLC, you know,
15   helped out with that -- but ultimately, you
16   know, the payroll was the responsibility for the
17   23 entities, right?
18        MR. MOORMAN:  Objection.
19   BY MR. RENNER:
20        Q.   Taking out -- stripping out, you know,
21   actual Ocean State, LLC employees, getting back
22   to like Barrington, the Barrington location
23   example, right, you know, it's that Barrington
24   PC that's responsible for paying its employees,
25   right?
```

**Page 70**

```
 1        MR. MOORMAN:  Objection, form.
 2        THE WITNESS:  I mean, the structure was
 3   set up such that the LLC would do -- would
 4   manage all the nonmedical, and so as I talked
 5   about earlier, payroll benefits, you know, they
 6   managed all that, and they paid all that, right,
 7   and so there were collections, you know, from
 8   third-party payors in the world of a physician
 9   practice, collections were done by the 23
10   entities, but that money coming in was
11   ultimately always transferred up to the LLC, and
12   then all the bills and all the payroll and
13   everything was paid out of that LLC.
14   BY MR. RENNER:
15        Q.   I guess --
16        A.   For all -- for all employees of that --
17   of those medical companies.
18        Q.   I guess, what I'm trying to figure out
19   is, at the end of the day, whose money was
20   paying that Barrington employee; was it the
21   Barrington practice's or was it Ocean State,
22   LLC's money?
23        MR. MOORMAN:  Objection, form.
24        THE WITNESS:  Yeah, I mean, I don't
25   know if I can get into the legal side of things,
```

**Page 71**

```
 1   but it was -- I can tell you how the money
 2   flowed.
 3   BY MR. RENNER:
 4        Q.   Yeah, sure, please.
 5        A.   You get -- you get payments from
 6   third-party payors that come into the each 23
 7   different entities, right.
 8        Q.   Like insurance companies, what do you
 9   mean?
10        A.   Yeah, I mean, that's -- if you're a --
11   I mean, I don't need to get into the specifics
12   of the physician practice, you can do that on
13   your own, but you get, you know, the third-party
14   payors, that's who pays for all this is all the
15   insurance companies, they pay the 23 entities,
16   right.
17        We're actually managing that at the LLC
18   level, because we have revenue cycle management
19   people that manage all that, but they're -- you
20   know, it's under the tax -- individual tax IDs
21   of all those different entities.  The money
22   flows into the accounts of those different
23   entities, but then it's all transferred up to
24   the LLC entity that pays everything, right.
25        Q.   The LLC basically facilitates payment
```

**Page 72**

```
 1   for the 23 entities, correct?
 2        MR. MOORMAN:  Objection, form.
 3   BY MR. RENNER:
 4        Q.   Correct?
 5        A.   Yes.
 6        Q.   Okay.  Why didn't each of those 23
 7   entities apply for a PPP loan itself as opposed
 8   to Ocean State, LLC?
 9        A.   Because they were, one, they're just
10   medical offices.  They don't have any financial
11   resources to do that, right, and --
12        Q.   What do you mean by that?
13        MR. MOORMAN:  Let him -- let him finish
14   his answers, too.
15        THE WITNESS:  They're doctors, and
16   they're physician assistants, so the structure
17   is, is that you have a management company that
18   manages all the business capabilities and the
19   nonmedical, as I've talked about a couple times
20   now, and, you know, so that's the structure of
21   it.
22   BY MR. RENNER:
23        Q.   That was the structure imposed by New
24   Harbor?
25        MR. MOORMAN:  Objection, form.
```

1     THE WITNESS:  It was a structure
2  created by the structuring of this whole thing,
3  and it's a structure basically any physician
4  practice group is structured this way.  There's
5  thousands of them, thousands of them in America,
6  they're all structured this way.
7  BY MR. RENNER:
8     Q.   Okay.  I guess, I'm just still unclear
9  why -- is there any other reason why each of
10 those 23 entities didn't file their own PPP
11 application, was it just because New Harbor --
12 or Ocean State, LLC had more --
13    A.   We had a --
14       MR. MOORMAN:  You guys --
15       THE WITNESS:  Oh, sorry.
16       MR. MOORMAN:  You guys keep talking
17 over each other.  You've got to let him finish,
18 and you've got to let him finish.  You guys keep
19 talking over each other.
20       Can you read back the question?
21          (Whereupon, the record was read
22              as requested.)
23       THE WITNESS:  So there's a -- as we
24 talked about in -- let me just pull out an
25 exhibit here, if I can find it.

73

1        As we talked about on Exhibit 2, there
2  is a management service agreement between Ocean
3  State Companies and Ocean State, LLC that
4  manages that relationship.
5     Q.   Did Ocean State, LLC undertake any kind
6  of analysis to determine whether it was
7  appropriate for Ocean State, LLC to submit the
8  PPP application after aggregating those 23
9  entity's employees?
10       MR. MOORMAN:  I'm going to caution you
11 not to share any communications you had with
12 attorneys beyond saying you consulted with
13 attorneys.
14       THE WITNESS:  Yeah, yeah, we did quite
15 a bit of analysis.
16 BY MR. RENNER:
17    Q.   Okay.  Who was involved in that
18 analysis?
19    A.   Sarah Charette mainly, and probably --
20 we probably discussed it with our bankers.  I
21 don't think anybody else beyond that.
22    Q.   Who were your bankers?
23    A.   It was Freedom Bank, but now they got
24 -- they merged with somebody else.  I can't
25 remember the -- Bristol Bank or something now --

74

1  does that still exist there?
2     Q.   Yeah, Bristol County Savings Bank?
3     A.   Yeah, I think they acquired Freedom
4  Bank.
5     Q.   What about Deerpath?
6     A.   I don't believe we -- we may have, but
7  I don't remember.
8     Q.   What about anyone from New Harbor?
9     A.   I'm sure we had discussions with them
10 about it, but I can't recall specifically.
11    Q.   Anyone else?
12    A.   Probably -- well, probably the board of
13 Ocean State.  There was probably discussions at
14 the board meetings.
15    Q.   Law firms?
16       MR. MOORMAN:  Again, you can answer
17 that question yes or no, like, did you talk to a
18 law firm about this issue?
19       THE WITNESS:  Yes.
20       MR. MOORMAN:  And nothing else.
21 BY MR. RENNER:
22    Q.   Did Ocean State, LLC, or anyone on its
23 behalf, conduct any kind of need-based analysis
24 in advance of applying for the PPP loan?
25    A.   Yes.

75

1     Q.   And when I said -- I mean before
2  April 3rd?
3     A.   Yes.
4     Q.   Okay.  And describe for me what that
5  involved.
6     A.   Well, so, you know, my understanding
7  was, we -- as I remember, you had to show -- we
8  went in -- had to show a need based on -- you
9  know, it was the Payroll Protection Act, PPP,
10 right, so, you know, they wanted you to maintain
11 your employees and -- but, I mean, it was a very
12 clear need.
13       I mean, the business was not paying its
14 creditors, right, literally not paying Deerpath
15 for all the money they loaned us, right, we had
16 to -- we had had to lay off a number of
17 employees previous to all this.
18       We -- then as COVID hit, our urgent
19 care business went to zero.  Nobody came in from
20 one day to the next, gone, right.  Nobody could
21 go into a primary care office.
22       We were able to transition to
23 telemedicine that reimbursed it about half what
24 normally would have been reimbursed at, and then
25 eventually, we were able to start providing

76



**Page 77**

```
 1  respiratory services.
 2        We got designated by the state of Rhode
 3  Island as our respiratory services care offices,
 4  like, five or six of our locations, and so we
 5  provided -- we were providing COVID testing,
 6  and, I think, at one point we were the largest
 7  provider of COVID testing in Rhode Island, but,
 8  you know, that didn't reimburse very well, so
 9  our revenues dropped, if I remember correctly,
10  by about half from the previous year, so it was
11  a very clear need.
12        If we didn't get that loan, we were
13  going to be closing entirely.
14     Q.  To be clear, I'm talking about before
15  the April 3rd, 2020 application.
16     A.  Yeah, that's what I just explained to
17  you.
18     Q.  I just want to understand.
19        I'm talking about analysis that was
20  performed before the application.
21     A.  And that's what I just explained to
22  you.
23     Q.  Okay.  Did Ocean State, or anyone on
24  its behalf, reach out to any banks to see if it
25  could obtain a loan?
```

**Page 78**

```
 1     A.  So as I explained earlier, Deerpath was
 2  our senior lender.
 3        They had veto rights on any additional
 4  debt we could take.
 5        They had told us you can't take
 6  additional debt, so what would have been the
 7  point of reaching out to other banks?
 8     Q.  So no was the answer?
 9     A.  No.
10        MR. MOORMAN:  No wasn't his answer.
11        He explained his answer, which was they
12  couldn't reach out to other banks.
13  BY MR. RENNER:
14     Q.  All right.  Did you ask Deerpath, hey,
15  Deerpath --
16     A.  Yes.
17     Q.  -- can we reach out to other banks?
18     A.  Yes.
19     Q.  And what -- their answer was no?
20     A.  There answer was no.
21     Q.  And why was their answer no?  What
22  answer was given to you?
23     A.  I can't give you their reasoning.
24        I can just tell you that they had the
25  right to say no, and they said no.
```

**Page 79**

```
 1     Q.  And was that communicated to Ocean
 2  State or someone at New Harbor?
 3     A.  Ocean State.
 4     Q.  So was that communicated to you
 5  personally?
 6     A.  Yes.
 7     Q.  All right.  So someone from Deerpath --
 8  you asked someone from Deerpath -- let me finish
 9  --
10     A.  Yeah.
11     Q.  You -- is it your testimony that you
12  went to Deerpath, and said, hey, Deerpath, you
13  know, we want to reach out to see about getting
14  a loan from a bank to, you know, fulfill our
15  needs during COVID, and Deerpath responded that
16  they were vetoing you doing that?
17     A.  So from the time I joined Ocean State,
18  we hadn't paid Deerpath any interest.  We were
19  in technical default, and I was having weekly --
20  I had a weekly call with the representative from
21  Deerpath, Mauricio, we just talked through how
22  the business was going, you know, were we making
23  progress on the turnaround, so various times
24  throughout those weekly calls for, you know,
25  months and months, I'm sure we discussed that at
```

**Page 80**

```
 1  some point.  I can't recall exactly.
 2     Q.  But I'm saying -- my question is kind
 3  of a specific timeframe, though, it's, you know,
 4  March is, you know, COVID comes along, and then
 5  that timeframe between onset of COVID in March
 6  and --
 7     A.  Yeah.
 8     Q.  -- then the April 3rd, 2020
 9  application, did you reach out to Deerpath and
10  inquire whether they would allow Ocean State to
11  take a loan from another bank?
12     A.  Again, I was talking to Mauricio
13  weekly, so during that time, yes, we probably
14  discussed that.
15     Q.  Again, are you speculating or can you
16  recall a specific conversation?
17        MR. MOORMAN:  Objection, asked and
18  answered.
19        THE WITNESS:  Yeah, I think, I answered
20  your question.
21  BY MR. RENNER:
22     Q.  You probably did.  Is that what you're
23  saying?
24     A.  I've answered your question.
25     Q.  You haven't answered my question, sir.
```

**Page 81**

1    MR. MOORMAN:  You can provide another
2  answer.  It's up to you.
3        Why don't you read the question back,
4  and you can answer the question.
5        (Whereupon, the record was read
6             as requested.)
7    THE WITNESS:  Again, I had weekly
8  discussions with him.
9        We had discussed -- we discussed this a
10  number of times.
11       We weren't paying our interest at the
12  time, and hadn't for months, and, like, on my
13  weekly call, did I ask them every time will you
14  let us borrow money, more money, I'm sure we
15  discussed that at various points.
16  BY MR. RENNER:
17    Q.  But again, you don't have a specific
18  recollection?
19    MR. MOORMAN:  Are you -- he answered
20  this question.
21       Are you asking him, like, does he
22  remember the date and time of the conversation?
23    MR. RENNER:  No, I'm trying to -- so
24  COVID --
25    MR. MOORMAN:  He said -- he said it

**Page 82**

1  three times, Eric, I talked about this with
2  Mauricio on our weekly calls.
3    MR. MOORMAN:  He didn't say -- he
4  probably -- he said he probably talked to him.
5    THE WITNESS:  I did talk to him about
6  that.
7  BY MR. RENNER:
8    Q.  About what?
9    A.  That could we borrow more money, and
10  the answer was no.
11    Q.  But was this after the onset of COVID?
12    A.  Why would that have changed anything?
13    Q.  Well, it would have changed anything in
14  this way.
15       So COVID comes along, right, Ocean
16  State has a choice, it can apply for a PPP loan
17  or it can first go to Deerpath, and say, hey --
18    A.  Yeah.
19    Q.  -- can we reach out to one of our
20  banks, or a bank, and get a loan instead of
21  taking PPP money, I'm trying to figure out if
22  you had that discussion with Mauricio.
23    A.  I'm sure I did.
24       I mean, I can't remember specific
25  discussions I had since I was talking to him

**Page 83**

1  weekly, but I'm sure we had that discussion.
2    Q.  But you can't point to a specific
3  conversation; is that fair to say?
4    MR. MOORMAN:  Asked and answered.
5       He's told you that he is sure he had
6  that specific conversation three times.
7  BY MR. RENNER:
8    Q.  So Exhibit 20 is the memo you prepared
9  dated May 7, 2020, right?
10    A.  Yeah.
11    Q.  Are there any other memos prepared
12  similar to this prior to May 7?
13    A.  Well, we had a number of drafts if
14  that's, you know -- but this is the -- I believe
15  this is the final version.
16    Q.  All right.  Getting back.  So we talked
17  about obviously conversations with Deerpath
18  about reaching out to banks, right?
19    A.  Mm-hmm.
20    Q.  Did -- was there any thought given to
21  New Harbor Capital going to its investors for
22  funds?
23    A.  Yes.
24    Q.  Okay.  And can you describe for me
25  those conversations or that thought process?

**Page 84**

1    A.  Well, as we talked about earlier, they
2  had -- in September there was additional funding
3  from Deerpath, and then there was a guarantee
4  that New Harbor provided on some of that, and at
5  that point they -- it was clear that -- and they
6  said specifically -- this is the last thing we
7  can do.
8    Q.  And who is they?
9    A.  Both Deerpath and New Harbor.
10    Q.  Okay.
11    A.  Both of them.
12    Q.  So we talked about Deerpath, right?
13    A.  Yeah.
14    Q.  So New Harbor, you, John Roselli, as
15  Ocean State CEO, did you have discussions with
16  anyone from New Harbor about obtaining money
17  from investors.
18    A.  Yes.
19    Q.  Okay.  And what were those discussions?
20    A.  So, you know, with John Pircon and Ed
21  Lhee, we talked about could we, you know, get
22  more equity infusion into the business from New
23  Harbor at any point, and those discussions
24  happened in September after we did the
25  guarantees, and they were, like, that's it, we

John Roselli 03/14/2024

Confidential

1  can't do any more.
2      Q.   Okay.  But specifically, the timeframe
3  March, April, May of 2020, were those
4  conversations --
5      A.   Yes.
6      Q.   -- that took place?
7      A.   Yes.
8      Q.   Okay.  And those conversations, can you
9  describe those for me?
10     A.   Well, I mean, we -- you know, I had
11 weekly calls with the New Harbor teams, so
12 during those calls, we would talk about other
13 sources of funding, and they said numerous times
14 New Harbor cannot provide any more equity.
15     Q.   Why?
16         MR. MOORMAN:  Why did they say or why
17 couldn't New Harbor, because there's a
18 foundation objection to the latter?
19 BY MR. RENNER:
20     Q.   Why did they say?
21     A.   Why did they say, I mean, so --
22         MR. MOORMAN:  Objection, form.
23         THE WITNESS:  You know, the business
24 had struggled for a very long time, and they
25 were trying to support it as much as they could,

85

1  but ultimately, you know, they have a fiduciary
2  duty to their investors, and they had determined
3  that they had invested as much as they could,
4  and any more dollars invested would have not
5  been a good investment for their investors, so
6  they determined not to provide funding.
7  BY MR. RENNER:
8      Q.   And who did you have those
9  conversations with?
10     A.   John Pircon and Ed Lhee.
11     Q.   Anyone else?
12     A.   I don't believe so.
13         Probably other board members, too,
14 because these were discussions that probably
15 happened in board meetings.
16     Q.   Ocean State board members?
17     A.   Ocean State board members, right.
18     Q.   So, I mean, there's only so many of
19 them.
20         That would Tom Formolo, did you have
21 conversations with him?
22     A.   Not directly.
23         Ed was the lead partner, and John
24 Pircon was vice president on it, so I would have
25 had discussions with them directly.

86

1      Q.   Prior to the April 3rd, 2020 PPP
2  application, did Ocean State undertake any kind
3  of formal cash flow analysis in connection with
4  its need-based analysis?
5      A.   So cash was very tight, so we managed
6  cash -- we actually did a daily cash analysis,
7  daily and weekly analysis, so yeah, we were
8  doing it a lot.
9      Q.   And was a cash flow analysis conducted
10 specific -- specifically in connection with the
11 decision process whether or not to apply for a
12 PPP loan?
13         MR. MOORMAN:  Objection, form.
14         THE WITNESS:  I mean, since we were
15 doing daily and weekly, there -- we didn't have
16 to do a specific analysis for a PPP loan.  We
17 were doing it on a daily basis already, we did
18 have to -- oh, never mind, strike that.
19         MR. MOORMAN:  That's the first time
20 that's ever happened.
21 BY MR. RENNER:
22     Q.   This is the first time I'll ask this.
23 What were you just about to say?
24     A.   Nothing.
25     Q.   Nothing?

87

1      A.   Mm-hmm.
2      Q.   Okay.  You said we did have to, and
3  then we stopped.  What were you going to say?
4      A.   Nothing.
5      Q.   All right.  I'll show you Exhibit 11.
6  Do you recognize this document, sir?
7      A.   Yes.
8      Q.   All right.  And why does this document
9  have a Blueprint letterhead?
10     A.   So Blueprint had worked on a similar
11 document, and we were just -- we were just
12 borrowing this first paragraph on there from
13 them, and -- because everything else is totally
14 related to Ocean State, we just -- there was
15 just some good language that I wanted to use,
16 and I had seen this, so I just, you know,
17 borrowed it, and we do that in the private
18 equity world.  There's constantly sharing among
19 companies for various things, not even related
20 to financial.
21     Q.   So just the first paragraph --
22     A.   Yeah.
23     Q.   -- that you borrowed from Blueprint?
24     A.   It might be -- let me just keep going.
25 Yeah, probably just that.

88

1  rapidly. So we had discussions with our board,
2  and there were sort of verbal approval to move
3  forward, but, you know, we needed to move
4  quickly to get this done, and so we determined
5  to do the unanimous board consent documentation
6  of it post doing the actual loan.
7      Q.  All right. So in the fourth whereas
8  paragraph, Page 1; do you see that?
9      A.  Yeah.
10     Q.  It references an April 4th, 2020
11  letter?
12     A.  Mm-hmm.
13     Q.  That it says the board carefully
14  reviewed?
15     A.  Mm-hmm.
16     Q.  Do you know when the board reviewed
17  that April 4, 2020 letter; was it in May or was
18  it back in April before the application?
19     A.  I honestly can't remember that.
20  Can I see the letter? Do you have the
21  letter in your -- in the documentation?
22     Q.  I do. I have one copy of it, but I'll
23  show it to you.
24         I think I brought a copy of it. You
25  know what, I have notes on this, so I'm not

93

1      assume.
2          At the time of this written consent, do
3  you know whether or not you had written your
4  May 7th memo?
5      A.  You know, this is not a signed
6  document, so I don't know when it was signed.
7      Q.  Well, it's signed, and I only brought
8  one copy, but there are several versions each
9  signed by --
10     A.  No date.
11     Q.  There is not a date, but this one, for
12  instance, is signed by Tom Formolo, but I'll
13  represent to you there are other versions signed
14  by other board members.
15     A.  Okay. But there's no date on this
16  document.
17     Q.  There's not.
18     A.  So I need to see a date in order to,
19  you know, understand when it was signed.
20     Q.  So you don't -- you don't know one way
21  or another whether or not this is before or
22  after your May 7th memo?
23         MR. MOORMAN: Objection, form.
24         THE WITNESS: It's not a signed
25  document.

95

1  going to give it to you.
2         MR. MOORMAN: That's fine.
3  BY MR. RENNER:
4      Q.  All right. So do you know -- are you
5  familiar with this April 4th, 2020 letter that's
6  being referenced, do you know what that letter
7  is?
8      A.  I do not, but I'm happy to look at it.
9      Q.  I didn't bring it as an exhibit today,
10  so we'll have to ask someone else.
11         MR. MOORMAN: Just so we're clear --
12         THE WITNESS: I'm sure I've seen the
13  letter, but I need to see it in front of me in
14  order to talk intelligently about it.
15  BY MR. RENNER:
16     Q.  All right. All right. Exhibit 12 also
17  references on Page 2 your May 7th memo?
18     A.  Yeah. Where do you see that?
19     Q.  It's on Page 2. It's the fifth whereas
20  paragraph.
21     A.  Okay. And there's an exhibit, was it
22  attached, it says Exhibit B?
23     Q.  Well, it says a PPP qualification and
24  needs memo, which I can only assume is referring
25  to your -- you know what, I'm not going to

94

1         MR. MOORMAN: Hold on. Objection,
2  objection to form.
3         Why don't you restate the question.
4  BY MR. RENNER:
5      Q.  Well, I'm trying to figure out,
6  right -- so Exhibit 20 is your memo that we
7  talked about, right, the May 7th --
8      A.  Yeah.
9      Q.  -- 2020 memo?
10     A.  Yeah.
11     Q.  I'm trying to figure out whether or not
12  this -- I'm trying to figure out whether
13  Exhibit 20 was prepared before or after
14  Exhibit 12 was signed, and Exhibit 12, as you
15  noted, does not have a date on it, so I don't
16  know when it was prepared. I'm asking -- I'm
17  trying to get that from you.
18     A.  Well, I didn't prepare this document,
19  so it's very hard for me to speculate when it
20  was prepared.
21         I reviewed it, and I'm sure -- and it
22  was signed and dated at some point, but this --
23  the exhibit you're showing me is not dated.
24     Q.  This is the exhibit that I was given,
25  so that's what I have.

96

1    A.   And so I don't think I can respond to
2  your question.
3    Q.   Okay.  All right.  I'm showing you
4  Exhibit 13.  Have you seen this document before,
5  sir?
6    A.   Yes, I have seen this document.
7    Q.   All right.  This is dated April 20,
8  2020, right?
9    A.   Yes, it is.
10   Q.   All right.  So you testified earlier
11 about, you know, Deerpath vetoing Ocean State
12 taking on another loan from a bank, right?
13   A.   Yes.
14   Q.   Why did Deerpath allow Ocean State to
15 take out a PPP loan?
16       MR. MOORMAN:  Objection, foundation.
17 BY MR. RENNER:
18   Q.   Or what reason was given by Deerpath?
19   A.   Well, at the time the CARES Act was
20 created, and we were eligible for -- the
21 business was eligible for the loan, and so
22 Deerpath approved it.
23       I can't get into why they did that.
24 That's their decision, but they did.
25   Q.   Okay.  Did they ever give you an

97

1  explanation about their decision?
2    A.   They provided a certification that, you
3  know, they were SBIC qualified lender, but no,
4  they didn't.
5    Q.   Well, no, but didn't Ocean State -- it
6  had to go and get approval from Deerpath to take
7  out the PPP loan, right?
8    A.   Correct.
9    Q.   All right.  And what reason, if any,
10 was given by Deerpath to Ocean State as to why
11 it was allowed -- why Deerpath was allowing
12 Ocean State to take out a PPP loan?
13   A.   We were eligible, and they said yes,
14 you can do it.
15   Q.   Nothing else?
16   A.   Nothing else.
17   Q.   All right.  Exhibit 13, the first page,
18 if you look at Recital C.
19   A.   Mm-hmm.
20   Q.   It references a 5 million dollar
21 payment from New Harbor to Deerpath; do you see
22 that?
23   A.   Yes.
24   Q.   Do you recall the details surrounding
25 that 5 million dollar payment?

98

1    A.   I don't.
2    Q.   You don't, is that the answer?
3    A.   I don't.
4    Q.   Is there any reason why New Harbor
5  didn't make a payment in the amount of 5 million
6  dollars, or some lesser amount, to Ocean State
7  that could have been used by Ocean State to fund
8  its ongoing operations?
9        MR. MOORMAN:  Objection, foundation.
10       THE WITNESS:  Yeah, I can't respond on
11 New Harbor's rationale.
12 BY MR. RENNER:
13   Q.   Well, this is a loan agreement which
14 Ocean State is a party, right?
15   A.   Yes.
16   Q.   And you were at this time the CEO of
17 Ocean State, right?
18   A.   Mm-hmm.
19   Q.   So I take it you must have been aware
20 of the fifth amendment to the loan agreement
21 that's Exhibit 13, right?
22   A.   Yes.
23   Q.   All right.  But what involvement, if
24 any, did you have in this loan agreement?
25   A.   Well, you know, I worked with Deerpath

99

1  and New Harbor to put this together.
2        You know, we had lawyers obviously
3  document the whole thing.
4    Q.   You signed this document, though,
5  right?
6    A.   Yeah.
7    Q.   And if you look at Bates 74126, that's
8  your signature?
9    A.   Mm-hmm.
10   Q.   All right.  So you signed the document,
11 and on Page 1 it references a 5 million dollar
12 payment from New Harbor to Deerpath, right?
13   A.   Yeah.
14   Q.   All right.  I'm just trying to get from
15 you the details of that 5 million dollar
16 payment, why it was made, if you know?
17       MR. MOORMAN:  Objection, form and
18 foundation.
19       THE WITNESS:  So in this document
20 Deerpath is consenting to the PPP loan.  That's
21 on Item D.
22 BY MR. RENNER:
23   Q.   But really what I'm trying to figure
24 out is why was it that New Harbor chose to pay 5
25 million dollars to Deerpath as opposed to paying

100

1  that money to Ocean State, and help out Ocean
2  State during COVID?
3       MR. MOORMAN:  Objection, foundation,
4  and scope to the extent you're asking for New
5  Harbor's rationale, and I also object, I think,
6  you're misstating what this agreement -- what is
7  happening in this agreement.
8  BY MR. RENNER:
9       Q.  Guarantors, the guarantors are who?
10      A.  I'm going to have to read this really
11 closely.
12      MR. MOORMAN:  While he's reading it, is
13 this the amendment that relates to the same
14 series of amendments that you showed him dated
15 back to 2019?
16      MR. RENNER:  Yes.
17      THE WITNESS:  Yes, exhibit -- fourth
18 amendment.
19      MR. MOORMAN:  And is there -- was this
20 the original guarantee or were there guarantees
21 before this?
22      MR. RENNER:  That would be a stated
23 guarantee, and I assume that there is reference
24 to a document.
25      MR. MOORMAN:  Okay.

                                            101

1       THE WITNESS:  So the guarantors are all
2  the various Ocean State entities; Ocean State,
3  LLC, Ocean State Holdings.
4  BY MR. RENNER:
5       Q.  So you're saying that the guarantors
6  are not Deerpath -- I mean, excuse me, strike
7  that.
8       The guarantors, your understanding is
9  that that doesn't refer to New Harbor?
10      A.  I don't see New Harbor referenced here
11 in the first paragraph at all.
12      Q.  All right.  So then by that, is Ocean
13 State making the 5 million dollar payment?
14      MR. MOORMAN:  Objection again to the
15 extent that it mischaracterizes this series of
16 documents.
17 BY MR. RENNER:
18      Q.  I'm just trying to figure out who made
19 this 5 million dollar payment to Deerpath.
20      A.  I'm going to have to read this
21 document, like, the whole document to understand
22 it, so if you would like me to do that, I can.
23      Q.  You know, I mean, it sounds like we
24 might need to ask New Harbor, they might be able
25 to --

                                            102

1       A.  But again, the guarantors are Ocean
2  State.
3       New Harbor isn't a party to this
4  agreement.
5       Q.  Okay.  So then -- well, it refers to
6  Ocean State Holdings, right?
7       A.  Mm-hmm.
8       Q.  Okay.  So then why didn't Ocean State
9  Holdings make a payment to fund Ocean State, LLC
10 to help out during COVID?
11      MR. MOORMAN:  Again, objection,
12 foundation.
13      He's here to discuss the reasons,
14 perspectives of why Ocean State, LLC, the
15 defendant in this case, not why any of the New
16 Harbor entities did anything.
17      I also continue to object to the
18 characterization that this was a 5 million
19 dollar payment, the obligation of which is
20 stated here.
21 BY MR. RENNER:
22      Q.  So are you able to testify as to
23 details concerning this 5 million dollar payment
24 referenced in Exhibit 13?
25      A.  I would need to read through the entire

                                            103

1  -- not only this fifth amendment -- but all
2  other amendments to really get a full
3  understanding of this.
4       Q.  As you sit here today, do you have a
5  recollection of the details concerning this 5
6  million dollar payment in April of 2020?
7       A.  I don't have a recollection of this.
8       Q.  Okay.
9       A.  I -- yeah.
10      Q.  All right.  I'll show you Exhibit 14,
11 and just let me know if you recognize this
12 document.
13      A.  I would really have to just read
14 through this whole document to understand it and
15 recollect.
16      Q.  All right.  But as you sit here today,
17 you don't have an independent recollection of
18 this document?
19      A.  No.
20      Q.  Okay.  So I want to refer --
21      MR. MOORMAN:  You can stop reading the
22 document.  He's going to ask you questions.
23 BY MR. RENNER:
24      Q.  So I want to refer you back to March
25 and April of 2020, that timeframe.

                                            104

1    Was Ocean State, LLC, was it ordered by
2  any kind of governmental entity to shut down?
3    A.  Well, I think there was -- there was --
4  you know, at the time Rhode Island had their
5  state requirements about how you could operate a
6  doctor office.
7      Initially, you had to -- what I do --
8  what I recollect is it took them a few weeks to
9  come out with pronouncements about how you could
10  operate in certain settings, and they had
11  guidelines around a doctor's office setting, and
12  yeah, so we had requirements from the state of
13  Rhode Island.
14    Q.  But did Ocean State ever have to
15  actually shut down and close its operations?
16    A.  No.
17    Q.  What were the relevant industry trends
18  for Ocean State's line of business as of April
19  2020?
20      MR. MOORMAN:  Objection to foundation.
21      THE WITNESS:  I don't have any trend.
22  BY MR. RENNER:
23    Q.  Well, what was the general -- in March
24  and April of 2020, what was the general outlook
25  for, you know, the healthcare industry?

105

1    A.  You know, I didn't get sort of trend
2  information from anywhere.
3      I mean, you know, it's healthcare,
4  right, everybody needs healthcare all the time,
5  so -- but as far as like did I get trend
6  analysis from various research organizations,
7  no, I haven't -- I didn't see that at that time.
8    Q.  What were Ocean State's revenues driven
9  by, like, you referenced third-party payors
10  before, you know, is that largely from insurance
11  companies, private individuals or something
12  like --
13    A.  Well, revenue is driven by patient
14  visits, right, so patients come in, and most
15  patients have insurance, they provide us their
16  insurance information, and they might have a
17  co-pay, so they pay their co-pay, and then you
18  will create a claim for their visit, and you put
19  the claim through a clearinghouse, and those go
20  out to their insurance companies, and then the
21  insurance companies ultimately pay back to the
22  business based on the negotiated rate, right.
23    Q.  What about collections, are collections
24  an issue with insurance companies or not?
25    A.  Yes, it can be an issue with insurance

106

1  companies.
2      You have charges that you set, you
3  know, as provider, and you submit those claims.
4      The insurance companies might have a
5  negotiated rate, might not.
6      They'll come back to you for that
7  claim, that code, we pay this much, and it might
8  be 30 percent under what you actually, you know,
9  charge.
10      I think, if I remember correctly, with
11  Ocean State, we had about -- it was from charges
12  to actual collections, there was like a
13  30 percent, 35 percent discount from that.
14    Q.  Yeah, maybe I didn't word my question
15  correctly.
16      When I'm referring to collections, I
17  mean, like, actually getting the money from the
18  insurance company.
19    A.  Yeah.
20    Q.  They might mark it down, but they
21  always pay, right?
22    A.  No.
23    Q.  No?
24    A.  No, you've got to -- you've got to --
25  yeah, I mean, there's -- it's a lot of work to

107

1  manage the revenue cycle side of a physician
2  practice group, and, you know, you've got to
3  always be following up, and they often will come
4  back and not pay on claims, and then you have to
5  go back and forth with them, and, you know,
6  fight over that.
7      You might have miscoded something, they
8  might have misread something, you know, and you
9  just kind of -- and then sometimes you have to
10  write things off.
11    Q.  As of March 31, 2020, how much cash did
12  Ocean State have on hand?
13    A.  As of what date?
14    Q.  March 31, 2020.
15    A.  You know, you're going to --
16    Q.  I mean, I'm not asking to the penny,
17  but if you have an idea.
18    A.  I mean, approximately, I would say we
19  had maybe $500,000 on hand.  This is prior to
20  getting the PPP loan.
21    Q.  Right.
22    A.  I think I saw documents earlier at some
23  point we had about 350.  I don't know if it was
24  that date.  It was around the date that we got
25  the PPP loan.

108



Page 113:

```
 1        MR. MOORMAN:  Objection.  He can answer
 2   the question if he knows in his personal
 3   capacity, but not on behalf of -- he's not here
 4   to testify on behalf of New Harbor.
 5        THE WITNESS:  Yeah, so I'm not -- I
 6   can't really respond to New Harbor's
 7   perspective, but typically, what they would do
 8   is just have any business that was kind of
 9   reaching -- you know, typically we own a
10   business for five years or more, and so you'd
11   have stuff in there that is around that vintage,
12   and, yeah, so --
13   BY MR. RENNER:
14        Q.   So are you aware whether as of March
15   2020, there was a plan to exit from Ocean State?
16        A.   As of March 2020, we were not working
17   on an exit, from an Ocean State perspective, we
18   were not working at all on selling the business.
19        Q.   Okay.  But are you able to testify as
20   to from a New Harbor perspective?
21        A.   Probably not.  I think that would be a
22   New Harbor question.
23        Q.   But you're not able to testify to that,
24   is that what you're saying?
25        A.   Yes.
                                              113
```

Page 114:

```
 1        Q.   Okay.  All right.  Could you look at be
 2   Exhibit 16, please?
 3        A.   Okay.  Got it.
 4        MR. MOORMAN:  Eric, this handwriting on
 5   top, is that --
 6        MR. RENNER:  That's not mine.  It's the
 7   original.
 8        THE WITNESS:  Yeah.
 9        MR. RENNER:  The 16, no, it's not mine,
10   not my handwriting.
11   BY MR. RENNER:
12        Q.   Have you seen this document before,
13   sir?
14        A.   Yes.
15        Q.   All right.  Who is Livingstone
16   Partners, LLC?
17        A.   They're an investment bank.
18        Q.   All right.  Is it a fair
19   characterization -- well, strike that.
20        Did Ocean State have discussions with
21   Livingstone regarding selling Ocean State?
22        A.   Yeah.
23        Q.   All right.  And do you know when those
24   discussions with Livingstone first took place?
25        A.   It would be on and around this date of
                                              114
```

Page 115:

```
 1   April 1.
 2        Q.   Okay.  And did -- this is an unsigned
 3   document --
 4        A.   Okay.
 5        Q.   -- I'll tell you, sir, but do you know
 6   if Ocean State ultimately did end up in engaging
 7   Livingstone?
 8        A.   Yes.
 9        Q.   And do you know when, roughly, the
10   date?
11        A.   It was around this date.  Obviously, it
12   wasn't before April, but it was close to that.
13        Q.   All right.  So is it accurate to say
14   that as of April 1, 2020, Ocean State had
15   engaged Livingstone in connection with the sale
16   of Ocean State?
17        A.   Yes.
18        MR. MOORMAN:  Objection, objection,
19   form.
20        Are you talking the sale that
21   ultimately happened or are you talking about a
22   potential sale here, that's the form objection,
23   because there was a sale.
24        MR. RENNER:  I'm referring to a
25   potential sale.
                                              115
```

Page 116:

```
 1        THE WITNESS:  Okay.  Potential sale.
 2   BY MR. RENNER:
 3        Q.   So why did Ocean State engage
 4   Livingstone?
 5        A.   To explore a potential sale of Ocean
 6   State.
 7        Q.   Okay.  And so is it fair to say that as
 8   of April 1, 2020, Ocean State had engaged
 9   Livingstone to explore the potential sale of
10   Ocean State?
11        A.   Yes.
12        Q.   All right.  So is it fair to say then
13   that as of April 1, 2020, Ocean State was
14   contemplating the potential sale of Ocean State?
15        A.   Yes.  I just should be clear, though,
16   that this is like the first step.
17        Like, when you start to consider exit,
18   the first thing you do is hire an investment
19   bank, so this was the beginning of that.
20        Q.   Did you have discussions with
21   individuals from Livingstone?
22        A.   Yes.
23        Q.   Okay.  And when did those discussions
24   first --
25        A.   On and around --
                                              116
```

1    MR. MOORMAN:  You guys --
2    THE WITNESS:  I'm sorry.
3    MR. MOORMAN:  -- you've got to give him
4  time to ask his question.
5  BY MR. RENNER:
6    Q.   When did you first have discussions
7  with Livingstone about the sale -- or potential
8  sale of Ocean State?
9    A.   On or around this date.
10    Q.   When Ocean State certified in its PPP
11  application that it needed the PPP loan, were
12  the proceeds of a potential sale of Ocean State
13  considered?
14    MR. MOORMAN:  Objection, form.
15    THE WITNESS:  Yeah, can you -- can you
16  be more specific or elaborate a little bit more
17  what you're asking?
18  BY MR. RENNER:
19    Q.   Well, I assume -- correct me if I'm
20  wrong -- but Ocean State anticipated that when
21  when it was sold, there would be proceeds from
22  the sale coming to Ocean State, correct?
23    A.   Mm-hmm, mm-hmm.
24    MR. MOORMAN:  Hold on.  Coming to who?
25    MR. RENNER:  To Ocean State.
                                              117

1    THE WITNESS:  Well, it would have been
2  coming to the owners of Ocean State.
3  BY MR. RENNER:
4    Q.   Okay.  When it made that -- when Ocean
5  State made the, you know, economic necessity
6  certification in its PPP loan application, did
7  it consider the fact that there would be
8  proceeds from the potential sale coming in?
9    MR. MOORMAN:  Objection, form.
10    THE WITNESS:  Again, a potential sale
11  would provide -- would provide -- the dollars
12  would flow to the owners.  It may not
13  necessarily flow into the business.
14    When you sell a business, it's equity
15  to the owners and paying off the debt, and there
16  -- you know, there may not be any additional
17  capital invested in the business.
18  BY MR. RENNER:
19    Q.   Well, this isn't invested in the
20  business, it's proceeds of a sale --
21    A.   That goes to the owners of the
22  business.
23    Q.   Well, it would come to the business,
24  and then would be distributed to the owners; is
25  that fair to say?
                                              118

1    MR. MOORMAN:  Objection, form.
2    THE WITNESS:  It typically flows
3  directly to the owners of the business when you
4  sell a company, and you'll have a -- you'll have
5  a funds flow, and it will have, you know, the
6  owners and their, you know, bank accounts, and
7  the money gets wired directly to the owners.
8  BY MR. RENNER:
9    Q.   All right.  But my question, I guess,
10  is when Ocean State certified that the PPP loan
11  was necessary --
12    A.   Yeah.
13    Q.   -- did Ocean State give any
14  consideration to there being a potential sale of
15  Ocean State?
16    MR. MOORMAN:  Objection, form.
17    THE WITNESS:  Well, it was contemplated
18  at some point that we would sell the business,
19  but you understand, if you sell a business -- if
20  you start the process of selling a business,
21  it's three to five months before you ever
22  actually sell the business, and we were running
23  out of money immediately, like, we weren't -- we
24  weren't going to be able to make payroll in two
25  weeks, so it wouldn't have been a source of
                                              119

1  funding.
2    we would have, you know, closed up
3  shop, and there would be nothing to sell.
4  BY MR. RENNER:
5    Q.   How was Ocean State funded in the past?
6    MR. MOORMAN:  Objection, form.
7  BY MR. RENNER:
8    Q.   Like we talked about Deerpath, right?
9    MR. MOORMAN:  Objection, form.
10    THE WITNESS:  Funded in the past, well,
11  you know, it was funded through the operations
12  of the business and then some loans but, you
13  know, it's usually you want a business to be
14  funded through the operations of the business in
15  order to be a viable business.
16  BY MR. RENNER:
17    Q.   Well, I'm just trying to get a sense of
18  all the available sources of funding.
19    You talked about operations revenue,
20  right?
21    A.   Earnings, not revenue.
22    Q.   Fair enough, earnings.
23    Well, Ocean State had utilized SBIC
24  funding as a source of -- as a source before,
25  correct?
                                              120

1    A.    Correct.
2    Q.    And had Ocean State used New Harbor as
3    a source of funding in the past?
4    A.    Well, they provided equity investments,
5    yeah, not debt, but equity.
6    Q.    Do you know how much?
7    A.    You know, it probably would be
8    difficult for me to answer that question.
9    Q.    All right.  So other than New Harbor
10   and Deerpath and earnings, what other funding
11   sources were there for Ocean State?
12        MR. MOORMAN:  Objection, form.
13        THE WITNESS:  I think at some point
14   some of the other owners, the doctors that owned
15   might have done some pro rata, you know, equity
16   injections when that was done, but I -- it was
17   before I was there.
18        They didn't do that after I was there.
19   BY MR. RENNER:
20   Q.    What about funding through investors?
21   A.    You'd have to be more specific about
22   what do you mean by investors?
23   Q.    Well, the LPs in the fund?
24        MR. MOORMAN:  Objection, form.
25        THE WITNESS:  Yeah, I think you're

121

1    A.    To fund operations.
2    Q.    All right.  And why was that funding
3    made or provided -- provided -- why was that
4    funding provided by New Harbor?
5        MR. MOORMAN:  Objection, foundation,
6    also scope.
7        He's here to talk about Ocean State,
8    not New Harbor.
9        THE WITNESS:  So I can tell you from a
10   -- from an Ocean State perspective, we were
11   running out of funding.
12        We were not operationally cash-flow
13   positive, so we needed additional equity.
14   BY MR. RENNER:
15   Q.    How did Ocean State request that
16   additional equity?
17   A.    That would be difficult for me to ask
18   -- or answer, because they did that before I was
19   even involved.
20        Like, it funded right after I got
21   involved, but the discussions started before I
22   was interim CEO of the business.
23   Q.    So I want to focus on the timeframe
24   just prior to the April 3rd, 2020 PPP
25   application.

123

1    going to have to talk to New Harbor about that.
2    BY MR. RENNER:
3    Q.    All right.  How would Ocean State get
4    funding from New Harbor Capital, like, what's
5    the process?
6        MR. MOORMAN:  Objection to form.
7        THE WITNESS:  Yeah, again, as an Ocean
8    State CEO from September 19th or you, know,
9    early September onward, we didn't get any equity
10   infusions from New Harbor, so I have difficulty
11   answering that question.
12   BY MR. RENNER:
13   Q.    That would be something New Harbor
14   would have to answer?
15   A.    Yeah, I would think so, yeah.
16   Q.    So in 2019 is it correct that New
17   Harbor Capital provided funds to Ocean State for
18   working capital?
19   A.    I'm sorry, when?
20   Q.    In 2019 do you recall New Harbor
21   providing 2 million dollars roughly in funds to
22   Ocean State?
23   A.    Yes.
24   Q.    Okay.  And what was the purpose of that
25   2 million dollars?

122

1        Did Ocean State have access to a
2    revolving line of credit from Deerpath?
3    A.    We had a revolving line of credit with
4    Deerpath.
5    Q.    Was there credit available?
6    A.    No.
7    Q.    No.  It had been used up, is that
8    right?
9    A.    That's correct.
10   Q.    And I take it from your earlier
11   testimony, Ocean State didn't submit any loan
12   applications at other -- for non-PPP funds?
13   A.    No.
14   Q.    And I take it from your prior
15   testimony, Ocean State didn't request funding
16   from Deerpath?
17   A.    No, that's not what I said earlier,
18   but, you know, I don't know if I want to get
19   into this again, but --
20   Q.    These were the discussions with
21   Mauricio you talked about?
22   A.    I had weekly discussions with Deerpath
23   from the time I started in September.
24   Q.    So without the PPP loan, how would
25   Ocean State have survived?

124

1    A.   Well, I think it would be fair to say
2  that it probably wouldn't have.
3    Q.   So it would have shut down?
4    A.   It wouldn't have been able to pay its
5  employees.
6    Q.   New Harbor -- your understanding is
7  that New Harbor would have just let it fail?
8         MR. MOORMAN:  Objection.  He's here to
9  talk about Ocean State, not New Harbor.
10        THE WITNESS:  I can't speak to New
11  Harbor, but, you know, given that we -- that the
12  cash position and the disruption of the business
13  via -- as a result of COVID, it would have
14  likely ceased to operate.
15  BY MR. RENNER:
16   Q.   Even though it was planned to be sold?
17   A.   The --
18        MR. MOORMAN:  Hold on.  Objection,
19  form.  That is not his testimony.
20        MR. RENNER:  That's a question I'm
21  asking.
22        THE WITNESS:  Can you ask it again?
23  BY MR. RENNER:
24   Q.   Right.  So we talked about the
25  potential sale of Ocean State, right?

125

1  loan -- from the time I got involved until, you
2  know, after COVID, we weren't paying on our
3  loan, so they could have done that at any point,
4  but they felt like we were working hard to try
5  to turn the business around, and as a -- just
6  basically a lender, they have no ability to run
7  a primary care, urgent care business, so they
8  really were depending on -- they thought we were
9  their best option to try to turn the business
10  around.
11   Q.   And when you say we, are you referring
12  to --
13   A.   Ocean State management, Ocean State
14  board.
15   Q.   All right.  I'm going to show you
16  Exhibit 17.  This is April 16, 2020, e-mail.  Do
17  you recall this e-mail?
18   A.   No.
19   Q.   Okay.  So you say in here -- this is
20  sent from you to --
21   A.   Mauricio.
22   Q.   -- Mauricio and Patrick Kane at
23  Deerpath, and you say the password on the profit
24  improvement plan is COVID19; do you see that?
25   A.   Yeah.

127

1    A.   Mm-hmm.
2    Q.   And that was in the works no later than
3  April 1 of 2020, right?
4    A.   Mm-hmm.
5    Q.   I mean, Ocean State would have just
6  been allowed to fail rather than be sold?
7    A.   No, the --
8         MR. MOORMAN:  Objection, form.  You've
9  got to slow down.  Objection, form and
10  foundation.
11        THE WITNESS:  No, the likely -- the
12  likely scenario, it's called we'd hand over the
13  keys.  We'd say to Deerpath, it's your business,
14  because they're now the, you know -- they have
15  all the debt, they have all the senior debt, and
16  we just -- we're, like, we're done, and here's
17  the business and --
18  BY MR. RENNER:
19   Q.   Did you discuss that scenario with
20  Deerpath?
21   A.   Yes.
22   Q.   Okay.  Can you describe those
23  communications?
24   A.   I mean, they could have done that from
25  the beginning, because we weren't paying on our

126

1    Q.   What does that mean?
2    A.   It means that's the password for a
3  document.
4    Q.   For what document?
5    A.   I honestly don't remember, but we had
6  probably put together a turnaround plan, and so
7  that's the password for the turnaround plan.
8    Q.   Is that a password you selected?
9    A.   Probably, yes.
10        MR. MOORMAN:  Just for the record, this
11  is only part of the document, right, there's
12  more to this?
13        MR. RENNER:  I mean, it looks to be an
14  e-mail, part of an e-mail chain.
15        I don't recall how it's produced off
16  the top of my head.
17        MR. MOORMAN:  Okay.
18  BY MR. RENNER:
19   Q.   All right.  So now I want to talk about
20  the time period after Ocean State received the
21  PPP funds, okay?
22        So after receiving the funds, did Ocean
23  State make all of its outstanding rent payments?
24   A.   If my memory is correct, yes, we did.
25   Q.   Did it negotiate lower rent with the

128

1  proceeds of the sale, right?
2       A.   It was as I -- let's see.
3            As I remember it, the sale happened
4  before the forgiveness was given by the
5  government, and so when the sale happened, there
6  was an escrow account set up for the total
7  amount of the loan, right, so that -- they held
8  back proceeds, and then once the loan was
9  forgiven, then they distributed the proceeds.
10      Q.   Right, but my question was then, I
11 assume, it's fair to say that the proceeds of
12 the sale were not used to pay back any of the
13 PPP loan money, right?
14      A.   No -- well, no -- can I restate that?
15      Q.   Yes.
16           MR. MOORMAN:  Yes, of course.
17           THE WITNESS:  I mean, yes, they were,
18 but as I said, the transaction happened, right.
19 BY MR. RENNER:
20      Q.   Which transaction?
21      A.   The sale of Ocean State to what
22 ultimately is Village MD.
23           Village MD paid some money, right, and
24 then there was an escrow account set up, you
25 know, equivalent to the loan agreement, and

133

1  standard questionnaire that was sent to
2  basically any entity that took more than
3  2 million dollars, I think, so it was like after
4  the PPP thing, they came up with that -- that
5  questionnaire.
6       Q.   So is it fair to say that that -- well, did
7  you or anyone else on Ocean State's behalf ever
8  speak with anyone from either the SBA or any
9  other governmental agency about Ocean State's
10 PPP loan?
11           MR. MOORMAN:  Hold on.  So what time
12 period?
13           MR. RENNER:  Well, I guess, up until --
14 well, I know we had the -- not in connection
15 with the lawsuit.
16           MR. MOORMAN:  Okay.
17           THE WITNESS:  Not in connection with
18 the lawsuit, not that I'm aware of.
19           You have to remember, when these --
20 when this was happening, like, they had phone
21 numbers you could call to get information.  You
22 couldn't get anybody to pick up.  There was no
23 way to talk to anybody.
24 BY MR. RENNER:
25      Q.   Right.

135

1  after the sale, a month or two later -- I can't
2  remember the exact time -- the loan was
3  forgiven, and then the escrow was released.
4       Q.   Fair enough.
5            My question was, so the money from the
6  sale to Village MD wasn't used to pay back like
7  -- was it Freedom Bank --
8       A.   No.
9       Q.   -- or the government that those monies
10 that were obtained in the PPP loan; no, right?
11      A.   The -- no.
12      Q.   Okay.  Did the SBA or any other
13 governmental agency ever do an audit of Ocean
14 State's PPP loan?
15      A.   At some point we had to fill out a
16 questionnaire that went into a whole bunch of
17 detail about our ownership structure, and we
18 answered all the questions about private equity
19 and various other things.
20           I don't believe they did an audit.  I
21 wasn't aware of one --
22      Q.   So other than --
23      A.   -- beyond that.
24      Q.   Other than the questionnaire?
25      A.   Yeah, and the questionnaire was a

134

1       A.   Because there was, you know, 100
2  million companies around the U.S. trying to
3  figure this out.
4       Q.   All right.  So the answer is no, right?
5       A.   Yeah, no.
6       Q.   And is that -- that question was
7  regarding, I guess, the PPP loan application.
8            Is it also true that there were no
9  discussions with any SBA or governmental
10 officials regarding forgiveness of the loan?
11      A.   That's correct.
12           MR. MOORMAN:  Except in connection with
13 this lawsuit?
14           THE WITNESS:  Except in connection with
15 the lawsuit?
16           MR. RENNER:  Right.
17           THE WITNESS:  Again, the PPP loan
18 program was administered by local banks, so our
19 communication was with the bank that
20 administered it.
21 BY MR. RENNER:
22      Q.   Are you aware if your banks -- other
23 than the application itself for -- you know, the
24 loan application and the forgiveness
25 application, other than those documents, are you

136

John Roselli 03/14/2024
Confidential

1  aware if the bank provided any other information
2  to the SBA or the government regarding Ocean
3  State's obligations?
4       A.   I can't answer for the bank.  I have no
5  idea.
6       Q.   Did you or anyone else at Ocean State
7  ever discuss the idea of giving the PPP money
8  back?
9       A.   No.
10      Q.   After the application in April of 2020,
11 did Ocean State ever do any kind of
12 re-evaluation of whether or not it actually
13 needed the loan, the PPP loan?
14      A.   Well, as I said, we were managing cash
15 on a daily and weekly basis, so, you know, it
16 was very clear that we needed the money to
17 operate the business.
18      Q.   This is Exhibit 18.  Do you recognize
19 this document, sir?
20      A.   Yes.
21      Q.   You've seen it before?
22      A.   Yes.
23      Q.   And on the last page, it's the
24 electronic signature, but you verified this?
25      A.   Yes.

137

1  BY MR. RENNER:
2       Q.   Sure, we'll start with that.
3       A.   Ocean State board, Deerpath, the bank
4  we worked through, and, you know, Sarah and
5  myself.
6       Q.   Anyone else?
7       A.   No.
8       Q.   What was Deerpath's involvement --
9  strike that.
10           Who else had involvement?
11      A.   Involved --
12           MR. MOORMAN:  Hold on.  The last
13 question you asked was awareness or involvement.
14 He answered awareness.
15           MR. RENNER:  Right.  So now we're going
16 to move to involvement.
17           MR. MOORMAN:  Okay.
18           THE WITNESS:  Involved in actually
19 filling out the application?
20 BY MR. RENNER:
21      Q.   No, no, not just filling it out, but
22 either providing input, information, that kind
23 of thing.
24      A.   So some of our board members, most
25 likely Ed Lhee and John Pircon and Deerpath, so

139

1       Q.   I just want to talk about a few of the
2  interrogatory answers here.
3       A.   Okay.
4       Q.   I think you may have answered some of
5  them.
6            All right.  So if you go to Page 12,
7  and the supplemental response to Interrogatory
8  No. 8.
9       A.   Mm-hmm.
10      Q.   So the third sentence down, it says
11 defendant further states that additional
12 individuals may have had awareness of the PPP
13 loan applications or loan forgiveness
14 applications for Ocean State, including the
15 other individuals listed in response to No. 1?
16      A.   Mm-hmm.
17      Q.   So who specifically either had
18 awareness, involvement in the PPP loan
19 application?
20           MR. MOORMAN:  Wait.  It's awareness or
21 involvement?
22           MR. RENNER:  Well, both, either one.
23           THE WITNESS:  So awareness, who had
24 awareness of it?
25

138

1  Mauricio and Patrick Kane.
2       Q.   All right.  Anyone else?
3       A.   Not that I'm aware of, no.
4       Q.   And what was Deerpath's involvement?
5       A.   They were really just helpful in --
6  first, they provided us a certification that
7  they were an SBA certified lender, which we
8  included in the application, but they were --
9  they were helpful, because they had -- they were
10 SBIC lenders, so basically every one of their
11 companies was applying for a PPP loan, so they
12 were super knowledgeable and helpful in this
13 period where it was hard to get any information,
14 so they were sharing a lot of, you know, advice
15 and counsel on the process.
16      Q.   And what about the board members you
17 referenced?
18           MR. MOORMAN:  Who?
19           MR. RENNER:  Pircon and Ed Lhee.
20           MR. MOORMAN:  Objection, form.
21           THE WITNESS:  Can you be more specific
22 with your question?
23 BY MR. RENNER:
24      Q.   Sure.  What involvement did Mr. Lhee
25 and Mr. Pircon have?

140

1 position of Ocean State?
2        MR. MOORMAN: It's both. He's here to
3 testify on behalf of Ocean State at the same
4 deposition.
5 BY MR. MOORMAN:
6    Q.   Mr. Renner showed you some documents
7 like the LLC agreements, you know, other
8 management agreements.
9        Do those -- is it your understanding or
10 based on -- what is your understanding -- strike
11 that.
12        What is your your understanding of
13 whether the agreements between Ocean State and
14 New Harbor, or any New Harbor affiliated entity,
15 whether those agreements give Ocean State the
16 ability to access New Harbor's assets?
17    A.   They -- as far as I -- as far as my
18 understanding, it gives them no ability to
19 access New Harbor assets.
20        MR. RENNER: Objection to form,
21 foundation.
22 BY MR. MOORMAN:
23    Q.   So I want talk about the affiliation
24 requirement, right?
25        Just remind me and the jury -- although

161

1 we're not videotaped right now -- how was Ocean
2 State able to apply for a PPP loan given the
3 existence of the affiliation requirement?
4        MR. RENNER: Objection.
5        THE WITNESS: There was a waiver
6 provided in the -- in the PPP loan regulations
7 for any company that had already applied for and
8 received a loan from an SBIC accredited lender,
9 and we had that through Deerpath, and provided
10 that in our application, a certification of that
11 in our application.
12 BY MR. MOORMAN:
13    Q.   And just -- I think you just said this,
14 but I wasn't paying attention.
15        How did you know Deerpath qualified as
16 an SBIC lender?
17    A.   They provided certification that they
18 were -- they were SBIC certified.
19    Q.   So just big picture. How confident
20 were you, was Ocean State, that based on all of
21 the eligibility rules you reviewed, all of the
22 diligence you did, that Ocean State was eligible
23 for a PPP loan notwithstanding the affiliation
24 rules?
25    A.   We were very confident that we

162

1 qualified.
2    Q.   Mr. Renner asked you about the timing
3 of when Ocean State received funding from
4 Deerpath as an SBIC lender; do you recall that?
5    A.   Yes.
6    Q.   At the time you applied for a PPP loan,
7 did you understand whether the SBIC exception
8 imposed any time limitation on when a company
9 received lending support from the SBIC company?
10    A.   As far as we knew, there was no time
11 limit on SBIC lending.
12    Q.   I want to ask you some questions about
13 payroll.
14        So Mr. Renner asked you some questions
15 about which entity was responsible for paying
16 the people that worked for Ocean State, and
17 also, I think, the 23 companies that provided
18 health care services; do you remember that?
19    A.   Yes, yes.
20    Q.   Who was responsible for paying all of
21 those employees?
22        MR. RENNER: Objection, form.
23        THE WITNESS: Ocean State, LLC.
24 BY MR. MOORMAN:
25    Q.   Okay. And that includes the Ocean

163

1 State, LLC employees?
2    A.   Yes.
3    Q.   Does that also include the people that
4 work for those 23 entities that are providing
5 healthcare services?
6    A.   Yes.
7        MR. RENNER: Objection, form.
8 BY MR. MOORMAN:
9    Q.   And from whose bank account did the
10 money to pay the employees that worked for those
11 23 entities come from?
12    A.   Ocean State, LLC.
13    Q.   How did Ocean State, LLC get the money
14 to make those payments?
15    A.   There was -- so the cash flow from
16 patient visits came from third-party payors into
17 the professional services companies, and there
18 was a sweep on a daily basis of that money up to
19 the Ocean State accounts.
20    Q.   And did the 23 companies have a right
21 to that money or did that money go to Ocean
22 State, LLC?
23    A.   It directly went to Ocean State based
24 on the services agreements.
25    Q.   And did Ocean State have any ability

164

1  not to make payroll, to keep the money for
2  itself?
3      A.  No.
4      Q.  And were these obligations limited to
5  payroll or was Ocean State, LLC also responsible
6  for other payments for the 23 medical
7  organizations?
8      A.  They made all payments -- all of AP was
9  paid by Ocean State, LLC.
10      Q.  And if Ocean State, LLC did not make
11  those payments, not make those payroll payments,
12  what happens?
13      A.  All the businesses are unable to pay
14  their debts.
15          So all the medical companies could not
16  pay payroll, could not pay, you know, for all
17  the medical equipment and supplies that they
18  needed.
19      Q.  So I want to turn your attention to
20  Exhibit 20.  I think it's right there, John.
21      A.  Which one, this one?
22      Q.  This one.
23          So, Mr. Roselli, Exhibit 20 is the
24  May 7th, 2020 memo that you prepared with the
25  subject Paycheck Protection Program.

165

1      Do you remember getting asked questions
2  about this?
3      A.  Yes.
4      Q.  Does this memo contain the analysis
5  that you conducted to determine whether you were
6  eligible for a PPP loan?
7      A.  Yes.
8      Q.  Did you conduct the analysis
9  memorialized in this memorandum before you
10  applied for the PPP loan?
11      A.  Yes.
12      Q.  You also were asked some questions --
13  oh, before I get to that -- this May 7th, 2020
14  memorandum that contains the analysis you did
15  about your eligibility for the loan, did you
16  provide that to the board of Ocean State?
17      A.  Yes, we did.
18      Q.  Okay.  So Exhibit 12, this is the
19  unanimous consent of the board of managers,
20  right?
21      A.  Yeah, mm-hmm.
22      Q.  And if you turn to the end, there's
23  Exhibit B.
24      A.  Yeah.
25      Q.  It says, memo.  I know it's not

166

1  attached to the resolution, but is the memo that
2  is Exhibit B, this May 7th, 2020 memorandum that
3  you prepared?
4      A.  Yes.
5      Q.  Do you have any reason to doubt that
6  the people that signed this Exhibit 12 had not
7  read your memorandum before they signed it?
8      A.  No, it was included, and I have no
9  reason to believe that they didn't read it.
10      Q.  Did Ocean State's business start to
11  improve in the months after it applied for its
12  PPP loan?
13      A.  There were -- it was very difficult for
14  the first few months, and we started to see
15  improvement, but it was nowhere near what it was
16  the prior year.
17      Q.  Could Ocean State have gotten to the
18  point where its business started to improve had
19  it not received a PPP loan in March of 2020?
20      A.  No.
21      Q.  All right.  Mr. Roselli, just one more
22  question, I think.
23          Would you have ever applied for a PPP
24  loan, allowed Ms. Charette to sign the PPP loan
25  application, recommended the PPP loan to the

167

1  board of Ocean State if you did not think Ocean
2  State was eligible for the loan?
3      A.  Absolutely not.
4      Q.  Okay.  I have no further questions.
5          FURTHER EXAMINATION
6  BY MR. RENNER:
7      Q.  Just one question.
8          Do you recall sending an e-mail -- it's
9  not an exhibit, I didn't bring it, but I believe
10  from my memory, it's July of 2020 -- do you
11  remember sending an e-mail stating that year
12  over year Ocean State was doing better in 2020
13  than 2019?
14      A.  I don't -- I don't remember that.
15      Q.  All right.  Do you recall, is that the
16  case, that year-over-year basis, was 2020 better
17  than 2019?
18      A.  No.
19      Q.  Okay.  But, I mean, obviously, the
20  financial documents will --
21      A.  Yeah, the financial --
22          MR. MOORMAN:  Hold on.  Don't take his
23  word for the document.
24  BY MR. RENNER:
25      Q.  I assume, you know, if we were to

168