# **EXHIBIT 72**

1/3/25, 12:17 PM   Office of Public Affairs | Victory Automotive Group Inc. Agrees to Pay $9 Million to Settle False Claims Act Allegations Relating to Paycheck Protection Program Loan | United States D…

Case 1:20-cv-00536-JJM-PAS   Document 66-72   Filed 01/06/25   Page 2 of 43 PageID #: 2616



PRESS RELEASE

# Victory Automotive Group Inc. Agrees to Pay $9 Million to Settle False Claims Act Allegations Relating to Paycheck Protection Program Loan

Wednesday, October 11, 2023

**For Immediate Release**

Office of Public Affairs

Port Richey, Florida-based automotive management company Victory Automotive Group Inc. (VAG) has agreed to pay $9 million to resolve allegations that it violated the False Claims Act (FCA) by knowingly providing false information in support of a Paycheck Protection Program (PPP) loan forgiveness application it submitted.

Congress created the PPP in March 2020, as part of the Coronavirus Aid, Relief and Economic Security (CARES) Act to provide emergency loans to small businesses suffering economic hardship due to the COVID-19 pandemic. The CARES Act authorized these businesses to seek forgiveness of the loans if they spent the loan funds on eligible expenses. Only small businesses were eligible for PPP loans. Whether an applicant qualified as a small business depended on various factors, including the number of employees, amount of revenues and net worth of the applicant, along with any other corporate affiliates that share common operational control. When applying for PPP loans, borrowers were required to certify the truthfulness and accuracy of all information provided in their loan applications.

VAG's application for a PPP loan certified it was a small business with fewer than 500 employees. However, VAG shared common operational control with dozens of automobile dealerships across the country, and VAG and its affiliates had more than 3,000 employees in total. For that reason, VAG was not eligible for the $6,282,362 PPP loan it received, which was later forgiven in full.

Case 20-cv-00538-JJM-PAS    Document 66-52    Filed 01/06/25    Page 3 of 43 PageID #: 2617

"PPP loans were intended to help small businesses during the pandemic," said Principal Deputy Assistant Attorney General Brian M. Boynton, head of the Justice Department's Civil Division. "The department is committed to holding accountable those who undermined the purpose of the PPP program and knowingly obtained PPP funds for which they were not eligible."

"Even though the PPP Program has ended, our mandate to investigate and redress the harm from improper PPP loans to companies and sole proprietors continues," said U.S. Attorney Roger Handberg for the Middle District of Florida. "We will continue to seek repayment of those loans and, where appropriate, additional sanctions from applicants who obtained a loan to which they were not entitled."

"This resolution demonstrates the department's resolve in pursuing businesses that improperly received pandemic relief funds," said Director Michael C. Galdo of the Justice Department's COVID-19 Fraud Enforcement. "I want to thank the Small Business Association (SBA) and our law enforcement partners for their assistance with the Justice Department's pandemic fraud enforcement efforts."

"The settlement in this matter demonstrates the excellent results achieved through the combined efforts of SBA and the Department of Justice to uncover and forcefully respond to PPP misconduct," said SBA General Counsel Therese Meers. "The federal government is strongly committed to identifying and aggressively pursuing any instances of fraud or misconduct within the Paycheck Protection Program."

The settlement resolved a lawsuit filed under the qui tam or whistleblower provision of the FCA, which permits private parties to file suit on behalf of the United States for false claims and share in a portion of the government's recovery. The *qui tam* lawsuit is captioned *U.S. ex rel. Jones v. Victory Automotive Group, Inc, et al.*, No. 8:21-cv-1742 (M.D. Fla.). The whistleblower will receive a total of approximately $1.62 million in connection with the settlement.

The resolution obtained in this matter was the result of a coordinated effort among the Civil Division's Commercial Litigation Branch, Fraud Section and the U.S. Attorney's Office for the Middle District of Florida, with assistance from the SBA's Office of General Counsel and the SBA's Office of Inspector General.

This matter was handled by Senior Trial Counsel Benjamin C. Wei of the Civil Division and Assistant U.S. Attorney Lindsay Saxe Griffin for the Middle District of Florida, with assistance from Christopher J. McClintock of the SBA.

On May 17, 2021, the Attorney General established the COVID-19 Fraud Enforcement Task Force to marshal the resources of the Justice Department in partnership with agencies across government to enhance efforts to combat and prevent pandemic-related fraud. The task force bolsters efforts to investigate and prosecute the most culpable domestic and international criminal actors and assists agencies tasked with administering relief programs to prevent fraud by, among other methods, augmenting and incorporating existing coordination mechanisms, identifying resources and techniques to uncover fraudulent actors and their schemes and sharing and harnessing information and insights gained from prior enforcement efforts. For more information on the department's response to the pandemic, please visit www.justice.gov/coronavirus.

Tips and complaints from all sources about potential fraud affecting COVID-19 government relief programs can be reported by visiting the webpage of the Civil Division's Fraud Section, which can be found here. Anyone with information about allegations of attempted fraud involving COVID-19 can also report it by calling the Justice Department's National Center for Disaster Fraud (NCDF) Hotline at 866-720-5721 or via the NCDF Web Complaint Form at www.justice.gov/disaster-fraud/ncdf-disaster-complaint-form.

*The claims resolved by the settlement are allegations only. There has been no determination of liability.*

Settlement

*Updated October 12, 2023*

## Topics

| CORONAVIRUS | DISASTER FRAUD | FALSE CLAIMS ACT |

## Components

Civil Division  |  USAO - Florida, Middle

Press Release Number: 23-1118

# Related Content

---

**PRESS RELEASE**

**Government Contractor Agrees to Pay $1M to Resolve False Claims Act**

**PRESS RELEASE**

**Booz Allen Agrees to Pay $15.875M to Settle False Claims Act Allegations**

**PRESS RELEASE**

**Southern California-Based Clinics, Laboratory and Their Owners to Pay $10M**

1/3/25, 12:17 PM        Office of Public Affairs | Victory Automotive Group Inc. Agrees to Pay $9 Million to Settle False Claims Act Allegations Regarding a Paycheck Protection Program Loan | United States D…

Case 1:20-cv-00536-JJM-PAS   Document 66-72   Filed 01/06/25   Page 5 of 43 PageID
#: 2619

### Allegations for Submitting Fraudulent Bids on Prime Vendor Contracts

Johnny Buscema Jr. of New Port Richey, Florida, and his companies, S.A.F.E. Structure Designs, based in Las Vegas, and U.S.A. Manufacturing, based in New Port Richey, have agreed to pay...

January 3, 2025

Booz Allen Hamilton Holding Corporation (Booz Allen) has agreed to pay the United States $15,875,000 to resolve allegations that Booz Allen Hamilton Engineering Services LLC (BES), a wholly owned subsidiary...

January 3, 2025

### for False Claims Arising from Kickbacks and Self-Referrals

Mohammad Rasekhi M.D., Sheila Busheri, Southern California Medical Center (SCMC) and R & B Medical Group Inc., doing business as Universal Diagnostic Laboratories (UDL) (collectively, the defendants), have agreed to...

December 26, 2024

 **Office of Public Affairs**

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington DC 20530

Office of Public Affairs Direct Line

202-514-2007

Department of Justice Main Switchboard

202-514-2000

SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among the United States
of America, acting through the United States Department of Justice and on behalf of the
Small Business Administration (collectively the "United States"), Victory Automotive
Group, LLC, and David Jones (hereafter collectively referred to as "the Parties"), through
their authorized representatives.

RECITALS

A.      Victory Automotive Group, LLC, ("VAG") is a Florida limited liability
company with its principal address in Port Richey, Florida. VAG provides management
services to approximately 42 car dealerships ("Affiliates") located throughout the United
States.

B.      On July 12, 2021, David Jones (the "Relator") filed a *qui tam* action in the
United States District Court for the Middle District of Florida captioned *United States ex rel.
David Jones v. Victory Automotive Group, LLC*, Case No. 8:21-cv-1742-CEH-CPT, pursuant to
the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the "Civil Action").

C.      The United States contends that it has certain civil claims against VAG
arising from a loan under the Paycheck Protection Program, 15 U.S.C. § 636(a)(36) (the
"PPP"), that VAG obtained on April 17, 2020, and for which VAG sought forgiveness on
May 6, 2021, and which was forgiven on June 24, 2021. These civil claims are based on the
alleged "Covered Conduct" described in Paragraph E below.

D.      The PPP is a federally guaranteed loan program created in response to the
economic crisis spurred by the COVID-19 pandemic. The program authorizes SBA-
approved private lenders to extend the loans, which were fully guaranteed by SBA. Proceeds

from PPP loans could be used for  payroll and other eligible business expenses, such as mortgage interest, rent, and utilities. If a borrower used at least 60 percent of the proceeds for payroll and all other remaining proceeds for eligible business expenses, the borrower could receive loan forgiveness for the full amount of the loan. Only a "small business concern," which is defined as a business with 500 or fewer employees or that satisfies the relevant employee-based or revenue-based size standard for the industry in which the business operates, is eligible for a PPP loan. To determine size, a business must apply the affiliation rules under 13 C.F.R. § 121.301(f), which require aggregating the employees and revenue of related companies. For the PPP, the affiliation rules are waived for any business concern operating as a franchise so long as it is assigned a franchise identifier code by the SBA.

E.    "Covered Conduct" as used in this Agreement means the following allegations by the United States, which the United States contends occurred between April 3, 2020, and June 24, 2021:

    i.    The United States alleges that VAG obtained a PPP loan for $6,282,362 on or about April 3, 2020. VAG was ineligible for this loan because it was not a "small business concern" due to its size after inclusion of VAG's Affiliates. These affiliation rules applied to VAG as it was not operating as a franchise with a franchise identifier code from SBA.  Notwithstanding the size of VAG after inclusion of its Affiliates, VAG certified in its PPP loan application that the company was "eligible to receive a loan under the rules in effect at the time [the] application [was] submitted."

    ii.   The United States further alleges that by May 2021, VAG should have

2

known it was ineligible for PPP loans because of its size after inclusion of its Affiliates.  Despite its ineligibility for the PPP loan, VAG applied for and obtained forgiveness of the full loan amount of $6,282,362 on June 24, 2021.

F.      This Settlement Agreement is neither an admission of liability by VAG nor a concession by the United States or Relator that their claims are not well-founded.

G.      Relator claims entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relator's reasonable expenses, attorneys' fees, and costs.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

TERMS AND CONDITIONS

1.      VAG shall pay to the United States $9,000,000.00 (the "Settlement Amount"), of which $6,971,256.95 is restitution, by electronic funds transfer pursuant to written instructions to be provided by the Civil Division of the United States Department of Justice no later than 60 days after the Effective Date of this Agreement.

2.      Conditioned on the United States receiving the Settlement Amount and as soon as feasible after receipt, the United States shall pay $1,620,000 to Relator (Relator's Share) by electronic funds transfer pursuant to instructions provided by Relator's counsel.

3.      Within 20 days of the Effective Date of this Agreement, VAG shall pay to Relator's counsel reasonable expenses and attorney's fees and costs pursuant to 31 U.S.C. § 3730(d) in the amount of $80,000.00 ("Fees Settlement"). The Fees Settlement will be

made by electronic funds transfer, pursuant to written instructions provided by Relator's

Counsel.

4.    Subject to the exceptions in Paragraph 6 (concerning reserved claims) below,

and upon the United States' receipt of the Settlement Amount, the United States releases

VAG, together with VAG's current and former parent corporations; Affiliates; direct and

indirect subsidiaries; brother or sister corporations; divisions; current or former corporate

owners; and the corporate successors and assigns of any of them ("VAG Releasees"), from

any civil or administrative monetary claim the United States has for the Covered Conduct

under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies

Act, 31 U.S.C. §§ 3801-3812; the Financial Institutions Reform, Recovery, and Enforcement

Act of 1989, 12 U.S.C. § 1833a; or the common law theories of breach of contract, payment

by mistake, unjust enrichment, and fraud.

5.    Subject to the exceptions in Paragraph 6 below, and upon the United States'

receipt of the Settlement Amount, Relator, for himself and for his heirs, successors,

attorneys, agents, and assigns, releases the VAG Releasees from any civil monetary claim

the Relator has on behalf of the United States under the False Claims Act, 31 U.S.C. §§

3729-3733, for the Covered Conduct or allegations in the Civil Action.

6.    Notwithstanding the release given in Paragraph 4 of this Agreement, or any

other term of this Agreement, the following claims and rights of the United States are

specifically reserved and are not released:

a.    Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

b.    Any criminal liability;

4

  c. Except as explicitly stated in the Agreement, any administrative liability or enforcement right, or any administrative remedy, including the suspension and debarment rights of any federal agency;

  d. Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

  e. Any liability based upon obligations created by this Agreement; and

  f. Any liability of individuals.

  7. Relator and his heirs, successors, attorneys, agents, and assigns shall not object to this Agreement but agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B). Conditioned upon Relator's receipt of the Relator's Share, Relator and his heirs, successors, attorneys, agents, and assigns fully and finally release, waive, and forever discharge the United States, its agencies, officers, agents, employees, and servants, from any claims arising from the filing of the Civil Action or under 31 U.S.C. § 3730, and from any claims to a share of the proceeds of this Agreement and/or the Civil Action.

  8. Conditioned upon Relator's receipt of the Fees Settlement, Relator, for himself, and for his heirs, successors, attorneys, agents, and assigns, releases the VAG Releasees, and their officers, agents, and employees, from any liability to Relator arising from the filing of the Civil Action, or under 31 U.S.C. § 3730(d) for expenses or attorneys' fees and costs.

  9. VAG waives and shall not assert any defenses VAG may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth

Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

10.    The VAG Releasees fully and finally releases the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that the VAG Releasees have asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants, related to the Covered Conduct or the United States' investigation or prosecution thereof.

11.    The VAG Releasees fully and finally release the Relator from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that the VAG Releasees have asserted, could have asserted, or may assert in the future against the Relator, related to the Civil Action and the Relator's investigation and prosecution thereof.

12.    This Agreement is intended to be for the benefit of the Parties only.

13.    Upon receipt of the payment described in Paragraph 1, above, the Parties shall promptly sign and file in the Civil Action a Joint Stipulation of Dismissal of the Civil Action pursuant to Rule 41(a)(1). The dismissal will be with prejudice as to the Relator and with prejudice to the United States only as to the Covered Conduct.

14.    Except as outlined above and specifically reserved in Paragraph 3, each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

15.     Each Party and signatory to this Agreement represents that it freely and voluntarily enters this Agreement without any degree of duress or compulsion.

16.     This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Middle District of Florida. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

17.     This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

18.     The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

19.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

20.     This Agreement is binding on VAG's successors, transferees, heirs, and assigns.

21.     This Agreement is binding on Relator's successors, transferees, heirs, and assigns.

22.     All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

23.     This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement). Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

THE UNITED STATES OF AMERICA

DATED: 9/27/2023    BY: _____

BENJAMIN C. WEI
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice

DATED: 9/26/23    BY: _____

LINDSAY S. GRIFFIN
Assistant United States Attorney
Middle District of Florida

8

DEFENDANT

DATED: _9/26/25_ BY: _____, Eric Cappo_
                        Victory Automotive Group, LLC


DATED: _9/27/23_ BY: _____
                        RODNEY A. FIELDS
                        Counsel for Victory Automotive Group, LLC

RELATOR

DATED: 9/26/23   BY: _____
                      David Jones

DATED: _____  BY: _____
                      JANEL QUINN
                      Counsel for David Jones

FILED

2021 JUL 19 PM 12: 55

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA *ex rel.*
[UNDER SEAL]

      *Plaintiffs*,

v.

[UNDER SEAL]

      *Defendants*.

Case No. 8:21-cv-1742-CEH-CPT

**Complaint for Violations of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.***

**FILED UNDER SEAL PUSUANT TO 31 U.S.C. § 3730(b)(2)**

**Jury Trial Demanded**



TPA064368
7/19/2021

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA

*ex rel.* DAVID JONES

      11250 Homewood Lane
      Auburn, California 95603

      *Plaintiff,*

v.

VICTORY AUTOMOTIVE GROUP, LLC

      Registered Agent:
      Eric E. Cappo
      46352 Michigan Avenue
      Canton, Michigan 48188

-and-

JEFFREY EUGENE CAPPO

      46352 Michigan Avenue
      Canton, Michigan 48188

-and-

CAPPO MANAGEMENT XXV, LLC

      Registered Agent:
      Eric Eugene Berglands-Cappo
      8442 US Highway 19
      Port Richey, Florida 34668

-and-

DOWNTON FORD SALES, CAPPO
MANAGEMENT IX, INC., CAPPO
MANAGEMENT XII, INC., CAPPO
MANAGEMENT XXIII, INC., CAPPO

Case No. _____

**Complaint for Violations of the
Federal False Claims Act, 31
U.S.C. § 3729** *et seq.*

**FILED UNDER SEAL
PUSUANT TO 31 U.S.C. §
3730(b)(2)**

**Jury Trial Demanded**

MANAGEMENT XXVI, INC., CAPPO
MANAGEMENT XXVII, INC., CAPPO
MANAGEMENT XXVIII, INC., CAPPO
MANAGEMENT XXIX, INC., CAPPO
MANAGEMENT XXXI, INC., CAPPO
MANAGEMENT XXXIII, INC., CAPPO
MANAGEMENT XXXIV, INC., CAPPO
MANAGEMENT XXXV, INC., CAPPO
MANAGEMENT XL, INC., CAPPO
MANAGEMENT XLI, INC., CAPPO
MANAGEMENT XLV, INC., CAPPO
MANAGEMENT XLVI, INC., CAPPO
MANAGEMENT XLVIII, INC., CAPPO
MANAGEMENT XLIX, INC., CAPPO
MANAGEMENT LI, INC., CAPPO
MANAGEMENT LIII, INC., & CAPPO
MANAGEMENT LIV, INC.

Registered Agent:
InCorp Services, Inc.
5716 Corsa Avenue, Suite 110
Westlake Village, California 91362

-and-

CAPPO MANAGEMENT, INC., CAPPO
MANAGEMENT XVIII, INC., CAPPO
MANAGEMENT XX, INC., CAPPO
MANAGEMENT XXII, INC., CAPPO
MANAGEMENT XXIV, INC., & CAPPO
MANAGEMENT XXXII, INC.

Registered Agent:
Rodney A. Fields, Esq.
620 Market Street, Floor 5
Knoxville, Tennessee 37902

-and-

CAPPO MANAGEMENT II, INC, CAPPO
MANAGEMENT VI, INC., CAPPO
MANAGEMENT XVII, INC., & CAPPO
MANAGEMENT XXX, INC.,

Registered Agent:

Eric E. Cappo
46352 Michigan Avenue
Canton, Michigan 48188

-and-

CAPPO MANAGEMENT VII, INC. & CAPPO
MANAGEMENT XLIV, INC.

  Registered Agent:
  InCorp Services, Inc.
  176 Mine Lake Court, Suite 100
  Raleigh, North Carolina 27615

-and-

CAPPO MANAGEMENT XLVII, INC. &
CAPPO MANAGEMENT LII, INC.

  Registered Agent:
  InCorp Services, Inc
  44 School Street, Suite 505
  Boston, Massachusetts 02108

-and-

CAPPO MANAGEMENT X, INC.

  Registered Agent:
  Susan Barker
  4901 West McGalliard Road
  Muncie, Indiana 47304

-and-

CAPPO MANAGEMENT XV, INC.

  Registered Agent:
  David A. Jesse
  625 Burr Oak Drive
  Tipp City, Ohio 45371

-and-

CAPPO MANAGEMENT XXXVII, INC.

Registered Agent:
CT Corporation Systems
2 North Jackson Street, Suite 605
Montgomery, Alabama 36104

-and-

CAPPO MANAGEMENT XXXVIII, INC.

Registered Agent:
CT Corporation Systems
1999 Bryan Street, Suite 900
Dallas, Texas 75201

-and-

CAPPO MANAGEMENT L, INC.

Registered Agent:
InCorp Services, Inc.
99 Washington Avue, Suite 805A
Albany, New York 12210

*Defendants.*

## I.     INTRODUCTION

1.     *Qui tam* Relator David Jones, by his attorney, individually and on behalf of the United States of America, files this Complaint against Defendants Victory Automotive Group, Downton Ford Sales, Cappo Management, Inc., Cappo Managements II, VI, VII, IX, X, XII, XV, XVII, XX, XXII-XXXV, XXXVII, XXVIII, XL, XLI, and XLIV- LIV (collectively "Corporate Defendants") and Jeffrey Eugene Cappo (all, collectively, "Defendants") to recover damages, penalties, and attorneys' fees for violations of the Federal False Claims Act, 31 U.S.C. §§ 3729-32 ("FCA" or "False Claims Act").

2.     Defendants violated the FCA by certifying that Corporate Defendants were eligible to receive Paycheck Protection Program ("PPP") loans and knowingly concealed Corporate Defendants' obligation to repay those loans. These certifications and acts of concealment were a material fact relied upon by the Small Business Administration ("SBA") in approving the loan applications and loan forgiveness applications.

3.     Defendants are liable for: (1) the amount of first draw PPP funds received by Victory Automotive Group for which it was ineligible; (2) the amount of first draw PPP funds received by the Corporate Defendants as a corporate group over $20 million to the extent they have certified authorized use of those funds when applying for forgiveness or for second draw loans; (3) the amount of second draw PPP funds received by the Corporate Defendants to the extent they have certified authorized use of first draw funds when applying for second draw loans; and (4) the full amount of loan processing fees paid by the SBA to Lenders for loans disbursed and/or forgiven due to the fraudulent conduct alleged herein.

## II.    JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

5.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because the corporate defendants conduct business within this judicial district.

6.      Venue is proper in this Court under 28 U.S.C. § 1391(c) and 28 U.S.C. 2732(a) because the Defendants maintain an office and conduct business in this judicial district.

7.      Relator Jones is the "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), and to his knowledge of the information contained herein has not been publicly disclosed.

## III.    THE PARTIES

8.      Relator Jones is a citizen of the United States and a resident of Auburn, California.

9.      Jones was hired by Victory Automotive Group as Corporate Finance Director in or around March 2013.

10.     In 2014, Jeffrey Cappo promoted Jones to General Manager of Auburn Honda, assumed name of Cappo Management XII, Inc.

11.     In or around August 2020, Jones was terminated.

12.     Defendant Victory Automotive Group ("Victory HQ") is a limited liability company incorporated in Michigan. It acts as the de facto corporate headquarters for the association of forty-three car dealerships across the country.

13.     Defendant Jeffrey Eugene Cappo is a resident of Michigan.

14.     Jeffrey Cappo is the CEO of Victory Automotive Group.

15.     Defendants Downton Ford Sales, Cappo Management, Inc., Cappo Managements, II, VI, VII, IX, X, XII, XV, XVII, XX, XXII-XXXV, XXXVII, XXVIII, XL, XLI, and XLIV-LIV ("Dealership Entities") are entities incorporated across 12 states, with Jeffrey Cappo listed as an officer or registered agent for each entity.

16.     Between all affiliate companies owned or managed by Jeffrey Cappo, Corporate Defendants collectively employ approximately 2,602 employees.

17.     The Dealership Entities operate under fictitious names as car dealerships. Each Dealership Entity operates under a Dealer Agreement or a Dealer Sales and Service Agreement with the carmaker(s) for whom they sell new cars.

18.     As the General Manager for Cappo Management XII, Inc. (doing business as Auburn Honda), Relator Jones was an employee of Victory HQ and received paychecks from Victory HQ, not the Dealership Entity. Each Dealership Entity has a similar management structure, with upper management of each dealership being employed and paid directly by Victory HQ.

19.     Victory HQ does not function as a dealership and does not sell cars directly. It does not have a Dealer Agreement or a Dealer Sales and Service Agreement with any carmaker.

## IV.     LEGAL BACKGROUND

### A. The Federal False Claims Act ("FCA")

20.     The False Claims Act imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

21.     The False Claims Act imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

22.     The False Claims Act imposes liability for knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government. 31 U.S.C. § 3729(a)(1)(G).

23.     The term "knowingly" as used in the FCA means that a person, with respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b). No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA. *Id.*

24.     Any person who violates the FCA is liable for civil penalties between $11,665.00 and $23,331.00 per false claim prior to November 2, 2015, as adjusted for inflation, plus three times the amount of damages that the Government sustains as a result of the defendant's actions. 31 U.S.C. § 3729(a), 28 C.F.R. § 85.5.

**B. The Paycheck Protection Program ("PPP")**

25.     The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") is a law intended to address the economic fallout of the COVID-19 pandemic in the United States.

26.     The CARES Act resulted in, *inter alia*, the Paycheck Protection Program. Coronavirus Aid, Relief, and Economic Security Act, No. 116-136 (March 27, 2020).

27.     The PPP is a loan program designed to provide eligible businesses low-interest rate loans guaranteed by the Small Business Administration (SBA) with support from the Department of the Treasury.

28.     This program provides small businesses with funds to pay up to 24 weeks of payroll costs including benefits.

29.     The PPP is similar to existing SBA Loan Programs. However, the CARES Act suspends the ordinary requirement that borrowers must be unable to obtain credit elsewhere, as defined in the Small Business Act. 15 U.S.C. § 632(h).

30.     The PPP section of the CARES Act expanded eligibility for SBA loans beyond the limitations of the Small Business Act. 15 U.S.C. §§ 632, 636.

31.     The following entities affected by Coronavirus (COVID-19) may be eligible:

   i.     Any small business concern that meets SBA's size standards (either the industry based size standard or the alternative size standard);

   ii.    Any business, 501(c)(3) non-profit organization, 501(c)(19) veterans organization, or Tribal business concern (sec. 31(b)(2)(C) of the Small Business Act) with the greater of:

        a.   500 employees, or

        b.   That meets the SBA industry size standard if more than 500;

   iii.   Any business with a [North American Industry Classification System ("NAICS")] Code that begins with 72 (Accommodations and Food Services) that has more than one physical location and employs less than 500 per location;

   iv.    Sole proprietors, independent contractors, and self-employed persons.

5

32.     The size of a business concern is determined under the SBA's size standards as they apply to the "concern whose size is at issue and **all of its domestic and foreign affiliates**." 13 C.F.R. § 121.301(f)(6) (emphasis added).

33.     Entities that are applicants for a PPP loan submit their Borrower Application Form to a federally insured depository institution, federally insured credit union, or a Farm Credit System ("Lender") which processes the loan application and funds the loan.

34.     The SBA guarantees 100% of the outstanding balance, and that guarantee is backed by the full faith and credit of the United States. 15 U.S.C. § 636(a)(2)(F).

35.     For its work to process the application and fund the loan, the SBA pays the Lender a processing fee based on the size of the loan funded by the Lender. SBA will pay lenders fees for processing First Draw PPP loans in the following amounts: Five (5) percent for loans of not more than $350,000; Three (3) percent for loans of more than $350,000 and less than $2,000,000; and One (1) percent for loans of at least $2,000,000. 15 U.S.C. § 636(a)(36)(P).

36.     To be eligible for loan forgiveness, borrowers must complete SBA Form 3508 or SBA Form 3508EZ to calculate eligible payroll and nonpayroll costs.

37.     Borrowers must certify that the dollar amount for which forgiveness is requested:

    i.     Was used to pay costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments);

    ii.     Includes all applicable reductions due to decreases in the number of full-time equivalent employees and salary/hourly wage reductions;

    iii.     Includes payroll costs equal to at least 60% of the forgiveness amount; and

      iv.    Does not exceed eight weeks' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $15,385 per individual or, if a 24-week covered period applies, does not exceed 2.5 months' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $20,833 per individual.

SBA Form 3508 "Paycheck Protection Program Loan Forgiveness Application" (June 2020).

38.    Additionally, borrowers must certify that:

      i.    They have submitted to the Lender the required documentation verifying payroll costs, the existence of obligations and service (as applicable) prior to February 15, 2020, and eligible business mortgage interest payments, business rent or lease payments, and business utility payments; and

      ii.    The information provided in the application and the information provided in all supporting documents and forms is true and correct in all material respects.

*Id.*

39.    An entity can also be eligible for a PPP loan as a small business concern if, as of March 27, 2020:

      a.    The maximum tangible net worth of the business is not more than $15 million; and

      b.    The average net income after Federal income taxes (excluding any carry-over losses) of the business for the two full fiscal years before the date of the application is not more than $5 million.

Small Bus. Admin, "Paycheck Protection Program Loans Frequently Asked Questions (FAQs)" (June 25, 2020).

40.     In December 2020, the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act modified and extended the PPP.  Consolidated Appropriations Act, 2021, Pub. L 116-260, tit. III, sec. 311 (to be codified as amended at 15 U.S.C. § 636(a)(37)).

41.     To be eligible to receive a second draw loan, an entity must employ not more than 300 employees or not more than 300 employees per location for a discrete group of industries. 15 U.S.C. § 636(a)(37)(A)(iv).

42.     In addition, a borrower must have "experienced a revenue reduction in 2020 relative to 2019" of at least 25% in order to be eligible. Paycheck Protection Program Second Draw Loans, 86 Fed. Reg. 3,712, 3,713 (Jan. 14, 2021) (to be codified at 13 C.F.R. pts. 120, 121).

43.     The Second Draw of the PPP does not allow for any additional size standards by which an entity can be eligible to receive a loan and requires that the eligibility standard must be met by the applicant together with its affiliates.

44.     To receive a Second Draw Loan, an applicant must submit SBA Form 2483-SD, Second Draw Borrower Application Form.

45.     Applicants must indicate if the Applicant or any of the Applicant's owners have common management with or own another business.

46.     The authorized representative of the Applicant must certify that the applicant is eligible to receive a Second Draw Loan and that together with its affiliates, the Applicant employs no more than 300 employees.

47. The authorized representative of the Applicant must also certify in good faith that before the Second Draw Loan is disbursed that Applicant will have used the full loan amount of the first draw loan only for eligible expenses.

48. The SBA adjusted the fees to be paid to lenders for the processing Second Draw PPP Loans to the following amounts:

(i) for a Second Draw PPP Loan of up to (and including) $50,000, in an amount equal to the lesser of:

    (A) 50 percent of the balance of the financing outstanding at the time of disbursement of the loan; or

    (B) $2,500; and

(ii) for a Second Draw PPP Loan of more than $50,000, in an amount that is:

    (A) 5 percent of the balance of the financing outstanding at the time of disbursement of the loan for a loan up to (and including) $350,000; and

    (B) 3 percent of the balance of the financing outstanding at the time of disbursement of the loan for a loan above $350,000.

SBA Interim Final Rule, "Business Loan Program Temporary Changes; Paycheck Protection Program Second Draw Loans" 86 Fed. Reg. 3,712, 3,721-3,722 (Jan. 14, 2021) (to be codified at 13 C.F.R. §§ 120-121).

### C. SBA Exceptions and Limitations on Affiliation and Loan Eligibility

49. SBA Form 2483, which all applicants must submit to be considered for a PPP loan, requires an indication of Yes or No to the question: "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business? If yes, list all such businesses and describe the relationship on a separate sheet

identified as addendum A." SBA Form 2483, "Paycheck Protection Program Borrower Application Form" (April 2020).

50.     Agency guidance specified that "applicants in SBA's Business Loan Programs (which include the PPP) are subject to the affiliation rule contained in 13 CFR § 121.301." SBA Interim Final Rule "Business Loan Program Temporary Changes; Paycheck Protection Program." 85 Fed. Reg. 20,819 (April 15, 2020).

51.     Entities that have the power to control another are affiliates of one another. Entities that are controlled by the same third party are also affiliates of each other as well as of the third party. 13 C.F.R. § 121.301(f).

52.     Entities are affiliates of one another if a principal of an entity controls the management of another. Affiliation between entities also arises if a single individual controls the management or Board of Directors of those entities. 13 C.F.R. § 121.301(f)(3).

53.     The CARES Act waived the § 121.103 affiliation provisions for a limited category of business concerns: businesses in the Accommodation and Food Services sector as determined by their North American Industry Classification System (NAICS) code; businesses operating as a franchise that are listed in the SBA's Franchise Directory; and businesses receiving financial assistance from a licensed Small Business Investment Company (SBIC). 15 U.S.C. §636(a)(36)(D)(iv).

54.     The Economic Aid Act preserved these affiliation waivers for the purposes of PPP Second Draw Loans while still applying the revised size standard. 15 U.S.C.A. §636(37)(E).

55.     On the First Draw PPP Loan Borrower Application Form, the Applicant must indicate yes or no if it is a franchise that is listed in the SBA's Franchise Directory. The Applicant

is not required to list the Franchise Identified Code issued by the SBA on this form. SBA Form 2483, "Paycheck Protection Program Borrower Application Form" (April 2020).

56.     On the Second Draw PPP Loan Borrow Application Form, the Applicant must list its SBA Franchise Identifier Code if it is a franchise listed in SBA's Franchise Directory. SBA Form 2483-SD, "Second Draw Borrower Application Form" (March 18, 2021).

57.     Agency guidance clarified the boundaries of affiliation rules as applied to PPP loans:

> [B]usinesses that are part of a single corporate group **shall in no event receive more than $20,000,000 of PPP loans in the aggregate**. For purposes of this limit, businesses are part of a single corporate group if they are majority owned, directly or indirectly, by a common parent.
>
> …
>
> SBA's affiliation rules, which relate to an applicant's eligibility for PPP loans, and any waiver of those rules under the CARES Act, continue to apply independent of this limitation. **Businesses are subject to this limitation even if the businesses are eligible for the waiver-of-affiliation provision** under the CARES Act or are otherwise not considered to be affiliates under SBA's affiliation rules.

SBA Interim Final Rule "Business Loan Program Temporary Changes; Paycheck Protection Program-Requirements-Corporate Groups and Non-Bank and Non-Insured Depository Institution Lenders" 85 Fed. Reg. 26,324 at 26,325 (May 4, 2020).

58.     This rule specifies that applicants have the responsibility to notify the Lender if they have applied for, have received, or expect to received PPP loans in excess of the $20 million limit per corporate group. "Failure by the applicant to do so will be regarded as a use of PPP funds for **unauthorized purposes**." *Id*. (emphasis added).

59.    A similar rule exists for Second Draw PPP loans. Businesses that are part of the

same corporate group "shall in no event receive more than $4,000,000 of Second Draw PPP

Loans in the aggregate." SBA Interim Final Rule "Business Loan Program Temporary Changes;

Paycheck Protection Program Second Draw Loans" 85 Fed. Reg. 3,712 at 3,720 (Jan. 14, 2021).

## V.    FACTUAL ALLEGATIONS

60.    Prior to April 8, 2020, Defendant Victory Automotive Group submitted its

Borrower Application form, SBA Form 2843 the Bank of Ann Arbor to apply for a PPP loan. To

be approved for a loan, an authorized representative of Victory HQ certified that it, as the

Applicant, was eligible to receive a PPP loan under the SBA rules at the time and by meeting the

applicable size standard.

61.    Between April 7 and April 13, 2020, all Corporate Defendants were approved for

PPP loans by the same Lender, the Bank of Ann Arbor. Collectively, Corporate Defendants were

approved for over $32 million in PPP loans.

| Date Approved | Business Name | Loan Amount | State | Zip | Lender |
|---|---|---|---|---|---|
| 4/7/2020 | CAPPO MANAGEMENT, INC. | $660,463 | TN | 38555 | Bank of Ann Arbor |
| 4/7/2020 | CAPPO MANAGEMENT II, INC. | $255,244 | MI | 48162 | Bank of Ann Arbor |
| 4/8/2020 | CAPPO MANAGEMENT VI, INC. | $504,633 | MI | 48170 | Bank of Ann Arbor |
| 4/7/2020 | CAPPO MANAGEMENT VII, INC. | $392,228 | NC | 27949 | Bank of Ann Arbor |
| 4/9/2020 | CAPPO MANAGEMENT IX, INC. | $685,210 | CA | 94010 | Bank of Ann Arbor |
| 4/9/2020 | CAPPO MANAGEMENT X, INC. | $401,654 | IN | 47304 | Bank of Ann Arbor |
| 4/7/2020 | CAPPO MANAGEMENT XII, INC. | $533,270 | CA | 95603 | Bank of Ann Arbor |
| 4/8/2020 | CAPPO MANAGEMENT XV, INC. | $373,020 | OH | 44870 | Bank of Ann Arbor |

| 4/8/2020 | CAPPO MANAGEMENT XVII, INC. | $408,764 | MI | 48188 | Bank of Ann Arbor |
|---|---|---|---|---|---|
| 4/7/2020 | CAPPO MANAGEMENT XVIII, INC. | $552,932 | TN | 38501 | Bank of Ann Arbor |
| 4/7/2020 | CAPPO MANAGEMENT XX, INC | $343,328 | TN | 37055 | Bank of Ann Arbor |
| 4/7/2020 | CAPPO MANAGEMENT XXII, INC. | $507,946 | TN | 38305 | Bank of Ann Arbor |
| 4/9/2020 | CAPPO MANAGEMENT XXIII, INC. | $954,517 | CA | 95073 | Bank of Ann Arbor |
| 4/7/2020 | CAPPO MANAGEMENT XXIV, INC. | $407,331 | TN | 37660 | Bank of Ann Arbor |
| 4/9/2020 | CAPPO MANAGEMENT XXV, INC. | $718,926 | FL | 34668 | Bank of Ann Arbor |
| 4/9/2020 | CAPPO MANAGEMENT XXVI, INC. | $837,742 | CA | 94066 | Bank of Ann Arbor |
| 4/9/2020 | CAPPO MANAGEMENT XXVII, INC. | $832,475 | CA | 92675 | Bank of Ann Arbor |
| 4/7/2020 | CAPPO MANAGEMENT XXVIII, INC. | $590,315 | CA | 94945 | Bank of Ann Arbor |
| 4/7/2020 | CAPPO MANAGEMENT XXIX, INC. | $1,181,529 | CA | 95825 | Bank of Ann Arbor |
| 4/7/2020 | CAPPO MANAGEMENT XXX, INC. | $267,965 | MI | 48160 | Bank of Ann Arbor |
| 4/8/2020 | CAPPO MANAGEMENT XXXI, INC. | $873,629 | CA | 93003 | Bank of Ann Arbor |
| 4/7/2020 | CAPPO MANAGEMENT XXXII, INC, | $451,280 | TN | 38555 | Bank of Ann Arbor |
| 4/7/2020 | CAPPO MANAGEMENT XXXIII, INC. | $1,001,482 | CA | 95630 | Bank of Ann Arbor |
| 4/8/2020 | CAPPO MANAGEMENT XXXIV, INC. | $851,415 | CA | 93230 | Bank of Ann Arbor |
| 4/7/2020 | CAPPO MANAGEMENT XXXV, INC. | $412,185 | CA | 95448 | Bank of Ann Arbor |
| 4/10/2020 | CAPPO MANAGEMENT XXXVII, LLC | $311,122 | AL | 35218 | Bank of Ann Arbor |
| 4/9/2020 | CAPPO MANAGEMENT XXXVIII, LLC | $436,192 | TX | 75605 | Bank of Ann Arbor |
| 4/9/2020 | CAPPO MANAGEMENT XL, LLC | $1,263,196 | CA | 94109 | Bank of Ann Arbor |
| 4/8/2020 | CAPPO MANAGEMENT XLI, LLC | $730,823 | CA | 90605 | Bank of Ann Arbor |
| 4/8/2020 | CAPPO MANAGEMENT XLIV, LLC | $304,970 | NC | 28470 | Bank of Ann Arbor |
| 4/10/2020 | CAPPO MANAGEMENT XLV, LLC | $856,868 | CA | 90605 | Bank of Ann Arbor |

| 4/9/2020 | CAPPO MANAGEMENT XLVI, LLC | $762,670 | CA | 94066 | Bank of Ann Arbor |
| 4/10/2020 | CAPPO MANAGEMENT XLVII, LLC | $685,634 | MA | 2188 | Bank of Ann Arbor |
| 4/7/2020 | CAPPO MANAGEMENT XLVIII, LLC | $753,677 | CA | 92832 | Bank of Ann Arbor |
| 4/9/2020 | CAPPO MANAGEMENT XLIX, LLC | $580,515 | CA | 95037 | Bank of Ann Arbor |
| 4/9/2020 | CAPPO MANAGEMENT L, LLC | $303,423 | NY | 14424 | Bank of Ann Arbor |
| 4/13/2020 | CAPPO MANAGEMENT LI, LLC | $1,059,145 | CA | 91601 | Bank of Ann Arbor |
| 4/9/2020 | CAPPO MANAGEMENT LII, LLC | $676,243 | MA | 2301 | Bank of Ann Arbor |
| 4/10/2020 | CAPPO MANAGEMENT LIII, LLC | $750,716 | CA | 93955 | Bank of Ann Arbor |
| 4/9/2020 | CAPPO MANAGEMENT LIV, LLC | $315,466 | CA | 93955 | Bank of Ann Arbor |
| 4/7/2020 | DOWNTOWN FORD SALES | $933,632 | CA | 95811 | Bank of Ann Arbor |
| 4/8/2020 | VICTORY AUTOMOTIVE GROUP, LLC | $6,282,362 | MI | 48188 | Bank of Ann Arbor |

62.     Each Corporate Defendants' application listed the corporation's individual places of business as its address, but the applications were filled out and submitted by the main Victory Automotive office in Canton, Michigan.

63.     Victory Automotive Group directly employs and pays the salary of management positions at each Dealership Entity. Jeffrey Cappo is an officer or registered agent for Victory Automotive and each individual Dealership Entity. Victory Automotive also exercises direct financial control over the operations of each Dealership Entity.

64.     Due to this common ownership and control, Victory Automotive and each of the Dealership Entities are affiliates under 13 C.F.R. § 121.301.

65.     Of the Corporate Defendants, the dealerships that operate in the various states have franchise agreements with the automobile makers for whom they sell cars. As such, the

dealerships as affiliates might otherwise have failed to qualify for PPP loans due to their size but meet the franchise exception under the CARES Act.

66.     However, Victory Automotive Group does not sell cars and does not operate under a franchise agreement. As such, Victory Automotive does not qualify for PPP funds under any of the applicable small business size standards used by the SBA for purposes for the PPP and does not fall into any applicable exceptions.

67.     Therefore, Victory Automotive was not eligible to receive a PPP loan in the amount of $6,282,362.

68.     As a result of Victory Automotive's fraudulent PPP loan, the Bank of Ann Arbor received a 1% loan processing fee from the SBA in the amount of $62,823.

69.     Once each Dealership Entity received the PPP loan funds, Victory HQ removed the funds from the Dealership accounts. From that point forward, Victory Automotive controlled the use and disbursement of the PPP funds entirely, and the dealership management did not have visibility into how the money was used.

70.     On April 28, 2020, the SBA published an immediately effective interim final rule that established, *inter alia*, a safe harbor for borrowers that had certified that the loan request was necessary to support the ongoing operations of the Applicant. Any borrower who repaid the loan in full by May 7, 2020, would be deemed to have made the required certification in good faith. SBA Interim Final Rule "Business Loan Program Temporary Changes; Paycheck Protection Program-Requirements-Promissory Notes, Authorizations, Affiliation, and Eligibility" 85 Fed. Reg. 23,450, 23,451. (April 28, 2020).

71.     In subsequent rules, the SBA extended the safe harbor deadline to May 14, 2020, and then to May 28, 2020. *See* SBA Interim Final Rule "Business Loan Program Temporary

Changes; Paycheck Protection Program-Requirements-Extension of Limited Safe Harbor With Respect to Certification Concerning Need for PPP Loan Request" 85 Fed. Reg. 29,845 (May 19, 2020) *and* SBA Interim Final Rule "Business Loan Program Temporary Changes; Paycheck Protection Program-Second Extension of Limited Safe Harbor With Respect to Certification Concerning Need for PPP Loan and Lender Reporting" 85 Fed. Reg. 31,357 (May 26, 2020).

72.     On May 4, 2020, the SBA issued an immediately effective interim final rule that placed a cap on the amount of PPP loans a single corporate group could receive at $20 million. The Agency specified that applicants had the responsibility to notify lenders if they had received PPP loans in excess of this amount. SBA Interim Final Rule "Business Loan Program Temporary Changes; Paycheck Protection Program-Requirements-Corporate Groups and Non-Bank and Non-Insured Depository Institution Lenders" 85 Fed. Reg. 26,324, 26,325 (May 4, 2020).

73.     The Agency gave notice that failure to notify lenders of loans received in excess of this rule would be regarded as "use of PPP funds for unauthorized purposes [and would mean that] the loan will not be eligible for forgiveness." *Id.*

74.     Upon information and belief, none of the Corporate Defendants withdrew or cancelled their PPP loans with Bank of Ann Arbor due to Defendants' corporate group receiving PPP loans in excess of $20 million, or otherwise notified the lender that the affiliated entities collectively received loans in excess of $20 million.

75.     As such, the Corporate Defendants improperly retained approximately $5,723,775 in PPP funds over the $20 million collective cap.

76.     For processing all Corporate Defendants' PPP loans, the Bank of Ann Arbor received a 1-5% loan processing fee per loan for processing the falsely retained PPP funds from the SBA in the amount of at least $377,880.

77.     As of May 2021, publicly available records on FederalPay.org suggest that at least 12 of the Corporate Defendants have applied for and received forgiveness of their First Draw PPP loans. It is Relator Jones' understanding that all Corporate Defendants have applied for or intend to apply for forgiveness of First Draw PPP loans.

78.     On or around January 31, 2021, Cappo Management IX was approved for a Second Draw PPP loan of $685,210 by lender Bank of Ann Arbor.

79.     On or around February 6, 2021, Cappo Management XII was approved for a Second Draw PPP loan of $533,270 by lender Bank of Ann Arbor.

80.     On or around February 12, 2021, Cappo Management XXIII and Cappo Management XXVI were approved for Second Draw PPP loans of $954,517 and $837,742 respectively by lender Bank of Ann Arbor.

81.     In order to have been approved for these Second Draw loans, all four entities were required to certify that they had received a First Draw loan and that the full amount of that loan would have been used only for eligible expenses prior to the disbursement of the Second Draw loan.

82.     These four Cappo entities could not have truthfully certified that their First Draw PPP loans were used for an authorized purpose in accordance with the SBA's May 4, 2020 Interim Final Rule "Business Loan Program Temporary Changes; Paycheck Protection Program-Requirements-Corporate Groups and Non-Bank and Non-Insured Depository Institution Lenders" that clarified that, failure by the applicant to notify the Lender if they have applied for, have received, or expect to received PPP loans in excess of the $20 million limit per corporate group will be regarded as a use of PPP funds for unauthorized purposes. *See* 85 Fed. Reg. 26,324 at 26,325.

83.     For processing Cappo Management IX, XII, XXIII, XXVI's PPP loans, the Bank of Ann Arbor received loan processing fees from the SBA in the amount of $90,322.

### COUNT I
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
### Submitting False Claims for Payment
### (against Victory Automotive Group, Jeffrey Cappo, and Corporate Recipient Defendants)

84.     Relator Jones incorporates all the allegations set forth in the foregoing paragraphs as though fully alleged herein.

85.     The False Claims Act imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

86.     Defendants knowingly presented or caused to be presented to the Small Business Administration a claim for approval of a First and/or Second Draw PPP loan for which they were ineligible.

87.     Defendants' knowingly false certifications on Corporate Defendants PPP loan application were material to the government's decision to award them First and Second Draw PPP loans intended for small businesses in an amount exceeding $35 million. When submitting the application, an applicant company must certify that it is eligible and that all information included in the application form is true and accurate in all material respects.

88.     But for Defendants' submission of their false claims, the SBA would not have approved the loans.

89.     But for Defendants' submission of their false claims, the SBA would not have paid the Lender the processing fee of the loan applications.

90.     The United States of America has been damaged by all aforementioned misrepresentations and failures to comply with requisite laws and regulations by paying Defendants approximately $12,006,137.

91.     Accordingly, the United States government is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty for each false claim presented or caused to be presented by Defendants.

## COUNT II
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### Creating a False Record or Statement Material to a False Claim
### (against all Defendants)

92.     Relator Jones incorporates all the allegations set forth in the foregoing paragraphs as though fully alleged herein.

93.     The False Claims Act imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim paid or approved by the United States government. 31 U.S.C. § 3729(a)(1)(B).

94.     Defendants knowingly made or caused to be made false records or statements to support a false claim submitted to the Lender and the SBA for approval of First and Second Draw PPP loans.

95.     The false records and statements Defendants made were used to support false claims Defendants submitted to the United States government.

96.     Defendants' creation of knowingly false loan applications supported the Bank of Ann Arbors claims to the SBA for loan processing fees for loans that were falsely or fraudulently obtained by Defendants.

97.     The United States of America has been damaged by all aforementioned misrepresentations and failures to comply with requisite laws and regulations by paying Bank of Ann Arbor approximately $210,382 in loan processing fees for illegitimate PPP loans.

98.     Accordingly, the United States government is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty as deemed appropriate.

## COUNT III
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C)
### Conspiracy to Violate the False Claims Act
### (against all Defendants)

99.     Relators Jones incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

100.    The False Claims Act imposes liability on any person who conspires to commit a violation of the False Claims Act. 31 U.S.C. § 3729(a)(1)(C).

101.    All defendants conspired to violate the False Claims Act.

102.    As set forth more fully above, Jeffrey Cappo directed or knowingly allowed direction to be given to Corporate Defendants to each apply for a First and/or Second Draw PPP loan and certified or caused to be certified the applications containing false statements.

103.    The United States of America has been damaged by the aforementioned misrepresentation in a dollar amount to be determined at trial of approximately $36 million.

104.    Accordingly, the United States government is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty as deemed appropriate.

## COUNT IV
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G)
### Improper Avoidance of Obligation to Government
### (against all Defendants)

105.    Relator Jones incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

106.    The False Claims Act imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government. 31 U.S.C. § 3729(a)(1)(G)

107.    Defendants knowingly concealed or knowingly and improperly avoided an obligation to pay money to the government when they falsely certified compliance with the PPP program in applying for forgiveness of their PPP loans.

108.    As set forth more fully above, Defendants knowingly concealed their affiliation and failed to return the PPP loans received in error for the purpose of decreasing their obligation to pay money to the government.

109.    But for Defendants' concealment, the SBA would not have forgiven the Corporate Defendants' obligation to repay the PPP loans including interest and would not have approved Defendants' Second Draw PPP loans.

110.    The United States of America has been damaged by the aforementioned misrepresentations in a dollar amount to be determined at trial.

111.    Accordingly, the United States government is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil monetary penalty as deemed appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Relator Jones, acting on behalf of and in the name of the United States of America, and on his own behalf, prays that judgment will be entered against Defendants for violations of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* as follows:

a) That for violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, this Court enter Judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of the Defendants' actions, plus a civil penalty of between $11,665 – $23,331for each action in violation of 31 U.S.C. § 3729;

b) That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d), including the costs and expenses of this action and reasonable attorneys' fees;

c) That a trial by jury be held on all issues;

d) That, in the event the United States Government elects to intervene in and proceed with this action, Relator be awarded between 15% and 25% of the proceeds of the action or of any settlement in accord with 31 U.S.C. § 3730(d)(1);

e) That, in the event that the United States Government does not proceed with this action, Relator be awarded between 25% and 30% of the proceeds of the action or of any settlement in accord with 31 U.S.C. § 3730(d)(2);

f) That, pursuant to 31 U.S.C. § 3730(c)(5), Relator be awarded a share of any alternate remedy that the United States Government elects to pursue;

g) That permanent injunctive relief be granted to prevent any recurrence of the False Claims Act conduct described above for which redress is sought in this Complaint;

h) That the United States and the Relator be awarded prejudgment and post judgment interest; and

i) That the United States Government and Relator receive all other relief, both in law and equity, to which they may reasonably be entitled.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Jones hereby demands a jury trial.

July 12, 2021                                  Respectfully Submitted,

R. Scott Oswald, (Bar no. 158437)
The Employment Law Group, P.C.
1717 K St, NW, Suite 1110
Washington, D.C. 20006
(202) 261-2813
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com

Attorney for *Qui Tam* Relator