UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA ex rel.
JAMES R. BERKLEY,

             Plaintiff,

vs.

OCEAN STATE, LLC,
NEW HARBOR CAPITAL FUND LP, NEW
HARBOR CAPITAL FUND II LP,
NEW HARBOR CAPITAL MANAGEMENT
LP, BLUEPRINT TEST PREPARATION,
LLC, FYZICAL ACQUISITION
HOLDINGS, LLC,

             Defendants.

C.A. No. 1:20-cv-00538-JJM-PAS

## RELATOR'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to LR Cv 56(a), plaintiff-relator, James R. Berkley ("Relator"), submits the following statement of undisputed material facts in support of his motion for partial summary judgment against defendants, Ocean State, LLC ("Ocean State"), New Harbor Capital Fund LP ("NHC Fund I"), New Harbor Capital Fund II LP ("NHC Fund II"), New Harbor Capital Management LP ("NHC Management" and collectively with NHC Fund I and NHC Fund II, "New Harbor Capital") and Fyzical Acquisition Holdings, LLC ("Fyzical Holdings") (collectively, the "MSJ Defendants").

The documents referred to herein, denoted **"Ex. #"**, are attached to the accompanying Declaration of Eric E. Renner in Support of Relator's Motion for Partial Summary Judgment.

1

I.      **New Harbor Capital's Ownership, Direction and Control of Ocean State and Fyzical Holdings**

A.      **New Harbor Capital**

1.      At all relevant times, defendant NHC Fund I was a private equity fund and was managed, controlled and directed by defendant NHC Management and non-parties New Harbor Capital Fund GP, LP and New Harbor Capital Management LLC.  **Ex. 1**; **Ex. 2**.

2.      At all relevant times, defendant NHC Fund II was a private equity fund and was managed, controlled and directed by defendant NHC Management and non-parties New Harbor Capital Fund II GP, LP and New Harbor Capital Management II LLC.  **Ex. 3**; **Ex. 4**.

3.      At all relevant times, New Harbor Capital Fund GP, LP was the General Partner of NHC Fund I and owned a controlling stake in NHC Fund I and managed, controlled, and directed the conduct and affairs of NHC Fund I on behalf of itself and NHC Fund I's investors.  **Ex. 1**; **Ex. 2**.

4.      NHC Fund I's General Partner is an agent of NHC Fund I and NHC Fund I's Amended and Restated Agreement of Limited Partnership ("NHC Fund I Limited Partnership Agreement") gives the General Partner exclusive authority to act on behalf of NHC Fund I to effectuate its purposes.  **Ex. 1**; **Ex. 2**.

5.      At all relevant times, New Harbor Capital Fund GP, LP was a party to a Management Agreement with NHC Management pursuant to which New Harbor Capital Fund GP, LP appointed NHC Management to manage, control, and direct the conduct and affairs of NHC Fund I.  **Ex. 1**; **Ex. 2**.

6.  At all relevant times, New Harbor Capital Fund GP, LP's conduct and affairs were ultimately managed, controlled, and directed by its general partner, New Harbor Capital Management LLC.  **Ex. 1**; **Ex. 2**.

7.  At all relevant times, New Harbor Capital Fund II GP, LP was the General Partner of NHC Fund II.  **Ex. 3**; **Ex. 4**.

8.  At all relevant times, New Harbor Capital Fund II GP, LP was the General Partner of NHC Fund II and owned a controlling stake in NHC Fund II and managed, controlled, and directed the conduct and affairs of NHC Fund II on behalf of itself and NHC Fund II's investors.  **Ex. 3**; **Ex. 4**.

9.  NHC Fund II's General Partner is an agent of NHC Fund II and NHC Fund II's Amended and Restated Agreement of Limited Partnership ("NHC Fund II Limited Partnership Agreement") gives the General Partner exclusive authority to act on behalf of NHC Fund II to effectuate its purposes.  **Ex. 3**; **Ex. 4**.

10.  At all relevant times, New Harbor Capital Fund II GP, LP was a party to a Management Agreement with NHC Management pursuant to which New Harbor Capital Fund II GP, LP appointed NHC Management to manage, control, and direct the conduct and affairs of NHC Fund II.  **Ex. 3**; **Ex. 4**.

11.  At all relevant times, New Harbor Capital Fund II GP, LP's conduct and affairs were ultimately managed, controlled, and directed by its general partner, New Harbor Capital Management II LLC.  **Ex. 3**; **Ex. 4**.  .

12.  At all relevant times, New Harbor Capital Management LLC was the general partner of New Harbor Capital Fund GP, LP and the Ultimate General Partner of NHC Fund I.  **Ex. 1**; **Ex. 2**.

13.    In its capacity as the Ultimate General Parter, New Harbor Capital Management LLC ultimately managed, controlled, and directed the conduct and affairs of NHC Management, New Harbor Capital Fund GP, LP, NHC Fund I and Ocean State.  **Ex. 1**; **Ex. 2**.

14.    At all relevant times, New Harbor Capital Management II LLC was the general partner of New Harbor Capital Fund II GP, LP and the Ultimate General Partner of NHC Fund II. **Ex. 3**; **Ex. 4**.

15.    In its capacity as the Ultimate General Parter, New Harbor Capital Management II LLC ultimately managed, controlled, and directed the conduct and affairs of NHC Management, New Harbor Capital Fund II GP, LP, NHC Fund II and Fyzical Holdings. **Ex. 3**; **Ex. 4**.

### B.    Ocean State

16.    At all relevant times, Ocean State was a portfolio company that was majority owned and controlled by NHC Fund I and NHC Management and their affiliates.  **Ex. 5**; **Ex. 6**; **Ex. 7**; **Ex. 8**, No. 3, 6.

17.    As of January 1, 2020, Ocean State was 100% owned by its sole member, Ocean State, Buyer, LLC.  **Ex. 5**; **Ex. 9**.

18.    Ocean State Buyer, LLC was 100% owned by its sole member, Ocean State Holdings, LLC.    **Ex. 5**; **Ex. 10**.

19.    NHC Fund I and its affiliates owned 84% of Ocean State Holdings, LLC.  **Ex. 8**, No. 3; **Ex. 11**; **Ex. 12**

20.    Sections 6.1 and 6.2 of Ocean State's Amended and Restated LLC Agreement permit its sole Member, Ocean State Buyer, LLC, to make capital contributions to and issue membership interests in Ocean State. **Ex. 9.**

21.     Section 10 of Ocean State's Amended and Restated LLC Agreement gives Ocean State Buyer, LLC full and complete power to manage and control Ocean State's business and affairs. **Ex. 9.**

22.     Likewise, Sections 6.1 and 6.2 of Ocean State Buyer, LLC's Amended and Restated LLC Agreement permit its sole member, Ocean State Holdings, LLC, to make capital contributions to and issue membership interests in Ocean State Buyer, LLC. **Ex. 10.**

23.     Section 10 of Ocean State Buyer, LLC's Amended and Restated LLC Agreement gives Ocean State Holdings, LLC full and complete power to manage and control Ocean State Buyer, LLC's business and affairs. **Ex. 10.**

24.     Section 2.2 of Ocean State Holdings, LLC's Second Amended and Restated LLC Agreement permits the Board to authorize capital contributions to and to issue Units in Ocean State Holdings, LLC. **Ex. 11.**

25.     Section 4.1 of Ocean State Holdings, LLC's Second Amended and Restated LLC Agreement gives its Board full and complete power to manage and control Ocean State Holdings, LLC's business and affairs. **Ex. 11.**

26.     Per Section 4.2, Ocean State Holdings, LLC's Board was comprised of 7 Representatives, consisting of: three New Harbor Representatives (Ed. Lhee ("Mr. Lhee"), Tom Formolo ("Mr. Formolo") and John Pircon ("Mr. Pircon")); two Executive Representatives; and two Independent Representatives. **Ex. 11.**

27.     Per Section 4.4(b), each New Harbor Representative had three votes and each Executive Representative and Independent Representative had one vote. **Ex. 11.**

28.     New Harbor Capital held voting control over Ocean State Holdings, LLC's Board and by extension held control over Ocean State Buyer, LLC and Ocean State. **Ex. 11.**

5

29.     Mr. Lhee served as President of Ocean State Holdings, LLC and Ocean State Buyer, LLC and Vice President of Ocean State.  **Ex. 9**; **Ex. 10**.

30.     Mr. Formolo and Mr. Pircon each served as a Vice President of Ocean State Holdings, LLC, Ocean State Buyer, LLC and Ocean State.  **Ex. 9**; **Ex. 10; Ex. 11.**

31.     At all relevant times, Mr. Lhee and Mr. Formolo were NHC Fund I's investment committee members and under the terms of the NHC Fund I Limited Partnership Agreement had sole discretion to make all decisions about how Fund I money is used—including providing funding to portfolio companies—and New Harbor Capital Fund GP, LP (as the General Partner and an agent of NHC Fund I) had the sole discretion over management decisions of NHC Fund I, including use of NHC Fund I money and supporting investments (i.e., portfolio companies). **Ex. 1**; **Ex. 13**, p. 94:12-22, 97:6-8, 99:17-22; **Ex. 14**, p. 13:24-14:1-18, 15:14-19.

32.     And in practice, Mr. Lhee was solely responsible for use of NHC Fund I money in connection with Ocean State because he was the New Harbor Capital partner in charge of managing the Ocean State investment.  **Ex. 14**, p. 78:23-79:10; **Ex. 15**, p. 5:16-18, 23:14-24:11, 27:24-28:3.

33.     The NHC Fund I Limited Partnership Agreement gave the General Partner, New Harbor Capital Fund GP, LP—and Mr. Formolo and Mr. Lhee in particular—the exclusive authority to act on behalf of the Partnership (i.e., NHC Fund I) to effectuate its purposes.  **Ex. 1.**

34.     These purposes included managing and supervising investments in portfolio companies, as well as engaging in such other activities incidental or ancillary thereto as deemed advisable by the General Partner.  **Ex. 1.**

35.     Specifically, Section 1.3 of the NHC Fund I Limited Partnership Agreement states that: "[t]he Partnership is organized for the principal purposes of (a) making investments of the

kind and nature described in the Partnership's confidential Private Placement Memorandum dated May 2013, as supplemented or amended prior to the date hereof, (b) managing, supervising and disposing of such investments and (c) engaging in such other activities-incidental or ancillary thereto as the General Partner deems necessary or advisable." **Ex. 1.**

36.     Section 6.1 gives the General Partner (New Harbor Capital Fund GP, LP) the exclusive management over the business and assets of the Partnership (i.e., the portfolio companies) and the sole discretion to manage the Partnership. **Ex. 1.**

37.     Conversely, Section 7.2 says the Limited Partners (i.e., the Fund I investors) shall not participate in the management of the Partnership. **Ex. 1.**

38.     New Harbor Capital Fund GP, LP was a party to a Professional Services Agreement with Ocean State pursuant to which New Harbor Capital Fund GP, LP managed, controlled, and directed the conduct and affairs of Ocean State. **Ex.** 7; Ex**. 8**, No. 3, 6.

39.     Ocean State's CEO was John Roselli ("Mr. Roselli"), an Operating Partner at New Harbor Capital. **Ex. 8**, No.4; **Ex. 16,** p. 9:21-10:11, 15:14-16:22.

40.     The structure and management of NHC Fund I and its affiliates shows that New Harbor Capital is deeply involved in the management and operation of the companies in which it invests, including Ocean State. **Ex. 1; Ex. 17** (describing that New Harbor Capital's investment strategy is to closely partner with portfolio company management and engage in active investment management and that New Harbor Capital focuses primarily on making control equity investments).

41.     This involvement includes the authority to make decisions and determinations relating to decisions about Investments, Investment Contributions, Investment Proceeds, Partnership Expenses (including all costs, expenses, liabilities and obligations relating to the

Partnership's and/or its subsidiaries' activities, investments and business (to the extent not borne or reimbursed by a Portfolio Company), Affiliates (including Portfolio Companies and subsidiaries thereof) (as those terms are defined). **Ex. 1**.

42.     NHC Fund I's controlling stake in Ocean State placed NHC Fund I and NHC Fund I's affiliated entities in a position where they were intimately involved in the management and operation of Ocean State, well beyond that of a passive investor or shareholder. **Ex. 1.**

43.     NHC Fund I's investment approach is distinguishable from mere stock holding or mutual fund investments and NHC Fund I's investment strategy could only be achieved by active management through an agent, since NCH Fund I itself had no employees. **Ex. 17.**

44.     New Harbor Capital directed and controlled Ocean State through a combination of management (e.g., through the Professional Services Agreement and installing Mr. Roselli as Ocean State's CEO and Mr. Lhee, Mr. Formolo and Mr. Pircon as officers of Ocean State Holdings, LLC, Ocean State Buyer, LLC and Ocean State), operational influence (e.g., voting and governance control through control of the Boards), and financial control (e.g., through the controlling stake in Ocean State). **Ex. 1**; **Ex. 2**; **Ex. 5**; **Ex. 7**; **Ex. 8**, No. 3, 6; **Ex. 9**; **Ex. 10**; **Ex. 11**; **Ex. 16**, p. 9:21-10:11, 15:14-16:22; **Ex. 18**; **Ex. 19**; **Ex. 20**.

**C.     Fyzical Holdings**

45.     At all relevant times, Fyzical Holdings was a portfolio company that was majority owned and controlled by NHC Fund II and NHC Management and their affiliates. **Ex. 21**; **Ex. 22**; **Ex. 23**.

46.     As of January 1, 2020, NHC Fund II and its affiliates owned a controlling stake in Fyzical Holdings. **Ex. 21**; **Ex. 23**; **Ex. 24; Ex. 25**; **Ex. 26**; **Ex. 27,** No. 3, 6.

47.     Section 2.2 of Fyzical Holdings' Second Amended and Restated LLC Agreement permits its Board to authorize capital contributions to and to issue Units in Fyzical Holdings. **Ex. 28.**

48.     Section 4.1 of Fyzical Holdings' Second Amended and Restated LLC Agreement gives its Board full and complete power to manage and control Fyzical Holdings' business and affairs. **Ex. 28.**

49.     Per Section 4.2, Fyzical Holdings' Board was comprised of 7 Representatives, consisting of: the Executive Representative (i.e., Fyzical Holdings' CEO); three New Harbor Representatives (Mr. Lhee, Mr. Formolo and Mr. Pircon); and three Independent Representatives. **Ex. 28.**

50.     Per Section 4.4(b), the New Harbor Representatives were ensured a majority and controlling vote on all matters submitted to the Board or any committee thereof. **Ex. 28.**

51.     Thus, New Harbor Capital held voting control over Fyzical Holdings' Board and any committee thereof. **Ex. 28.**

52.     At all relevant times, Mr. Lhee and Mr. Formolo were NHC Fund II's investment committee members and under the terms of NHC Fund II's Amended and Restated Agreement of Limited Partnership ("NHC Fund II Limited Partnership Agreement") had sole discretion to make all decisions about how NHC Fund II money was used—including providing funding to portfolio companies—and New Harbor Capital Fund II GP, LP (as the General Partner and an agent of NHC Fund II) has the sole discretion over management decisions of NHC Fund II, including use of NHC Fund II money and supporting investments (i.e., portfolio companies). **Ex. 3**; **Ex. 13**, p. 94:12-22, 98:6-8, 99:17-22; **Ex. 14**, p. 13:24-14:18; **Ex. 15**, p. 23:14-24:11, 58:1-7.

53.     And in practice, Mr. Formolo was solely responsible for use of NHC Fund II money in connection with Fyzical Holdings because he was the New Harbor Capital partner in charge of managing the Fyzical Holding investment.  **Ex. 14**, p. 81:2-6.

54.     The NHC Fund II Limited Partnership Agreement gave the General Partner, New Harbor Capital Fund II GP, LP—and Mr. Formolo and Mr. Lhee in particular—the exclusive authority to act on behalf of the Partnership (i.e., NHC Fund II) to effectuate its purposes.  **Ex. 3**.

55.     These purposes included managing and supervising investments in portfolio companies, as well as engaging in such other activities incidental or ancillary thereto as deemed advisable by the General Partner.  **Ex. 3**.

56.     Specifically, Section 1.3 of the NHC Fund II Limited Partnership Agreement states that: "[t]he Partnership is organized for the principal purposes of (a) making investments of the kind and nature described in the Partnership's confidential Private Placement Memorandum dated May 2013, as supplemented or amended prior to the date hereof, (b) managing, supervising and disposing of such investments and (c) engaging in such other activities-incidental or ancillary thereto as the General Partner deems necessary or advisable."  **Ex. 3**.

57.     Section 6.1 gives the General Partner (New Harbor Capital Fund II GP, LP) the exclusive management over the business and assets of the Partnership (i.e., the portfolio companies) and the sole discretion to manage the Partnership.  **Ex. 3**.

58.     Conversely, Section 7.2 says the Limited Partners (i.e., the NHC Fund II investors) shall not participate in the management of the Partnership.  **Ex. 3**.

59.     Pursuant to Section 5.1, New Harbor Capital Fund II GP, LP was a party to a Management Agreement with NHC Management pursuant to which New Harbor Capital Fund II

GP, LP appointed NHC Management to manage, control, and direct the conduct and affairs of NHC Fund II. **Ex. 3**.

60.     At all relevant times, New Harbor Capital Fund II GP, LP was also a party to a Professional Services Agreement with Fyzical Holdings' subsidiary, Fyzical Buyer, LLC, pursuant to which New Harbor Capital Fund II GP, LP managed, controlled, and directed the conduct and affairs of Fyzical Holdings and its direct and indirect subsidiaries. **Ex. 27**, No. 6; **Ex. 21**; **Ex. 22**.

61.     New Harbor Capital Fund II GP, LP's conduct and affairs were ultimately managed, controlled, and directed by its general partner, New Harbor Capital Management II LLC. **Ex. 3**; **Ex. 4**.

62.     The structure and management of NHC Fund II and its affiliates shows that New Harbor Capital is deeply involved in the management and operation of the companies in which it invests, including Fyzical Holdings. **Ex. 3**; **Ex. 17**.

63.     This involvement includes the authority to make decisions and determinations relating to decisions about Investments, Investment Contributions, Investment Proceeds, Partnership Expenses (including all costs, expenses, liabilities and obligations relating to the Partnership's and/or its subsidiaries' activities, investments and business (to the extent not borne or reimbursed by a Portfolio Company), Affiliates (including Portfolio Companies and subsidiaries thereof) (as those terms are defined). **Ex. 3**.

64.     NCH Fund II's General Partner is an agent of NCH Fund II and the NCH Fund II Limited Partnership Agreement gives the General Partner exclusive authority to act on behalf of Fund II to effectuate its purposes. **Ex. 3**.

65.     NCH Fund II's controlling stake in Fyzical Holdings placed NCH Fund II and NCH Fund II's affiliated entities in a position where they were intimately involved in the management and operation of Fyzical Holdings, well beyond that of a passive investor or shareholder.  **Ex. 3**.

66.     As with NCH Fund I, NCH Fund II's investment approach is distinguishable from mere stock holding or mutual fund investments, and its investment strategy could only be achieved by active management through an agent, since Fund II itself had no employees.  **Ex. 17**.

67.     New Harbor Capital directed and controlled Fyzical Holdings through a combination of management (e.g., through the Professional Services Agreement), operational influence (e.g., voting and governance control through control of the Board), and financial control (e.g., through the controlling stake in Fyzical Holdings).  **Ex. 3**; **Ex. 18**; **Ex. 19**; **Ex. 20**; **Ex. 22**.

III.    **Ocean State—With New Harbor Capital's Oversight, Direction and Control—Falsely and Knowingly Certified Its Compliance with the PPP Size and Affiliation Rules and Eligibility to Receive Its PPP Loan and Then Falsely and Knowingly Certified that the Loan Funds Were Used to Pay Costs that were Eligible for Forgiveness and Avoided Its Obligation to Repay the PPP Funds**

68.     ███████████████████████████████████████████████████

█████████████████████████████████████████████████████████

**Ex. 29**.

69.     ███████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███ ██ ██ ████ ██ ██ ████ ████ ██ ████ ████ ██ ███

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████ **Ex. 29**.

70.     On March 27, 2020, a New Harbor Capital principal, Justin Marquardt ("Mr. Marquardt"), sent an internal email to others at New Harbor Capital stating that: "To the extent we're eligible for CARES act funds (████████████████████████████████████ ████████████████████████████████████ from what I'm hearing we'll need to access the funds through a 7a lender.  It's still going to take some time for the funds to be available, but we should try to get to the front of the line where possible." **Ex. 29**.

71.     On March 29, 2020, Mr. Lhee sent an email stating that: "Let's make sure to coordinate efforts with Deerpath for NYKC, Ocean State, Certica, and Blueprint" and "I think we should get the lenders who already deal with the SBA to help us." **Ex. 30.**

72.     On March 29, 2020, Mr. Roselli sent an email stating that: "It may be helpful to designate a New Harbor point Person regarding this program so we can coordinate efforts with portfolio companies." **Ex. 30**.

73.     In a March 30, 2020, Mr. Marquardt stated in an email to Ocean State, Fyzical Holdings and other New Harbor Capital portfolio companies stating that "I wanted to reach out on behalf of NHC to help coordinate efforts re: SBA funding from the CARES Act." **Ex. 31**.

74.     ████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████ **Ex. 32**.

75.     ████████████████████████████████████

13



**Ex. 32** (emphasis added).

76. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



**Ex. 32**.

77. On April 3, 2020, Ocean State applied for a first draw PPP loan through Freedom National Bank ("Freedom National") in the amount of $3,159,800, which loan was approved by Freedom National. **Ex. 12**; **Ex. 33**, ¶¶ 6-7.

78. In doing so, Ocean State claimed 277 employees ██████████████ ██████████████████████ and certified that it fell below the 500-employee threshold. **Ex. 12**.

79. ████████████████████████████████████ ████████████████████████████████████**Ex. 12**.

80. ████████████████████████████████ ████████████████████████████████████ ████████████████**Ex. 12**.

81. Ocean State checked the "No" box in its PPP application in response to the question whether any of Ocean State's owners was an owner of any other business, or had common management with, any other business, and failed to identify all such businesses and describe the relationship in an addendum A. **Ex. 12**.

82. Ocean State certified in its PPP borrower application form that "[t]he Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the [SBA] and the Department of the Treasury (Treasury) implementing the Paycheck Protection Program …" **Ex. 12**.

83.     Ocean State certified in its PPP borrower application form that together with its affiliates (if applicable), it "employ[ed] not more than the greater of" 500 employees or a size standard set by the SBA for the business's industry.  **Ex. 12**.

84.     Ocean State certified in its PPP borrower application form that "[a]ll loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rules."  **Ex. 12**.

85.     Ocean State certified in its PPP borrower application form "that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects."  **Ex. 12**.

86.     On April 10, 2020, Mr. Lhee, on behalf of Ocean State Buyer, as the sole member of Ocean State, executed a written consent approving Ocean State's PPP loan application.  **Ex. 34**.

87.     ███████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████**Ex. 34**.

88.     ███████████████████████████████████████████████
███████████████████████████████████████████████████████
███ **Ex. 34**.

89.     ███████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████**Ex. 35**.

90. ████████████████████████████████

████████████████████████████████████████████ **Ex.**

**35**.

91. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ **Ex. 36**.

92. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ **Ex. 36**.

93. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ **Ex. 36**.

94. ████████████████████████████████

████████████████████████████████████████████

**Ex. 36**.

95.     On May 7, 2020, Mr. Roselli and Ocean State's nominal CFO, Sarah Charette ("Ms. Charette"), created a document entitled "PPP Business Case", which they then sent to New Harbor Capital for review.  **Ex. 8**, No. 4, 7; **Ex. 37**.

96.     ███████████████████████████████████████████████████

███████████████████████████████ **Ex. 37**.

97.     ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████ **Ex. 38**.

98.     ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ **Ex. 38**.

99.     ███████████████████████████████████████████████████

███████████████████████████████ **Ex. 39**.

100.    ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████   ██████ **Ex. 39**.

101.    ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████ **Ex. 40**.

102.    ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████ **Ex. 40**.

103.  █████████████████████████████████████

████████████████████████ **Ex. 40**.

104.  █████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████ **Ex. 41**.

105.  In November 2020, Ocean State applied for loan forgiveness, this time certifying that it used the loan exclusively for its own payroll costs to retain employees and that it accurately verified the payments for the eligible payroll costs.  **Ex. 33**, ¶ 8; **Ex. 42**.

106.  In June 2021, the SBA forgave Ocean State's PPP loan in the amount of $3,159,800.  **Ex. 33**, ¶ 11.

107.  Ocean State did not repay its PPP loan and neither Ocean State nor New Harbor Capital ever considered repaying the PPP money in light of the SBA guidance.  **Ex. 15**, p. 46:18-47:15; **Ex. 16**, p. 137:6-17.

108.  The SBA did not conduct a manual review of Ocean State's PPP loan forgiveness application.  **Ex. 33**, ¶ 12.

109.  Together with its affiliates, Ocean State had more than 500 employees and it did not meet the SBA employee-based or revenue-based size standard.  **Ex. 2**; **Ex. 5**; **Ex. 12**; **Ex. 16**, p. 54:15-57:5; **Ex. 21**; **Ex. 22**; **Ex. 25**; **Ex. 43**; **Ex. 44**; **Ex. 45**; **Ex. 46**.

110.  Absent waiver of the affiliation rules, Ocean State was not eligible for a PPP loan. **Ex. 1**; **Ex. 2**; **Ex. 5**; **Ex. 7**; **Ex. 9**; **Ex. 10**; **Ex. 11**; **Ex. 16**, p. 54:15-57:5; **Ex. 18**; **Ex. 19**; **Ex. 34**; **Ex. 38**; **Ex. 40**.

111.    The MSJ Defendants claim that Ocean State qualified for a waiver of the affiliation rules and thus did not need to consider affiliates with respect to its PPP loan application because it received financial assistance from SBIC-approved lender Deerpath Funding Advantage IV, LP ("Deerpath") during the covered period. **Ex. 47**, No. 9, 10.

112.    Ocean State was the MSO that provided non-medical administrative and management services to the 23 separate and legally distinct PC's ("Ocean State Companies") that were 100% owned by Dr. Crausman (not Ocean State) and for whom most of the employees claimed in Ocean State's PPP borrower application form worked. **Ex. 5**; **Ex. 6**; **Ex. 48**; **Ex. 49**.

113.    Ocean State entered into a Management Services Agreement ("MSA") with each of the 23 Ocean State Companies. **Ex. 5**; **Ex. 16**, p.72:15-21, 74:1-4.

114.    As the MSO, Ocean State merely "facilitated" payment of payroll costs incurred by the 23 separate Ocean State Companies and managed the business and non-medical tasks for the Ocean State Companies . **Ex. 5**; **Ex. 16**, p. 21:4-23:21, 24:11-14, 25:16-22, 27:8-28:21, 34:10-15, 64:20-65:6, 67:15-72:21.

115.    Ocean State itself had only about a dozen employees; the rest of the 277 "employees" included in Ocean State's PPP loan application worked in the medical operations at the 23 Ocean State Companies. **Ex. 12**; **Ex. 16**, p. 28:2-21; **Ex. 43**; **Ex. 48**; **Ex. 50**; **Ex. 51**; **Ex**. **52**.

116.    As Ocean State and New Harbor Capital knew or should have known by virtue of being parties to the Deerpath loan documents, none of the 23 Ocean State Companies (each a separate "business concern") were parties to those loan documents, and thus did not qualify for the SBIC waiver of the affiliation rule and were ineligible for PPP loans given the affiliation rules. **Ex. 40**; **Ex. 53**; **Ex. 54**; **Ex. 55**; **Ex. 56**.

117.    The MSJ Defendants assert that they "diligently investigated the applicable laws and regulations in order to ensure the lawfulness of their conduct" and that "[t]he boards of each company reviewed applicable regulations and supporting documentation prior to determining whether to approve the PPP loans and reached the same conclusion that the applications were lawful—including any New Harbor Capital employees or agents serving as board members of Ocean State, Fyzical, or [Blueprint Test Preparation, LLC]." **Ex. 8**, No. 11; **Ex. 47**, No. 10, 17, 18; **Ex. 57,** No. 13, 14.

118.    Ocean State and New Harbor Capital delegated authority for analyzing whether it was appropriate to aggregate the Ocean State Companies' employees to Ocean State's nominal CFO, Ms. Charette. **Ex. 8**, No. 7, 13; **Ex. 14**, p. 87:2-10; **Ex. 16**, p. 74:5-21; **Ex. 58**, p. 26:24-27:3, 31:18-23; **Ex. 59**, p.12:13-15:11.

119.    Ms. Charette, who was not qualified to handle the task, testified that she came up with the 277 employees included in Ocean State's PPP borrower application form by simply looking at Ocean State's payroll reports (which included the employees of the 23 Ocean State Companies for which Ocean State facilitated payroll payment). **Ex. 58**, p. 26:24-27:3, 75:1-3.

120.    Ocean State and New Harbor Capital then relied on a one-page generic form letter from Ocean State's lender, Deerpath, to claim that Ocean State qualified for the SBIC affiliation waiver without conducting (or at least identifying in this litigation) any further investigation or analysis of their own. **Ex. 60**.

121.    The letter was addressed to Ocean State's PPP lender and simply said that the "Applicant" has received financial assistance from Deerpath; the letter says nothing specific about Ocean State or about the separate 23 Ocean State Companies receiving financial assistance from Deerpath (which they did not) or about the legality of Ocean State aggregating the employees of

the 23 Ocean State Companies for purposes of determining Ocean State's eligibility for and the amount of the PPP loan. **Ex. 16**, p. 161:23-162:18; **Ex. 59**, p. 15:3-11; **Ex. 60**, p. 30:24-31:7, 32:4-10, 36:21-22, 38:16-39:8, 105:16-20.

122.    New Harbor Capital and Ocean State designed a complex ownership structure to create a legal separateness between themselves and between Ocean State and the 23 Ocean State Companies to both comply with Corporate Practice of Medicine ("CPOM") laws and to limit liability. **Ex. 2**; **Ex. 5**; **Ex. 6**; **Ex. 16**, p. 67:15-72:21.

123.    With Ocean State's PPP loan application, however, Ocean State disregarded the legal separateness of the 23 Ocean State Companies, claimed payroll costs for the 277 employees included in its PPP borrower application form, and claimed that it qualified for the SBIC affiliation waiver and was an "eligible recipient" for the "covered loan" it applied for and received. **Ex. 12**.

124.    This contrasts with another of New Harbor Capital's portfolio companies, Blueprint: unlike Ocean State, the Blueprint-entity that applied for the PPP loan was Blueprint Test Prep, LLC, which was the business concern that the employees worked for and that paid payroll costs. **Ex. 44**; **Ex. 45**; **Ex. 46**.

125.    Unlike the 23 Ocean State Companies, Blueprint Test Prep, LLC was a party to the loan documents with SBIC lender Deerpath and thus received financial assistance from a SBIC lender. **Ex. 61**.

126.     Ocean State did not produce a copy of its MSAs with the 23 Ocean State Companies in this litigation; however, to comply with Rhode Island CPOM laws, those MSAs necessarily must provide for Ocean State's independent corporate existence and affairs and disclaim any ownership or employer-employee relationship between Ocean State and the 23 Ocean State Companies. *See, e.g.,* R.I. Gen. Laws § 7-5.1-3 (mandating that every officer, director and

shareholder of a professional services corporation must be an individual authorized to practice such profession and be employed by the corporation in such practice). **Ex. 5**; **Ex. 16**, p. 67:15-72:21.

**C.** **Fyzical Holdings—With New Harbor Capital's Oversight, Direction and Control— Falsely and Knowingly Certified Its Compliance with the PPP Size and Affiliation Rules and Eligibility to Receive Its PPP Loan and Then Falsely and Knowingly Certified that the Loan Funds Were Used to Pay Costs that were Eligible for Forgiveness and Avoided Its Obligation to Repay the PPP Funds**

127.    On April 3, 2020, Fyzical Holdings applied for a First Draw PPP loan through Webster Bank, NA ("Webster Bank") in the amount of $3,076,600, which loan was approved by Webster Bank. **Ex. 25**; **Ex. 33**, ¶¶ 14-15.

128.    In doing so, Fyzical Holdings claimed 226 employees and certified that it fell below the 500-employee threshold. **Ex. 25**.

129.    ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ **Ex. 25**.

130.    ███████████████████████████████████████

████████████████████████████████████████████

████████████████████ **Ex. 25**.

131.    Fyzical Holdings checked the "No" box in its PPP application in response to the question whether any of Fyzical Holdings' owners was an owner of any other business, or had common management with, any other business, and failed to identify all such businesses and describe the relationship in an addendum A. **Ex. 25**.

132. Additionally, Fyzical Holdings checked the "Yes" box in its PPP application in response to the question whether it is a franchise that is listed in the SBA's Franchise Directory. **Ex. 25**.

133. Fyzical Holdings certified in its PPP borrower application form that "[t]he Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the [SBA] and the Department of the Treasury (Treasury) implementing the Paycheck Protection Program …" **Ex. 25**.

134. Fyzical Holdings certified in its PPP borrower application form that together with its affiliates (if applicable), it "employ[ed] not more than the greater of" 500 employees or a size standard set by the SBA for the business's industry. **Ex. 25**.

135. Fyzical Holdings certified in its PPP borrower application form that "[a]ll loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rules." **Ex. 25**.

136. Fyzical Holdings certified "that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects." **Ex. 25**.

137. ███████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ **Ex. 35**.

138. ███████████████████████████████████████████ ████████████████████████████████████████████████

**Ex. 35**.

139.

**Ex. 35**.

140.

**Ex. 62**.

141.

**Ex. 63**, p. 9:23-25; 69:6-25.

142.

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████

**Ex. 62** (emphasis added).

143.   ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████ **Ex. 62**.

144.   On May 13, 2020, Mr. Thompson emailed the Fyzical Holdings board members regarding a "Board Resolution for Accepting PPP Funds."   **Ex. 64**

145.   ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████   ████ **Ex. 64**.

146.   ████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ **Ex. 64**

147.   That same day, Fyzical Holdings' Board—inclusive of Mr. Formolo, Mr. Lhee and Mr. Pircon—voted to authorize Fyzical Holdings to file an application to obtain a PPP loan, which, or course, Fyzical Holdings had already done on April 3, 2020.   **Ex. 65**

148.   ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████ **Ex. 65**.

149.    In January 2021, Fyzical Holdings applied for loan forgiveness, this time certifying that it used the loan exclusively for its own payroll costs to retain employees and that it accurately verified the payments for the eligible payroll costs.  **Ex. 33**, ¶ 16; **Ex. 66.**

150.    In June 2021, the SBA forgave Fyzical Holdings' PPP loan in the amount of $3,076,600.  **Ex. 33**, ¶ 19.

151.    Fyzical Holdings did not repay its PPP loan and neither Fyzical Holdings nor New Harbor Capital ever considered repaying the PPP money in light of the SBA guidance.  **Ex. 15**, p. 48:15-22; **Ex. 63**, p. 144:5-7.

152.    The SBA did not conduct a manual review of Fyzical Holdings' PPP loan forgiveness application.   **Ex. 33**, ¶ 20.

153.    Fyzical Holdings—a holding company—is a passive business primarily involved in investment or speculation.  **Ex. 21**; **Ex. 63**, p. 25:5-16; 28:3-10; 44:13-18; 75:18-76:8; **Ex. 67** ("Fyzical Acquisition Holdings, LLC was formed as a holding company for investment in its subsidiaries."); **Ex. 68**.

154.    Again, the MSJ Defendants assert that they diligently investigated and were aware of the rules and requirements of the PPP loan program, including those contained in the PPP

statute, in the SBA regulations, and in the relevant guidance from the SBA, including the SBA FAQ's, the IFRs and the Consolidated IFR.  **Ex. 27**, No. 9, 11; **Ex. 57**, No. 13, 14; **Ex. 69**, No. 17, 18.

155.    Fyzical Holdings had more than 500 employees and it did not meet the SBA employee-based or revenue-based size standard.  **Ex. 4**; **Ex. 5**; **Ex. 12**; **Ex. 25**; **Ex. 44**; **Ex. 45**.

156.    Absent waiver of the affiliation rules, Fyzical Holdings was not eligible for a PPP loan for the additional reason that it had more than 500 employees and it did not meet the SBA employee-based or revenue-based size standard.  **Ex. 3**; **Ex. 4**; **Ex. 18**; **Ex. 19**; **Ex. 21**; **Ex. 22**; **Ex. 23**; **Ex. 26**;    **Ex. 28**; **Ex. 62**; **Ex. 63**, p. 91:9-92:5; **Ex. 65**.

157.    Fyzical Holdings and New Harbor Capital claim that Fyzical Holdings qualified for a waiver of the affiliation rules and thus did not need to consider affiliates with respect to its PPP loan application because Fyzical Holdings "was a 'business operating as a franchise' within the meaning of the CARES Act because it was parent of the Fyzical franchise brand and its employees directly participated in running the franchise system, including in the operation of company-run clinics."  **Ex. 27**, No. 9, 11; **Ex. 69**, No. 10, 17, 18.

158.    Each Fyzical-entity in the so-called Fyzical "franchise-system" that Defendants refer to, including the "company-run clinics", is a separate and distinct legal entity.  Ex. 24; **Ex. 63**, p. 25:5-16; 28:3-10; 44:13-18; 75:18-76:8, 78:9-18; **Ex. 67**; **Ex. 68**.

159.    Fyzical Holdings is (and was) merely a holding company that has no operations of its own and has maybe around 10 employees of its own.  **Ex. 24**; **Ex. 63**, p. 25:5-16, 28:3-10, 44:13-18; 76:8, 78:9-18; **Ex. 67**; **Ex. 68**; **Ex. 70**.

160.    There were roughly 200 "Fyzical" franchisees.  **Ex. 63**, p. 66:4-22.

161.     These franchisees operated under a franchise agreement with another "Fyzical" entity, Fyzical, LLC.  **Ex. 63**, p. 48:5-7, 55:24-56:3, 78:3-8; 80:12-17.

162.     The "company-run clinics" are not franchisees but rather are 100% owned by Fyzical Buyer, LLC.  **Ex. 63**, p. 66:14-67:25; 78:13-79:25.

163.     Fyzical Holdings itself did not sell any goods or services or operate under a franchise agreement.  **Ex. 63**, p. 66:14-67:25; 78:13-79:25; **Ex. 67**; **Ex. 68**.

164.     The non-franchisee "company-run clinics" were managed by New Harbor Capital Fund II GP, LP—not Fyzical Holdings—pursuant to a Professional Services Agreement between New Harbor Capital Fund II GP, LP and Fyzical Buyer, LLC.  *See* PPPLITDEFS_00047987.

165.     Fyzical Holdings claimed its PPP loan for its indirectly owned, *non-franchisee* "company-run clinics."  **Ex. 69**, No. 10.

166.     The majority of the roughly 200 "Fyzical" franchisees (as opposed to the "company-run clinics" that Fyzical Holdings indirectly owned) applied for their own PPP loans.  **Ex. 63**, p. 78:3-8; 80:12-17; **Ex. 68**.

167.     Fyzical Holdings is not the Fyzical entity that enters into franchise agreements with its franchisees.  Fyzical, LLC is the franchisor.  **Ex. 63**, p. 28:11-21, 48:5-7, 55:24-56:3, 79:12-18; **Ex. 68**.

168.     The individual "company-run clinics" incurred the payroll for their own employees and then other Fyzical entities—Fyzical, LLC and FyzBiz, LLC—paid the payroll on behalf of those clinics, not Fyzical Holdings.  **Ex. 63**, p. 27:6-12; 34:1-14; 35:3-8; 61:4-62:22.

169.     Fyzical Holdings operated under a management agreement with a third-party, New Harbor Capital, who is affiliated with the franchisor.  **Ex. 22**; **Ex 63**, p. 114:3-18; **Ex. 71**.

170.     The MSJ Defendants assert that Fyzical Holdings claimed payroll costs for the 226 employees included in its PPP borrower application form based on its status as the "franchise brand" that is the tertiary parent for the company-run clinics that "owns all of the money underneath it." **Ex. 21**; **Ex. 24**; **Ex. 63**, p. 30:16-25, 32:12-20, 34:11-14, 34:22-25, 36:2-7, 61:4-63:20, 64:23-25, 67:20-21, 75:18-76:8.

171.     As with Ocean State, New Harbor Capital and Fyzical Holdings designed a complex ownership structure to create a legal separateness between themselves and between Fyzical Holdings and the "company-run clinics" to both comply with CPOM laws and to limit liability. **Ex. 4; Ex. 21**; **Ex. 23**.

172.     With Fyzical Holdings' PPP loan, however, Fyzical Holdings disregarded the legal separateness of the company-run clinics, falsely and knowingly claimed payroll costs for the 226 employees included in its PPP borrower application form, and falsely and knowingly claimed that it qualified for the franchise affiliation waiver and was an "eligible recipient" for the "covered loan" it applied for and received. **Ex. 25**.

173.     In September 2023, the US Department of Justice ("DOJ") reached a settlement in a False Claims Act action filed in the United States District Court for the Middle District of Florida captioned *United States ex rel. David Jones v. Victory Automotive Group, LLC,* Case No. 8:21-cv-1742-CEH-CPT ("Victory Automotive Action"). **Ex. 72**.

174.     In the Victory Automotive Action, the United States alleged that Victory Automotive Group, LLC ("VAG") provides management services to approximately 42 car dealerships ("Affiliates") located throughout the United States and that VAG obtained a PPP loan for $6,282,362 on or about April 3, 2020 (which coincidentally is the same day as Fyzical Holdings' PPP application). **Ex. 72**.

175. In the September 2023 Settlement Agreement, VAG agreed that it was ineligible for the PPP loan because it was not a "small business concern" due to its size after inclusion of VAG's Affiliates.  **Ex. 72**.

176. The affiliation rules applied to VAG as it was not operating as a franchise with a franchise identifier code from SBA because VAG does not sell cars and does not operate under a franchise agreement.  **Ex. 72**.

177. Notwithstanding the size of VAG after inclusion of its Affiliates, VAG certified in its PPP loan application that the company was "eligible to receive a loan under the rules in effect at the time [the] application [was] submitted."  **Ex. 72**.

178. VAG agreed to pay $9 million plus $80,000 in attorney's fees to settle the Victory Automotive Action.  **Ex. 72**.

## IV.    The MSJ Defendants' Public Disclosure Bar Defense

179. Relator propounded interrogatories to the MSJ Defendants that asked them to "State the basis for Your Second Affirmative Defense that "The False Claims Act's public disclosure bar bars Relator's claim in whole or in part."  **Ex. 47**, No. 16; **Ex. 57**, No. 12; **Ex. 69**, No 16.

180. In response, the MSJ Defendants did not identify a single source of alleged public disclosure concerning the allegations or transactions alleged by Relator concerning Ocean State and Fyzical Holdings' false certifications of compliance with the PPP size and affiliation or forgiveness rules or repayment avoidance.  **Ex. 47**, No. 16; **Ex. 57**, No. 12; **Ex. 69**, No 16.

181. Nor dd the MSJ Defendants identify a single source of alleged public disclosure concerning the allegations or transactions alleged by Relator concerning New Harbor Capital's direction and control of Ocean State and Fyzical Holdings' PPP applications or loans.  **Ex. 47**, No. 16; **Ex. 57**, No. 12; **Ex. 69**, No 16.

Respectfully submitted,

/s/ Eric E. Renner
Eric E. Renner (#7481)
DUFFY & SWEENEY, LTD
321 South Main Street, Suite 400
Providence, RI  02903
Phone: 401-457-1803
Fax: 401-457-0701
erenner@duffysweeney.com

*Attorneys for Plaintiff-Relator,*
*United States of America ex rel James R. Berkley*

Date:  January 6, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of January, 2025, a true copy of the foregoing document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and copies will be mailed to those indicated as non-registered participants.

/s/ Eric E. Renner