## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. JAMES R. BERKLEY, <br><br> *Relator*, <br><br> v. <br><br> OCEAN STATE, LLC, NEW HARBOR CAPITAL FUND LP, NEW HARBOR CAPITAL FUND II LP, NEW HARBOR CAPITAL MANAGEMENT LP, BLUEPRINT TEST PREPARATION, LLC, FYZICAL ACQUISITION HOLDINGS, LLC, <br><br> *Defendants*. | C.A. No. 1:20-cv-00538-JJM-PAS |

## <u>DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

**Page**

ARGUMENT ........................................................................................................... 3

I.  **Relator's Opposition Brief Confirms His Claims Are Barred under the FCA's Public Disclosure Bar.** ................................................................... 3

    A.    Relator Has Conceded Each Essential Element of His Claim Was Publicly Disclosed. ................................................................................... 3

    B.    Relator Has Failed To Prove The "Investigation" or "Experience" That Allowed Him To Survive Defendants' Motion to Dismiss Contributed Any Information to the Essential Elements of His Claims. .................................. 9

II.  **Relator Cannot Establish Defendants' PPP Loan Submissions Were False as a Matter of Law** ............................................................................... 11

    A.    Relator's Opposition Confirms That Blueprint's Submissions Were Not False. .......................................................................................................... 11

    B.    Ocean State and Fyzical Qualified for an Affiliation Waiver. .............................. 13

    C.    Relator Has Produced No Evidence Showing Ocean State and Fyzical Falsely Certified their PPP Loans Were Necessary. ............................................... 19

        1.    Relator's Interpretation of the CARES Act Contradicts Basic Principles of Corporate Separateness. ...................................................... 20

        2.    Relator Fails To Explain How His Theory Differs From the Credit Elsewhere or Personal Resources Tests That The CARES Act Disclaimed. ........................................................................................ 24

        3.    Relator's Other Necessity Arguments With Respect to Ocean State and Fyzical are Equally Meritless. ............................................................. 25

III.  **Neither Relator Nor the Government Can Show the Alleged Misrepresentations Were Material under the FCA.** ................................................. 27

IV.  **The New Harbor Defendants Are Entitled to Summary Judgment as Separate Corporate Entities.** .......................................................................... 31

V.  **Defendants Are Entitled to Summary Judgment on Relator's Reverse False Claims, Which Are Derived Entirely from His Other FCA Theories.** ........................ 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A-1 Ambulance Serv., Inc. v. California*,
202 F.3d 1238 (9th Cir. 2000) ...............................................................10

*U.S. ex rel. Banignan v. Organon USA Inc.*,
2012 WL 1190826 (D. Mass. Apr. 9, 2012) ...................................22, 32

*U.S. ex rel. Bartz v. Ortho-McNeil Pharm., Inc.*,
856 F. Supp. 2d 253 (D. Mass. 2012) .......................................................8

*U.S. ex rel. Beck v. St. Joseph Health Sys.*,
2021 WL 7084164 (N.D. Tex. Nov. 30, 2021)........................................10

*United States ex rel. Behnke v. CVS Caremark Corp*,
2020 WL 1953626 (E.D. Pa. 2020) .........................................................35

*United States ex rel. Bloomfield v. Engineered Structures, Inc.*,
2024 WL 4610555 (E.D. Va. Oct. 29, 2024)...........................................33

*United States ex rel. Campie v. Gilead Scis., Inc.*,
862 F.3d 890 (9th Cir. 2017) ...................................................................29

*Dewberry Grp., Inc. v. Dewberry Eng'rs Inc.*,
2025 WL 608108 (U.S. Feb. 26, 2025).............................................. *passim*

*U.S. ex rel. Duxbury v. Ortho Biotech Prods.*,
L.P., 719 F.3d 31 (1st Cir. 2013) ...............................................................8

*Elkind v. Liggett & Myers, Inc.*,
635 F.2d 156 (2d Cir. 1980).......................................................................9

*United States ex rel. Escobar v. Universal Health Servs., Inc.*,
842 F.3d 103 (1st Cir. 2016).....................................................................27

*U.S. ex rel. Feingold v. AdminaStar Fed., Inc.*,
324 F.3d 492 (7th Cir. 2003) .................................................................5, 7

*United States ex rel. Foreman v. AECOM*,
19 F.4th 85 (2d Cir. 2021) .................................................................28, 31

*Godfried v. Ford Motor Co.*,
2022 WL 2869700 (D. Me. July 21, 2022)............................................6, 7

### TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.,*
    397 F.3d 1217 (9th Cir. 2005) ...................................................................................7

*InterGen N.V. v. Grina,*
    344 F.3d 134 (1st Cir. 2003) ..............................................................................20, 22

*Katz v. Belveron Real Estate Partners, LLC,*
    28 F.4th 300 (1st Cir. 2022) ...................................................................................13

*U.S. ex rel. Kneepkins v. Gambro Healthcare, Inc.,*
    115 F. Supp. 2d 35 (D. Mass. 2000) .......................................................................22

*In re Lantus Direct Purchaser Antitrust Litig.,*
    2022 WL 4239367 (D. Mass. Aug. 17, 2022) .........................................................21

*U.S. ex rel. Lisitza v. Johnson & Johnson,*
    765 F. Supp. 2d 112 (D. Mass. 2011) ..................................................................4, 8

*U.S. ex rel. Lisitza v. Par Pharmaceutical Cos., Inc.,*
    2013 WL 870623 (N.D. Ill. March 7, 2013) ...........................................................32

*Miranda-Rivera v. Toledo-Dávila,*
    813 F.3d 64 (1st Cir. 2016) .....................................................................................13

*United States ex rel. Nunez-Unda v. Lafayette RE Management LLC,*
    Case No. 5:22-cv-00659-FB (W.D. Tex.) .................................................................30

*U.S. ex rel. Ondis v. City of Woonsocket,*
    587 F.3d 49 (1st Cir. 2009) ...............................................................................3, 4, 9

*United States ex rel. Patzer v. Sikorsky Aircraft Corp.,*
    2018 WL 3518518 (E.D. Wis. July 20, 2018) ........................................................34

*Pencheng Si v. Laogai Rsch. Found.,*
    71 F. Supp. 3d 73 (D.D.C. 2014) ............................................................................35

*U.S. ex rel. Poteet v. Bahler Med., Inc.,*
    619 F.3d 104 (1st Cir. 2010) .....................................................................................4

*U.S. ex rel. Relator, LLC v. Koostra,*
    2024 WL 3666470 (E.D. Cal. Aug. 6, 2024) ............................................................5

*U.S. ex rel. Schaengold v. Memorial Health, Inc.,*
    2014 WL 6908856 (S.D. Ga. Dec. 8, 2014) ...........................................................32

*U.S. ex rel. Schutte v. SuperValu Inc.,*
    598 U.S. 739 (2023) ................................................................................................16

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Seikel v. Alvarez*,
2024 WL 1315869 (N.D. W. Va. Mar. 27, 2024)................................................4, 5

*U.S. ex rel. Solomon v. Lockheed Martin Corp.*,
878 F.3d 139 (5th Cir. 2017) ..........................................................................4, 5, 9

*Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii LLC*,
512 F. Supp. 3d 1096 (D. Haw. 2021) .................................................................34

*U.S. v. Bestfoods*,
524 U.S. 51 (1998)................................................................................................32

*U.S. v. ManPow, LLC*,
2024 WL 305699 (C.D. Cal. Jan 3, 2024) ..........................................12, 27, 29, 30

*United States v. Kellog*,
2024 WL 4887531 (S.D. Cal. Nov. 25, 2024) ........................................................5

*United States v. Mount Sinai Hosp.*,
256 F. Supp. 3d 443 (S.D.N.Y. 2017)...................................................................34

*United States v. Omnicare, Inc.*,
2021 WL 1063784 (S.D.N.Y. Mar. 19, 2021) ......................................................34

*United States v. Royer*,
549 F.3d 886 (2d Cir. 2008)....................................................................................9

*Univ. Health Servs., Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016)....................................................................................2, 27, 29

*U.S. ex rel. Westmoreland v. Amgen, Inc.*,
738 F. Supp. 2d 267 (D. Mass. 2010) ......................................................10, 23, 25

*In re Williams*,
190 B.R. 728 (D.R.I. 1996)...................................................................................22

*U.S. ex rel. Winkelman v. CVS Caremark Corp.*,
827 F.3d 201 (1st Cir. 2016) ........................................................................ *passim*

*United States ex rel. Zotos v. Town of Hingham*,
98 F.4th 339 (1st Cir. 2024)............................................................................29, 31

**Statutes**

15 U.S.C. § 636(a)(36)................................................................................... *passim*

31 U.S.C. § 3730(e)(4)(A) ........................................................................................1

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

**Rules**

Fed. R. Civ. P. 56(a) ...........................................................................................................18

Fed. R. Evid. 801(c)(2) .........................................................................................................4

**Other Authorities**

85 Fed. Reg. 20817 ..............................................................................................................11

86 Fed. Reg. 3692, 3698 ......................................................................................................17

86 Fed. Reg. 3692, 3706 ......................................................................................................11

86 Fed. Reg. 3706 ................................................................................................................12

Relator's Opposition confirms Defendants are entitled to summary judgment on multiple, independent grounds.

*First*, the Court should enter summary judgment under the public disclosure bar. Across three separate briefs filled with overblown rhetoric, Relator still cannot identify an "essential element" of his claim that was not publicly disclosed in the news media, as he must to avoid dismissal. 31 U.S.C. § 3730(e)(4)(A); *U.S. ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 (1st Cir. 2016). Nor does Relator contest that the "investigation" and "expertise" he alleged to survive Defendants' motion to dismiss in fact had nothing to do with the actual elements of his FCA claim, meaning that none of the essential elements of his claim were based on non-public information. Instead, Relator's Opposition now asks the Court to rule—for the first time ever in an FCA case—that something he calls the "mosaic theory" precludes application of the public disclosure bar. That is not the First Circuit test, and it is not consistent with First Circuit precedent. The Court should decline to adopt this novel legal theory, follow settled precedent, and enter summary judgment for Defendants.

*Second*, Relator's claim also fails on the merits. He has no answer to the undisputed record showing Defendants qualified for PPP loans. Relator expressly abandons the theory he pleaded in his complaint that Ocean State and Blueprint did not qualify for the SBIC Affiliation Waiver, as he must given it is undisputed they "receive[d] financial assistance from a" SBIC lender. 15 U.S.C. § 636(a)(36)(D)(iv)(II). To salvage his claim against Ocean State, he manufactures a new argument that Ocean State improperly included the employees of the medical clinics it operates. But the CARES Act specified that an applicant should include employees for whom it "paid salaries and payroll taxes," which Ocean State undisputably did. 15 U.S.C. § 636(a)(36)(F)(ii)(II)(bb)(AA).

As for Fyzical, Relator invokes irrelevant rules against investment companies like banks receiving PPP loans, and he tries to rewrite the CARES Act to limit the Affiliation Waiver to franchisees.  But the CARES Act's express text provides a waiver to "any business concern" "operating as a franchise that is assigned a franchise identifier code by the [SBA]," and Fyzical falls squarely within that definition as it operates the Fyzical franchisor and multiple clinic locations. 15 U.S.C. § 636(a)(36)(D)(iv)(II).  Relator's argument is inconsistent with this text and must be rejected.

The only evidence Relator cites to support his necessity theory is also foreclosed by the CARES Act and settled principles of corporate law.  He argues that borrowers had to assess the "availability of alternative liquidity," but that is nothing more than a synonym for the "credit elsewhere test" that the CARES Act explicitly set aside for purposes of PPP loans.

*Third*, neither Relator nor the Government can wish away the highly relevant and undisputed fact that the Government had actual knowledge of the factual underpinnings of Relator's allegations (and Relator's allegations themselves), and declined to exercise its right to seek repayment of the loans.  As the Supreme Court mandated in *Escobar*, the Government's payment of a claim despite "actual knowledge" of the alleged violations is "very strong evidence" the violations were not material.  The First Circuit has applied this principle, with bite, and this Court should do the same.  *E.g.*, *United States ex rel. Zotos v. Town of Hingham*, 98 F.4th 339 (1st Cir. 2024).  The Court should grant summary judgment on this ground too, as other district courts have done in similar circumstances.

*Fourth*, Relator argues that the FCA should override the distinction between an investor and the company it has invested in, but as the Supreme Court recently explained, courts must

"read federal statutes to incorporate" "background principles of corporate law," and in particular the principle of corporate separateness. *Dewberry Grp., Inc. v. Dewberry Eng'rs Inc.*, 2025 WL 608108, at *3 (U.S. Feb. 26, 2025). Relator's attempt to hold the New Harbor Defendants liable for the actions of separate companies is foreclosed by these well-established principles.

*Finally*, Relator tries to defend his reverse false claims, but his Opposition only confirms that he has no independent theory of liability, just a reiteration of the same false-certification theories that form the basis of the rest of his complaints. Courts do not permit relators to bring such redundant claims for double-liability on the same conduct, and so they must fail for this independent reason.

The Court should grant summary judgment in favor of all Defendants for the reasons set forth here and in Defendants' Motion for Summary Judgment. Dkt. 76-1.

## <u>ARGUMENT</u>

### I. Relator's Opposition Brief Confirms His Claims Are Barred under the FCA's Public Disclosure Bar.

#### A. Relator Has Conceded Each Essential Element of His Claim Was Publicly Disclosed.

As Defendants explained in their opening brief, Relator's complaint is barred by the public disclosure bar because the record establishes that the "essential elements" from which "the listener or reader may infer fraud" have been publicly disclosed through the means identified in the FCA. *Winkelman*, 827 F.3d at 208; *U.S. ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 54-55 (1st Cir. 2009); Dkt. 76-1 at 14. Relator does not contest the First Circuit's essential-elements standard, nor could he. *See* Dkt. 90-1 at 8. He nonetheless asserts that "Defendants have not shown any prior public disclosure" that bar his claims, but this argument fails for three separate reasons. *Id.* at 9.

*First*, Relator fails to identify an "essential element" of his claim that has not been publicly disclosed. Defendants' opening brief identified the three essential elements of Relator's claims—(1) the fact of Ocean State, Fyzical, and Blueprint's PPP loans, (2) New Harbor's so-called "controlling" investment in each company, and (3) these companies' employee counts and New Harbor's assets under management—as well as the specific and statutorily recognized public sources disclosing each of these elements. Dkt. 76-1 at 15–16. Relator does not contest that these are the "essential" elements to his claim under *Winkelman*. And he does not even try to dispute that the official government documents, news reports, and other sources Defendants have cited properly disclose this information "in the manner specified in the statute." *Winkelman*, 827 F.3d at 208; *Ondis*, 587 F.3d at 53.

Instead, Relator contends that these public sources do not bar his claim because they "do not show any prior public disclosure of a fraudulent scheme to circumvent the PPP necessity certification" by these Defendants. Dkt. 90-1 at 9. But the public disclosure bar applies so long as "the facts publicly available ... <u>could have been synthesized</u> to form the same inference he now alleges in his complaint," not that any prior source <u>actually synthesized</u> that information into the identical "fraudulent scheme" Relator alleges. *U.S. ex rel. Solomon v. Lockheed Martin Corp.*, 878 F.3d 139, 145 (5th Cir. 2017) (emphasis added). Relator offers no grounds to distinguish *Solomon*, and his Opposition merely requotes this same language. Dkt. 90-1 at 8. So too in the First Circuit, which has explicitly held that public disclosures "may come from different sources, as long as the disclosures together lead to a plausible inference of fraud"— exactly what Relator asks this Court to allow him to do. *Ondis*, 587 F.3d at 54. Lower courts in this circuit endorse and apply this dispositive rule. *See, e.g.*, *U.S. ex rel. Lisitza v. Johnson & Johnson*, 765 F. Supp. 2d 112, 123 (D. Mass. 2011) (applying public disclosure bar even though

the relator "was the first to name [the defendant] specifically"); *U.S. ex rel. Poteet v. Bahler Med., Inc.*, 619 F.3d 104, 116 (1st Cir. 2010) (applying public disclosure bar even though relator was first to "describe in greater detail how the defendant doctors improperly influenced the third-party doctors").[1]

This correct application of the Public Disclosure Bar led three separate courts to reject similar FCA claims based on PPP loans where the essential elements were disclosed in the SBA's PPP loan data and other public sources. *Seikel v. Alvarez*, 2024 WL 1315869 (N.D. W. Va. Mar. 27, 2024); *U.S. ex rel. Relator, LLC v. Koostra*, 2024 WL 3666470 (E.D. Cal. Aug. 6, 2024); *United States v. Kellog*, 2024 WL 4887531 (S.D. Cal. Nov. 25, 2024). Relator has no contrary authority, and no basis to distinguish these virtually identical complaints based on some of the same public sources from which Relator derived his allegations. *See* Dkt. 85-1 at 8–9. Relator's lone substantive response to these cases is that one case, *Seikel*, cited "pre-2010" FCA cases, *id.*, but nothing in the 2010 FCA amendments changed the applicable legal standard, as the First Circuit has recognized. *Winkelman*, 827 F.3d at 207–09 (explaining that these amendments "provide[] alternative original source definitions based on the timing of the public disclosure").

***Second***, Relator tries to escape his fatal deposition admissions and the public sources that disclosed the essential elements of his claims by arguing that Defendants "improperly conflate" the public disclosure bar and original source exception. Dkt. 90-1 at 8–9. Relator misunderstands both Defendants' argument and the law. Defendants' arguments address the

---

[1]    Relator also objects to three exhibits Defendants cite in support of their public disclosure bar arguments: Exhibits 62, 63, and 64. *See* Dkt. 76-2, Defendants' Statement of Fact ("D-SOF"), ¶¶ 215, 217, 218. The three documents are New Harbor press releases confirming fund investments in the three PPP recipients, and each was produced by Relator in this litigation. Relator's cursory objections to these documents as inadmissible hearsay are meritless because Defendants' Exhibits 62, 63, and 64 are to establish that New Harbor Capital's investments in Ocean State, Fyzical, and Blueprint were publicly disclosed before Relator filed his lawsuit, not for "the truth of [any] matter." Fed. R. Evid. 801(c)(2).

proper standard: whether public sources have disclosed the "essential elements" of Relator's claims. *Winkelman*, 827 F.3d at 208. In addition to identifying these elements and the applicable public sources, Defendants highlight Relator's admissions that he relied upon these public sources because this record demonstrates, beyond a shadow of a doubt, that there is no material "evidence upon which this suit depends that is not publicly disclosed." *U.S. ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 497 (7th Cir. 2003). Relator's complete lack of any non-public source is proof-positive that anyone else could have "synthesized" the same information "to form the same inference" Relator now makes. *Solomon*, 878 F.3d at 145.

Relator is correct that his admissions independently prohibit him from "satisfy[ing] the original source test," and the First Circuit has recognized that these two inquiries "often overlap[.]" Dkt. 90-1 at 8; *Winkelman*, 827 F.3d at 211 ("The question of whether a relator's information 'materially adds' to public disclosures often overlaps with the questions of whether public disclosure has occurred."). But that "overlap" does not change the public disclosure analysis or that Defendants are entitled to summary judgment on all claims.

***Third***, Relator devotes pages of heavy rhetoric to accusing Defendants of having "mischaracterize[d] statements made by Relator" in his deposition that confirm all of the information he relied on for his complaint came from public sources. Dkt. 85-1 at 9–12. Relator has repeatedly resorted to baseless accusations like these throughout the case. Tellingly, Relator's briefing on this issue does not cite a <u>single</u> excerpt from Relator's actual deposition testimony or other record evidence to challenge Defendants' supposed "mischaracterizations." *See id.* (no record cites); Dkt 90-1 at 10–11 (cross-referencing this same, citation-free argument). The reason Relator does not show any actual misrepresentations is because Defendants did not mischaracterize a word—quoting Relator's own admissions from Relator's own deposition.

6

Relator cannot escape his own admissions that the essential elements of his claims came from public sources.

At the same time, Relator's so-called dispute in his statement of facts relies entirely on an *errata* that Relator used to add to and change the substance of his deposition testimony. *E.g.*, Dkt. 90-2, Relator's Response to Defendants' Statement of Facts, ("R-D-SOF") ¶ 208 (citing R-D-Ex. 2 (errata)). The federal rules do not permit such "changes offered solely to create a material factual dispute in a tactical attempt to evade an unfavorable summary judgment." *Godfried v. Ford Motor Co.*, 2022 WL 2869700, at *6 (D. Me. July 21, 2022) (quoting *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1225 (9th Cir. 2005)). As the Second Circuit explained, "plaintiffs cannot defeat a motion for summary judgment by responding with affidavits recanting that earlier testimony. Nor can they do so by submitting errata sheets long after their depositions were taken, or by filing 'supplemental answers' to interrogatories." *Margo v. Weis*s, 213 F.3d 55, 60–61 (2d Cir. 2000) (citations and quotation omitted); *accord Truly v. Sheahan*, 135 F. App'x 869, 871 (7th Cir. 2005) ("We agree with the district court that Truly may not contradict deposition testimony with his subsequent affidavits or errata sheets stating alternatively that he did not receive responses and that he appealed."). Indeed, "multiple courts have held that deploying an errata sheet to radically change deposition testimony without adequate explanation is improper." *Godfried*, 2022 WL 2869700, at *6 (collecting authority) (granting summary judgment where errata contradicted testimony and only explanation was that it was supposed to "clarify" statements).

With respect to Blueprint and Fyzical, Relator's testimony was simple and dispositive. Relator admitted all of the "████████████████████████████████████████ ████████████████████████████████████████████." D-SOF ¶ 208. Relator does not contest

this whatsoever with respect to Fyzical. *See* R-D-SOF ¶ 208. And for Blueprint, Relator "disputes" his own admission by pointing to his own errata, which sought to add substantive testimony that Ocean State CEO John Roselli " ████████████████████ " *Id*. But even this improper errata did not identify any information he supposedly learned about ***Blueprint*** from his sole " ████████████ " conversation with Mr. Roselli about the rent payments due from ***Ocean State***. His argument only confirms that there is "no evidence upon which this suit depends that is not publicly disclosed." *Feingold*, 324 F.3d at 497.

Relator's arguments with respect to Ocean State are equally flawed. Relator admitted at his deposition that he ████████████████████████████ ████████████████████ " and that he " ████████████████████████████ " before filing this lawsuit. D-SOF ¶¶ 205. His sole factual basis to dispute this is also an improper errata that "clarified … he had and reviewed Ocean State's PPP application" prior to filing his complaint. R-D-SOF ¶ 205; *Godfried*, 2022 WL 2869700, at *6; *see also* Dkt. 28, Relator's Second Amended Complaint ("SAC") ¶ 134 ("According to SBA PPP loan data made public by the SBA and Treasury, Ocean State received PPP loan funds…"). And despite his prior claims that he "communicated with numerous Ocean State landlord/employees," he admits that he " ████████████ " whether ████████████████████████████ ████████████████████ R-D-SOF ¶ 227.

Beyond these improper errata, Relator is left with nothing more than his assertion that he asked Ocean State CEO Roselli to ask New Harbor to pay Relator and Roselli told Relator " ████████████████ " R-D-SOF ¶ 293. After years of litigation and numerous briefs, he has failed to explain how this off-hand statement in a rent dispute has any relevant to his FCA claims. And in all events, a "sprinkle of factual garnish" like this comment does not entitle

relators to avoid the public disclosure bar. *Lisitza*, 765 F. Supp. 2d at 123; *U.S. ex rel. Bartz v. Ortho-McNeil Pharm., Inc.*, 856 F. Supp. 2d 253, 265 (D. Mass. 2012) (explaining that "gather[ing] for government consumption additional tidbits" is not enough to salvage a claim because "the public disclosure bar's focus is on notice and not detail"). Relator's Opposition does not even attempt to explain how this comment amounts to an "essential element" of Relator's FCA claim. *Winkelman*, 827 F.3d at 208.

> **B.    Relator Has Failed To Prove The "Investigation" or "Experience" That Allowed Him To Survive Defendants' Motion to Dismiss Contributed Any Information to the Essential Elements of His Claims.**

At the motion to dismiss stage, the Court permitted Relator to proceed because of his allegations that his "own research" and his "investigation and analysis into New Harbor and its portfolio companies" allowed him to "discern the fraud." Dkt. 33 at 11–12. Relator invokes the Court's motion to dismiss decision but ignores this pivotal language.[2] *See* Dkt. 90-1 at 9. Instead, he has explicitly <u>abandoned</u> his prior position, and asserts that the Court "does not need to" consider his so-called investigation and makes no mention of his prior experience. *Id.* at 10. Relator has backed away from this argument for good reason. He admitted in discovery that he conducted no investigation at all: everything he learned about Fyzical and Blueprint he learned "online," and for Ocean State, he admitted that he never reviewed the PPP loan application, never talked to any employees who knew anything material to this claim, and was relying entirely on a 15-minute conversation with Ocean State's CEO about a rent dispute. *See* Dkt. 75-1 at 21–22.

---

[2]    It is also uncontested that the motion to dismiss decision did not resolve the public disclosure bar, as Relator has also moved for summary judgment on this issue. Dkt. 69-1 at 52-53. Courts in the First Circuit also routinely consider the public disclosure bar at summary judgment. *E.g.*, *U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 719 F.3d 31, 37 (1st Cir. 2013) (affirming summary judgment under public disclosure bar).

Relator's sole argument is that, if the Court considers his investigation, it should look to "the application of the 'mosaic theory' to his fraud investigation," under which his ability to gather "information from various sources, like online information" and "piece[] them together" means that he conducted an investigation which constituted a non-public essential element of his claims.  Dkt. 85-1 at 7.  But this so-called "mosaic theory" is an invention by Relator that contradicts established FCA law.  His only citations are two Second Circuit <u>securities</u> cases, where the only mention of the word "mosaic" comes in a 45-year old discussion of the obligation on a company to disclose information to financial analysts.  *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 165 (2d Cir. 1980); *United States v. Royer*, 549 F.3d 886, 898 (2d Cir. 2008).  To state the obvious, these cases do not remotely suggest that the FCA permits a Relator to overcome the public disclosure bar by claiming that he has pieced together a "mosaic" of public disclosures into his claim of fraud.

Nor could he because Relator's "mosaic theory" contradicts settled FCA law.  As the First Circuit (and this Court) has explained, the facts relevant to the public disclosure analysis "may come from <u>different sources</u>, as long as the disclosures together lead to a plausible inference of fraud" —exactly what Relator asks this Court to allow him to do.  *Ondis*, 587 F.3d at 54 (emphasis added); Dkt. 33 at 9 n.2 (rejecting Relator's argument that "each individual piece of data or information must contain both misrepresentation and the true fraudulent plan").  The dispositive question is whether the public information "could have been synthesized" into a claim of fraud, not if Relator actually synthesized the so-called mosaic of different sources.  *Solomon*, 878 F.3d at 145.  Even a Relator who brings a "novel legal theory of fraud" that depends on his "own expertise in the area" cannot overcome the public disclosure bar.  *A-1 Ambulance Serv., Inc. v. California*, 202 F.3d 1238, 1245 (9th Cir. 2000); *U.S. ex rel. Beck v. St.*

*Joseph Health Sys.*, 2021 WL 7084164, at *4–5 (N.D. Tex. Nov. 30, 2021) ("while Relator attempts to buoy his 'whistleblower' status with a claim that he synthesized the information in light of his personal knowledge of 'the Lubbock market,' this is far from sufficient to fend off the application of the public disclosure bar").

## II.    Relator Cannot Establish Defendants' PPP Loan Submissions Were False as a Matter of Law.

Relator's Opposition yet again confirms he has no factual or legal basis to claim any Defendant falsely certified "compliance with a statute or regulation as a condition to payment." *U.S. ex rel. Westmoreland v. Amgen, Inc.*, 738 F. Supp. 2d 267, 272–73 (D. Mass. 2010)

To the contrary, Relator has fully abandoned his Affiliation theory against Blueprint, and he does not contest that Ocean State also qualified for the same Affiliation waiver.  His Opposition instead continues to press forward with a novel theory challenging Ocean State's corporate organization that was never pleaded in his Compliant and has been waived.  And his attempt to circumvent Fyzical's franchise directory code with legal gymnastics also fails to create an actionable false certification.

On Necessity, Relator's Opposition confirms that he cannot point to any clear legal obligation that required Defendants to set aside basic principles of corporate separateness and obtain funds from separate corporate entities as a matter of law.  And he still cannot show any daylight between his theory that the PPP applicants were required to obtain funds elsewhere and the "Credit Elsewhere" eligibility test that Congress waived.  15 U.S.C. § 636(a)(36)(I).

### A.  Relator's Opposition Confirms That Blueprint's Submissions Were Not False.

The Court can easily resolve Relator's claims against Blueprint.  Relator conceded in his motion for summary judgment that Blueprint qualified for a waiver of the Affiliation Requirement because it "was a party to the loan documents with SBIC lender Deerpath and thus

received financial assistance from a SBIC lender." Dkt. 69-1 at 15. In his Opposition, he does not offer any other Affiliation theory as to Blueprint. It is therefore uncontested that Blueprint is entitled to summary judgment on Relator's Affiliation theory.

Blueprint's $1,267,228 PPP loan also satisfied the Necessity Requirement because of the CARES Act's dispositive safe harbor for loans under $2 million. *See* Dkt. 76-1 at 25. And, in all events, it readily satisfied the Necessity Requirement because it faced economic harm and an uncertain future for its in-person LSAT prep class business in the depths of the COVID-19 pandemic. *See id.* Relator raises two flawed arguments to escape the clear-cut application of this uncontested statutory safe harbor. *See* Dkt. 90-1 at 14.

*First*, Relator misstates the SBA's safe harbor, and claims that Blueprint had to include the loan amounts of its affiliates in determining if it was eligible for the safe harbor. *Id.* But the SBA's guidance says the exact opposite. SBA FAQ 46, which addresses the $2 million safe harbor, states that for "purposes of this safe harbor, a borrower must include its affiliates to the extent required under the interim final rule on affiliates, 85 FR 20817." D-Ex. 89, SBA FAQ 46 n.20. That interim final rule on affiliates explicitly incorporated the Affiliation Waiver rules, stating that they "remain in full force and effect." 85 FR 20817 n.1. The safe harbor in FAQ 46 was later codified by the SBA. 86 Fed. Reg. 3692, 3706 n.87 ("This subsection has been added to codify the safe harbor contained in FAQ 46 (posted May 13, 2020)."). In other words, the SBA's codified regulation lays out, in black and white, that a company with an Affiliation Waiver (like Blueprint) does not count its affiliates' loan amounts to determine if it met the $2 million safe-harbor threshold. Under 15 U.S.C. § 636 (a)(36)(D)(iv), which sets forth the Affiliation Waiver rule, "the provisions applicable to affiliations … are waived with respect to eligibility for a covered loan" because Blueprint received an SBIC loan. *Id.* There is no dispute

12

that Blueprint qualified for this statutory waiver, and the SBA's $2 million safe harbor explicitly incorporates this waiver provision for purposes of assessing whether the loan qualifies as "necessary."

**Second**, Relator also argues that Blueprint was "not sufficiently affected by the economic risks and consequences of the COVID-19 pandemic." Dkt. 90-1 at 41. This argument fails at the threshold because it is undisputed that Blueprint's loan qualifies for SBA's safe harbor. *See U.S. v. ManPow, LLC*, 2024 WL 305699, at *9 (C.D. Cal. Jan 3, 2024) (citing 86 Fed. Reg. at 3706) (explaining that this safe harbor is "conclusive on [the defendant's] potential liability for its economic uncertainty certifications"). Even without the safe harbor, Relator's argument still fails because the record is entirely one-sided on Necessity. Blueprint offered **in-person LSAT test-prep** classes which were significantly impacted by COVID-19, forcing Blueprint to draw down its revolver loan and breach its loan covenants with Deerpath. D-SOF ¶ 123. Relator cites nothing to dispute this, but rather makes the conclusory assertion that "Blueprint could have asked for additional capital." R-D-SOF ¶ 123. But that is just another ay of saying Blueprint should have sought "credit elsewhere," and asked discussed further below, the CARES Act explicitly stated that that "requirement that a small business concern is unable to obtain credit elsewhere, as defined in section 632(h) of this title, shall not apply to a covered loan." 15 U.S.C. § 636(a)(36)(I) (emphasis added). The Court should thus grant summary judgment on all of Relator's claims against Blueprint.

### B.    Ocean State and Fyzical Qualified for an Affiliation Waiver.

**Ocean State.** Relator has now conceded on multiple occasions that Ocean State, LLC received financial assistance from an SBIC lender, Deerpath Capital, and therefore it was entitled to a waiver of the affiliation rules. *See, e.g.*, Ex. 107, Relator's 6/28/2024 Interrog. Resp. at 10 ("Ocean State … was the entity … with an SBIC loan."); Dkt. 69-1 at 14 (identifying Ocean

13

State as a party to the loan document).[3]  That alone dooms his Affiliation theory as pleaded in the Complaint.

To avoid this result, Relator invented a new theory at summary judgment that Ocean State falsely certified its employee count by counting the employees at medical practices for which it was responsible for payroll.  But these theories are plainly waived.  *See Miranda-Rivera v. Toledo-Dávila*, 813 F.3d 64, 76 (1st Cir. 2016); *see also Katz v. Belveron Real Estate Partners, LLC*, 28 F.4th 300, 310 (1st Cir. 2022).  Relator's Opposition insists these "liability theories have always been that the MSJ Defendants falsely certified compliance with the … size and affiliation requirements" and "any differences from the complaint are not of theory but of fact."  Dkt. 85-1 at 11.  That is just wrong.  The Complaint does not mention anything about Ocean State's payroll practices, let alone a theory that Ocean State reported ***too many*** employees on its PPP loan application.  Indeed, at the motion to dismiss stage, the Court summarized Relator's allegations: "Mr. Berkley … alleges that the PPP recipients falsely certified their employee counts to appear 'small'" and "the CARES Act's waiver of the affiliation rules did not apply to them."  Dkt. 33 at 10, 16.  While discovery proved Relator's theories wrong, that does not give him license to invent new liability theories after the close of fact discovery to survive summary judgment.

Relator's Opposition confirms his new Affiliation theory is wrong on the merits, too.  Relator does not (and cannot) deny that the CARES Act expressly states that a company's "payroll costs" dispositive as to whether an employee may be counted in a PPP loan

---

[3]    In his Opposition, Relator bizarrely contends that Exhibit 45—a Deerpath lender letter confirming Ocean State, LLC received SBIC funding—is inadmissible hearsay.  That is not the case.  Exhibit 45 plainly meets the requirements of the business records exception, as multiple witnesses with personal knowledge have testified.  D-SOF ¶¶ 29, 39.  And the letter merely memorializes an undisputed fact in the record—that Deerpath is an SBIC lender.  D-SOF ¶¶ 29, 39.

application——even if the applicant is responsible for payroll costs of employees that work for a separate corporate entity. Dkt. 85-1 at 16. Nor is it disputed that Ocean State, LLC handled "payroll" for each of the medical practice entities for which it operated, as it "█████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████ " D-SOF ¶ 17-18; *id.* ██████████████████████████

█████████ ").

      Instead, Relator argues Ocean State was not "responsible" for the medical clinics' payroll because one witness agreed that Ocean State, LLC "█████████████████████ " R-Ex. 16, 71:25–72:4; Dkt. 85-1 at 15. Using "facilitates" instead of "responsible" does not change the other evidence of how Ocean State, LLC handles its employees' payroll. Indeed, the same witness testified Ocean State, LLC "██████████████████ " functions of the medical clinics including ████████ " and "████████ " and "█████████████████████████

██████████████████████████████████████████████████████████████

█████████ ." R. Ex. 16, 70:2–13 (emphasis added); *see also* D-R-SOF ¶ 114. That the witness agreed to Relator's choice of the word "facilitates" to characterize this relationship changes nothing. This is precisely what the CARES Act describes—that the applicant "<u>paid salaries</u> and payroll taxes" for the individual employees included in its application. 15 U.S.C. 636(a)(36)(F)(ii)(II)(bb)(AA) (emphasis added). Multiple entities was the required structure to operate as one business because, as Relator repeatedly notes, Rhode Island regulations required separate medical clinic entities with respect to medical functions. Dkt. 90-1 at 20. Relator cannot flip Ocean State's compliance with these laws into a falsity theory with no support in any statute or regulation.

Relator also points to irrelevant provisions of the CARES Act using the terms "business concern" and "employee" and argues that this must necessarily limit a PPP applicant to a single corporate entity. Dkt. 85-1 at 16.   Those words cannot bear the weight Relator places on them. The CARES Act does not define "business concern" or impose any requirements on which corporate arrangements may qualify.  Nor does it define "employees," or otherwise suggest that the use of this word was somehow meant to override the "payroll" provision in the statute. Under § 636(a)(36)(A)(viii)(I)(aa), Ocean State must have "paid salaries" of employees for which it was responsible, which it did when it satisfied its contractual obligation to pay the salaries of Ocean State employees that worked at individual clinics. 15 U.S.C. § 636(a)(36)(A)(viii)(I)(aa).  Relator wishes to erase this language from the CARES Act and read in new restrictions that Congress never imposed, but his theory finds no support in the statute.

Relator's convoluted readings of SBA guidance on these issues fare no better.  For FAQ 10, he repeats his failed argument that the use of the phrase "borrower's employees" somehow overrides the CARES Act's explicit references to "payroll."  Dkt. 85-1 at 18.  He tries this same tactic with the PPP application form, but the form explicitly references "employees <u>for whom [the borrower] paid salaries and payroll taxes,</u>" meaning Relator's argument would make the rest of this phrase after "employee" a nullity.  *Id*. at 19.  And Relator has no response at all to FAQ 72, but merely quotes the language confirming that the relevant inquiry is if "the borrower is ultimately responsible for the payroll expense," which Ocean State, LLC unquestionably was here. *Id.* at 18.

Finally, Relator invokes the Supreme Court's decision in *U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 752 (2023), but that <u>scienter</u> decision has nothing to do with the <u>falsity</u> element at issue here.  Dkt. 85-1 at 18.  Bizarrely, Relator tries to paint Defendants'

arguments interpreting the statute as an impermissible "post-hoc justification."  *Id.*  But nothing in *Schutte* or any other case suggests that an FCA defendant needed to have their complete legal defense laid out in contemporaneous business documents.  The question under the falsity element of the FCA is whether the FCA defendant followed the law, and Ocean State did.  *See Westmoreland*, 738 F. Supp. 2d at 272–73.

**Fyzical**.  With respect to Fyzical, Relator renews the scattershot arguments he raised in his motion for summary judgment.  But the dispositive facts are simple and undisputed.  "Fyzical" had a franchise code in the SBA franchise directory.  R-D-SOF ¶ 63; D-SOF ¶ 85, D-Ex. 60.  An Affiliation Waiver is available to "any business concern" "operating as a franchise that is assigned a franchise identifier code by the [SBA]." 15 U.S.C. § 636(a)(36)(D)(iv)(II). And Fyzical, the PPP applicant, operated the Fyzical franchisor, as well as several clinics under the Fyzical brand, making it a "business concern … operating as a franchise."  D-SOF ¶ 63.  His arguments in response remain unpersuasive.

***First***, Relator renews his argument that Fyzical engaged in "investment or speculation" and therefore violated the rules against financial institutions like banks receiving PPP funds. Dkt. 85-1 at 21.  But his Opposition makes clear that the sole basis for this argument is that Fyzical, the applicant, is structured as "a holding company."  *Id.*  The regulation Relator relies on in his motion for summary judgment explicitly applies to "hedge funds," "private equity firms" and other businesses "primarily engaged in investment or speculation" from applying for PPP loans.  Dkt 69-1 at 22 (citing, e.g., 86 Fed. Reg. 3692, 3698).  Fyzical is a business operating physical therapy clinics, and nothing in these regulations suggests a mere holding-company structure made a business ineligible for a PPP loan.  As Defendants pointed out, 7,762 other PPP applicants had "holdings" in their name, and Relator's only response is nothing in this record

shows any of these thousands of entities were "actually a holding company."  Dkt. 85-1 at 21. That does nothing to cabin the sweeping implications of his argument:  if businesses with "holdings" in their name have a holding company structure, thousands of applications were unlawful under the CARES Act.

*Second*, Relator restates his argument that Fyzical—despite operating the Fyzical franchisor and several clinics—was not a "business concern … operating as a franchise."  Dkt. 85-1 at 22.  But he cites no new statute, regulation, case, or other authority to support this point, presumably relying entirely on the disjointed arguments he made in his motion for summary judgment, which Defendants addressed.  Dkt. 69-1 at 24–28 (setting forth arguments); Dkt. 76-1 at 32–35 (explaining why each is wrong).  In short, the plain statutory language— a "business concern … operating as a franchise"—does not impose any "franchisee only" or single-business requirement that would render Fyzical's PPP loan application false.   15 U.S.C. § 636(a)(36)(D)(iv)(II).  As Defendants explained in their motion, the PPP application itself asked only "Is the Applicant a *franchise* that is *listed in the SBA's Franchise Directory*." D-SOF ¶ 92. And SBA standard operating procedures confirm the relevant inquiry is only if "*the Applicant's brand* is on the Directory," which Fyzical's clearly was.  D-Ex. 87, SOP 50 10 5(K), Subpart B, Ch. 2(II)(D)(8)(b); id. at (II)(D)(8)(c)(i)(a) (emphasis added).  Relator's desperate search for loopholes in this straightforward Affiliation waiver finds no support in any statute or regulation.

*Third*, Relator renews his same corporate-structure challenge for Fyzical as with Ocean State.  Dkt. 85-1 at 23.  He claims that Fyzical should not have included the employees of the entities it operated through, even though it "███████████████████████." D-Ex.106, E. Thompson Tr. 101:15–19, 11:1-19.  He does not dispute this fact or offer anything to contradict the record evidence that Fyzical "paid salaries and payroll taxes" for these employees, as the

CARES Act requires. 15 U.S.C. 636(a)(36)(F)(ii)(II)(bb)(AA). Relator complains about the corporate structure Fyzical adopted, but none of his grievances establish an FCA violation, let alone a "genuine dispute" of "material fact" that he must establish to survive summary judgment. Fed. R. Civ. P. 56(a).

### C. Relator Has Produced No Evidence Showing Ocean State and Fyzical Falsely Certified their PPP Loans Were Necessary.

There is ample, undisputed evidence that Ocean State, Fyzical, and Blueprint had a good faith basis to certify that "the uncertainty of current economic conditions makes necessary the loan request to support [their] ongoing operations." 15 U.S.C. § 636(a)(36)(G)(i)(I). Ocean State's primary care locations lost more than half their revenue as patients canceled in-person appointments, and Ocean State had to close four of its urgent care sites. D-SOF ¶ 33. As Ocean State's CEO explained, the business was "█████████████████████████████████████ █████████████████████████████████" without the PPP loan. D-SOF ¶ 35 (D-Ex. 75, J. Roselli Tr. 119:22–25, 157:2–25). Fyzical's revenue dropped significantly as physical therapy practices complied with public health mandates. D-SOF ¶ 76. Fyzical defaulted on its senior debt facility covenants during the first quarter of 2020, and it was "████████" as clinics were shut down. D-SOF ¶ 80. Blueprint also faced significant adversity, as discussed above. D-SOF ¶ 123.

Nonetheless, Relator's theory of the case is that these companies falsely certified Necessity because they did not adequately exhaust the "availability of alternative liquidity" before accessing a PPP loan, specifically in the form of accessing funds from New Harbor. Dkt. 90-1 at 16. But this argument fails for two independent reasons. First, Relator's theory that Ocean State or Fyzical even could access funds controlled by its investor, New Harbor, violates bedrock principles of corporate separateness. The FCA does not override these rules; quite the

opposite, as the Supreme Court recently explicitly held that courts must "read federal statutes to incorporate" these specific "background principles of corporate law." *Dewberry Grp., Inc. v. Dewberry Eng'rs Inc.*, 2025 WL 608108, at *3 (U.S. Feb. 26, 2025). Second, and independently, Relator's theory fails because Ocean State and Fyzical had no obligation to exhaust the "availability of alternative liquidity." Dkt. 90-1 at 16. "Alternative liquidity" is nothing more than a synonym for "credit elsewhere," and the CARES Act explicitly abrogated the credit elsewhere test for PPP loans.

### 1. Relator's Interpretation of the CARES Act Contradicts Basic Principles of Corporate Separateness.

Relator's Opposition makes a candid, and fatal, admission: that to prevail on necessity, he must show that "Ocean State, Fyzical Holdings and Blueprint … [had] an ability to access liquidity from New Harbor Capital." Dkt. 90-1 at 21; *id.* at 36 (asserting that "Ocean State (and Fyzical Holdings and Blueprint) had the ability to access liquidity from New Harbor Capital"). But Relator's own admissions show he cannot establish this dispositive fact. Specifically, he concedes that these companies are separate corporate entities from any New Harbor entity and that they had no "specific contractual right" to access any New Harbor capital. Dkt. 90-1 at 21. In effect, Relator is asking the Court to ignore any notion of corporate separateness between two companies because of an investment relationship—even for Fyzical, where New Harbor owned *less* than 50% of the equity and had 3 of 9 board seats. D-SOF ¶ 68.

This argument directly contradicts binding First Circuit and Supreme Court case law. The "principle of limited liability" is "the cornerstone of corporate law." *InterGen N.V. v. Grina*, 344 F.3d 134, 150 (1st Cir. 2003). Just last month, the Supreme Court mandated that courts must "read federal statutes to incorporate" "background principles of corporate law," and in particular the principle of corporate separateness. *Dewberry Grp., Inc. v. Dewberry Eng'rs Inc.*, 2025 WL

608108, at *3 (U.S. Feb. 26, 2025).   The Court held that it is "long settled as a matter of American corporate law that separately incorporated organizations are separate legal units with distinct legal rights and obligations," and thus a "a court has <u>no authority to 'disregard corporate separateness</u>'" between a defendant and its affiliates.  *Id.* at *3, 4 (emphasis added).

Here, Relator argues that the "plain meaning of the word 'necessary'" as used in the CARES Act means that the Court must impose an obligation on Ocean State, Fyzical, and Blueprint to access New Harbor's funds.  Dkt. 90-1 at 22.  But forcing the PPP Recipients to treat New Harbor's capital as its own absent a "specific contractual right" to do so would override the "background principles" of "corporate separateness" that must be "read [into] federal statutes."  *Id.*   That has never been permissible under the "cornerstone" principle of "limited liability" recognized in this circuit and is not a colorable interpretation of the CARES Act in light of *Dewberry*.  *InterGen*, 344 F.3d at 150.

Relator makes four arguments to try to contradict *Dewberry* and interpret the CARES Act in violation of cornerstone principles of corporate separateness, each meritless.

***First***, Relator argues that while the PPP Recipients had no contractual right to New Harbor funds, they had some amorphous "ability" to access them because some board members also had roles at New Harbor.  Dkt. 90-1 at 22.  Relator points out that Tom Formolo and Ed Lhee were board members at the individual PPP Recipients while also serving in roles at New Harbor entities, but wrongly contends that this somehow required them to act only in the interests of the PPP Recipients when making decisions for New Harbor.  *Id; see* D-SOF ¶¶ 48, 100, 131 146-50.  As one court in this circuit explained, "under general principles of corporate law, officers and/or directors having <u>affiliations with more than one corporate entity</u> are presumed to <u>'change hats' to represent **each entity separately**</u>."  *In re Lantus Direct Purchaser*

*Antitrust Litig.*, 2022 WL 4239367, at *17 (D. Mass. Aug. 17, 2022) (emphasis added). Relator's argument is that these individuals should not have represented "each entity separately" but rather advanced the PPP Recipients' interests, despite any duty they may have had to New Harbor and its investors. *Id.* But that is not the law. Indeed, Relator admitted at his deposition that Ocean State " ███████████████████████████████████████████████ ███████ ." D-SOF ¶ 167.

**Second**, Relator invokes the testimony of Defendants' expert Gustavo Schwed that "New Harbor Capital Board members … did not have the right to violate the law." Dkt. 90-1 at 24. The import of this argument is not clear, and it makes even less sense, given Mr. Schwed's actual opinion was that he has "never seen a portfolio company exercise the unilateral right to obtain 'liquidity' from its investors," directly undercutting Relator's theory. Ex. 108, Expert Report of Gustavo Schwed at 23. Relator tries to paint the fact that Defendants did not cite to Mr. Schwed in their opening brief in a nefarious light and suggests it merits an "adverse inference." Dkt. 90-1 at 25. But Defendants refrained from citing Mr. Schwed's testimony to show that they can prevail on summary judgment on the undisputed fact record alone, rather than any expert testimony. Relator's cases about missing witnesses at trial do not remotely support any "adverse inference" here. *Id.* at 25 (citing *In re Williams*, 190 B.R. 728, 733 (D.R.I. 1996) (rejecting request for adverse inference from missing testimony available to both parties)).

**Third**, acknowledging that his entire theory turns on piercing the corporate veil between New Harbor and the PPP applicants, Relator contends that he has showed sufficient "fraudulent intent or moral culpability for veil piercing purposes." *Id.* at 29–31. But in support of this argument, Relator cites terms of the utterly irrelevant legal documents governing New Harbor Fund I and New Harbor Fund II, which say nothing about these funds' relationships with the PPP

Recipients, and certainly do not come close to meeting the veil piercing standard. *E.g.*, R-D-SOF ¶¶ 267–74. The corporate "veil may be pierced only if the parent and subsidiary lacked independence, the principals conducted their affairs with a requisite degree of 'fraudulent intent,' and failure to pierce the veil would work substantial injustice." *U.S. ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 39-40 (D. Mass. 2000). Even a parent company's "sole ownership" of a subsidiary is "plainly not enough" to pierce the corporate veil, and here, there is not even that complete ownership. *Id.*

Relator's other arguments reduce to nothing more than a typical investor-investee relationship, such as the right to appoint board members. Dkt. 90-1 at 30. But a parent having "final say" over budgets, shared common employees, and board members is not sufficient to pierce veil. *U.S. ex rel. Banignan v. Organon USA Inc.*, 2012 WL 1190826, at *7 (D. Mass. Apr. 9, 2012). And Relator certainly cannot meet the high standard of veil piercing with broad appeals to the "purpose of the PPP loan program" given that "strong public policy considerations favor keeping intact" even an "elaborate corporate collage." *InterGen*, 344 F.3d at 150.

**Fourth**, Relator accuses Defendants of "collaps[ing] falsity and scienter" because they use the term "good faith." Dkt. 90-1 at 32. But the CARES Act explicitly requires a "a <u>good faith certification</u> that the uncertainty of current economic conditions makes necessary the loan request to support the ongoing operations of the eligible recipient." 15 U.S.C. § 636(a)(36)(G)(i)(I) (emphasis added). The falsity inquiry turns on "compliance with a statute," and so "good faith" is not just a proper consideration in determining if Defendants' certifications were false, but a <u>required</u> one. *Westmoreland.*, 738 F. Supp. 2d at 272–73. As one commentator has noted, the statute's "'good faith' language lowered the standard of proof for necessity . . . The loan only had to be 'necessary to support . . . ongoing operations,' not to avoid closing or

laying off workers." *The "Small Business" Myth of the Paycheck Protection Program*, 54 U.C. Davis L. Rev. Online 21, 37 (Oct. 2020).  Relator also trips over himself making this argument, as he elsewhere asserts "the falsity element is intertwined with the scienter element"—the exact so-called error he accuses Defendant of making.  Dkt. 85-1 at 14.

### 2. *Relator Fails To Explain How His Theory Differs From the Credit Elsewhere or Personal Resources Tests That The CARES Act Disclaimed.*

Defendants have also shown that they are entitled to summary judgment on Necessity—even if the PPP Recipients had the right to demand funds from New Harbor—because the CARES Act expressly repealed the "Credit Elsewhere" test.  Relator tries to evade this straightforward result by asserting that "suspending the credit elsewhere test" did not erase "a borrower's duty to assess their financial situation before certifying necessity in good faith."  Dkt. 90-1 at 16.  That is correct, and the record shows Defendants did that in accordance with the CARES Act.  But Relator goes further than the statute and asserts that borrowers had to assess the "availability of alternative liquidity, including from a lender or from a private equity owner." *Id.* (emphasis added).  There is no plausible daylight between availability of "alternative liquidity . . . from a private equity owner" and the ability to "obtain credit elsewhere," which the CARES Act repealed.  Relator cannot just insert financial synonyms for the abandoned test and credibly say that he is invoking a different legal standard than the one Congress revoked.

To support his theory Relator invokes SBA FAQs 31 and 37, and claims that they stand for the proposition that a "businesses owned by private companies with adequate sources of liquidity" may not qualify for PPP loans.  Dkt. 90-1 at 19.  But they say nothing of the sort.  Rather, SBA FAQ 31 reaffirms that "the CARES Act suspends the ordinary requirement that borrowers must be unable to obtain credit elsewhere," and uses the example of a "public

company with substantial market value and access to capital markets" as one that may not qualify for a PPP loan.  D-Ex. 92.

Nor are the PPP Recipients anything like public companies that by definition routinely access capital markets.  They never accessed the capital markets referenced in FAQ 31.  And FAQ 31 does not suggest companies must "access" its investors' capital based solely on the fact that the private equity sponsor had an equity interest in the company, as Relator suggests.  In addition to undermining principles of corporate separateness, that would eviscerate the CARES Act's express repeal of the Credit Elsewhere Test, which is not a mere paperwork change as Relator contends.  Rather, this guidance reinforces that companies did not have to engage in the extraordinary (and impossible) measures that Relator posits. At bottom, neither these FAQs nor any other authority allows Relator to resurrect the credit elsewhere or personal resources test and require a PPP applicant to exhaust the "availability of alternative liquidity" before accessing a PPP loan.  Dkt. 90-1 at 16.

Finally, the record evidence Relator cites offer no further support for his argument.  He cites one email that merely restated the statutory requirement that a borrower certify that it could not "access sources of liquidity sufficient to support its ongoing operations in a manner that is not significantly detrimental to the business."  Dkt. 90-1 at 20; R-Ex. 52.  Another email had nothing to do with PPP loans at issue in this case at all, and instead addressed a loan taken out by a different company facing different financial circumstances, Certica, who in fact *did* end up choosing to return its loan funds to the government.  R-Ex. 51.

### 3.   *Relator's Other Necessity Arguments With Respect to Ocean State and Fyzical are Equally Meritless.*

To overcome the undisputed record establishing each Defendants' financial distress and uncertainty during the COVID-19 crisis, Relator throws out a handful of additional conclusory

arguments regarding the Necessity of Ocean State and Fyzical's loans.  None of these come any closer to showing that any company falsely certified "compliance with a statute or regulation." *Westmoreland*, 738 F. Supp. 2d at 272–73.

    ***First***, Relator points to certain documents discussing a potential sale of Ocean State, but he cites no statutory or regulatory authority suggesting that a business considering a sale process when the pandemic began is ineligible for a PPP loan.  Dkt. 90-1 at 35. That suggestion would be absurd, too, as the CARES Act was passed so companies could avoid dire measures like liquidation.

    ***Second***, Relator claims "Ocean State had the ability to access liquidity from Deerpath," Dkt. 90-1 at 35, but the undisputed evidence establishes that Deerpath had "████████████ ████████████████████████████████████████."  D-SOF ¶ 42.  Relator cites a document referencing "<u>covenant</u> relief," but that merely means Deerpath, as the "senior lender," would permit Ocean State to take on an additional PPP loan without foreclosing on its assets—not provide additional funds from its own credit line. *Id.*; R-D-SOF ¶ 246; R-Ex. 8.

    ***Third***, Relator asserts that "Fyzical [ ] had adequate liquidity on its own," but in support, he cites only one document referencing Fyzical's liquidity "through the short term." Dkt. 90-1 at 38.  This is entirely consistent with Fyzical's cash forecasts showing the company's cash position was "██████████████████████████████████████████ ████████" in a matter of months. D-SOF ¶ 86.  Fyzical's CFO testified that without the PPP loan, "██████████████████████████████████" operations, and the company "████████████████████████."  *Id*.  Relator cites other documents suggesting Fyzical would run out of cash as soon as "July 17, 2020"—less than four months after Fyzical's loan application.  Dkt. 90-1 at 39; R-D-SOF ¶ 326.  That is an ample basis for a good

faith certification that the "current economic uncertainty" made Fyzical's PPP loan necessary, and no witness and no expert has suggested otherwise. Relator apparently believes that companies must have been facing imminent financial ruin in a matter of weeks, rather than merely months, to satisfy the Necessity requirement. But the CARES Act imposes no such requirement, and the record here shows the PPP loans were necessary to Fyzical's "ongoing operations."

*Fourth*, Relator claims Fyzical could have accessed funding from its PPP loan lender, Webster Bank, because Fyzical had not "identified any specific documents or communication where they sought and were denied funding from Webster Bank … in lieu of submitting the PPP loan request." Dkt. 90-1 at 39. This is another blatant admission that Relator is trying to reimpose the "credit elsewhere" test—he explicitly faults Fyzical for failing to prove that it could not obtain an alternative loan from a bank, which is the exact opposite of how Congress decided to structure the PPP loan program.

*Fifth*, Relator claims that both Ocean State and Fyzical could have chosen to return their loan monies, but that has no bearing on assessing whether their loans were necessary at the time they applied, which is the dispositive inquiry under the CARES Act. Dkt. 90-1 at 37, 40; 15 U.S.C. § 636(a)(36)(G)(i)(I) (requiring certification based on the "uncertainty of <u>current</u> economic conditions"). And Relator's circular logic that Defendants should have adopted his interpretation of (nonexistent) PPP rules certainly does not establish FCA liability.

## III.    Neither Relator Nor the Government Can Show the Alleged Misrepresentations Were Material under the FCA.

Neither the Government nor Relator can avoid controlling Supreme Court precedent in *Escobar* instructing that where "the Government pays a particular claim in full despite its actual knowledge that certain requirements were [allegedly] violated, that is very strong evidence that

those requirements are not material." *Univ. Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194–95 (2016). Despite the Government's attempt to downplay inconvenient facts in the record, there is no dispute that the Government actually knew of Relator's allegations, had the ability to demand repayment of the PPP loans, and yet has chosen not to do so for years. Courts have granted summary judgment in favor of other PPP applicants on virtually identical grounds where the Government has declined to seek repayment, and the Court should do so here. *See ManPow*, 2024 WL 305699.

**First**, the Statement of Interest notes that government "action may bear on materiality only when the paying agency has '*actual knowledge* that certain requirements were violated.'" *Id.* at 4 (quoting *Escobar*, 579 U.S. at 195). That is exactly right. The First Circuit interpreted this "actual knowledge" standard in *Escobar II*, the circuit's decision on remand from the Supreme Court. *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103 (1st Cir. 2016). There, the court held that the plaintiff had adequately pled that the government lacked actual knowledge of the violations because the government agency "did not conclusively discover the extent of the" supposed violation until "well after the commencement of the litigation. *Id.* at 112 (noting that the complaint "only cites reimbursements paid up to 'the filing of this litigation'").

Here, in contrast, there is clear and undisputed record evidence that the Government had knowledge of the fact that the PPP Recipients had New Harbor as investor independent <u>prior</u> to Relator's allegations. On its PPP application—submitted before it received any funds—Fyzical listed "███████████████████" as an owner. D-SOF ¶¶ 91, 92. Fyzical even submitted a Necessity Questionnaire explicitly disclosing New Harbor's investment in response to a question about private-equity ownership, and SBA subsequently forgave Fyzical's loan. D-SOF

¶¶ 102, 107, 109–11.  Ocean State did the same.  D-SOF ¶ 55.  Fyzical provided SBA with "███████████████████████████," including "███████████████████████████ ███████████████████████████" and uploaded payroll documentation. SOF ¶ 129; D-Ex. 106, E. Thompson Tr. 162:16–163:13; see also D-Ex. 22, PPPLITDEFS_00011195 (Fyzical providing ███████████████████████████ ███████████" to the SBA). Ocean State submitted detailed payroll records along with its PPP loan applications.  See D-Ex. 104 PPPLITDEFS_00042360 (showing Ocean State's detailed payroll records).  While the Government seems to suggest that it only had information on these facts from "relator's allegations," the record evidence establishes that is not the case, and the Government cannot claim ignorance of documents that have been in its possession for years to avoid *Escobar*'s result.  Dkt. 83 at 7.

According to the Government's own case law, that is "powerful evidence that any misrepresentations … were not material to the government's payment decision."  *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 113 (2d Cir. 2021) (holding submissions not material where reports to government identified exact factual basis of relator's claim, but the government extended contract and continued payment anyway).  The parties do not "dispute exactly what the government knew and when," and thus Defendants must prevail on this record.  *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 906 (9th Cir. 2017).

**Second**, the Government goes further and contends "that drawing inferences about materiality from [ ] agency decision" "not to suspend payment" or otherwise recoup funds "would be improper."  Dkt. 83 at 5.  That is simply not the law.  The Supreme Court held in *Escobar* that when "the Government pays a particular claim in full despite its actual knowledge that certain requirements were [allegedly] violated, that is <u>very strong evidence that those</u>

<u>requirements are not material.</u>" *Escobar*, 579 U.S. at 194–95.  The First Circuit interpreted this rule with bite in *United States ex rel. Zotos v. Town of Hingham*, 98 F.4th 339 (1st Cir. 2024), and held submissions were not material because the government had notice of claims of fraud but continued to fund the project at issue.  *Id.* at 346. The lack of materiality is even clearer here because, in *Zotos*, the state agency merely had prior lawsuits alleging wrongdoing, while in this case, the Government had explicit statements, in writing, from Defendants, of the basis for Relator's fraud claims before he had even filed his lawsuit.  *Id.*  The Government offers no cogent grounds to distinguish that holding from this record.  *See* Dkt. 83 at 7 (describing conclusion as "dicta," but ignoring that it was the sole grounds to dismiss certain claims involving "the chapter 90 program").

The Government also asks the Court to set aside the on-point reasoning of *United States v. ManPow, LLC*, 2024 WL 305699 (C.D. Cal. Jan. 3, 2024).  The Government argues that in *ManPow*, the SBA "separately reviewed each of Defendant's forgiveness applications" and "reviewed all of Relator's allegations," while here SBA's declarants refused to admit that they did any such thing.  *See* Dkt. 83 at 9.  This is a distinction without a difference:  it is true that in *ManPow*, the government declarants admitted to reviewing the allegations and documents, but to avoid the same result, the government had declined to make the same statements here.  But it strains credulity for the Government to imply that it was somehow unaware of the statements on the face of the PPP loan applications, or that the government has not "reviewed all of relator's allegations" in this case.  *Id.*  That is particularly true when Relator has admitted that he personally ███████████████████████████████ and that DOJ attorneys ████████████████████ about his theory. D-SOF ¶ 235.  The SBA declarants admitted that it received the "records" related to "the First Draw PPP loan obtained by" Ocean State,

Fyzical, and Blueprint, and those records set forth the basis for the supposed fraud claims Relator has brought. D-SOF ¶ 7; D-Ex. 79, Frulla Decl. ¶ 4.  The Government cannot just assert that is has not "reviewed" the allegations or PPP loan submissions to escape *ManPow*.[4]

Relator points to an out-of-court settlement the government entered into in an unrelated proceeding, *United States ex rel. Nunez-Unda v. Lafayette RE Management LLC*, Case No. 5:22-cv-00659-FB (W.D. Tex.).  But that case involved entirely different issues, namely whether the PPP recipient improperly used loan funds for "expenses associated with a complex and ultimately unsuccessful attempted corporate acquisitions."  *Id.* Dkt. 1 ¶ 4.  Relator has never claimed in this litigation that any Defendant in this action improperly used PPP loan funds for anything other than payroll expenses.

Beyond this, Relator contributes nothing distinct from the arguments raised in the Government's Statement of Interest.  He contends in a single sentence that the certifications here must be material because they involve "millions of dollars," but of course has no citation to support this point.  Dkt. 90-1 at 44.  And courts routinely find no materiality even when there are "millions" at issue.  *See, e.g.*, *Zotos*, 98 F.4th at 339 (claims at issue for $11 million); *Foreman*, 19 F.4th at 97 (claims at issue for as much as $1.9 billion).

## IV.    The New Harbor Defendants Are Entitled to Summary Judgment as Separate Corporate Entities.

The undisputed record shows the PPP Recipients—not the New Harbor Defendants—made the decision to apply for the PPP loans.  Dkt. 76-1 at 39-42.  Relator alleges Defendants "engage in misdirection" for merely restating the law under which a non-submitting entity can be held liable under the FCA.  Dkt. 90-1 at 47.  But as the case law makes clear, FCA liability can

---

[4]    The Government also argues that is "decision to decline intervention" does not undercut materiality, but Defendants never made any such argument.  Dkt. 83 at 9–10.

only attach to a separate corporate entity (1) under "a veil piercing or alter ego theory;" or (2) where the entity "is directly liable for its own role in the submission of false claims." Dkt. 76-1 at 39-40. Relator fails to show that either standard applies here, and his argument again violates the basic principles of "corporate separateness" that the Supreme Court has held are incorporated into federal statutory language. *Dewberry*, 2025 WL 608108, at *3–4; *see supra* at 20–21.

Relator now claims he does not seek to pierce the corporate veil with respect to FCA liability, which he describes as a "separate, irrelevant question." Dkt. 90-1 at 47-48. Nor could he, as Defendants explained in their Motion. *See* Dkt. 76-1 at 40-42. And although Relator purports to have a "mountain of … evidence" showing New Harbor Capital directly caused the submission of the PPP loan applications, it too falls short of creating a genuine dispute.

Relator does not dispute that each PPP Recipient conducted its own PPP eligibility analysis and made the decision to apply for a PPP loan before receiving approval from its authorized corporate board. *See* D-SOF ¶¶ 38, 39, 43, 84, 85, 124, 125. And Relator concedes that all three PPP loan applications, loan promissory notes, and loan forgiveness applications were prepared and signed by a member of the PPP Recipients' management team (and none of the signatories were New Harbor employees). *See* SOF ¶¶ 45, 52, 96, 103, 108, 127, 135; *see also U.S. ex rel. Lisitza v. Par Pharmaceutical Cos., Inc.*, 2013 WL 870623, at *4 (N.D. Ill. March 7, 2013) (to "cause" false claim submission requires "affirmative participation or action by these defendants that furthers the unlawful objective").

Instead, Relator merely points to the fact that certain New Harbor Capital employees were board members of the PPP recipients, and that New Harbor had a "███████████ ███" in the portfolio companies. *E.g.*, Ex. 67, J. Berkley Tr. 98:20-99:2; *see also* Dkt. 69-1 at 48. Such arrangements do not show the New Harbor Defendants were "directly involved in

submitting false claims." *See U.S. ex rel. Schaengold v. Memorial Health, Inc.*, 2014 WL 6908856, at *14 (S.D. Ga. Dec. 8, 2014) (dismissing FCA claim absent allegation that defendant "actually submitted a falsely certified cost report"). Indeed, Relator admits that New Harbor board members made decisions "acting on behalf" of the respective portfolio companies, R-D-SOF ¶ 27, and courts "presume that the directors are wearing their 'subsidiary hats' ... when 'acting for the subsidiary.'" *U.S. v. Bestfoods*, 524 U.S. 51 at 69 (1998). These are the baseline "corporate separateness" principles that Relator may not wish away. *Dewberry*, 2025 WL 608108, at *3–4. The testimony of Defendants' expert witness, Mr. Schwed, which Relator cites in support of *his* argument, only further supports that New Harbor Capital employees made decisions in their capacity as board members of the portfolio companies. R-D-Ex. 20, Tr. 151:13-16 ("████████████████████████████████████████████████████████ ██████████████████████████████████████████████."). Apart from the "normal badges of ownership," Relator fails to identify any specific conduct the New Harbor Defendants engaged in that demonstrates they "caused" the submission of the false claims. *Banignan*, 2012 WL 1190826, at *7; Dkt. 90-1 at 47-48.

Relator's brief otherwise makes conclusory, unsupported assertions that "the structure and management" of the various Defendants "shows that New Harbor Capital is deeply involved in the management and operation of the companies in which it invests." *See* Dkt. 85-1 at 34, Dkt. 69-1 at 49. The evidence he uses to support such sweeping claims includes (1) a forward-looking Private Placement Memorandum for New Harbor Capital Fund III, LP, which is not named as a defendant in this case, and did not invest, directly or indirectly, in any of the portfolio companies that are parties to this case; and (2) the NHC Fund I and Fund II LPAs, which do not define or describe the relationship between the respective funds and the companies they invest

in, and to which neither Ocean State, Fyzical or Blueprint are parties. *See* Dkt. 80-1 ¶¶ 40, 62. None of this evidence even relates to the PPP loans at issue in this litigation, much less creates a genuine dispute as to New Harbor's involvement in the PPP loan submission.

## V.    Defendants Are Entitled to Summary Judgment on Relator's Reverse False Claims, Which Are Derived Entirely from His Other FCA Theories.

Relator claims that Defendants are subject to reverse false claims liability for the purportedly false certifications Defendants made in their loan forgiveness applications, and for "fail[ing] to repay the PPP loan funds." Dkt. 69-1 at 10.  But as Defendants have explained, these arguments turn on the same purportedly false certifications made in the original PPP loan applications.  Contrary to Relator's telling, the Court has not "already rejected" this argument. *See* Dkt. 29.  Relator's Opposition cites to a portion of the Court's opinion regarding whether Relator satisfied Rule 9(b)'s heightened pleading requirements, not a discussion of reverse false claim liability. Dkt. 33 at 16-17.[5]

Relator does not and cannot dispute Defendants' case law explaining that recovery "under a reverse claims theory must be based on an obligation that arose independent of the affirmative false claims themselves."  *Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii LLC*, 512 F. Supp. 3d 1096, 1119-20 (D. Haw. 2021).   Vitally, Relator identifies no separate supposedly false certification related to Defendants' forgiveness applications or supposed failure to repay PPP loan funds:  the only supposed false certifications at issue were on the initial PPP loan applications, and thus Relator's "reverse" claims rise and fall with the rest of his complaint, rendering them entirely "redundant" and legally invalid.  *United States v. Mount Sinai Hosp.*,

---

[5]    Although *United States ex rel. Bloomfield v. Engineered Structures, Inc.*, cites the Court's decision in this case, it misreads the Court's opinion, which related to Relator's 9(b) pleading requirement, not the viability of a reverse false claim theory. 2024 WL 4610555, at *4 (E.D. Va. Oct. 29, 2024)

256 F. Supp. 3d 443, 457 (S.D.N.Y. 2017) ("By this logic, just about any traditional false statement or presentment action would give rise to a reverse false claim action." (cleaned up)).

Relator's own cases do not support permitting such a claim to survive summary judgment, as they turned on the principle that "the government is permitted to plead theories in the alternative, especially at this early stage of the litigation," and relied on allegations that the defendant improperly retained funds after receiving new information about potential violations by "internal, state, and other third-party audits" after it had received the funds. *United States v. Omnicare, Inc.*, 2021 WL 1063784, at *12 (S.D.N.Y. Mar. 19, 2021). Here, in contrast, Relator has alleged no new facts learned by Defendants, no new false certification, and nothing else that would create an "independent" false claim—just a continuing obligation to repay funds. *Torricer*, 512 F. Supp. 3d at 1119–20. *See also United States ex rel. Patzer v. Sikorsky Aircraft Corp.*, 2018 WL 3518518, at *8 (E.D. Wis. July 20, 2018) (articulating the "concern[] that recognizing a reverse false claim under these circumstances would erode the distinction between a direct false claim and a reverse false claim and create a double punishment for the same allegedly wrongful act").

Relator's arguments to try to save these redundant claims are meritless.

***First***, Relator gestures towards a novel theory that Defendants somehow falsely certified that "they used the PPP loan funds to pay costs that were eligible for forgiveness." *See* Dkt. 90-1 at 52; *contrast* SAC ¶¶ 220-31 (alleging only that PPP recipients "failed to repay PPP loan funds," not that Defendants made any false certifications on their loan forgiveness applications). This "improper use" theory has never appeared before in Relator's complaint, discovery, or any prior briefing, and even now it remains completely undefined. Nor does he identify what certification was supposedly false under this theory, meaning that, by default, it must be the same

as the certifications at issue in all of his other claims, proving that the reverse claims are redundant.  It is certainly waived, and too undeveloped and conclusory to save any of his claims.

**Second**, Relator argues that Defendants' scienter arguments raised in this litigation somehow create a separate, independent basis for FCA liability.  Dkt. 90-1 at 51.  Relator proposes that because Defendants argue they did not "knowingly" submit a false claim, they "arguably *may* not be liable" under an affirmative FCA theory; therefore, Relator is entitled to pursue reverse false claims act for the **same conduct** just in case he can prove Defendants learned the claim was false **after** submission.  Dkt. 90-1 at 50-51.  That is not the law, and the FCA does not authorize multiple theories of liability arising from the same allegedly false claim. *See Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 96–97 (D.D.C. 2014) ("[B]y this logic, just about *any* traditional false statement or presentment would give rise to a reverse false claim action; after all, presumably any false statement actionable under sections 3729(a)(1)(A) or 3729(a)(1)(B) could theoretically trigger an obligation to repay the fraudulently obtained money.")*.*  Settled law does not permit Relator to recast his affirmative FCA liability theories to avoid dismissal, and the Court should grant summary judgment on the same grounds as Relator's other theories.  *United States ex rel. Behnke v. CVS Caremark Corp*, 2020 WL 1953626, at *10 (E.D. Pa. 2020).

## CONCLUSION

For all of these reasons the Court should grant Defendants' motion for summary judgment.

Dated: March 12, 2025                 Respectfully submitted,


                                      /s/ Patricia K.Rocha
                                      Patricia K. Rocha (#2793)
                                      procha@apslaw.com
                                      Patrick N. Sampson (#9885)
                                      psampson@apslaw.com
                                      ADLER POLLOCK & SHEEHAN P.C.
                                      One Citizens Plaza, 8th Floor
                                      Providence, RI  02903-1345
                                      Tel:  (401) 274-7200
                                      Fax: (401) 351-4607

                                      Ryan J. Moorman, P.C. (*pro hac vice*)
                                      Patrick Weeks (*pro hac vice*)
                                      KIRKLAND & ELLIS LLP
                                      333 West Wolf Point Plaza
                                      Chicago, IL 60654
                                      Tel:  (312) 862-2000
                                      Fax: (312) 862-2200
                                      ryan.moorman@kirkland.com
                                      patrick.weeks@kirkland.com


                                      *Attorneys for Defendants Ocean State, LLC,
                                      New Harbor Capital Fund LP, New Harbor
                                      Capital Fund II LP, New Harbor Capital
                                      Management LP, Blueprint Test Preparation,
                                      LLC, and Fyzical Acquisition Holdings, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I filed the foregoing through the ECF system on March 12, 2025, and that notice will be sent electronically to all counsel of record for Case No. 1:20-cv-00538-JJM-PAS.

*/s/ Patricia K. Rocha*
Patricia K. Rocha (#2793)
procha@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI  02903-1345
Tel:  (401) 274-7200
Fax: (401) 351-4607